IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

THOMAS GOODSON,

Plaintiff,

v.

Civil Action No. 9:11-CV-0541 (LEK/DEP)

LESTER N. WRIGHT; DONALD SAWYER, Director of CNYPC; BRIAN FISCHER, Commissioner of DOCCS; CHRIS BOYER, Treatment Assistance Worker at CNYPC; ROB AMBROSE, Treatment Assistance Worker at CNYPC; MARK LUKZAC, Treatment Assistance Worker at CNYPC; DOMINICK MARANGI, Treatment Assistance Worker at CNYPC; CASEY JONES, Treatment Assistance Worker at CNYPC; LIN, Nurse at CNYPC; and CYNTHIA LAWS, Medical Doctor at CNYPC,

Defendants.

---

APPEARANCES:

FOR PLAINTIFF: OF COUNSEL:

THOMAS GOODSON, *Pro Se*
90T1254
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
Office of the Attorney General
State of New York
Department of Law
The Capitol
Albany, NY 12224

MEGAN M. BROWN, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Thomas Goodson, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983, claiming that the defendants deprived him of his civil rights. In his complaint plaintiff alleges that while undergoing treatment at the Central New York Psychiatric Center ("CNYPC" or "Center") employees at the facility failed to protect him from an attack by a known antagonist, retaliated against him for speaking out regarding the fellow patient's gambling activities, and failed over a period of three years to arrange for surgery to correct injuries to his nose allegedly suffered during the assault.

Currently pending before the court are two separate though similar motions to dismiss plaintiff's complaint 1) for failure to state a cause of action upon which relief may be granted, 2) for non-compliance with the

controlling pleading requirements of the Federal Rules of Civil Procedure, and 3) on the basis of qualified immunity. For the reasons set forth below, I recommend defendants' motion be granted and that plaintiff's claims in the action be dismissed, with leave to replead.

I. BACKGROUND[1]

Plaintiff is a prison inmate currently entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and is presently being housed at the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *See generally* Complaint (Dkt. No. 1); *see also* Dkt. No. 24. At the times relevant to his claims plaintiff was a patient at the CNYPC, located in Marcy, New York. Complaint (Dkt. No. 1) p. 10.

On several occasions prior to May 18, 2008, plaintiff made complaints regarding a fellow patient's gambling activities at the facility.[2] Complaint (Dkt. No. 1) pp. 6-13. The fellow inmate became enraged at

---

[1] In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).

[2] It is unclear from plaintiff's complaint whether his complaints were made to employees at the Center, the fellow patient, or both.

plaintiff's complaint and assaulted him on May 18, 2008, causing Goodson to suffer what was later diagnosed as either a fractured nose or a deviated septum, as well as a cut lip. *Id.* Plaintiff maintains that defendants Chris Boyer, Rob Ambrose, Mark Lukzac, Dominick Marangi, and Casey Jones, all of whom are listed as treatment assistance workers employed at the Center, knew or should have known of the fellow inmate's dangerous propensities and his intention to assault Goodson but failed to take appropriate measures to protect him from harm. *Id.* Plaintiff maintains that the defendants' failure to protect him was based, at least in part, upon retaliatory animus due to plaintiff's complaints to staff regarding the fellow patient's gambling. *Id.*

Following treatment for his injuries at an outside hospital, plaintiff was transferred to the Attica Correctional Facility ("Attica"), instead of being returned to the CNYPC. Complaint (Dkt. No. 1) pp. 10-13. Plaintiff contends that his transfer into Attica was in retaliation for his having lodged complaints with staff at the Center. *Id.* Plaintiff further claims that defendants delayed surgery to correct his nose condition for three years, and that he was excessively drug tested following the incident, circumstances which he attributes to the fact that he is black. *Id.* at 12-13.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on May 13, 2011. Dkt. No. 1. Named as defendants in plaintiff's complaint are Dr. Lester N. Wright, the chief medical director for the DOCCS; Donald Sawyer, executive director of the CNYPC; Brian Fischer, the DOCCS Commissioner; Chris Boyer, Rob Ambrose, Mark Lukzac, Dominick Marangi, and Casey Jones, treatment assistance workers at the CNYPC; Nurse Lin, a nurse at the CNYPC; and Cynthia Laws, a medical doctor at the Center.[3] *Id.* Generously construed, plaintiff's complaint potentially asserts claims of failure to protect him from harm, retaliation, and deliberate indifference to his medical condition, and seeks recovery of compensatory damages in the total amount of $33 million.

Two separate dismissal motions have been filed in response to plaintiff's complaint. In the first, defendants Fischer and Wright have moved for dismissal of plaintiff's claims against them, arguing that they were not sufficiently involved in the constitutional deprivations alleged to support a finding of liability against them, additionally claiming that

---

[3] Plaintiff's complaint also named James J. Barba, president of the Albany Medical Center Hospital, as a defendant. *See* Dkt. No. 1. By initial decision and order issued by Senior District Judge Lawrence E. Kahn on October 11, 2011, plaintiff's claims against defendant Barba were dismissed *sua sponte*. Dkt. No. 4.

plaintiff's complaint fails to comply with the applicable pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure, and that in any event they are entitled to qualified immunity. Dkt. No. 9. That motion was followed by another, filed on behalf of the remaining defendants on January 13, 2012, requesting dismissal of plaintiff's claims on similar grounds. Dkt. No. 25. Defendants' motions, to which no response has been received, are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[4] *See* Fed. R. Civ. P. 72(b).

---

[4] Unlike the situation when faced with a motion for summary judgment, in which there exists an affirmative duty to demonstrate the existence of genuine issues of material fact once a moving party has made a *prima facie* showing that no triable issues of fact exist, a plaintiff is under no obligation to oppose a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See McCall v. Pataki*, 232 F.3d 321, 322-23 (2d Cir.2000) (error to dismiss complaint solely for failure to file opposition to motion to dismiss under Fed.R.Civ.P. 12(b)(6) without assessing legal sufficiency of complaint); *Maggette v. Dalsheim*, 709 F.2d 800, 802 (2d Cir.1983) (error to grant motion for judgment on pleadings under Fed.R.Civ.P. 12(c) for failure to oppose motion where pleadings themselves sufficient to withstand dismissal). Such a failure does not preclude the court from addressing the motion without the benefit of an opposing submission. *See*, *e.g., White v. Mitchell,* No. 99-CV-8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan. 18, 2001). This is so because a motion to dismiss tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall,* 232 F.3d ay 322-23; *White,* 2001 WL 64756, at n. 2 (citing *McCall*).

## III. DISCUSSION

### A. Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, 1964-65 (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also id.* While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S. Ct. at 1950.

In deciding a Rule 12(b)(6) dismissal motion, though the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party, *Hudson v. Palmer*, 468 U.S.

517, 541 n.1, 104 S. Ct. 3194, 3208 n.1 (1984) (citing cases); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.), it is "'not bound to accept as true a legal conclusion couched as a factual allegation'", *Iqbal*, 556 U. S. at 678,129 S. Ct. at 1950 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974) (alteration in original).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v.*

*Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citations omitted); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Social Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011).

B. Personal Involvement

In their motion, Commissioner Fischer and Dr. Wright argue that plaintiff's complaint fails to allege sufficient facts to support a plausible claim against them, noting that it lacks any allegations demonstrating their personal involvement in the conduct giving rise to his constitutional claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection

between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Both Commissioner Fischer and Dr. Wright are supervisory DOCCS employees. It is well-established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.[5]

---

[5] The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* upon the categories of supervisory liability under *Colon*. Lower courts have struggled with this issue, and specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See Sash v. United States*, 674 F. Supp. 2d at 531, 542-44 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued viability of some of the categories set forth in *Colon.*") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) . While

*Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Stripped of its conclusory allegations, plaintiff's complaint appears to name Commissioner Fischer and Dr. Wright solely on the basis of their respective supervisory capacities. In his fifth cause of action, for example, plaintiff alleges that "Dr. Lester N. Wright is the Chief Medical Doctor at this time in the Department of Corrections and is thereby directly responsible for the almost three (3) year delay to repair my fractured nose." Complaint (Dkt. No. 1) 16. Similarly, plaintiff alleges that defendant Fischer "is the commissioner and he is in total control over all decisions that concern the department of corrections." *Id.* at 17. These allegations are insufficient to plausibly implicate the requisite degree of personal involvement of those defendants in the constitutional violations alleged in plaintiff's complaint to support a finding of liability.

---

some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 Civ. 1801 (SAS), 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, 718 F. Supp.2d 340, 346-47 (S.D.N.Y. 2010), *aff'd,* 2012 WL 498854 (2d Cir. Feb. 16, 2012); *Qasem v. Toro*, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010).

It is true that plaintiff's complaint also alleges that Dr. Wright and Commissioner Fischer participated in a conspiracy to transfer him to Attica rather than returning him to the CNYPC, based upon his race. Without any factual support, however, such a barebones, conclusory allegation is insufficient to establish a palpable conspiracy claim against those defendants. *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (quoting *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir.1993)) ("It is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.' ").

Based upon the foregoing, I recommend that plaintiff's claims against defendants Dr. Lester N. Wright and DOCCS Commissioner Brian Fischer be dismissed based upon a lack of personal involvement.

C. <u>Failure To Protect</u>

The centerpiece of plaintiff's complaint is his claim that the defendants failed to protect him from a foreseeable assault by a fellow patient at the CNYPC. At several points in his complaint plaintiff argues that based upon the circumstances, including his complaints regarding his fellow inmate's gambling activities, defendants "knew or should have

known that an assault was going to happen." *See, e.g.,* Complaint (Dkt. No. 1) 6. Defendants contend that these allegations are legally insufficient to demonstrate the existence of a plausible failure to protect claim.

1. Failure to Protect – Eighth Amendment

Unquestionably, under the Eighth Amendment prison officials are required to take reasonable measures to guarantee the safety of inmates; this duty includes within it an obligation to protect prisoners from harm caused by fellow inmates. *Farmer v. Brennan*, 511 U.S. 825, 833-34, 114 S. Ct. 1970, 1976-77 (1994) (citations omitted); *see also Matthews v. Armitage*, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (Homer, M.J.) (citing, *inter alia*, *Farmer*). When examining a failure to protect claim under the Eighth Amendment, a court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of serious harm, and that 2) prison officials exhibited deliberate indifference to the inmate's plight. *Farmer*, 511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979; *Matthews*, 36 F. Supp. 2d at 124-25; *Coronado v. Lefevre*, 886 F. Supp. 220, 224 (N.D.N.Y. 1995) (Scullin, J.). As can be seen, this analysis entails both an objective and a subjective

inquiry.

a. Objective Test

In objective terms, to prevail a plaintiff must prove that an alleged deprivation is "sufficiently serious" such that it has denied him or her the "minimal civilized measure of life's necessities." *Dawes v. Walker*, 239 F.3d 489, 493-94 (2d Cir. 2001) (internal quotations and citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992 (2002). Specifically, as noted above, in situations where an inmate's safety is at issue, that person must demonstrate that he or she was incarcerated under conditions posing a substantial risk of serious harm. *Farmer*, 511 U.S. at 834, 837, 114 S. Ct. at 1977, 1979; *Dawes*, 239 F.3d at 493; *Matthews*, 36 F. Supp. 2d at 124-25.

b. Subjective Test

To establish that corrections workers were deliberately indifferent to his or her circumstances, an inmate plaintiff must show that the prison officials actually knew of, but disregarded, an excessive risk to his or her health and safety – "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct.

at 1979; *Matthews*, 36 F. Supp. 2d at 124-25.

2. Fourteenth Amendment

Claims involving the alleged failure of prison officials to protect an inmate from harm are also subject to review under the Fourteenth Amendment's substantive due process provision. Though the requisite mental state for establishing a Fourteenth Amendment failure to protect claim is somewhat unclear, to be legally cognizable under that provision the actions alleged on the part of a defendant at a minimum must transcend mere negligence. *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S. Ct. 668, 670 (1986) (lack of due care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent); *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 663 (1986) (same); *Morales v. New York State Dep't of Corrs.*, 842 F.2d 27, 30 (2d Cir. 1988) (section 1983 does not provide cause of action for negligent failure of prison officials to protect an inmate from injury); *Abdul-Matiyn v. New York State Dep't of Corr. Servs.*, 871 F. Supp. 1542, 1546-47 (N.D.N.Y. 1994) (citing *Morales*).

3. Analysis

Whether analyzed under the Eighth Amendment or instead the

Fourteenth, plaintiff's complaint fails to allege sufficient facts to demonstrate the existence of a plausible failure to protect claim. Objectively, plaintiff's complaint does not demonstrate that he was confined under conditions posing a substantial risk of serious harm. Rather, plaintiff's complaint suggests the existence of an isolated and brief encounter with a fellow patient resulting in his suffering only relatively modest injuries. See *Bass*, 790 F.2d at 262-263.

Plaintiff's complaint also fails to allege facts that would suffice to meet the subjective prong of the controlling failure to protect test. Plaintiff's complaint in essence alleges that defendants knew or should have known of the danger posed by being exposed to a fellow inmate. Subjectively, however, to plausibly establish his failure to protect claim Goodson must set forth facts demonstrating that the defendants were actually aware of the risk, and not simply that they should have been. *Farmer,* 511 U.S. 837, 511 U.S. at 847, 114 S. Ct. at 1979; *see also Bridegwater v. Taylor*, 698 F. Supp. 2d 351, 359 (S.D.N.Y. 2010) (dismissing the plaintiff's failure to protect claim because he failed to plead sufficient facts to establish the "actual knowledge" component of the subject prong); *Shell v. Brun*, 585 F. Supp. 2d 465, 469-70 (W.D.N.Y.

2008) (stating that "[i]n failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety. Mere negligence (for example if a prison guard should know of a risk but does not) is not enough . . ..") (quoting *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (internal quotation marks and citations omitted)).

Because plaintiff's failure to protect claim plaintiff's claim fails to allege facts plausibly satisfying the objective and subjective requirements of a failure to protect claim under either the Eighth or Fourteenth Amendments, I recommend dismissal of that cause of action.

D. Retaliation

Embedded within plaintiff's complaint is also a retaliation cause of action. Plaintiff contends that the defendants retaliated against him as a result of his complaints regarding the gambling activities of his fellow inmate by permitting that inmate to assault him. Additionally, when liberally construed, plaintiff's complaint could be interpreted as alleging that his transfer out of the CNYPC and into Attica was also motivated by retaliatory animus.

When adverse action is taken by prison officials against an inmate,

motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes*, 239 F.3d at 491 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S. Ct. 992 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287,

97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty*, 713 F.2d at 13. And, of course, retaliation claims are subject to the requirement that to be held liable a defendant must have been personally

involved in the underlying conduct giving rise to the claim. *See Wright*, 21 F.3d at 501.

It should be noted that not all speech is deserving of the First Amendment protection. *See e.g., DeBlasio v. Rosati*, No. 9:10–CV–1436, 2011 WL 4345307, at * 3 (N.D.N.Y. Aug. 15, 2011) (Lowe, M.J.) (finding that the plaintiff failed to allege that he engaged in any protected speech or conduct where he merely alleged that he "disrespected" the defendant), *report and recommendation adopted*, 2011 WL 4345692 (N.D.N.Y. Sep. 15, 2011) (D'Agostino, J.).[6]

Plaintiff's complaint is exceedingly vague, and does not clearly delineate the protected conduct that allegedly prompted the defendants' retaliatory actions. It is uncertain, for example, whether plaintiff's alleged complaints regarding the gambling activities of his fellow patient were made directly to the patient, or instead to CNYPC personnel, and if so to whom. If the complaints were voiced solely to the fellow patient, it is questionable whether the plaintiff was engaged in protected activity for purposes of a First Amendment retaliation claim. If his complaints were to workers at the Center, on the other hand, while the speech could arguably

---

[6] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

be protected, plaintiff's complaint fails to identify the individuals to whom those concerns were registered.

It is also unclear whether plaintiff has sufficiently alleged that he was subjected to adverse action as a result of having engaged in protected activity. As was more fully discussed above, plaintiff's complaint fails to allege facts plausibly demonstrating that the defendants knowingly exposed him to a known or anticipated danger of assault by a fellow inmate. The second prong of his retaliation claim, alleging a transfer to Attica from the CNYPC, on the other hand, could be regarded as sufficiently alleging an adverse action. *Edwards v. Horn*, No. 10 Civ. 6194(RJS)(JLC), 2012 WL 760172, at * 16 (S.D.N.Y. Mar. 8, 2012) (citing cases).

Even assuming that plaintiff has established the existence of protected conduct and adverse action, conspicuously absent from his complaint are allegations that would establish the requisite causal connection between the two. When a claim of retaliation is alleged in only a conclusory fashion, unsupported by facts tending to establish a nexus between protected activity and the adverse action complained of, dismissal for failure to state a cognizable claim is warranted. *Crenshaw v.*

*Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010); *McQuilkin v. Cent. New York Psychiatric Ctr.*, No. 9:08-CV-00975, 2010 WL 3765847, at * 15 (N.D.N.Y. Aug 27, 2010) (Peebles, M.J.), *report and recommendation adopted*, 2010 WL 3765715 (N.D.N.Y. Sep 20, 2010) (McAvoy, S.J.).

In sum, because plaintiff's complaint fails to allege facts sufficient to satisfy the essential elements of a retaliation claim, instead alleging in only conclusory terms that the defendants retaliated against him, I recommend dismissal of that cause of action.

E. Deliberate Medical Indifference

While this is far from readily apparent, plaintiff's complaint could be viewed as asserting a claim of deliberate medical indifference based upon the delay in providing corrective surgery for his nose. It remains unclear, however, as to against whom, among the named defendants, that claim is asserted aside from Dr. Lester Wright who, plaintiff alleges, is directly responsible for the delay based upon his position as chief medical officer of the DOCCS. *See, e.g.,* Complaint (Dkt. No. 1) Fifth Cause of Action. Although defendants' motion does not address this cause of action, I recommend that the court *sua sponte* address its legal sufficiency. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 363 (2d Cir.

2000).

Like plaintiff's failure to protect cause of action, the claim that prison officials have intentionally disregarded his medical needs falls under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 290, 291. The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright*, 554 F.3d at 268; *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

1. Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . .

.", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin*, 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id*. at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith*, 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged

period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

2. Subjective Element

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a

sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 2325 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

Plaintiff's complaint fails to allege facts sufficient to satisfy either the subjective or the subjective elements of a deliberate indifference claim. By plaintiff's own account he has received treatment, including medical consultations, concerning his nose condition. There are no allegations that the condition has degenerated over time as a result of defendants'

alleged neglect such that the delay in treatment could properly be viewed as a refusal to provide treatment. *See Shomo v. City of New York*, No. 03 Civ. 10213(AKH), 2005 WL 756834, at * 10 (S.D.N.Y. 2005); *Felix v. Simon*, No. 01-CV-6023, 2004 WL 5739416, at * 7 (E.D.N.Y. 2004), *aff'd* 202 Fed. App'x 21 (2d Cir. 2008). Simply stated, this is a situation involving a medical condition of relatively modest severity that does not rise to a level of constitutional concern. *See, e.g., Harris v. Morton*, No. 9:05-CV-1049, 2008 WL 596891, at *3, n.2 (N.D.N.Y. Feb. 29, 2008) (Kahn, J. and Treece, M.J.) ("We note that although Plaintiff states he suffered from a 'snapped' neck, he does not indicate he suffered from anything other than a generic neck injury."); *Bennett v. Hunter*, No. 9:02-CV-1365, 2006 WL 1174309, *3 (N.D.N.Y. May 1, 2006) (Scullin, S.J. and Lowe, M.J.) (pinched nerve not a serious medical need)); *Jones v. Furman*, No. 02-CV-939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs do not constitute the requisite serious medical need) (citing *Hemmings v. Gorczyk*, 134 F.3d 104, 109 (2d Cir.1998)); *Tapp v. Tougas*, No. 9:05-CV-0149, 2008 WL 4371766, at * 9 (N.D.N.Y. Aug. 11,

2008) (Peebles, M.J.) (citing *Peterson v. Miller*, No. 9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (citing *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied sub nom., Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995))), *report and recommendation adopted in part and rejected in part,* 2008 WL 4371762 (N.D.N.Y. Sep 18, 2008) (Mordue, C.J.); *Salaam v. Adams*, No. 03-CV-0517, 2006 WL 2827687, *10 (N.D.N.Y. Sept. 29, 2006) (Kahn, J. and Lowe, M.J.) (intermittent back pain requiring pain relievers and physical therapy, a gastrointestinal problem with stomach pains, and a psychological problem requiring Wellbutrin and/or Neurontin did not constitute serious medical condition); *see also Ford v. Phillips*, No. 05 Civ. 6646, 2007 WL 946703, at *12 & n.70 (S.D.N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim); *Sonds v. St. Barnabas Hosp. Corr. Health Servs*., 151 F. Supp. 2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't*, No. 99 Civ. 3207, 2000 WL

1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation).

Plaintiff has also failed to allege facts to show that any of the defendants were aware of but disregarded an excessive risk to his health or safety. While plaintiff's complaint names Dr. Cynthia Laws and Nurse Lin as defendants, it contains no factual allegations concerning their involvement in the care and treatment of his nose condition. In short, plaintiff similarly cannot satisfy the requisite mental state element necessary to support a deliberate indifference claim. *See Salahuddin*, 467 F.3d at 282. *Felix*, 2004 WL 5639416, at *7.

For these reasons, I recommend that plaintiff's medical indifference claim, to the extent that his complaint may be construed as containing one, be dismissed.

F. Conspiracy

Plaintiff's complaint could also be interpreted as alleging the existence of a race-based conspiracy, in violation of 42 U.S.C. § 1985(3). Although this claim is also not addressed in defendants' motion, I also recommend that the court *sua sponte* examine the sufficiency of that claim. *Fitzgerald*, 221 F.3d 363.

To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must allege facts plausibly demonstrating that the defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws or equal privileges and immunities secured by law. *United Brotherhood of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 834-39, 103 S. Ct. 3352, 3359-61 (1983); *Gagliardi v. Village of Paing,* 18 F.3d 188, 194 (2d Cir. 1994); *Gleason v. McBride*, 869 F.2d 688, 694 (2d Cir. 1989); *Patterson v. Cnty. of Oneida*, No. 00-CV-1940, 2002 31677033, at *4 (N.D.N.Y. 2002) (Hurd, J.), *aff'd in relevant part*, 375 F.3d 206 (2d Cir. 2004); *Benson v. United States*, 969 F. Supp. 1129, 1135-36 (N.D. Ill. 1997) (citing, *inter alia*, *United Brotherhood*, 463 U.S. at 434-37); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can, in the alternative, be evidenced circumstantially by a showing that the parties had a "'tacit understanding to carry out the prohibited conduct.'" *LeBlanc-Sternberry*, 67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). This notwithstanding, in order to properly plead such a claim,

a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) (per curiam); *Williams v. Reilly*, 743 F. Supp. 168, 173 (S.D.N.Y. 1990) ("[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).

It is well settled, moreover, that a plaintiff attempting to establish a claim under 42 U.S.C. § 1985(3) must demonstrate that the defendant under consideration acted with class-based invidiously discriminatory animus. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 266-68, 113 S.Ct. 753, 758-59 (1993). "When a plaintiff fails to establish membership in a protected group, a civil rights conspiracy complaint under 42 U.S.C. § 1985 may be dismissed." *Estes-El v. Town of Indian Lake*, 954 F. Supp. 527, 532 (N.D.N.Y. 1997) (citation and internal quotations omitted).

Plaintiff's conspiracy claim is stated in wholly conclusory terms, and

is predicated entirely upon his contention that because he is black he endured the treatment alleged in his complaint. Such a bald allegation, unsupported by facts from which race-based bias can reasonably be inferred, is insufficient to demonstrate the existence of a plausible conspiracy claim under section 1985(3). *Edwards*, 2012 WL 760172, at * 21. I therefore recommend dismissal of plaintiff's conspiracy claim under that section.

G. Whether to Permit Amendment

The next issue to be addressed is whether the dismissal of plaintiff's various claims should be subject to leave to amend. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). In this instance I am unable to conclude with certainty that if given the opportunity to amend

plaintiff nonetheless be unable to state a plausible constitutional claim. I therefore recommend that leave to amend be granted.

Should he choose to amend, plaintiff should be cognizant of the fact that the law in this circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995 ) (McAvoy, C.J.) (citing *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (other citations omitted)); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 U.S. Dist. LEXIS 7136, at *24-25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). In his amended complaint, plaintiff therefore must clearly set forth the facts, including the wrongful acts that give rise to the claim, the dates, times and places of the alleged acts, and each individual(s) who committed each alleged wrongful act. Such an amended complaint, must replace the existing second amended complaint, must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court, *see Harris v. City of N.Y.*, 186 F.3d 243, 249 (2d Cir. 1999) (citing *Shields v. Citytrust Bancorp, Inc.*, 25

F.3d 1124, 1128 (2d Cir. 1994)); Fed. R. Civ. P. 10(a), and should specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass,* 790 F.2d at 263.

Plaintiff is also advised that any such amended complaint must comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure – something which, defendants argue, his initial complaint does not. Rule 8 of the Federal Rules of Civil Procedure, which sets forth the general pleading requirements applicable to most complaints filed in the federal courts, requires that such a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a); *see In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 756 (S.D.N.Y. 2003). The purpose of Rule 8 "'is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense.'" *Hudson v. Artuz*, No. 95 CIV. 4768, 1998 WL 832708, *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano*, 75 F.R.D. 497,

498 (D.D.C.1977))) (other citation omitted). A complaint asserting only bare legal conclusions is insufficient. *Iqbal*, 556 U. S. at 678, 129 S. Ct. at 1950 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1965). Instead, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. A claim will have "facial plausibility when the plaintiff pleads [sufficient] factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

Federal Rule of Civil Procedure 10, which imposes a requirement whose intent is largely pragmatic, requires, among other things, that a pleading consist of separately numbered paragraphs "each of which shall be limited as far as practicable to a statement of a single set of circumstances[.]" Fed. R. Civ. P. 10(b). Rule 10(b) is designed to assist litigants and the court by allowing the interposition of a responsive pleading and the corresponding framing of issues with sufficient clarity to allow an orderly and meaningful presentation of a plaintiff's claims and any corresponding defenses, either on motion or at trial. *See Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (Munson, S.J.).

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action, which is exceedingly repetitive, vague, and conclusory in nature, fails to set forth sufficient allegations to support a finding that plausible constitutional claims have been asserted under the First, Eighth, and Fourteenth Amendments to the United States Constitutional as well as 42 U.S.C. § 1985(3). Accordingly, I recommend dismissal of plaintiff's claims, with leave to replead. It is therefore hereby respectfully

RECOMMENDED that defendants' two dismissal motions (Dkt. Nos. 9, 25) be GRANTED, and that plaintiff's complaint in this action be dismissed in its entirety, with leave to replead within thirty days of any decision and order adopting my recommendation in full.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this court's local rules.

Dated: May 23, 2012
Syracuse, NY

David E. Peebles
U.S. Magistrate Judge





Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Antwon WHITE, Plaintiff,
v.
Dr. J. MITCHELL, Arthur Kill Correctional Facility Health Services Director, Dennis Breslin, Arthur Kill Correctional Facility Superintendent and Edward Checkett, D.D.S., Arthur Kill Correctional Facility Dentist, Defendants.
**No. 99-CV-8519 (FB).**

Jan. 18, 2001.

Antwon White, Arthur Kill Correctional Facility, Staten Island, New York, for the Plaintiff, pro se.

Eliot Spitzer, Attorney General of the State of New York, By: Maria Filipakis, New York, New York, for the Defendants.

*MEMORANDUM AND ORDER*

BLOCK, J.

***1** Plaintiff Antwon White ("White"), a prison inmate, brings this action *pro se* pursuant to 42 U.S.C. § 1983 and New York law alleging that defendants were both negligent and deliberately indifferent to his medical needs in connection with treatment for hearing loss he suffered following the extraction of a wisdom tooth. White pleads that this conduct violated his rights under the Eighth Amendment, and seeks injunctive relief as well as compensatory and punitive damages. While White does not make the distinction clearly, the Court construes the complaint as naming defendants in both their individual and official capacities.[FN1] Defendants have moved to dismiss White's complaint pursuant to Fed.R.Civ.P. 12(b)(6) asserting that (1) the complaint fails to state a claim under the Eighth Amendment for deliberate indifference to his medical needs; (2) the complaint fails to allege personal involvement by defendant Dennis Breslin ("Breslin"), Superintendent of Arthur Kill Correctional Facility ("Arthur Kill"); and (3) defendants are entitled to qualified immunity. Although White has filed no opposition to defendants' motion, the Court can decide the motion without the benefit of a submission from him.[FN2] For the reasons set forth below, defendants' motion is denied.

FN1. "[T]he plaintiff ... should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other." *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

FN2. *See* *McCall v. Pataki,* 232 F.3d 321, 323 (2d Cir.2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal").

BACKGROUND

The following facts are drawn from White's complaint and the records attached thereto, and are accepted as true for the purposes of this motion: On August 5, 1999, while incarcerated at Arthur Kill, White had a wisdom tooth extracted by defendant Edward Checkett ("Checkett"), a dentist employed at Arthur Kill. Read broadly, the complaint seems to allege that Checkett was aware that he negligently injured White during the extraction procedure, but failed to provide immediate medical attention.

Soon after the extraction, White began experiencing ringing and hearing loss in his left ear. On several occasions, White brought these complaints to the attention of defendant Jennifer Mitchell ("Mitchell"), Arthur Kill's Health Services Director. However, Mitchell did not provide White with prompt medical attention, and, in particular, failed to refer him to an ear specialist.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

On November 15, 1999, White filed an administrative complaint, pursuant to the Department of Correctional Services' grievance procedures, requesting medical attention for his hearing problem and, "if necessary," a referral to an ear specialist. Inmate Grievance Complaint attached to Compl. White alleges that Breslin denied his grievance, and "failed to direct his subordinates" to provide White with prompt medical attention.[FN3]

FN3. Despite White's allegation to the contrary, the Inmate Grievance Resolution Committee ("IGRC") appears to have accepted White's grievance on November 30, 1999, and directed him to "report back to sick-call." Inmate Grievance Complaint attached to Compl.

On December 9, 1999, White was seen by an audiologist who described the degree of hearing loss in his left ear as "severe-profound." NYSDOCS Request & Report of Consultation attached to Compl. The audiologist recommended further medical consultation to determine the etiology of White's hearing loss and approval for a hearing aid evaluation. *See Id.* White filed the complaint in this action on December 23, 1999.

DISCUSSION

I. Standard on a Motion to Dismiss

***2** In considering a motion to dismiss, the court's task is " 'necessarily a limited one." ' *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). "[I]n ruling on [the] defendant[s'] motion, the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d. Cir1997). The Court may consider the allegations in the complaint and "all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken." *Hirsch v. Arthur Anderson & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995). In addition, because White is a *pro se* plaintiff, his pleadings must be read liberally. *See Corcoran v. New York Power Auth.,* 202 F.3d 530, 536 (2d Cir.1999); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). The Court should grant such a motion only if, after viewing the plaintiff's allegations in the most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Feder v. Frost,* 220 F.3d 29, 32 (2d Cir.2000).

II. Section 1983 Individual Capacity Claims

Defendants contend that White's complaint must be dismissed because it fails to state an Eighth Amendment violation. To state a claim under § 1983 for deprivation of medical treatment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). A serious medical need exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)) (internal quotation marks omitted). The Second Circuit has recently held that refusal to treat a degenerative condition that tends to have serious medical implications if left untreated is a sufficient basis to support the existence of a serious medical need. *See Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (holding that a tooth cavity may be a serious medical condition).

To establish deliberate indifference, the plaintiff must prove that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). Deliberate indifference will exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). "[M]ere medical malpractice' is not tantamount to deliberate indifference," but may rise to the level of deliberate indifference when it "involves culpable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

recklessness, *i.e.,* an act or failure to act ... that evinces 'a conscious disregard of a substantial risk of harm." ' Chance, 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted)).

***3** White has alleged a "serious medical condition" under *Gamble.* He states that the ringing in his ear developed into a progressive loss of hearing. Indeed, the audiologist's report referred to above characterizes the degree of hearing loss in White's left ear as being "severe-profound."

*Gamble'* s "deliberate indifference" prong is satisfied in respect to each of the defendants in their individual capacities by a reasonably liberal reading of White's *pro se* complaint. With respect to Checkett, White appears to allege that the injury leading to his hearing loss occurred when Checkett negligently extracted his wisdom tooth. Dental malpractice, without more, does not state a claim cognizable under § 1983. White further alleges, however, that Checkett was deliberately indifferent to his medical condition because, once he knew that he had injured White during the extraction procedure, he failed to render timely medical treatment to abate the harm.

As for Mitchell, White alleges that she ignored his subsequent repeated requests for appropriate treatment while his condition worsened, and failed to supervise Arthur Kills's medical personnel in connection with his treatment. Mitchell, therefore, allegedly knew of White's serious medical need, and consciously failed to act to prevent further harm to White.

Finally, Breslin allegedly failed to adequately supervise White's treatment, and denied his grievance. Defendants assert that the complaint must be dismissed as to Breslin because it fails to allege his personal involvement in the Eighth Amendment violation. Because "[s]ection 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." ' *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). However, "personal involvement of a supervisory defendant may be shown by evidence that ... the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong...." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). White alleges that his grievance made Breslin aware that his medical needs were being ignored. White's further allegations that Breslin denied the grievance, and failed to take steps to provide for White's treatment are sufficient to plead Breslin's personal involvement in the violation.

III. Section 1983 Official Capacity Claims

To the extent White has asserted claims seeking damages against defendants in their official capacities, they are barred by sovereign immunity. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58 (1989). However, the complaint also seeks injunctive relief against the defendants. Injunctive relief may be obtained in a § 1983 action for deliberate indifference to a serious medical need, even absent an official's personal involvement, if the complaint alleges that the official had "responsibility to ensure that prisoners' basic needs were met, and the complaint adequately alleged deliberate indifference to a serious medical need." *Koehl v. Dalsheim,* 85 F.3d 86, 89 (2d Cir.1996); *see also New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 135 (2d Cir.1995) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)) ("the Eleventh Amendment does not bar federal courts from issuing an injunction against a state official who is acting contrary to federal law"). White alleges that defendants have denied him treatment for his progressive hearing loss. If he can prove his contentions, he may be entitled to injunctive relief.

IV. Qualified Immunity

***4** The defendants enjoy qualified immunity from White's suit if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Even where a prisoner's rights are clearly established, "qualified immunity is still available to an official if it was 'objectively reasonable for the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

public official to believe that his acts did not violate those rights." ' *Hathaway,* 37 F.3d at 67 (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

Defendants contend that their actions were objectively reasonable. (*See* Def. Mem. at 9). However, because the complaint adequately alleges a claim for deliberate indifference, defendants are not entitled to qualified immunity on their Fed.R.Civ.P. 12(b)(6) motion. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (the issue when considering qualified immunity in the context of Fed.R.Civ.P. 12(b)(6) "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"). This allegation, if proved, could constitute a violation of White's Eighth Amendment rights, and more facts are necessary to resolve the qualified immunity question.

V. State Law Claims

As referred to above, the complaint, liberally construed, also alleges dental malpractice against Checkett and negligent supervision against Breslin and Mitchell in their individual capacities. Although theses claims are not cognizable in an action under § 1983, they do allege state law claims. Defendants do not address these claims in their motion to dismiss. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over these pendent claims. *See Shimon v. Department of Corr. Serv. for the State of N.Y.,* No. 93 Civ. 3144(DC), 1996 WL 15688, at *3 (S.D.N.Y. Jan. 17, 1996) (Section 24 of New York Correction Law does not bar federal court from hearing pendent state law medical malpractice claim asserted against New York State Department of Correctional Services employee in employee's individual capacity). However, the Eleventh Amendment bars White's claims for damages or injunctive relief against the defendants in their official capacities. *See Edelman v. Jordan,* 415 U.S. 651, 663 (1974); *Fleet Bank, Nat'l Ass'n v. Burke,* 160 F.3d 883, 891 (2d Cir.1998).

CONCLUSION

Defendants' motion to dismiss is denied.

SO ORDERED.

E.D.N.Y.,2001.
White v. Mitchell
Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

**I. FACTUAL AND PROCEDURAL SUMMARY**

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

***2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

***3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

***4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

***5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

**II. APPLICABLE LEGAL STANDARDS**

**A. Legal Standard Governing Motions for Summary Judgment**

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

***6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

***8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A)(3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> FN4. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

***9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and “may have caused more harm to the plaintiff” because the officers who allegedly assaulted him “are the persons that operate and give the decisions” regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to “provide humane conditions of confinement” for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must “ensure that inmates receive adequate food, clothing, shelter, and medical care, and must ‘take reasonable measures to guarantee the safety of the inmates.’ “ *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's “act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities.” *Farmer,* 511 U.S. at 834. Therefore, “extreme deprivations are required to make out a conditions-of-confinement claim.” *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a “single, identifiable human need such as food, warmth, or exercise.” *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment “does not mandate comfortable prisons.” *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

1. *Bedding*

***10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

***11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could* cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

***12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be ***GRANTED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

***13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jesse L. STEWART, Jr., Plaintiff,
v.
Gary HOWARD; D. Monell; N. Marsh; D. Spangenburg; D. Swarts; E. Hollenbeck; J. Edwards; and D. Russell, Defendants.
No. 9:09–CV–69 (GLS/GHL).

Sept. 30, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for the Defendants.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, District Judge.

**I. *Introduction***

***1** Plaintiff Jesse L. Stewart, an inmate at Forest State Correctional Institution, Forest County, Pennsylvania, brings this action under 42 U.S.C. § 1983, alleging that defendants Tioga County Jail employees violated his Eighth and Fourteenth Amendment rights during his incarceration at Tioga County Jail. (*See* Compl., Dkt. No. 1.) Defendants moved for summary judgment and for dismissal based on, among other things, Stewart's refusal to cooperate at his deposition. (Dkt. No. 30.) On April 26, 2010, Magistrate Judge George H. Lowe issued a Report and Recommendation Order (R & R) recommending that defendants' motion for dismissal as a discovery sanction be denied but that defendants' motion for summary judgment be granted. (Dkt. No. 38.) Pending are Stewart's objections to the R & R. (Dkt. No. 39.) For the reasons that follow, the court adopts the R & R in its entirety.

**II. *Standard of Review***

Before entering final judgment, this court routinely reviews all report-recommendations in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. *See* *Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at *6–7 (N.D.N.Y. Jan.18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of a magistrate judge for clear error. *See id.*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citing FED. R. CIV. P. 56(c)); *see also* *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). In considering a motion for summary judgment, the court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor ....“ *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation omitted). The initial burden is on the moving party to inform the court of the basis for its motion, and identify those portions of the pleadings, affidavits, and discovery and disclosure materials on file that it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* *SEC v. Kern,* 425 F.3d 143, 147 (2d Cir.2005). "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (citation omitted). And while the court remains obliged to read a pro se movant's supporting papers liberally and "interpret them to raise the strongest arguments that they suggest," *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Moreover, pro se status "does not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

exempt a party from compliance with relevant rules of procedural and substantive law" and courts cannot read into pro se submissions inconsistent claims or claims not suggested by those submissions. *See* *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (citations and internal quotation marks omitted).

### III. *Discussion*

***2** Construed liberally, Stewart's objections specifically challenge Judge Lowe's conclusions that: (1) Stewart failed to exhaust his administrative remedies regarding his excessive force and failure to provide medical care claims; (2) Stewart's claims regarding the amount of toilet paper, conditions of showering, and removal of bedding during the day failed to make out a viable Eighth Amendment claim; (3) Stewart had no protected liberty interest entitling him to additional process prior to the imposition of disciplinary sanctions; and (4) Stewart failed to raise any triable issue of fact as to his claim for denial of access to the courts. Consequently, the court will review those conclusions de novo.

#### A. *Failure to Exhaust Administrative Remedies*

Stewart objects to Judge Lowe's conclusion that his Eighth Amendment excessive force and denial of medical care claims are barred by his failure to exhaust his administrative remedies under the Prisoner Litigation Reform Act of 1995 (PLRA). Read liberally, Stewart's argument is threefold. First, Stewart argues that the grievance process at Tioga County Jail was such that any appeal he filed would be futile and accordingly those administrative remedies were not "available" to him under the meaning of 42 U.S.C. § 1997(e). (*See* Pl. Objections at 2, Dkt. No. 39.) This argument is without merit. Even if the court were to accept the allegation that following the grievance procedures would ultimately have lead to an unfair denial of Stewart's claims at the institutional level, perceived futility of the process "does not render the grievance system 'unavailable.' " *Yeldon v. Ekpe,* 159 Fed. Appx. 314, 316 (2d Cir.2005) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Second, Stewart argues that he was not required to use the prison system to exhaust his remedies because the prison grievance system cannot award monetary damages. (*See* Pl. Objections at 3, Dkt. No. 39.) However, "[e]ven when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citing *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). Accordingly, this argument also fails.

Finally, Stewart claims that he was threatened and did not file grievances at the institutional level for fear of being retaliated against. (*See* Pl. Objections at 2, Dkt. No. 39; *see also* Compl. at 10, Dkt. No. 1; Pl. Resp. at 1, Dkt. No. 32.) The Second Circuit has held that threats by prison officials may estop those officials from raising the affirmative defense of failure to exhaust administrative remedies. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 44–45 (2d Cir.2007). The estoppel argument can take two forms: either that the actions of a prison official made all administrative remedies unavailable, or that those actions made only some remedies unavailable. *See* *Hemphill,* 380 F.3d at 687. Stewart can only be arguing the latter. His objections state that he did complain of the use of excessive force and the failure to provide medical care in his letters to the Sheriff, Under Sheriff, and Commissioner. (*See* Pl. Objections at 2, Dkt. No. 39.) However, a review of those letters reveals that they are entirely bereft of any mention of the excessive force or failure to provide medical treatment claims, excepting two mentions—without any detail or request for action—of a civil claim for excessive force Stewart was pursuing against defendant Marsh. (*See* Compl. at 16–30, Dkt. No. 1.) As a consequence, even if the court were to presume Stewart's remedies at the prison level were unavailable, there is no question of fact as to whether Stewart failed to exhaust all his available remedies. Stewart could have raised those issues outside the local grievance process but failed to do so. Thus, defendants are entitled to judgment as a matter of law on those claims.

#### B. *Eighth Amendment Conditions of Confinement Claims*

***3** Stewart further argues that, contrary to Judge Lowe's conclusions, his conditions of confinement "shock the mind" and that he was subject to "barbaric," "draconian," and "extreme treatment" sufficient to make out cruel and unusual punishment under the Eighth Amendment. (Pl. Objections at 2–3, Dkt. No. 39.) Stewart

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

alleged in his complaint that for ten days he was denied bedding between the hours of 6:30 am and 11:00 pm, denied his personal property, allowed to shower only while in restraints, and provided only two sheets of toilet paper per defecation. (*See* Compl. at 8–9, Dkt. No. 1.) Judge Lowe was correct to find that these deprivations are not sufficiently serious to support an Eighth Amendment claim. (*See* R & R at 17–18, Dkt. No. 38.) The Supreme Court has held that

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Stewart's complaint and response fail to allege either the presence of an excessive risk to his health or safety or that any prison official was aware of such a risk. Accordingly, Judge Lowe's finding is adopted and Stewart's conditions of confinement claims are dismissed .[FN1]

> FN1. Stewart now claims via his objections that he was denied blankets at night (in contradiction of his complaint), that he had unspecified “medical life threatening ailments” which could have caused him to die in the cold without blankets, and that there was a risk he would slip and fall while wearing restraints in the shower. (*See* Pl. Objections at 4, Dkt. No. 39.) The court declines to consider these new claims at this late stage. *See* *Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1999).

**C.** ***Due Process***

Stewart's objections reassert the claim that his due process rights were violated due to a biased disciplinary hearing and generally flawed grievance system at Tioga County Jail. (*See* Pl. Objections at 2, Dkt. No. 39.) As the R & R observed, to establish a procedural due process claim, an inmate must show that he possessed a state granted interest in remaining free from the alleged deprivation and that the deprivation imposed “ ‘an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.’ “ (*See* R & R at 19, Dkt. No. 38 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).) Here, the conditions of Stewart's heightened confinement are not disputed by the parties and there is no evidence or allegation that the conditions of confinement were atypical in relation to other administrative confinements imposed in the ordinary course of prison administration. Thus, summary judgment is appropriate. *See* *Davis v. Barrett,* 576 F.3d 129, 134 (2d Cir.2009). In the absence of unusually harsh conditions, “restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection.” *Id.* at 133 (citation omitted). Given that Stewart's confinement was substantially shorter than 101 days, the court agrees with Judge Lowe's conclusion that Stewart possessed no protected liberty interest sufficient to support a procedural due process claim and adopts the recommendation that Stewart's due process claims be dismissed.

**D.** ***Access to the Courts***

***4** Lastly, Stewart argues that Judge Lowe erred in finding that Stewart failed to raise any triable issue of fact as to an injury suffered by his restricted use of the mail system. (*See* Pl. Objections at 4, Dkt. No. 39.) Stewart claims that his limited use of the mail prevented him from being heard in support of a habeas corpus petition, which resulted in an unfavorable outcome. (*See id.; see also* Pl. Resp. at 1, Dkt. No. 32.) Other than those two places, no allegation of any actual injury stemming from the mail restrictions has been made in Stewart's submissions. Judge Lowe was correct in observing that Stewart's response is unsworn and it cannot be treated as an affidavit for summary judgment purposes. (*See* R & R at 21, Dkt. No. 38.) Accordingly, the response's contents cannot constitute “evidence” sufficient to create a triable issue of fact. (*See* Pl. Resp. at 1, Dkt. No. 32.) The court is mindful of Stewart's pro se status and observes that even if his response could be construed as an affidavit, the statement therein is too conclusory to create a triable issue of fact regardless of his non-compliance with 28 U.S.C. § 1746. Stewart references no specific facts regarding the case he allegedly lost as a consequence of the denial of sufficient postage. Mere assertions unsupported by any specifics,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

even when contained in an affidavit, are insufficient to create the material dispute necessary to defeat a motion for summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008). Therefore, the court adopts Judge Lowe's recommendation that Stewart's denial of access to the courts claim be dismissed.[FN2]

FN2. The court observes in passing that even if it were willing to consider new evidence in Stewart's sworn objections, Stewart's statement therein regarding his lost legal case is no more helpful in identifying what case he lost or providing substantiation to the claim that he lost the case as a consequence of limited postage. (*See* Pl. Objections at 4, Dkt. No. 39.)

**E. *Remaining Recommendations***

Because Stewart has not objected to the remaining recommendations, the court has reviewed those recommendations for clear error and finds none. Accordingly, the remainder of the R & R is adopted.

**IV. *Conclusion***

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge George H. Lowe's April 26, 2010 Report and Recommendation Order (Dkt. No. 38) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion to dismiss based on Stewart's refusal to cooperate with his deposition (Dkt. No. 30) is **DENIED;** and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED** and Stewart's claims are **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Stewart v. Howard
Not Reported in F.Supp.2d, 2010 WL 3907137 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary **Civil Rights 78 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310 203**

310 Prisons

310II Prisoners and Inmates

310II(D) Health and Medical Care

310k203 k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1546 k. Medical care and treatment. Most Cited Cases

A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

***1** Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

**II. BACKGROUND**[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008 WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

**A. Facts**

**1. Parties**

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

**2. Bellamy's Surgery**

In August 2004, while in DOCS custody at Sing Sing

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. *See* *Bellamy I,* 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. *See* Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. *See* 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See *Bellamy I,* 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. *See id.* While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. *See* 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. *See, e.g.,* Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. *See* 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. *See* Moorjani Aff. ¶¶ 4-5.

FN12. *See* Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). *See also* Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

FN13. *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants (“Dawkins Decl.”).

FN14. *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

FN15. *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

FN16. *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses. [FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate. [FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

FN17. *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

FN18. *See id.*

FN19. *See id.* ¶ 13.

FN20. *See id.* ¶ 14.

FN21. *See id.*

***2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

FN22. *See id.* ¶ 15.

FN23. *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff." [FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution." [FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

## III. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN35] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [FN36] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [FN37] "It is the movant's burden to show that no genuine factual dispute exists." [FN38]

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[FN39] "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

party's case, and on which that party will bear the burden of proof at trial.' " FN40 To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " FN41 and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " FN42 However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " FN43

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

***3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.FN44 However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " FN45 Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." FN46

FN44. *See Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," FN47 and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." FN48 However, a pro se plaintiff must still meet the usual requirements of summary judgment .FN49 Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." FN50

FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

FN48. *Burgos,* 14 F.3d at 790.

FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.FN51 Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court at all." FN52 Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." FN53 Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice.FN54 The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." FN55

FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

FN53. *Id.*

FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. FN56

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." FN57 "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " FN58

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

**C. Eleventh Amendment Immunity**

***4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." FN59 "A state's Eleventh Amendment protection from suit extends to its agencies and departments." FN60 "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." FN61 To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." FN62 State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment.FN63

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." FN64 In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.FN65 "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." FN66 Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." FN67

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " FN68 Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." FN69 In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.FN70 However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." FN71 The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." FN72 Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." FN73 For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." FN74

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). *See also Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

***5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. *See Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See* *Winter,* 129 S.Ct. at 381.

**IV. DISCUSSION**

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

**A. Exhaustion of Administrative Remedies**

***6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5 (citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

**B. Eleventh Amendment Immunity**

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

**C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity**

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved with the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

***7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis. [FN91]

FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See* *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also* *Kshel Realty Corp. v. City of New York,* No. 01 Civ. 9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, Paul Nadel, in his individual capacity, Jennifer Treacy, in her individual capacity, Kenneth Post, in his individual capacity, and Timothy Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement investigator brought action against another investigator and other narcotics enforcement officials, alleging malicious prosecution, false arrest, unlawful detention, and other constitutional violations against arrestee, and First Amendment retaliation against investigator. Defendant investigator counterclaimed, alleging defamation by plaintiff investigator. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of supervisory liability against officials;

(2) law enforcement officers lacked even arguable probable cause to make arrest;

(3) investigator's statements were not protected by First Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 1395(6)**

78 Civil Rights

78III Federal Remedies in General

78k1392 Pleading

78k1395 Particular Causes of Action

78k1395(4) Criminal Law Enforcement; Police and Prosecutors

78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 63.4(2)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 1376(6)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[6] Arrest 35 ⚷ 63.4(8)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(7) Information from Others

35k63.4(8) k. Reliability of informer. Most Cited Cases

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

**[7] Constitutional Law 92 ⚷ 1941**

92 Constitutional Law

92XVIII Freedom of Speech, Expression, and Press

92XVIII(P) Public Employees and Officials

92k1941 k. Discipline or reprimand. Most Cited Cases

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

**[8] Constitutional Law 92 ⚷ 1955**

92 Constitutional Law

92XVIII Freedom of Speech, Expression, and Press

92XVIII(P) Public Employees and Officials

92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Municipal Corporations 268 185(1)**

268 Municipal Corporations

268V Officers, Agents, and Employees

268V(B) Municipal Departments and Officers Thereof

268k179 Police

268k185 Suspension and Removal of Policemen

268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 28**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k26 Repetition

237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 28**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k26 Repetition

237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

***342** James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 ***343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When ***344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this “*Miranda* sheet.” *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC ***345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528, 534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of ***346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General or FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the ***347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/* ***348** *pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is ***349** committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.*' " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases, *United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus ***350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous ***351** reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. ***352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶ ¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶ ¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation ***353** mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

> [U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment," and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals ***354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen." [FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see* *Sousa,* 578 F.3d at 170, and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see* *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001).

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be ***355** cured by repleading. *Cf.* *Oliver Schs., Inc. v. Foley,* 930 F.2d 248, 252-53 (2d Cir.1991). The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law. § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12, 2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 59 (2d Cir.2002). Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g.,* *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963). The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Even accepting as true Crisafi's non-conclusory factual allegations, including ***356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here, the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close ***357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Philip DEBLASIO, Plaintiff,
v.
C. ROSATI, Sarah Whetherell, Defendants.
No. 9:10–CV–1436 (MAD/GHL).

Aug. 15, 2011.
Philip Deblasio, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Adrienne J. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

***REPORT–RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Philip DeBlasio alleges that Defendant C. Rosati subjected him to excessive force and that Defendant Rosati would not have had access to him if Defendant Sarah Whetherell had processed paperwork to release him from the Special Housing Unit ("SHU"). (Dkt. No. 1.) Currently pending before the Court is Defendant Whetherell's motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 10.) Plaintiff has not opposed the motion, despite having been granted an extension of time in which to do so. (Text Order May 12, 2011.) For the reasons that follow, I recommend that Defendant's motion be granted.

**I. BACKGROUND**

Plaintiff alleges that on September 28, 2009, Defendant Correction Officer C. Rosati subjected him to excessive force in the SHU. (Dkt. No. 1 at 4, 7.) Plaintiff alleges that Defendant Rosati should not have had access to him because "they passed a new law prior to this incident ... that means basically that a level I inmate/patient cannot spend more than 30 days at a time in SHU." FN1 *Id.* at 8. Plaintiff alleges that Defendant Sarah Whetherell, who served as Plaintiff's primary therapist, did not "put that paperwork in" to timely remove Plaintiff from the SHU because "she was mad at [Plaintiff] because of the way [he] disrespected her on 8–7–09." *Id.* Plaintiff states that "Sarah W[h]etherell responsible and a party to this entire ordeal. She didn't physically hurt me but she is just as guilty. And I will prove she conspired to encourage ... C. Rosati to brutally hurt me." (Dkt. No. 1 at 9.) Plaintiff alleges that "Sarah W[h]etherell's mistreatment was considered cruel and unusual punishment by not getting me out of the SHU on time. She let me suffer by not doing her job [and] talking with me during those 68 days." *Id.* at 5. Plaintiff requests surgery on his face to remove the scars from Defendant Rosati's alleged use of excessive force and $1,000,000 in compensatory damages. *Id.* at 6.

FN1. The "new law" to which Plaintiff refers is the SHU Exclusion Law, known informally as the "Boot the SHU" law, which regulates disciplinary housing for mentally ill inmates. N.Y. Correct. Law § 137 (McKinney 2011). Although the legislation was enacted in 2008, the portion of the law to which Plaintiff refers did not go into effect until July 1, 2011. *Id.* at 6(d).

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

***2** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

Defendant Whetherell states that the only allegation against her in the complaint is that she "did not process paperwork necessary to end the [P]laintiff's SHU time." (Dkt. No. 10–1 at 2.) Defendant Whetherell does not address Plaintiff's allegation that she "conspired to encourage ... C. Rosati to brutally hurt me." (Dkt. No. 1 at 9.)

The complaint fails to state a claim against Defendant Whetherell for failing to submit paperwork to release Plaintiff from the SHU. As noted in the footnote above, the SHU Exclusion Law did not go into effect until July 1, 2011. It thus did not require Defendant to see that Plaintiff was released from the SHU after thirty days. Moreover, as Defendant Whetherell correctly notes (Dkt. No. 10–1 at 2), the complaint fails to state a claim on this theory even if she had such an obligation because "more than mere 'but for' causation is required to impose Section 1983 liability ..." *Deskovic v. City of Peekskill,* 673 F.Supp.2d 154, 162 (S.D.N.Y.2009) (holding that even if the defendant "set in motion events that led to Plaintiff's imprisonment, without which [another actor] allegedly could not have assaulted Plaintiff, more than 'but for' causation is required to impose Section 1983 liability on the [defendant] for the [other actor's] misconduct.").

Broadly construed, the complaint appears to assert a conspiracy claim against Defendant Whetherell. Defendant has not addressed this claim. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993) (quoting *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) (per curiam)). Plaintiff's vague allegation that Defendant Whetherell "conspired to encourage ... C. Rosati to brutally hurt me" is insufficient to plausibly allege that Defendants entered into an agreement to act in concert to inflict an unconstitutional injury on Plaintiff. Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's conspiracy claim against Defendant Whetherell.

***3** Broadly construed, the complaint may allege that Defendant Whetherell retaliated against Plaintiff "because of the way [he] disrespected her on 8–7–09." Defendant has not addressed this claim. To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.3d 489, 492 (2d. Cir.2001)). Plaintiff has not alleged that he engaged in any protected speech or conduct. Rather, he alleges merely that he "disrespected" Defendant Whetherell. It is not clear what form this "disrespect" took, but it is black-letter law that threatening and abusive language "finds little protection under the [F]irst [A]mendment." *Jermosen v. Coughlin,* 878 F.Supp. 444, 450 (N.D.N.Y.1995) (citing *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)). Therefore, I recommend that the Court *sua sponte* dismiss Plaintiff's retaliation claim against Defendant Whetherell.

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). Of course, an opportunity to amend is not required where the plaintiff has already amended the complaint. *See Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once). In addition, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted). Here, Plaintiff has not filed an amended complaint and there is a possibility, however slim, that he could allege facts plausibly suggesting that Defendant Whetherell violated his constitutional rights. Therefore, I recommend that the Court grant Plaintiff leave to amend his complaint within thirty days of any order adopting this Report–Recommendation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant Whetherell's motion to dismiss for failure to state a claim (Dkt. No. 10) be ***GRANTED*** with leave to amend within thirty days of any order adopting this Report–Recommendation.

***4** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

DeBlasio v. Rosati
Slip Copy, 2011 WL 4345307 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Philip DEBLASIO, Plaintiff,
v.
C. ROSATI, Correctional Officer, Great Meadow Correctional Facility; and Sarah Whetherell, Social Worker I, Great Meadow Correctional Facility, Defendants.
No. 9:10–cv–1436 (MAD/GHL).

Sept. 15, 2011.
Philip Deblasio, Marcy, NY, pro se.

Office of the New York State Attorney General, Adrienne J. Kerwin, AAG, of Counsel, Albany, NY, for Defendants.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

***1** On November 15, 2010, Plaintiff *pro se* commenced this civil rights action pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. In his complaint, Plaintiff alleges that Defendant Rosati subjected him to excessive force and that Defendant Rosati would not have had access to him if Defendant Whetherell had processed paperwork to release him from the Special Housing Unit ("SHU"). *See* Specifically, Plaintiff claims that, on September 28, 2009, Defendant Rosati subjected him to excessive force while he was housed in the SHU. *See id.* at 4, 7. Plaintiff alleges that Defendant Rosati should not have had access to him because "they passed a new law prior to this incident ... that means basically that a level I inmate/patient cannot spend more than 30 days at a time in SHU." *See id.* at 8.[FN1] Plaintiff alleges that Defendant Whetherell, who served as Plaintiff's primary therapist, did not "put that paperwork in" to remove Plaintiff from the SHU because "she was mad at [Plaintiff] because of the way [he] disrespected her on 8–7–09." *See id.* Plaintiff states that "Sarah W[h]etherell [is] responsible and a party to this entire ordeal. She didn't physically hurt me but she is just as guilty. And I will prove she conspired to encourage ... C. Rosati to brutally hurt me." *See id.* at 9. Further, Plaintiff alleges that Defendant "W[h]etherell's mistreatment was considered cruel and unusual punishment by not getting me out of the SHU on time. She let me suffer by not doing her job & talking with me during those 68 days." *See id.* at 5. In his prayer for relief, Plaintiff seeks surgery on his face to remove scars from Defendant Rosati's alleged use of excessive force and $1,000,000 in compensatory damages. *See id.* at 6.

> FN1. The "new law" to which Plaintiff refers is the SHU Exclusion Law, which regulates disciplinary housing for mentally ill inmates. *See* N.Y. Corr. Law § 137 (McKinney 2011). Although the legislation was enacted in 2008, the portion of the law to which Plaintiff refers did not go into effect until July 1, 2011. *See id.*

On February 2, 2011, Defendant Whetherell filed a motion to dismiss. In her motion, Defendant Whetherell argued that the only allegations in the complaint regarding her is that she failed to process paperwork necessary to end Plaintiff's time in the SHU and that she failed to talk to Plaintiff while he was housed in the SHU, which are insufficient to establish an Eighth Amendment violation. *See* Dkt. No. 10–1 at 2.

In a Report–Recommendation dated August 15, 2011, Magistrate Judge Lowe recommended that the Court find that Defendant Whetherell had no obligation under the New York SHU Exclusion Law to ensure that Plaintiff was released from the SHU after thirty days because the law did not go into effect until July 1, 2011. *See* Dkt. No. 28 at 4. Further, Magistrate Judge Lowe found that the complaint fails to state a claim on this theory even if Defendant Whetherell had such an obligation under the SHU Exclusion law because " 'more than mere "but for" causation is required to impose Section 1983 liability ...' " *See id.* (quoting *Deskovic v. City of Peekskill,* 673 F.Supp.2d 154, 162 (S.D.N.Y.2009)). Finally, Magistrate Judge Lowe recommended that the Court *sua sponte* dismiss Plaintiff's retaliation claim against Defendant

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Whetherell because of the claim's conclusory nature and Plaintiff's failure to allege that he engaged in any protected speech or conduct. *See id* . at 5–6. Neither party objected to Magistrate Judge Lowe's August 15, 2011 Report–Recommendation.

***2** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

Having reviewed Magistrate Judge Lowe's August 15, 2011 Report–Recommendation and the applicable law, the Court concludes that Magistrate Judge Lowe correctly recommended that the Court should grant Defendant Whetherell's motion to dismiss, but afford Plaintiff an opportunity to amend. Further, Magistrate Judge Lowe correctly determined that, to the extent Plaintiff has attempted to allege that Defendant Whetherell retaliated against him because of the way he disrespected her, he has failed to state a plausible cause of action.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Lowe's August 15, 2011 Report–Recommendation is **ACCEPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendant Whetherell's motion to dismiss is **GRANTED;** and the Court further

**ORDERS** that Plaintiff may file an amended complaint within **THIRTY (30) DAYS** of the date of this Order; and the Court further

**ORDERS** that, if Plaintiff fails to file an amended complaint within **THIRTY (30) DAYS** of the date of this Order, the Clerk of the Court shall terminate Defendant Whetherell from this action, without further order of this Court; and the Court further

***3 ORDERS** that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Deblasio v. Rosati
Slip Copy, 2011 WL 4345692 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
William EDWARDS, Plaintiff,
v.
Martin HORN, et al., Defendants.
No. 10 Civ. 6194(RJS)(JLC).

March 8, 2012.
*ORDER ADOPTING REPORT AND RECOMMENDATION*

RICHARD J. SULLIVAN, District Judge.

***1** *Pro se* Plaintiff William Edwards brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, alleging that at various times, Defendants violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration at five different facilities on Rikers Island. By Order dated September 1, 2010, this matter was referred to the Honorable James L. Cott, Magistrate Judge. On April 4, 2011, Defendants moved to dismiss the Complaint under Rule 12(b) (6) of the Federal Rules of Civil Procedure. On March 3, 2011, Judge Cott set a deadline of March 4, 2011 for Plaintiff to submit an opposition to Defendants' motion. Although Judge Cott thrice extended this deadline—on May 18, 2011, June 8, 2011, and June 29, 2011—Plaintiff never submitted an opposition. Accordingly, Judge Cott properly considered Defendants' motion fully submitted.

On February 14, 2012, Judge Cott issued the attached forty-six page Report and Recommendation (the "Report"), recommending that the motion to dismiss be granted except as to Plaintiff's retaliatory termination claim against Defendant Rosa to the extent that Plaintiff seeks nominal or punitive damages. In the Report, Judge Cott advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *Cf. Frank v. Johnson,* 968 F.2d 298 (2d Cir.1993).

When no objections to a report and recommendation are made, the Court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000). After reviewing the record, the Court finds that Judge Cott's well-reasoned and careful Report is not facially erroneous. Accordingly, the Court adopts the Report in its entirety and, for the reasons set forth therein, grants Defendants' motion to dismiss as to all but one of Plaintiff's claims. The court denies the motion as to Plaintiff's retaliatory termination claim against Defendant Rosa, and only to the extent that Plaintiff seeks nominal or punitive damages against her. The Clerk of the Court is respectfully directed to terminate the motion located at Doc. No. 88.

SO ORDERED.

*REPORT & RECOMMENDATION*

JAMES L. COTT, United States Magistrate Judge.

**To The Honorable Richard J. Sullivan, United States District Judge:**

Plaintiff William Edwards, proceeding pro se, brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 alleging that Defendants violated his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration in various facilities on Rikers Island. Edwards also alleges that he was discriminated against in violation of the Americans with Disabilities Act. Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, I recommend that the motion to dismiss be granted except as to Edwards' retaliatory termination claim against Defendant Rosa.

## I. *BACKGROUND*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A. Factual Background**

***2** The following facts are taken from the Complaint and are accepted as true for purposes of this motion. (*See* Complaint, dated June 23, 2010 ("Compl.") (Dkt. No. 2)). Edwards brings this suit pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 and Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.,* against 44 current and former New York City employees and two John Doe Defendants: Commissioner Martin Horn, Warden Bailey, Warden J. Davis, Warden E. Duffy, Warden Michael Hourihan, Warden Riordan, Warden Robert Shaw, Correctional Officer ("CO.") Dinolfo, CO. Grima, CO. Hernandez, CO. Holmes, CO. Lagos, CO. Lewis, CO. Maynard, CO. Morales, CO. Noon, CO. Reyes, CO. Richardson, CO. Rosa, CO. Smalls, CO. Smith, CO. Sumpter, Captain Alleyve, Captain Bethacourt, Captain Calle, Captain G. Davis, Captain Polak, Marybeth Campfield, Ms. Carrera, Mrs. M. Cattafesta, Mr. K. Guerrant, Cook Hannah, Deputy Hill, Florence Hunter, Ms. Jenkins, Ms. K. Johnson [FN1], Ms. G. Lee, Ms. P. Mimms, Mr. R. Mulvena, Ms. B. Musmacher, Ms. R. Padmore, Karen Powell, James Robinson, and Ms. Steven (together, "Defendants"). (*See* Compl. at 1–5).[FN2]

FN1. In the case caption on the first page of the Complaint, Edwards mistakenly identifies Defendant Johnson as "Ms. K. Jonhson." (Compl. at 1).

FN2. In Section I.b of the Complaint, Edwards lists 38 Defendants. Six additional Defendants—Carrera, Cattafesta, Duffy, Grima, Powell, and Steven—do not appear on this list, but are named in the case caption on the first page of the Complaint.

Edwards alleges that Defendants deprived him of his constitutional rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments during his incarceration at several facilities on Rikers Island: the Anna M. Kross Center ("AMKC"), the Eric M. Taylor Center ("EMTC"), the George Motchan Detention Center ("GMDC"), the George R. Vierno Center ("GRVC"), and the Robert N. Davoren Complex ("RNDC"). At the time he filed his Complaint, Edwards was an inmate at the Clinton Correctional Facility, and he is currently on parole. (*See* Letter, dated Dec. 11, 2011 (Dkt. No. 135)).

Throughout his roughly 100 paragraph, single-spaced, 25–page Complaint, Edwards does not present his allegations by cause of action, nor does he clearly articulate exactly what causes of action he is asserting, as many allegations appear to overlap and lack clarity.[FN3] Several of Edwards' allegations deal with Defendants' actions in relation to a separate lawsuit Edwards brought in the Northern District of New York, *Edwards v. Selsky,* No. 04 Civ. 493(FJS)(DRH), 2008 WL 190385 (N.D.N.Y. Jan. 22, 2008) (*"Selsky"* or the "NDNY action"), which was dismissed for failure to prosecute. The Court has made every effort to identify and address all possible claims asserted in the Complaint.[FN4] The Court is able to identify 12 potential causes of action spanning separate dates from July 25, 2007 to April 5, 2010. Specifically, Edwards asserts the following claims: (1) verbal harassment; (2) deprivation of access to free telephone calls; (3) deprivation of access to legal services; (4) mail tampering; (5) denial of required food portions; (6) unconstitutional strip search; (7) violation of due process rights within the prison's disciplinary and grievance system; (8) excessive force and denial of medical treatment; (9) deprivation of access to the prison's grievance system; (10) retaliation; (11) conspiracy; and (12) disability discrimination under the ADA. Edwards seeks $75,000,000 in damages, attorneys' fees, a reimbursement of penalties incurred due to two allegedly false infractions, injunctive relief in the form of expunging those false infractions, injunctive relief terminating Defendants from their positions in the New York City Department of Correction ("DOC") and permanently enjoining them from city, state, or federal employment, and a permanent restraining order to prevent Defendants from committing any future similar violations. (Compl.¶ V). Edwards does not present these allegations in a narrative fashion, but instead describes dozens of grievance letters that he has submitted to DOC staff at the various Rikers Island facilities over the course of nearly three years. To avoid repetition, the Court will describe the factual background relating to Edwards' specific allegations in the context of the relevant legal discussion below.

FN3. Accordingly, while Defendants do not argue as much, the Complaint could also be

dismissed under Rule 8(a)(2), which requires a pleading to contain "a short and plain statement" of the claims.

FN4. Edwards has attached more than 300 pages of documents to his Complaint, consisting of grievance letters, notices of infraction, and inmate grievance committee decisions. These materials can be properly considered in deciding Defendants' motion to dismiss. *See, e.g., Sira v. Morton,* 380 F.3d 57, 67 (2d Cir.2004) (citations omitted). However, while the Court will consider these materials in support of the claims asserted in the Complaint—indeed, nearly every paragraph advises the reader to "see attached exhibit" but fails to cite to a specific page—the Court will not attempt to identify the potentially innumerable causes of action that could be construed from the hundreds of allegations contained solely in the attachments.

**B. Procedural Background**

***3** Edwards filed the Complaint on August 18, 2010. (Dkt. No. 2). On October 29, 2010, the United States Marshals executed service of the Summons and Complaint on 32 of the 44 named defendants.[FN5] Over the course of the next several months, with the assistance of the Office of Corporation Counsel, the United States Marshals, and the Court, Edwards has attempted to serve the remaining 12 named defendants. (*See* Dkt. Nos. 56, 62, 69, 70, 75, 119, 120, 129). To date, Edwards has successfully served nine additional Defendants and appears to have served a number of Defendants twice.[FN6] Accordingly, there are three named Defendants who have not been served—Bethacourt, Davis, and Johnson-and two John Doe Defendants who have not been identified.[FN7]

FN5. This set of defendants consists of Sumpter (Dkt. No. 11), Horn (Dkt. No. 12), Cattafesta (Dkt. No. 13), Hunter (Dkt. No. 15), Guerrant (Dkt. No. 17), Lagos (Dkt. No. 18), Shaw (Dkt. No. 19), Campfield (Dkt. No. 20), Reyes (Dkt. No. 21), Davis (Dkt. No. 22), Hernandez (Dkt. No. 23), Holmes (Dkt. No. 24), Rosa (Dkt. No. 25), Smith (Dkt. No. 26), Mulvena (Dkt. No. 27), Polak (Dkt. No. 28), Noon (Dkt. No. 29), Duffy (Dkt. No. 31), Dinolfo (Dkt. No. 32), Mimms (Dkt. No. 34), Bailey (Dkt. No. 35), Lewis (Dkt. No. 36), Alleyve (Dkt. No. 37), Calle (Dkt. No. 39), Hannah (Dkt. No. 41), Hourihan (Dkt. No. 43), Jenkins (Dkt. No. 44), Maynard (Dkt. No. 45), Padmore (Dkt. No. 48), Richardson (Dkt. No. 49), Riordan (Dkt. No. 50), and Smalls (Dkt. No. 51).

FN6. Since October 29, 2010, Edwards has served the following Defendants: Lee (service executed on Dec. 2, 2010 (Dkt. No. 61)); Powell (service executed on Mar. 29, 2011 (Dkt. No. 98)); Steven (service executed on Feb. 24, 2011 (Dkt. No. 110); service executed on Mar. 31, 2011 (Dkt. No. 99)); Grima (service executed on Mar. 2, 2011 (Dkt. No. 107); service executed on Mar. 14, 2011 (Dkt. No. 100)); Robinson (service executed on Mar. 29, 2011 (Dkt. No. 101)); Musmacher (service executed on Mar. 14, 2011 (Dkt. No. 102)); Hill (service executed on Feb. 24, 2011 (Dkt. No. 112); service executed on Mar. 14, 2011 (Dkt. No. 103)); Horn (service executed on Mar. 31, 2011 (Dkt. No. 97)); and Carrera (service executed on Oct. 6, 2011 (Dkt. No. 131)).

FN7. As to Defendant Bethacourt, the Office of Corporation Counsel advised the Court by letter dated June 8, 2011 that it is unable to locate records that would assist in identifying Bethacourt. Accordingly, as stated in the Court's Order dated June 9, 2011 (Dkt. No. 120), it does not appear that any further action can be taken to identify this Defendant. As to Defendant Davis, the Office of Corporation Counsel advised the Court by letter dated February 16, 2011 that the Legal Bureau of the DOC would accept service on his behalf. By Order dated September 1, 2011, the Court directed Edwards to serve Davis by September 26, 2011 (Dkt. No. 129), but the docket sheet does not reflect any attempt to effect service. Lastly, on October 31, 2011, Edwards attempted to serve Defendant Johnson but was unsuccessful because she was not located at the address provided by the Office of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Corporation Counsel. (*See* Order, dated Dec. 12, 2011 (Dkt. No. 134), at 1). Edwards was directed to again attempt to serve Johnson by January 27, 2012 (*Id* .), but no proof of service has been filed.

During the pendency of his lawsuit, Edwards has submitted several requests to the Court. By Order dated November 1, 2010, the Court denied Edwards' request for an order prohibiting certain employees at the Southport Correctional Facility, where Edwards was incarcerated at the time, from tampering with his legal and personal mail. (Dkt. No. 8). By Orders dated November 30, 2010 and April 14, 2011, the Court denied Edwards' motions for default judgment against certain Defendants (Dkt.Nos.56, 92), and Edwards' interlocutory appeal of the November 30 Order was denied by the Second Circuit on May 26, 2011. (Dkt. No. 118). By Orders dated February 9, 2011, I declined Edwards' request that I disqualify myself from this action and also denied his motion for the appointment of counsel. (Dkt.Nos.73–74). Lastly, on March 8, 2011, I denied Edwards' request for sanctions in connection with Corporation Counsel's providing Edwards with service addresses for Defendants. (Dkt. No. 81).

On April 4, 2011, Defendants moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Defendants' Memorandum of Law in Support of Motion to Dismiss, dated Apr. 4, 2011 ("Def.Mem.") (Dkt. No. 89)).[FN8] Defendants assert that Edwards has failed to state a claim as to his verbal harassment, deprivation of telephone access, unconstitutional strip search, mail tampering, denial of food, denial of legal services, due process, grievance processing and protocol, excessive force and medical treatment, conspiracy, and retaliation causes of action. (Def. Mem. at 16–45). In addition, Defendants argue that Edwards' claims against Defendants Bailey, Cattafesta, Davis, Hill, Horn, Hourihan, Powell, and Riordan fail for lack of personal involvement, all defendants are entitled to qualified immunity, and Edwards' claims are barred by the Prison Litigation Reform Act (the "PLRA") .[FN9] (*Id.* at 14–16, 45–48). Pursuant to the Court's Order dated March 3, 2011, Edwards' deadline to submit an opposition to Defendants' motion was May 4, 2011. (Dkt. No. 80). However, despite receiving several extensions—first to May 18 (Dkt. No. 90) then to June 8 (Dkt. No. 116) and June 29 (Dkt. No. 122)—Edwards has not submitted any opposition. Accordingly, the Court considers Defendants' motion fully submitted.

FN8. Although the motion to dismiss was not filed on behalf of any of the unserved Defendants (*see* Def. Mem. at 2–3 n. 2), Counsel has stated that the arguments raised apply equally to all Defendants. Accordingly, in light of my recommendation to dismiss all claims against all Defendants except the retaliatory termination claim against Defendant Rosa, *see infra* Section ILK, the Court should *sua sponte* dismiss the Complaint as to Defendants Bethacourt, Davis, John Doe # 1, John Doe # 2, and Johnson.

FN9. Defendants have not moved to dismiss any of Edwards' claims on the ground that he has failed to exhaust his administrative remedies, as he is required to have done under the PLRA. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [Section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). While exhaustion under Section 1997e(a) is mandatory, *see* *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), non-exhaustion "is an affirmative defense that is waiveable." *Handberry v. Thompson,* 446 F.3d 335, 342 (2d Cir.2006) (citations, alterations, and quotation marks omitted); *see also* *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Here, because Defendants have not argued that Edwards failed to exhaust his administrative remedies, the non-exhaustion defense has been waived. *See, e.g.,* *Ortiz v. Dep't of Corr. of the City of N.Y.,* No. 08 Civ. 2195(RJS)(HBP), 2011 WL 2638137, at *4 (S.D.N.Y. Apr. 29, 2011) (defendant's failure to raise non-exhaustion constitutes waiver) (Report and Recommendation), *adopted,* 2011 WL 2638140

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(S.D.N.Y. Jul.5, 2011); *Hobson v. Fischer,* No. 10 Civ. 5512(SAS), 2011 WL 891314, at *2 n. 22 (S.D.N.Y. Mar.14, 2011) (finding waiver even where grievance "appears not to have been fully exhausted" under PLRA).

## II. *DISCUSSION*

### A. Applicable Legal Standards

***4** A plaintiff's failure to oppose a 12(b)(6) motion does not by itself merit dismissal of a complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183–84 (2d Cir.2010); *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). "[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *Id.* Consequently, as with all Rule 12(b)(6) motions, in deciding an unopposed motion to dismiss, a court is to "assume the truth of a pleading's factual allegations and test only its legal sufficiency" according to the principles below. *Id.* at 322.

A complaint will not survive a 12(b)(6) motion to dismiss if it "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Although "a complaint attacked by a 12(b) (6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 554, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quotation marks and citations omitted). "To survive a motion to dismiss, the complaint must set out only enough facts to state a claim to relief that is plausible on its face." *Hollander v. Copacabana Nightclub,* 624 F.3d 30, 32 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)). "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950 (citation omitted). A complaint thus may only survive a 12(b) (6) motion to dismiss if it has "facial plausibility" and pleads enough facts to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

Given that Edwards is proceeding *pro se,* the Court must "construe [his Amended Complaint] broadly and interpret it to raise the strongest arguments it suggests." *Sharpe v. Conole,* 386 F.3d 482, 484 (2d Cir.2004) (citation omitted). Furthermore, "when the plaintiff proceeds pro se ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004) (citation omitted). Nevertheless, "a *pro se* litigant [is] bound by the same rules of law ... as those [litigants] represented by counsel." *Fertig v. HRA Med. Assistance Program,* No. 10 Civ. 8191(RPP), 2011 WL 1795235, at *4 (S.D.N.Y. May 6, 2011) (quotation marks and citation omitted).

### B. Verbal Harassment

Edwards asserts that several Defendants, in violation of Section 1983, used harassing, threatening, and profane language towards him on 17 separate occasions taking place between July 25, 2007 and September 1, 2008. (Compl.¶¶ III, 2, 6, 8, 17, 19, 22, 24, 30, 33, 37, 38, 53, 55, 61, 83, 91(b)). In separate allegations, he claims that Defendants Campfield, Dinolfo, Grima, Hannah, Hernandez, Holmes, Lewis, Maynard, Morales, Noon, Reyes, Richardson, Smalls, and Smith, called him a "snitch" in front of other inmates, mocked his disability, falsely informed him that he had a visitor when in fact he did not have a visitor, and directed racial slurs and profane language toward him. (*Id.*). These claims should be dismissed. The Eighth Amendment prohibits the imposition of cruel and unusual punishment, *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), but its protection does not extend to verbal harassment of an inmate by correction officers without any resulting "appreciable injury." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 373 (S.D.N.Y.2011) (quoting *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)).

***5** Verbal harassment, by itself, is not a constitutional violation. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010) ("[v]erbal harassment itself does not rise to the level of a constitutional violation [,]" and "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

violations") (quotation marks and citation omitted); *Davidson v. Bartholome,* 460 F.Supp.2d 436, 446 (S.D.N.Y.2006) (no relief to inmate "simply because [an officer] made a hostile or derogatory comment"); *Lunney v. Brureton,* No. 04 Civ. 2438(LAK) (GWG), 2005 WL 121720, at *11 (S.D.N.Y. Jan. 21, 2005) (no claim because merely "insulting" or "disrespectful" comments "do not give rise to a constitutional violation") (quotation marks and citations omitted) (Report and Recommendation), *adopted,* 2005 WL 433285 (S.D.N.Y. Feb.23, 2005). Absent any appreciable injury, courts routinely dismiss claims of verbal harassment brought under Section 1983. *See, e.g., Felder v. Filion,* 368 F. App'x 253, 256 (2d Cir.2010) (verbal harassment did not violate Eighth Amendment where plaintiff did not present evidence of resulting injury); *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) ("allegations of verbal harassment are insufficient to base a [Section] 1983 claim if no specific injury is alleged"). Because Edwards does not allege any injury whatsoever, let alone one that could be considered "appreciable," Defendants' alleged threats, verbal harassment, or profane language do not give rise to constitutional violations and should therefore be dismissed.

**C. Denial of Required Telephone Calls**

Edwards alleges that since his incarceration began on January 23, 2008, he has not been provided with a free telephone call as required by the "DOC Telephone System." (Compl.¶ 46).[FN10] Edwards further alleges that he submitted a grievance on June 3, 2008 regarding his deprivation of free telephone calls. (*Id.*). However, "[p]hone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world." *Henry v. Davis,* No. 10 Civ. 7575(PAC)(JLC), 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) (citing cases) (Report and Recommendation), *adopted,* 2011 WL 5006831 (S.D.N.Y. Oct.20, 2011). Because inmates "have no right to unlimited telephone calls[,]" *Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1998) (citation omitted), Edwards must, but fails to, allege that he was stripped of alternate methods of communication to state a violation of his constitutional rights. *See, e.g., Paulino v. Menifee,* No. 00 Civ. 5719(RCC)(KNF), 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (refusing to issue injunction restoring phone privileges where inmate did not allege that alternate means of communication were inadequate). Edwards' claim regarding the denial of free telephone calls should therefore be dismissed.

FN10. In the context of his claim for the denial of free telephone calls, Edwards provides different dates for the start of his incarceration, stating January 23, 2008 in his Complaint and January 24, 2008 in an attached exhibit. (Compl. ¶ 46; Dkt. No. 2–3 at 4). These cited dates, however, appear to be inconsistent with the commencement of Edwards' incarceration, as his earliest allegation in this lawsuit takes place on July 25, 2007 while he was housed at the AMKC. (*Id.* ¶ III). In any event, regardless of whether Edwards has been denied free telephone calls since July 2007 or January 2008, his cause of action should be dismissed because he has failed to state an actionable claim.

**D. Deprivation of Access to Legal Services**

***6** Edwards alleges numerous deprivations of access to legal services by Defendants Campfield, Musmacher, and Smalls. As to Campfield, Edwards alleges that in March 2008 she denied him a legal manila envelope, lost his legal documents pertaining to the NDNY action, and denied him legal services. (Compl. ¶¶ 31, 36). As to Musmacher, Edwards asserts that she denied him legal services for more than a month around August 2008 and discriminated against him by providing legal services to Latino detainees when Edwards was "next ... on line" to receive such services. (*Id.* ¶¶ 56–57). As to Smalls, Edwards claims that she denied him extra time in the prison facility's law library in August 2008. (*Id.* ¶ 61). Each of these claims should be dismissed.

The Supreme Court has recognized that an inmate does not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Rather, a prison facility must ensure that its inmates have " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)). Accordingly, for a defendant's conduct to provide a basis for an inmate to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

invoke his right of access to the courts, it must cause "actual injury" or "materially prejudice[ ]" the inmate. *Salvatierra v. Connolly,* No. 09 Civ. 3722(SHS)(DF), 2010 WL 5480756, at *21 (S.D .N.Y. Sept. 1, 2010) (citations and quotation marks omitted) (Report and Recommendation), *adopted,* 2011 WL 9398 (S.D.N.Y. Jan.3, 2011).

Here, Edwards does not state sufficient facts to constitute any injury or material prejudice. He does not claim any injury suffered because of Defendants' alleged denials of legal services, legal supplies, extra time in the law library, or alleged discrimination in favor of Latino detainees. While he asserts that Campfield's losing his legal documents in connection with the NDNY action prevented him from "prosecuting" that action (Compl.¶ 36), he fails to provide any specifics as to his purported inability to prosecute. He does not elaborate on, for example, what documents he believes were lost and what actions he was prevented from taking in his litigation, which is especially relevant since Edwards appears to have participated in the NDNY lawsuit in some capacity, but failed to keep the court apprised of his mailing address. *See* *Selsky,* 2008 WL 190385, at *1–3. Accordingly, because Edwards has not identified any injury or material prejudice as a result of his alleged deprivation of access to legal services, these claims should be dismissed.

**E. Mail Tampering**

Edwards' mail tampering claims are based on allegations of interference with his outgoing non-legal mail and his incoming and outgoing legal mail at the EMTC and AMKC. Specifically, Edwards first alleges that on November 1, 2007 he wrote a letter to Michael Caruso at the DOC that was never sent from the EMTC. (Compl.¶ 16). Second, Edwards alleges that his "legal mail" addressed to Caruso never left the EMTC and was returned to him on November 27, 2007. ( *Id.* ¶ 27). Next, Edwards submitted a grievance on September 8, 2008 alleging that his "personal and legal mail" addressed to a co-defendant never left the AMKC because it was returned for insufficient postage despite being marked with a postage stamp. ( *Id.* ¶ 70). Edwards' fourth claim of mail tampering relates to the NDNY action. He asserts that Defendant Davis failed to forward his incoming legal mail to the correct address, despite Edwards' instruction for him to do so, and that as a result, his NDNY lawsuit was dismissed. ( *Id.* ¶ 47). Lastly, Edwards alludes to an allegation of tampering with his outgoing "legal and personal mail" against unnamed AMKC staff, which he documented in a November 18, 2008 grievance letter. ( *Id.* ¶ 94). None of these claims should withstand a motion to dismiss.

***7** Both legal and non-legal mail are protected by the First Amendment's "right to the free flow of incoming and outgoing mail." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "[A] prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Cancel v. Goord,* No. 00 Civ.2042(LMM), 2001 WL 303713, at *5 (S.D.N.Y. Mar.29, 2001) (citation omitted). In addition, "the Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.' " *Id.* (quoting *Thornburgh v. Abbott,* 490 U.S. 401, 413, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

With these principles in mind, Edwards' allegations as to outgoing non-legal mail-non-legal mail being afforded less protection than legal mail, *Davis,* 320 F.3d at 351–fail to state a claim because he does not assert that Defendants actually tampered with his mail, only that his mail never left the facility. Moreover, instead of establishing plausible mail tampering claims for his outgoing non-legal mail, Edwards' alleged facts make mail tampering an unlikely possibility. For example, Edwards' allegation that his November 1, 2007 letter to Michael Caruso never left the EMTC is based solely on the fact that Caruso never answered the letter. (Compl.¶ 16). Caruso's failure to respond to Edwards' letter, of course, does not necessarily suggest that it was never sent by EMTC staff. Absent any allegations that Defendants opened the letter, withheld it from being sent, or otherwise took any adverse action to make it plausible that EMTC staff tampered with Edwards' outgoing mail, Edwards' claim is merely speculative. Similarly, Edwards' allegation in his September 8, 2008 grievance that a letter to a co-defendant was returned to him for insufficient postage despite having a postage stamp does not suggest mail tampering, but rather that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Edwards had failed to affix sufficient postage. ( *Id.* ¶ 70). In any event, an isolated failure to mail an inmate's letter does not state a constitutional violation. *See, e.g., Battice v. Phillip,* No. 04 Civ. 669(FB)(LB), 2006 WL 2190565, at *6 (E.D.N.Y. Aug. 2, 2006) (defendant's failure to deliver plaintiff's mail, even if intentional, is "simply *de minimis* and therefore outside the ambit of constitutional protection") (citation and quotation marks omitted). Finally, Edwards' claim regarding mail tampering in November 2008 is devoid of any facts that could state a cause of action. (Compl.¶ 94).

As to Edwards' claims regarding interference with his incoming and outgoing legal mail, the Court notes that such interference "implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis,* 320 F.3d at 351. To survive a motion to dismiss, a plaintiff must allege that correction officers "regularly and unjustifiably" interfered with his mail, depriving him of his constitutional rights. *Shepherd v. Fisher,* No. 08 Civ. 9297(LTS)(RLE), 2011 WL 3278966, at *2 (S.D.N.Y. July 27, 2011) (citations and quotation marks omitted). To assert such a claim, a prisoner must allege that the defendant's actions (1) were "deliberate and malicious" and (2) "resulted in actual injury" to the plaintiff. *Cancel,* 2001 WL 303713, at *4 (quoted in *Davis,* 320 F.3d at 351). Actual injury exists where interference with legal mail results in "the dismissal of an otherwise meritorious legal claim." *Id.* However, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* at 352 (citations and quotation marks omitted).

***8** None of Edwards' claims of interference with his legal mail—both those related to incoming and outgoing mail—sufficiently states an actual injury. Edwards fails to allege that he suffered any injury in connection with DOC staff's alleged failure to send his outgoing legal mail on November 27, 2007, September 8, 2008, or November 18, 2008, assuming that Edwards' "legal mail" is in fact legal mail. (Compl.¶¶ 27, 70, 94). For the same reason, Edwards' claim pertaining to incoming mail from the NDNY does not state a constitutional violation. This claim is based on Defendant Davis' alleged failure to adhere to Edwards' request to have his mail sent to a forwarding address. For support, Edwards appears to rely on language in Judge Scullin's order that the magistrate judge's report and recommendation was returned to the Court marked "unable to forward." (Compl.¶ 47). The NDNY action, however, was not dismissed solely because certain documents were returned to the Court. Rather, the case was dismissed for Edwards' failure, for more than one year, to prosecute the action, which included his failure to keep the court and defendants apprised of his address, appear for a deposition, or pay a sanction, despite being aware of the pending litigation. *See Selsky,* 2008 WL 190385, at *1–3. Even if Davis had complied with Edwards' forwarding request, the court's decision to dismiss the complaint for Edwards' "repeated and ongoing failures to fulfill his obligations to notify the [c]ourt and counsel of his address and to cooperate in discovery" would likely have remained unchanged. *Id.* at *3. The alleged failure to forward did not, therefore, cause "the dismissal of an otherwise meritorious legal claim." *Cancel,* 2001 WL 303713, at *4 (citation omitted).

Moreover, Edwards does not plead that Defendants blocked his outgoing legal mail in connection with the NDNY action. Indeed, Edwards could not assert such an argument, since, as Judge Scullin noted, he had previously mailed documents to the court during the pendency of his lawsuit. *See Selsky,* 2008 WL 190385, at *1–2. Accordingly, Edwards cannot establish the requisite injury needed to state a cause of action for the deprivation of his constitutional right of access to the courts. Edwards' mail tampering claims should therefore be dismissed.

**F. Denial of Required Food Portions**

Edwards alleges that on several occasions Defendants Lagos, Lewis, and Richardson deprived him of required food portions, including "prescribed therapeutic diet 'soy milk' " on April 19, 2008 (Compl.¶ 38), a second chicken patty on or around May 2008 ( *Id.* ¶ 43), a "morning meal" on July 31, 2008 ( *Id.* ¶ 53), and an "afternoon meal" on or around October 2008. ( *Id.* ¶ 90). Each of these claims should be dismissed. The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.2d 12, 15 (2d Cir.1983) (per curiam) (quotation marks and citation omitted). Courts have found the Eighth Amendment to be implicated only where a prisoner's allegations involve a serious and continued deprivation of nutritionally adequate food. *See, e.g., Reeder v. Artus,* No. 09 Civ. 575(DNH)(DRH), 2010 WL 3636138, at *11 (N.D.N.Y. July 27, 2010) (seven out of twelve days without meals constituted sufficient deprivation to survive motion to dismiss) (Report and Recommendation), *adopted,* 2010 WL 3636132 (N.D.N.Y. Sept.9, 2010).

***9** Edwards does not allege that the alleged denials of food placed his health and well being in any immediate danger. *See, e.g., Martinez v. Lape,* No. 09 Civ. 0665(TJM)(RFT), 2011 WL 4527943, at *9 (N.D.N.Y. Mar. 28, 2011) (Report and Recommendation), *adopted,* 2011 WL 4528980 (N.D.N.Y. Sept.28, 2011) (no Eighth Amendment claim where inmate failed to allege how expired food and juice posed an immediate risk to health); *Bee v. Krupp,* No. 08 Civ. 10141(SHS)(KNF), 2009 WL 2981910, at *3 (S.D.N.Y. Sept. 15, 2009) ("visible globs of spit" in food did not violate Eighth Amendment). Nor do the allegations, which are alleged to have taken place on four separate dates over a span of six months, suggest that Edwards was in any danger. Accordingly, Edwards' claims regarding deprivation of meals should be dismissed.

**G. Unconstitutional Strip Search**

Edwards alleges that an unspecified officer subjected him to an "institutional" strip search on an unspecified date in violation of the Fourth Amendment. (Compl.¶ 13). Edwards argues that this strip search was unconstitutional because he was convicted of a misdemeanor and not a felony. (*Id.*). While the Fourth Amendment prohibits "unreasonable searches," *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (citation omitted), it is not unreasonable for prison officials to perform routine random strip searches on prison inmates. *See N.G. v. Connecticut,* 382 F.3d 225, 230–32 (2d Cir.2004). Edwards' reliance on the distinction between inmates convicted of misdemeanors and those convicted of felonies is misplaced, as that distinction is only relevant as to pre-trial detainees. *See Shain v. Ellison,* 356 F.3d 211, 214 (2d Cir.2004) ("clearly established Fourth Amendment precedent ... preclude[s] jails from strip searching misdemeanor arrestees absent a reasonable suspicion that weapons or other contraband were concealed"); *Walsh v. Franco,* 849 F.2d 66, 70 (2d Cir.1988) ("indiscriminate strip-searching of misdemeanor arrestees is unconstitutional"). Here, Edwards admits that he was convicted at the time of his strip search. (Compl.¶ 13). *See, e.g., Castro–Sanchez v. NY. State Dep't of Corr. Servs.,* No. 10 Civ. 8314(DLC), 2011 WL 6057837, at *8 (S.D.N.Y. Dec.6, 2011) (strip search claim dismissed because routine random searches of inmates are constitutional). Accordingly, Edwards' claim should be dismissed.

**H. Deprivation of Due Process Rights Within Prison's Disciplinary System**

Edwards alleges that he was denied certain rights during two disciplinary proceedings heard by Defendant Davis on September 30, 2008, which can be broadly construed as a claim asserting a deprivation of procedural due process under the Fourteenth Amendment. (Compl.¶¶ 86, 87b, 89, 95, 97–99). The disciplinary hearings appear to relate to Edwards' alleged violations of "numerous [ ] rules within the inmate misbehavior rule book" on September 20, 2008 and September 24, 2008. (*Id.* ¶¶ 86, 87). Edwards takes issue with several aspects of the disciplinary hearings, including that: (1) Davis found him guilty of the infraction without conducting an investigation into Edwards' claim that he never received a copy of the rule book ( *Id.* ¶ 86); (2) Davis failed to provide him with certain documentary evidence that "could have help [ed]" Edwards defend himself, including Edwards' "orange detention card," his "injury report," and a video tape of the alleged infraction (*Id.* ¶¶ 86, 87b); (3) no witnesses to Edwards' violations "endor[s]e[d]" the infraction against him ( *Id.* ¶ 87); and (4) Edwards never received responses to notices of appeal and letters submitted to Horn, Hourihan, Hunter, and Robinson regarding his fine and punitive segregation. (*Id.* ¶¶ 86, 87b, 89, 94–99). In addition, Edwards appears to challenge his resulting discipline, which included a $25.00 "surcharge" and 30 days of punitive segregation. (*Id.* ¶¶ 87, 87b).

***10** Edwards' cause of action for deprivation of his procedural due process rights fails because he does not allege sufficient facts to state an actionable claim. "In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation and quotation marks omitted). Prisoners subject to disciplinary proceedings can show a liberty interest only where "an institution's disciplinary decision results in an 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' " *Luna v. Pico,* 356 F.3d 481, 487 n. 3 (2d Cir.2004) (quoting *Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). In determining whether an inmate endured atypical and significant hardship during punitive segregation, the Second Circuit instructs courts to consider both the duration and conditions of the confinement. *See Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) ("[f]actors relevant to determining" whether inmate endured atypical hardship include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation imposed compared to discretionary confinement") (quotation marks and citation omitted).

The Second Circuit has expressly declined to provide a bright-line rule as to what length of time in punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined. *See id.* Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." *Bunting v. Nagy,* 452 F.Supp.2d 447, 456 (S.D.N.Y.2006) (quoting *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)); *Colon v. Howard.* 215 F.3d 227, 231 (2d Cir.2000). By contrast, 305 days or more of confinement has been deemed an atypical and a significant hardship. *Id.* at 231–32. Even if an inmate is segregated for fewer than 101 days, a violation of his liberty interest may be implicated if "the conditions were more severe than the normal [punitive segregation] conditions ... or a more fully developed record showed that even relatively brief confinements under normal [punitive segregation] conditions were, in fact, atypical." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (quoting *Palmer,* 364 F.3d at 65); *see also Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004). Indeed, " 'the conditions of confinement are a distinct and equally important consideration' in determining whether the prisoner has suffered a due process violation." *Sales v. Barizone,* No. 03 Civ. 6691(RJH), 2004 WL 2781752, at *6 (S.D.N.Y. Dec.2, 2004) (quoting *Palmer,* 364 F.3d at 64–65).

Here, Edwards claims that he was confined to punitive segregation for 30 days. Several courts have concluded that, absent unusual conditions, 30 days of segregation is not an atypical or significant hardship under *Sandin. See, e.g., Sandin,* 515 U.S. at 486 (30 days' disciplinary segregation not atypical and significant hardship); *Duncan v. Keane,* No. 95 Civ. 1090(SHS), 1997 WL 328070, at *2 (S.D.N.Y. June 13, 1997) (30 days in keeplock not atypical or significant hardship) (citation omitted); *Harris v. Keane,* 962 F.Supp. 397, 404 (S.D.N.Y.1997) (23 days in keeplock not atypical or significant hardship as "[t]he Second Circuit's post-*Sandin* decisions are unanimous that keeplock of 60 days or less in New York prisons is not an atypical hardship") (quotation marks and citations omitted); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1108 (S.D.N.Y.1995) (60 days in confinement does not implicate liberty interest). Given the duration of his segregation and Edwards' failure to allege that the conditions of his confinement were atypical and significant, Edwards' punishment does not implicate a liberty interest. Similarly, Edwards' $25.00 "surcharge" was not an atypical hardship. *See, e.g., Byrd v. Cornell Corr., Inc,* 60 F. App'x 191, 193–94 (10th Cir.2003) ( $50 fine and 30 days' segregation not atypical and significant hardship). Thus, neither Edwards' punitive segregation nor his $25 fine implicates the requisite liberty interest to state a due process claim.[FN11] Because of the absence of any protected liberty interest—and because Edwards' allegations cannot be construed to allege a protected property interest—any failures by the hearing officer to conduct a thorough investigation of Edwards' claims, including the provision of certain documentary evidence and witnesses, do not support a cause of action for the denial of due process. *See, e.g., Torres v. Mazzuca,* 246 F.Supp.2d 334, 341–42 (S.D.N.Y.2003) (inmate cannot claim due process violations at hearing where 12–day disciplinary confinement did not implicate protected liberty interest). Edwards' procedural due process claims should therefore be dismissed.

FN11. Edwards also alleges a claim for the deprivation of his procedural due process rights in connection with a September 24, 2008 disciplinary hearing. This claim fails because

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Edwards cannot establish the requisite liberty interest, as he does not allege that he was subject to any discipline as a result of Davis' finding him guilty on September 24, 2008. (Compl.¶ 86).

Even if Edwards had alleged disciplinary confinement resulting from the September 28 hearing, and assuming that that confinement implicated a liberty interest under the Fourteenth Amendment, Edwards still cannot state a claim for deprivation of due process. Citing to the Notice of Disciplinary Disposition Form # 6500D attached to the Complaint (Dkt. No. 2–7 at 1), Edwards alleges that he was "never called down" for the hearing and that the hearing officer, Defendant Davis, was biased in favor of finding him guilty of the underlying infraction. (Compl.¶ 86). While an inmate "has a right to a fair and impartial hearing officer [,]" *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citation omitted), and one who "does not prejudge the evidence[,]" *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990), Edwards fails to plead any specific facts, beyond his conclusory allegation of bias, to suggest that Davis was predisposed to finding him guilty. Moreover, despite Edwards' claim that he was never called down for a disciplinary hearing, Edwards' signature appears next to a notation on the Form # 6500D that the hearing was adjourned by Edwards himself.

**I. Excessive Force and Denial of Required Medical Treatment**

***11** Edwards asserts two allegations of physical injury, which the Court construes as excessive force claims, and a related allegation that he was denied medical treatment. (Compl.¶¶ 91, 91b). Edwards asserts that on November 1, 2008, Defendant Grima hit him in the head with a "pushdraw" and then refused Edwards' request for medical treatment. (*Id.* ¶ 91). He also argues that Grima inflicted "personal physical harm" upon him after Grima pressed the "emergency personal alarm device." (*Id.* ¶ 91b). Neither of these claims should survive Defendants' motion to dismiss.

The constitutional basis for Edwards' excessive force and deliberate indifference to medical needs claims is the Eighth Amendment's ban on cruel and unusual punishment. *See* *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (per curiam). Any actionable claim under the Eighth Amendment consists of a subjective component, which focuses on the defendant's motive for his conduct, and an objective component, which focuses on the conduct's effect. *See, e.g., Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). The subjective component "requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness ..." *Id.* (citations and quotation marks omitted). In the excessive force context, this means "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). In the medical needs context, the defendant must act with a "sufficiently culpable state of mind[,]" *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), which means that he must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment's objective component "focuses on the harm done, in light of contemporary standards of decency" and whether "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Wright,* 554 F.3d at 268 (citations and quotation marks omitted). For deliberate indifference claims, "the alleged deprivation must be sufficiently serious ... that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citations and quotation marks omitted).

Edwards' allegations of excessive force and denial of medical treatment fail to meet either the subjective or objective components under the Eighth Amendment. Both claims of excessive force are devoid of any specific information regarding the extent of a temporary or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

permanent injury, if any, and the level of pain that Edwards endured. The entirety of Edwards' first allegation of excessive force is that Grima "hit [him] in [the] head with the pushdraw that's part of the officers [sic] station" (Compl.¶ 91), which falls far short of what is needed to state a claim of excessive force. As to his second allegation, Edwards states only that Grima "caused [him] personal physical harm" after Grima pressed his "emergency personal alarm device[,]" but he fails to elaborate on what exactly Grima did, how and where it harmed Edwards, and what injury Edwards suffered. (*Id.* ¶ 91b). Edwards' medical treatment claims are similarly deficient, as he alleges only that Grima "said 'no' " after Edwards requested medical assistance and then sent Edwards away to pack up his belongings. (*Id.* ¶ 91). These allegations do not shed light on whether any injury that Edwards suffered was sufficiently serious to warrant medical attention, whether Grima knew of and disregarded an excessive risk to Edwards' health, or even whether there was any risk to Edwards' health. Accordingly, Edwards has failed to state claims for excessive force and denial of medical treatment, and those claims should be dismissed.

**J. Deprivation of Access to Prison Grievance System**

***12** Throughout the Complaint, Edwards claims that he submitted several grievance letters and complaints to numerous Defendants, who he alleges denied, ignored, never answered, and/or improperly processed his grievances on various dates from July 2007 through February 2009. (Compl.¶¶ 1–15, 17–20, 21–33, 36–39, 41–45, 48–51, 54–85, 88, 90, 91b, 92–94, 96). As one example, Edwards states that on September 18, 2007, he wrote a complaint letter to Defendant Horn about Defendant Rosa's use of her cellular phone while on duty, which caused a "security breach." (*Id.* ¶ 7). Edwards alleges that he was denied access to the grievance system because Defendant Mulvena failed to file that grievance (or any of his other grievances) and Defendant Horn did not follow up regarding the complaint. (*Id.*).

While a plaintiff has a right "to meaningful access to the court and to petition the government for the redress of grievances" under the First Amendment, *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (citation omitted), the failure to process a grievance does not rise to the level of a constitutional violation. *See, e.g., id.* at 370 ("inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable [Section] 1983 claim") (citation omitted); *Torres,* 246 F.Supp.2d at 342 ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment.") (citations omitted); *Cancel,* 2001 WL 303713, at *3–4 (violation of grievance procedures does not give rise to claim under First Amendment). Courts regularly dismiss claims brought to remedy alleged violations of inmate grievance procedures. *See, e.g., id.; Muhammad v. McMickens,* No. 86 Civ. 7376(SWK), 1988 WL 7789, at *3 (S.D.N.Y. Jan.25, 1998). Accordingly, because Edwards' claims for alleged violations of the inmate grievance process have no constitutional basis, those claims should be dismissed.[FN12]

FN12. Related to the allegations about the grievance system, Defendants also assert that Edwards' failure to allege personal involvement for Defendants Bailey (*Id.* ¶¶ 37, 41, 48, 52), Caruso (*Id.* ¶¶ 16, 27), Cattafesta ( *Id.* ¶ 80), Davis (*Id.* ¶¶ 13, 26, 47), Hill ( *Id.* ¶ 63), Horn (Compl.¶¶ 7, 9, 10, 12, 14–16, 21, 23, 25, 28, 29, 32–35, 39, 41–43, 45, 52, 59, 79, 97), Hourihan (*Id.* ¶¶ 50, 61, 66, 68, 77, 95, 98), Powell (*Id.* ¶¶ 57, 78), and Riordan ( *Id.* ¶ 6) provide an independent basis for dismissal. (Def. Mem. at 14–16). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation and quotation marks omitted). An official's failure to respond to a prisoner's letter of protest and request for an investigation, as Edwards is alleging in his Complaint, "is insufficient to hold that official liable for the alleged violations." *Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (citation and quotation marks omitted). Accordingly, Edwards' claims against these Defendants should be dismissed on this ground as well.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**K. Retaliation**

Edwards alleges that on 17 separate occasions between July 2007 and November 2008, Defendants Campfield, Grima, Hannah, Holmes, John Doe # 1, John Doe # 2, Lagos, Lee, Maynard, Polak, Richardson, Rosa, Shaw, Smalls, and Sumpter retaliated against him in response to his submitting, or informing Defendants that he intended to submit, grievance letters. Edwards' allegations of retaliation include the use of verbal threats or harassment, issuance of infractions, transfers between prison facilities, denials of meals, loss of legal documents, and termination from part-time employment he had while on Rikers Island.

To prove a First Amendment retaliation claim under Section 1983, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). For a retaliation claim to survive a motion to dismiss, it must be "supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (citation and quotation marks omitted). An "unsupported, speculative, and conclusory" allegation of retaliatory conduct may be dismissed on the pleadings. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citations and quotation marks omitted).

***13** In reviewing Edwards' retaliation claims, the Court is mindful that "[v]irtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). Indeed, while the "First Amendment protects prisoners from retaliation for filing grievances[,]" *Quezada v. Ercole,* No. 09 Civ. 2832(DLC), 2011 WL 3251811, at *5 (S.D.N.Y. Jul.29, 2011) (citations omitted), the Court recognizes "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 13). Moreover, courts should carefully scrutinize an inmate's claims of retaliation because such allegations "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Hodges v. Wright,* No. 10 Civ. 0531(GLS)(GHL), 2011 WL 5554866, at *9 (N.D.N.Y. Sept. 29, 2011) (quoting *Dawes,* 239 F.3d at 491) (citations omitted) (Report and Recommendation), *adopted,* 2011 WL 5554880 (N.D.N.Y. Nov.15, 2011). Therefore, courts reviewing an inmate's retaliation claims should do so "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted).

Edwards' allegations, in chronological order, are as follows: (1) in retaliation for submitting a grievance against Defendant Morales on July 25, 2007, Morales called Edwards' housing unit on August 1, 2007 and informed other officers that Edwards had a visitor, when in fact he did not, which caused him to wait in the inmate visitor process area for two hours (*Id.* ¶¶ 2, 4); (2) in retaliation for an incident where Defendant Hannah said she was made to apologize to Edwards for "making fun of [his] phsical [sic] disability/and deformity[,]" Hannah threatened Edwards on September 5, 2007 by saying "I'm going to get you back for that" ( *Id.* ¶ 6); (3) in retaliation for filing a grievance against Defendant Rosa on September 18, 2007, Rosa fired Edwards from his job as a Suicide Prevention Aide and issued an infraction against him on October 31, 2007 (*Id.* ¶¶ 14–16); (4) on or around November 1, 2007, after Edwards informed Defendant Holmes that he intended to submit a grievance against her, Holmes caused Edwards to be transferred to another housing facility ( *Id.* ¶ 17); (5) in retaliation for filing a grievance against Holmes on November 2, 2007, Holmes came to Edwards' housing unit and verbally abused him by "ridicul[ing] and mak[ing] fun of [his] physical disability and deformity" ( *Id.* ¶ 19); (6) on or around November 15, 2007, in retaliation for filing a grievance against Rosa, Rosa informed John Doe officers that Edwards "like[s] to utilize the grievance mechanism against staff [,]" subsequent to which Edwards was subjected to an unauthorized transfer from "6–Lower" to "7–Lower" in the EMTC ( *Id.* ¶ 20); (7) on or around November 25, 2007, in retaliation for Edwards' filing a grievance against Rosa, Defendants Hernandez and Smith retaliated against Edwards by informing another inmate that Edwards was a "snitch," which "cause[d] [Edwards] physical harm by

other inmate's [sic] within [the] housing unit" (*Id.* ¶¶ 24, 26); (8) in retaliation for submitting a grievance against Defendants Campfield and Reyes on or around March 22, 2008, Defendant Shaw had Edwards transferred out of the GRVC on March 25, 2008 ( *Id.* ¶ 34); (9) on or around April 1, 2008, in retaliation for submitting a grievance against her, Campfield intentionally lost Edwards' legal documents relating to the NDNY action ( *Id.* ¶ 36); (10) after filing a grievance on June 27, 2008, Edwards was transferred out of the GMDC that same day, which he says was approved by Defendant Bailey (*Id.* ¶¶ 48, 52); (11) after Edwards informed Defendant Richardson that he planned to file a grievance against her because she refused to turn off the lights in his jail cell on July 30, 2008, Richardson retaliated by denying Edwards his "morning meal" on July 31, 2008 ( *Id.* ¶ 53); (12) in retaliation for filing a grievance against him, Richardson put a "hit out" by offering 20 boxes of Frosted Flakes cereal to any inmate that physically assaulted Edwards, for which Edwards filed a grievance on August 7, 2008 ( *Id.* ¶ 55); (13) on August 18, 2008, in retaliation for informing a supervisor that Defendant Smalls was "only providing certain detainees with options on the hour every hour" in the law library, Smalls verbally abused Edwards (*Id.* ¶ 61); (14) on or around August 25, 2008, in retaliation for Edwards' use of the grievance mechanism against her, Defendant Smalls retaliated against Edwards through verbal abuse, threatening to have Edwards transferred, and informing other inmates that Edwards uses the grievance process ( *Id.* ¶ 66); (15) on or around September 24, 2008, in retaliation for filing numerous grievances against them, Defendants Maynard and Musmacher conspired to retaliate against Edwards by threatening physical violence and issuing an infraction, which resulted in a disciplinary hearing on September 30, 2008 (*Id.* ¶¶ 83, 87, 87b); (16) after Edwards informed Defendant Lagos on October 17, 2008 that he planned to file a grievance against her because of alleged racial discrimination, Lagos retaliated by denying Edwards his "afternoon meal" on October 18, 2008 ( *Id.* ¶ 90); and (17) after Edwards informed Defendant Grima that he intended to submit a grievance about his alleged physical assault with a "pushdraw" on November 1, 2008, Grima retaliated by threatening physical harm, pressing his "emergency personal alarm device," issuing an infraction, and causing Edwards to be transferred to a new housing unit (*Id.* ¶¶ 91, 91b).

**1. Protected Activity**

***14** It is well-established that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances" and is therefore actionable under Section 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (citation omitted); *see, e.g., Mateo v. Fischer,* 682 F.Supp.2d 423, 433–34 (S.D.N.Y.2010) (filing of a grievance is a protected activity). However, expressing an intent to engage in a constitutionally protected activity—in this case, filing a grievance—is not protected activity. *See Henry v. Dinelle,* No. 09 Civ. 0456(GTS)(DEP), 2011 WL 5975027, at *7 n. 12 (citing cases) & n. 13 (N.D.N.Y. Nov. 29, 2011) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.") (citing *McKinnie v. Heisz,* No. 09 Civ. 0188(BBC), 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009)). In light of these principles, Edwards' allegations of retaliation in response to his submitting grievance letters constitute protected activities. However, Edwards' allegations of retaliatory conduct arising from his expressing an intent to file a grievance—those allegations occurring on or about November 1, 2007 (Compl.¶ 17), July 31, 2008 ( *Id.* ¶ 53), October 18, 2008 ( *Id.* ¶ 90), and November 1, 2008 (*Id.* ¶¶ 91, 91b)-are not protected activities and therefore cannot form the basis of a claim for retaliation.[FN13]

FN13. Moreover, of the four allegations of retaliation that are not based on protected activities, two cannot be considered adverse actions-concerning Defendant Richardson on July 31, 2008 (Compl.¶ 53) and Defendant Lagos on October 18, 2008 ( *Id.* ¶ 90)-because both of these allege that these Defendants retaliated against Edwards by denying him a meal. The denial of meals on two occasions, separated by more than three months, is *de minimis* and not actionable. *See, e.g., Snyder v. McGinnis,* No. 03 Civ. 0902E (WMS), 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (denial of food to plaintiff two times would not chill First Amendment activity).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**2. Adverse Actions**

Having determined that four of Edwards' allegations of retaliation fail because he was not engaged in a constitutionally protected activity, the Court now considers whether the remaining 13 allegations meet the adverse action requirement. "[I]n the prison context [the Second Circuit has] defined 'adverse action' objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (citations and quotation marks omitted). An inmate can meet this requirement by "alleging a serious injury that is independent of a possible First Amendment chill, or by alleging that he has been chilled from engaging in the First Amendment activities that triggered the retaliation." *Smith v. Maypes–Rhynders,* No. 07 Civ. 11241(PAC)(MHD), 2009 WL 874439, at *4 (S.D.N.Y. Mar. 31, 2009). "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493 (citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. In applying this objective test to determine whether conduct is *de minimis,* the Court must consider that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (citation and quotation marks omitted).

**a. Retaliatory Verbal Abuse**

***15** Several of Edwards' allegations of retaliation are based on verbal harassment, abuse, or threats. (*See* Compl. ¶¶ 2, 4, 6 ("I'm going to get you back for that."), 19, 24 (calling Edwards a "snitch"), 26, 55 (putting a "hit out" on Edwards to any inmate that "fucks Edwards up"), 61 (calling Edwards a "crackhead" and "one arm faggot"), 66). While "some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action[,]" *Mateo,* 682 F.Supp.2d at 434 (citations omitted), "[n]on-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cnty. Jail,* No. 10 Civ. 3937(DLC), 2012 WL 86467, at *7 (S.D.N.Y. Jan.11, 2012). "[V]erbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered." *Hofelich v. Ercole,* No. 06 Civ. 13697(PKC), 2010 WL 1459740, at *2 (S.D.N.Y. Apr.8, 2010) (citation and quotation marks omitted).

Here, Edwards' claims of retaliatory verbal abuse do not include any allegations of harm, nor are they alleged with any specificity to suggest that they would deter others from exercising their constitutional rights. Several of his claims allege only that Edwards was forced to endure verbal abuse, but do not explain what was said and why that abuse was in any way adverse. And where Edwards has detailed the nature of the verbal abuse, his allegations are either *de minimis*—for example, in the case of being told he had a visitor when he in fact did not—amount to name-calling, or are insufficiently direct or specific to be adverse. *See, e.g., Dawes,* 239 F.3d at 492–93 (referring to plaintiff as an "informant" and "rat" in presence of other inmates not an adverse action); *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir.2000) (referring to transsexual inmate as "he/she" was "rudeness and name-calling" but not a constitutional violation); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) (name-calling, without any appreciable injury, not a constitutional violation); *Kemp v. LeClaire,* No. 03 Civ. 844S (WMS), 2007 WL 776416, at *15 (W.D.N.Y. Mar.12, 2007) (threats of "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" not adverse actions); *Battice,* 2006 WL 2190565, at *6–7 (defendant's making fun of plaintiff's disability does not constitute adverse action). Accordingly, Edwards' charges of retaliation that allege only retaliatory verbal abuse—on August 1, 2007 (Compl.¶¶ 2, 4), September 5, 2007 ( *Id.* ¶ 6), November 2, 2007 ( *Id.* ¶ 19), November 25, 2007 (*Id.* ¶¶ 24, 26), August 7, 2008 (*Id* . ¶ 55), August 18, 2008 ( *Id.* ¶ 61), and August 25, 2008 ( *Id.* ¶ 66)—should be dismissed.

**b. Retaliatory Loss of Legal Documents**

***16** Courts have held that theft, confiscation, or destruction of an inmate's legal documents may constitute an adverse action. *See, e .g., Smith,* 2009 WL 874439, at *5 (theft of legal papers is adverse action). However, "mere delays in the transfer of [an inmate's] legal papers, even if motivated by retaliation, is not the type of adverse

action required to support a retaliation claim." *Ford v. Fischer,* No. 09 Civ. 723(DNH)(ATB), 2011 WL 856416, at *8 (N.D.N.Y. Jan. 31, 2011); *see, e.g., Rivera v. Pataki,* No. 04 Civ. 1286(MBM), 2005 WL 407710, at *19 (S.D.N.Y. Feb.7, 2005) (several temporary incidents of interference with plaintiff's legal documents not an adverse action). Here, because Edwards has pled an injury in connection with this allegation—Defendant Campfield's allegedly retaliatory loss of his legal documents prevented him from prosecuting the NDNY action (Compl.¶ 36), which was subsequently dismissed for failure to prosecute, *see Selsky,* 2008 WL 190385, at *1—it contains sufficient facts to constitute an adverse action.

**c. Retaliatory Filing of Infractions**

Edwards alleges that Defendants Maynard, Musmacher, and Rosa issued false infractions against him on or about October 31, 2007 (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18) and September 24, 2008 (*Id.* ¶¶ 83, 87, 87b) in retaliation for filing grievances. While an "inmate has no general constitutional right to be free from being falsely accused in a misbehavior report[,]" *Boddie,* 105 F.3d at 862, a misbehavior report issued in retaliation for an inmate's exercise of a protected activity may constitute an adverse action. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under [Section] 1983.") (citation omitted); *see, e. g., Gill,* 389 F.3d at 384 (false misbehavior report and placement in keeplock constitutes adverse action); *Mateo,* 682 F.Supp.2d at 434 (false misbehavior report constitutes adverse action). Accordingly, Edwards' allegations that these Defendants filed false retaliatory infractions against him are sufficient to plead an adverse action.

**d. Retaliatory Transfers**

Edwards' allegations that Defendants Bailey, Bethacourt, Hannah, John Doe # 1, John Doe # 2, Rosa, and Shaw transferred Edwards between prison facilities in retaliation for submitting grievances are also sufficient to establish an adverse action at the motion to dismiss stage. (*See* Compl. ¶¶ 20, 34, 48, 52). While a "prisoner has no liberty interest in remaining at a particular correctional facility ... prison authorities may not transfer [him] in retaliation for the exercise of constitutionally protected rights." *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (citations omitted); *see, e.g., Soto v. Iacavino,* No. 01 Civ. 5850(JSM), 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003) (prison housing transfer is adverse action for retaliation claim).

**e. Retaliatory Termination**

***17** Finally, Edwards' allegation that Defendant Rosa fired him from his position as a Suicide Prevention Aide states sufficient facts to constitute an adverse action. (Compl. ¶¶ 14–16; Dkt. No. 2–6 at 18). "[A] claim for relief may be stated under [S]ection 1983 if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (citation omitted). More specifically, an inmate can bring a claim under Section 1983 for termination of employment in retaliation for his exercise of constitutionally protected rights. *See, e.g., Baker v. Zlochowon,* 741 F.Supp. 436, 439 (S.D.N.Y.1990). The termination of Edwards' job, if found to be retaliatory, could serve to "chill a person of ordinary firmness from continuing to engage" in a protected activity. *Thaddeus–X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999) (quoted in *Davis,* 320 F.3d at 353).

**3. Causal Connection**

Of his six allegations of retaliation that meet the adverse action requirement—those dated October 31, 2007, November 15, 2007, March 25, 2008, April 1, 2008, June 27, 2008, and September 24, 2008—all but one should be dismissed. Edwards has not alleged any facts, as he must, that his filing of grievances was a "substantial or motivating factor" for Defendants' actions. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted). In addressing the causal connection requirement, a court may consider: (1) the temporal proximity between the protected conduct and the alleged retaliatory act, (2) the inmate's prior disciplinary record, (3) vindication at a hearing on the matter, and (4) any statements by the defendants regarding their motives. *See Colon,* 58 F.3d at 872–73. However, "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty,* 713 F.2d at 13.

With the exception of his claim arising on October 31, 2007, Edwards' allegations of retaliation are wholly conclusory. Edwards does not set forth any specific facts,

other than his repeated use of the word "retaliation," to support his suspicion of retaliation or to suggest that Defendants were motivated in any way by Edwards' filing grievance letters. On several occasions, Edwards appears to rely on the mere fact that the purported adverse actions took place after he filed a grievance. To infer causation from the very fact that one activity preceded another, however, is insufficient here to adequately plead retaliatory intent. Temporal proximity may serve as circumstantial evidence of retaliation, *see, e.g., Colon,* 58 F.3d at 872, and the Second Circuit has found that such proximity can establish causality. *See Espinal v. Goord,* 558 F.3d 119, 129–30 (2d Cir.2009) (causal connection present where six months passed between protected activity and retaliatory beating); but see *Sloane v. Mazzuca,* No. 04 Civ. 8266(KMK), 2006 WL 3096031, at *14 (S.D.N.Y. Oct.31, 2006) (temporal proximity insufficient by itself to prove causation) (citations omitted); *Nunez v. Goord,* 172 F.Supp.2d 417, 431–32 (S.D.N.Y.2001) (same). But in this case, Edwards' reliance on temporal proximity does not make his claims plausible, as he fails to differentiate between his seemingly innumerable grievances or provide specific factual allegations, including but not limited to concrete dates, that might demonstrate any nexus between a specific grievance and a specific adverse action. *See, e.g., Andino v. Fischer,* 698 F.Supp.2d 362, 385 (S.D.N.Y.2010) (proximity between complaints and adverse actions the result of large number of grievances in short period of time).

***18** In addition to Edwards' failure to plead any facts suggesting retaliation, the facts that Edwards chose to include in the Complaint suggest a relationship between protected activity and adverse action that is too attenuated to plausibly constitute causation. For example, Edwards theorizes that on November 15, 2007 he was transferred by Defendant John Doe # 2 in retaliation for filing a grievance against Rosa, after Rosa informed John Doe # 1, who then informed John Doe # 2, of Edwards' use of the grievance mechanism. (Compl.¶ 20). However, absent any additional information, such as corroborating statements from other officers or inmates, it is simply not plausible to impute a retaliatory motive to John Doe # 2 by way of John Doe # 1 and Rosa. Edwards' allegations of March 25, 2008 suffer the same deficiency, as he aims to pin a retaliatory motive not on the target of his protected activity, but on an entirely different Defendant. ( *Id.* ¶ 34). Apart from any apparent temporal proximity, therefore, Edwards' allegations are wholly conclusory and should be dismissed. *See, e .g., Sioleski v. McGrain,* No. 10 Civ. 0665S (WMS), 2012 WL 32423, at *4 (W.D.N.Y. Jan.5, 2012); *Douglas v. Smith,* No. 05 Civ. 1000(LEK)(DRH), 2008 WL 434605, at *15 (N.D.N.Y. Feb. 14, 2008).

By contrast, Edwards is able to state an actionable claim of retaliatory termination against Rosa based on his allegations of October 31, 2007. Edwards states that on September 18, 2007, he submitted a grievance letter regarding Defendant Rosa's alleged use of her personal cell phone while on duty, which Edwards contends is a "security breach." (Compl.¶ 7). Then, on October 31, 2007, while he was working as a Suicide Prevention Aide, Edwards alleges that Rosa stated, "Watch your mouth boy before I write you. You like writing anyway." (Dkt. No. 2–6 at 18). Edwards asked another officer for a grievance form, intending to submit another grievance against Rosa, at which point Rosa stated: "What lies are you going to write on me now stupid nigger. The cellphone lie didn't work nigger. All you are nigger is a snitch don't worry, you're going to get yours. I'm going to make sure you get fuck up nigger." (*Id.*). Moments later, Rosa returned and asked for Edwards' identification card, stating, "I'm writing you up nigger. Two can play that game and also nigger you're fired. Morales get this nigger out of here now." (*Id.*).

These statements clearly suggest a retaliatory animus. *See, e.g., Baskerville v. Blot,* 224 F.Supp.2d 723, 732–33 (S.D.N.Y.2002) (defendant's comments during assault point to retaliatory animus). In mentioning the "cellphone lie," which likely refers to Edwards' September 18 grievance about Rosa's use of her personal cell phone, Rosa's comments establish a clear causal link between Edwards' protected activity and Rosa's decision to terminate Edwards from his job and issue an infraction against him. *See, e.g., Headley v. Fisher,* No. 06 Civ. 6331(PAC)(KNF), 2008 WL 1990771, at *18 (S.D.N.Y. May 7, 2008) (causal connection exists where officer referred to protected activity during retaliatory assault). Accordingly, Edwards has stated a plausible claim of retaliatory termination against Rosa, and Defendants'

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

motion to dismiss that claim should be denied.

**L. Conspiracy**

***19** Edwards alleges four conspiracy claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, specifically that (1) on October 31 and November 1, 2007, Rosa and Polak conspired to fire Edwards from his job as a Suicide Prevention Aide and issue an infraction against him (Compl.¶¶ 14–16); (2) as described in a complaint letter dated July 10, 2008, Defendant Johnson conspired with "the security staff to violate Edwards" constitutional rights by not filing his grievances ( *Id.* ¶ 50); (3) as described in a complaint letter dated August 28, 2008, Defendants Johnson and Sumpter conspired to deny Edwards access to the prison's grievance system ( *Id.* ¶ 69); and (4) as described in a September 24, 2008 grievance letter, Defendants Maynard and Musmacher conspired to issue threats of physical violence and submit a false infraction against Edwards. (*Id.* ¶ 83).

**1. Conspiracy Under Section 1983**

To state a conspiracy claim under Section 1983, a plaintiff must show "(1) an agreement between [two or more state actors or] a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). "[A] plaintiff must show that defendants acted in a willful manner, culminating in an agreement, understanding, or meeting of the minds, that violated [his] rights, privileges or immunities secured by the Constitution or federal courts." *Bussev v. Phillips,* 419 F.Supp.2d 569, 586–87 (S.D.N.Y.2006) (quotation marks and citations omitted). "[C]omplaints containing only conclusory, vague, or general allegations [of conspiracy] ... are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello,* 292 F.3d at 325 (citation and quotation marks omitted). Finally, "[a] violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (citation omitted). If a plaintiff fails to show an underlying constitutional violation on which to base a Section 1983 conspiracy claim, the conspiracy claim fails as a matter of law. *See, e.g., AK Tournament Play, Inc. v. Town of Wallkill,* No. 09 Civ. 10579(LAP), 2011 WL 197216, at *3–4 (S.D.N.Y. Jan.19, 2011), *aff'd,* 444 F. App'x 475 (2d Cir.2011).

Each of Edwards' conspiracy claims should be dismissed because he has failed to state any underlying constitutional violations, with the exception of his retaliatory termination claim against Rosa. Moreover, even if the Court were to find that Edwards could state plausible constitutional claims as a predicate for conspiracy, he fails to state any non-conclusory allegations pertaining to the existence of a conspiracy, a meeting of the minds to support a conspiracy claim, or any overt acts which would suggest the existence of a conspiracy. Edwards' statements that certain Defendants "conspired" with others is not, by itself, sufficient to state an actionable claim for conspiracy. *See Nealy v. Berger,* No. 08 Civ. 1322(JFB)(AKT), 2009 WL 704804, at *5 (E.D.N.Y. Mar. 16, 2009) ("The mere use of the term 'conspiracy' ... is clearly insufficient to satisfy Rule 12(b)(6) in connection with a Section 1983 conspiracy claim.") (citation omitted). The only claim for which Edwards alleges any facts is that Rosa and Polak conspired to retaliate against him. However, the statements that he attributes to Polak—"my girl said you are fired" and "you are not getting your job back" (Compl.¶ 15)—do not suggest any understanding, agreement, or meeting of the minds between these two Defendants. Polak's reinforcement of Rosa's decision to fire Edwards, at best, suggests only that Polak sided with Rosa's decision, but it is not sufficient to state a conspiracy claim. Absent any actionable allegations of a conspiratorial understanding between Polak and Rosa, Edwards' conspiracy claims fail.

**2. Conspiracy Under Section 1985**

***20** 42 U.S.C. § 1985(2) and (3) also provide relief for claims of conspiracy. To plead a claim under Section 1985(2), a plaintiff must show "(1) a conspiracy (2) for the purpose of impeding, hindering, obstructing, or defeating, in any manner, (3) the due course of justice in any State or Territory, (4) with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." *Rodriguez v. City of New York,* No. 05 Civ.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

10682(PKC) (FM), 2008 WL 4410089, at *15 (S.D.N.Y. Sept. 25, 2008) (citing 42 U .S.C. § 1985(2)). The elements of a claim under Section 1985(3) are: " '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ...; (3) an act in furtherance of the conspiracy; (4) whereby a person is ... deprived of any right of a citizen of the United States.' " *Id.* (quoting *Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000)).

As with Section 1983 conspiracy claims, Section 1985 claims require a showing of an underlying constitutional violation. *See, e.g., Okoh v. Sullivan,* No. 10 Civ. 2547(SAS), 2011 WL 672420, at *4 (S.D.N.Y. Feb.24, 2011), *aff'd,* 441 F. App'x 813 (2d Cir.2011); *Bishop v. Best Buy, Co.,* No. 08 Civ. 8427(LBS), 2010 WL 4159566, at *13 (S.D.N.Y. Oct.13, 2010). Because Edwards has not set forth sufficient facts to state any constitutional violations, with the exception of his retaliatory termination claim against Rosa, his Section 1985 claims should be dismissed as well. Even if the Court were to find any underlying constitutional violations, including the surviving retaliation claim, the Section 1985 claims should be dismissed because Edwards has failed to allege any facts, as he must, that Defendants' conspiracies were motivated not by any personal malice of the conspirators toward him, but rather by " 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' animus.' " *United Bhd. of Carpenters, Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (citation omitted); *accord Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993) (per curiam); *Okoh,* 2011 WL 672420, at *6.

**3. Conspiracy Under Section 1986**

To state a claim under Section 1986, a plaintiff must state a valid claim under Section 1985. "Section 1986 imposes liability on individuals who have knowledge of a conspiracy under [Section] 1985, but fail to take action to prevent them." *Jenkins v. N.Y. City Dep't of Educ.,* No. 10 Civ. 6159(BSJ)(THK), 2011 WL 5451711, at *5 (S.D.N.Y. Nov. 9, 2011) (citing 42 U.S.C. § 1986). A Section 1986 claim "must be predicated upon a valid [Section] 1985 claim." *Brown,* 221 F.3d at 341 (citation and quotation marks omitted). Because Edwards fails to state a claim under Section 1985 and otherwise fails to make any allegations that certain Defendants had knowledge of a conspiracy but failed to prevent it, the Court should also dismiss his Section 1986 claim.

**M. Disability Discrimination Claim**

***21** Edwards asserts that on five occasions he was discriminated against on the basis of an alleged disability in violation of Title II of the ADA. (Compl. ¶¶ 6, 17, 19, 30, 61). To state a claim under Title II, which applies to inmates in state prisons, *see United States v. Georgia* 546 U.S. 151, 153, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006), a prisoner must show: (1) "he is a 'qualified individual' with a disability"; (2) "he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity"; and (3) "such exclusion or discrimination was due to his disability." *Phelan v. Thomas,* 439 F. App'x 48, 50 (2d Cir.2011) (citing *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003)); *see* 42 U.S.C. § 12132.

Although Defendants have moved to dismiss the Complaint in its "entirety" (Def. Mem. at 49), they have failed to offer any specific arguments to dismiss Edwards' ADA claims. (*See* Def. Mem. at 3). Nevertheless, these claims should be dismissed. It appears from the Complaint that Edwards' alleged disability is that one of his arms is significantly shorter than the other, and his discrimination claims arise from Defendants' comments allegedly mocking this deformity. Leaving aside the question of whether Edwards' deformity falls under the ADA's definition of disability, Edwards fails to state that Defendants excluded him from participating in, or denied him the benefit of, any particular activity as a result of his alleged disability. Edwards' allegations of objectionable language are not sufficient to state a claim under the ADA.

**N. Edwards' Potential Recovery Is Limited to Nominal or Punitive Damages From Rosa**

In his Complaint, Edwards seeks both money damages and injunctive relief. (Compl.¶ V). However, because of qualified immunity, Edwards can only obtain monetary damages from Defendant Rosa and, because of the PLRA, that recovery is limited to nominal or punitive damages. In addition, Edwards' request for injunctive relief is moot because he is no longer in prison.

**1. Qualified Immunity Precludes Money Damages,**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Except From Rosa**

Qualified immunity provides a basis to preclude monetary damages, but not injunctive relief. *See Morse v. Frederick,* 551 U.S. 393, 432, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (citation omitted). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* ––– U.S. ––––, ––––, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A state actor is afforded qualified immunity if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001) (citations and quotation marks omitted). Because Edwards has failed to plead facts showing that Defendants violated any constitutional right, with the exception of his claim for retaliatory termination against Rosa, Defendants are entitled to qualified immunity for each of Edwards' claims.

***22** However, as to Edwards' surviving retaliation claim, Defendant Rosa is not entitled to qualified immunity. Courts have long recognized, well before the time of Edwards' allegations, that inmates have a constitutional right to seek redress of grievances without suffering retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988); *see, e.g., Baskerville,* 224 F.Supp.2d at 737–38 (no qualified immunity for retaliation claim because right to file grievances without retaliation is well-established); *Wells v. Wade,* 36 F.Supp.2d 154, 160 (S.D.N.Y.1999) (same). Here, Edwards has alleged intentional conduct by Rosa in response to a protected activity, adequately stating a cause of action for retaliation. Moreover, Defendants have offered no argument that Rosa's conduct was objectively reasonable. Accordingly, at the pleading stage, Rosa is not entitled to qualified immunity from monetary damages on Edwards' retaliatory termination claim against her.

**2. Any Money Damages from Rosa Are Limited to Nominal or Punitive Damages**

In light of the qualified immunity finding above, Edwards' recovery of monetary damages, if any, is limited to Rosa. Because of the PLRA's physical injury requirement, however, that recovery from Rosa cannot include compensatory damages. Defendants argue that all of Edwards' claims are barred by the PLRA because he does not allege that he has suffered any physical injury. (Def. Mem. at 46–48). Section 1997e(e) of the PLRA provides that " '[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.' " *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting 42 U.S.C. § 1997e(e)). The term "physical injury" is not statutorily defined; however, the injury complained of must be more than *de minimis* to meet the requirements of § 1997e(e). *See Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). Therefore, in the absence of a showing of physical injury, a prisoner cannot recover compensatory damages for mental or emotional injury. *Thompson,* 284 F.3d at 417. To recover punitive or nominal damages, however, a prisoner need not allege that he has sustained a physical injury. *Id.* at 418; *see also Abreu v. Nicholls,* No. 04 Civ. 7778(DAB)(GWG), 2011 WL 1044373, at *4 (S.D.N.Y. Mar. 22, 2011) (Report and Recommendation); *Walker v. Shaw,* No. 08 Civ. 10043(CM), 2010 WL 2541711, at *15 (S.D.N.Y. June 23, 2010) (citing *Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998)).

Edwards does not allege that he has suffered any physical injury as a result of his alleged constitutional violations, including his allegation of excessive force, which does not mention any temporary or permanent physical injury as a result of Defendants' actions. *See supra* Section ILL The only injuries that Edwards complains about are the "loss of amenity" and "limited liberty" as a result of his segregated confinement, and emotional distress arising from the "embarrass[ment]" caused by Defendants' ridiculing his physical deformity. (Compl.¶ V). Neither of these injuries constitutes a physical injury under the PLRA. *See, e.g., Henry,* 2011 WL 3295986, at *4 (no physical injury where inmate complained of embarrassment); *Wilson v. Phoenix House,* No. 10 Civ. 7364(DLC), 2011 WL 3273179, at *3 (S.D.N.Y. Aug.1, 2011) (confinement not enough, by itself, to fulfill physical injury requirement). Accordingly, in the absence of any allegations of physical injury,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Edwards' claims against Defendants (including his surviving retaliation claim against Rosa) should be dismissed insofar as he seeks compensatory damages, and he should be limited to seeking nominal or punitive damages from Rosa. *See, e.g., Brummell v. Stewart,* No. 09 Civ. 10326(PAC)(FM), 2011 WL 1306170, at *4 (S.D.N.Y. Mar. 24, 2011) (Report and Recommendation) (claims seeking compensatory damages dismissed because no allegation of physical injury suffered); *Kasiem v. Rivera,* No. 09 Civ. 9665(DLC), 2011 WL 166929, at *10 (S.D.N.Y. Jan.18, 2011) (request for compensatory damages for emotional injuries stricken from complaint).

**3. Edwards' Request for Injunctive Relief Is Moot**

***23** By letter dated December 11, 2011, Edwards informed the Court that he has been released from prison. (Dkt. No. 135). This factual development renders moot Edwards' request for injunctive relief. "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). Under that principle, an inmate's request for injunctive and declaratory relief against correctional staff at a particular correctional institution becomes moot when the inmate is discharged. *See Muhammad v. City of NY. Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997); *see, e.g., Khalil v. Laird,* 353 F. App'x 620, 621 (2d Cir.2009) (injunctive and declaratory relief moot because inmate released from prison); *Sheppard v. Lee,* No. 10 Civ. 6696(GBD)(JLC), 2011 WL 5314450, at *4 n. 6 (S.D.N.Y. Nov. 7, 2011) (declaratory and injunctive relief claims moot because inmate no longer incarcerated) (Report and Recommendation), *adopted,* 2011 WL 6399516 (S.D.N.Y. Dec.20, 2011). Accordingly, because Edwards has been released from prison, his claims for injunctive relief should be dismissed.[FN14]

FN14. In addition, Edwards cannot establish a likelihood of success on the merits or the possibility of irreparable injury as required for any injunctive relief. Even assuming he could however, and to the extent Edwards' claims for injunctive relief are not moot, the PLRA extends prospective relief "no further than necessary to correct the violation of the Federal right of a particular plaintiff[,]" 18 U.S.C. § 3626(a)(1)(A), and the relief Edwards seeks—terminating Defendants from their positions and enjoining them from future government employment—is not "narrowly drawn." *Id.; see also Barrington v. New York,* 806 F.Supp.2d 730, 750 (S.D.N.Y.2011) (proposed order directing installation of security cameras beyond narrow scope permitted by PLRA); *Easter v. CDC,* 694 F.Supp.2d 1177, 1188–90 (S.D.Cal.2010) (inmate not entitled to injunctive relief preventing officials from future supervision or control over him when inmate no longer in facility where attack took place, and no indication of imminent injury).

**III. *CONCLUSION***

For the foregoing reasons, I recommend that Defendants' motion to dismiss be granted as to Edwards' claims for verbal harassment, deprivation of access to free telephone calls, deprivation of access to legal services, mail tampering, denial of required food portions, unconstitutional strip search, violation of due process rights within the prison's disciplinary and grievance system, excessive force and denial of medical treatment, deprivation of access to the prison's grievance system, retaliation (against all Defendants except Rosa for Edwards' termination), conspiracy, and disability discrimination under the ADA. I further recommend that the motion to dismiss be denied only as to Edwards' retaliatory termination claim against Defendant Rosa to the extent Edwards seeks nominal or punitive damages against her.

***PROCEDURE FOR FILING OBJECTIONS***

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Sullivan. **FAILURE TO FILE OBJECTIONS WITHIN**

**FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. If Plaintiff does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from Defendants' counsel. *See* *Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

S.D.N.Y.,2012.

Edwards v. Horn

Slip Copy, 2012 WL 760172 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Rudolph McQUILKIN, Plaintiff,

v.

CENTRAL NEW YORK PSYCHIATRIC CENTER, J. Taylor, J. Berggren, V. Komareth, K. Sangani, Dr. Hernandez, D. Sawyer, S. Hanna, and G. Bodrog, Defendants.

Civil Action No. 9:08-CV-00975 (TJM/DEP).

Aug. 27, 2010.

Rudolph McQuilkin, New York, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants CNYPC, J. Taylor, J. Berggren, V. Komareth, Dr., Hernandez, D. Sawyer, S. Hanna, and G. Bodrog.

O'Connor, O'Connor Law Firm, Law Firm-Albany Office, Peter Joslin, Jr., Esq., of Counsel, Albany, NY, for Defendant K. Sangani.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

***1** Plaintiff Rudolph McQuilkin, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against the Central New York Psychiatric Center ("CNYPC" or "Center") and several Center employees as well as the superintendent of one of the correctional facilities in which he was previously housed, claiming that his civil rights were violated during the course of his confinement. In his complaint, as amended, plaintiff alleges that he was civilly committed to CNYPC against his will and forcibly medicated with various psychiatric drugs in retaliation for having served a "notice of summons" on the superintendent of the Gouverneur Correctional Facility ("Gouverneur"), without his consent and in violation of his religious beliefs. Plaintiff further complains of the seizure and destruction of certain of his personal property. Plaintiff's complaint seeks injunctive relief, elimination of any reference of being a mental health patient from his institutional record, and an award of both compensatory and punitive damages.

In response to plaintiff's complaint one of the defendants, Dr. Kishor R. Sangani, a psychiatrist, has moved for dismissal alleging that plaintiff's complaint fails to assert an actionable claim against him. Those remaining defendants who have been served and appeared in the action have moved for summary judgment on a variety of grounds, both procedural and substantive including, *inter alia,* on the basis of qualified immunity.

Having carefully considered defendants' motions, which McQuilkin has not opposed, I recommend that they be granted and that the second amended complaint be dismissed in its entirety.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

At the times relevant to the claims set forth in his second amended complaint, plaintiff was a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"), and designated to various DOCS prisons as well as the CNYPC, a facility located in Marcy, New York and operated under the authority of the New York State Office of Mental Health ("OMH"). *See generally* Second Amended Complaint. Plaintiff was released from DOCS custody on October 27, 2009. Waldron Aff. (Dkt. No. 66) ¶ 35 and Exh. A.[FN2]

FN2. Because defendants' summary judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

moving papers were filed traditionally, they do not appear on the docket but collectively have been assigned docket number 66.

Plaintiff was admitted into the CNYPC from the nearby Mid-State Correctional Facility ("Mid-State"), on September 17, 2007, and was diagnosed with schizophrenia, paranoid type.[FN3] *Id.* at ¶ 6, Exh. B. at P2; Defendants' Rule 7.1(a)(3) Statement ¶ 2. Paranoid schizophrenia can cause a variety of symptoms, the most prevalent of which are delusions, auditory hallucinations and disorganized thinking. Waldron Aff. (Dkt. No. 66) ¶ 7. Individuals who suffer from this type of schizophrenia frequently suffer from feelings of being persecuted or plotted against and may have grandiose delusions that are associated with protecting themselves from the perceived plot. Waldron Aff. (Dkt. No. 66) ¶ 7. According to his referral from Mid-State, on or about September 17, 2007, plaintiff "started to become irritable and paranoid. He displayed a thought disorder and believed that there was a plan by the mental health staff to murder him. He was refusing medication and mental health treatment." Waldron Aff. (Dkt. No. 66) Exh. B at P289.

FN3. The 2007 admission to the Center was plaintiff's second, the first having occurred in 1998. Waldron Aff. (Dkt. No. 66) ¶¶ 8-9. During the first admission, which lasted twenty-seven days, plaintiff was diagnosed with schizophrenia paranoid type. *Id.* The notes of that admission reflect that while at Mid-State plaintiff refused to take psychotropic medications. *Id.* at ¶¶ 8-9 and Exh. B at P289.

***2** Upon his arrival at the CNYPC, plaintiff consistently refused his medications. *Id.* at P291. Plaintiff explained the basis for that refusal by stating to CNYPC personnel "these are heterogeneous medications, work as isotopes, you know, like small nuclear bombs[,]", adding "I am a different organism, therefore under no circumstances I would take them." *Id.*

On or about October 1, 2007, Donald Sawyer, Ph. D., the Executive Director of the Center, petitioned the New York State Supreme Court, Oneida County, for an order committing plaintiff to the CNYPC for a period not to exceed six months. *Id.* at P271-272. Following a hearing regarding the petition held on October 11, 2007, Supreme Court Justice Anthony F. Shaheen issued a ruling, over plaintiff's objection, in which he determined that McQuilkin was mentally ill and a proper subject for custody and continued treatment in the CNYPC within the meaning of New York Mental Hygiene Law ("MHL") § 9.27, and therefore approved the requested retention period.[FN4] Waldron Aff. (Dkt. No. 66) Exh. B. at P263.

FN4. Pursuant to the MHL, the director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such a person. N.Y. MENTAL HYG. § 9.27(a). The examination may be conducted jointly but each examining physician must execute a separate certificate. *Id.*

Based on plaintiff's refusal to consent to the administration of medication while at the Center, and following an evaluation of his condition by CNYPC staff, on or about November 1, 2007, Sawyer once again petitioned the state courts, this time for an order authorizing OMH employees to forcibly administer psychiatric medication to McQuilkin. Waldron Aff. (Dkt. No. 66) ¶ 17 and Exh. B at P276-96. That involuntary treatment petition was granted on November 21, 2007, following a hearing and despite McQuilkin's objection, based upon a finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and that the administration of medication to the plaintiff was in his best interest. *Id.* at ¶¶ 19-20 and Exh. B at P318-19. The order granting the petition authorized the administration of psychiatric drugs "during the concurrent retention of Rudolph McQuilkin, and any extension thereof at [CNYPC] as well as for a period not to exceed twelve (12) months after the patient is discharged from the [CNYPC] to a psychiatric satellite unit operated by [OMH] at a New York State Correctional facility ..." *Id.* at Exh. B and P319.

Plaintiff was discharged from the CNYPC and transferred into the Clinton Correctional Facility

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

("Clinton") on January 4, 2008, commencing the twelve-month period of court-authorized forced medication. Waldron Aff. (Dkt. No. 66) ¶ 21. During that time, plaintiff was injected with fifty milligrams of Haldol, an antipsychotic medication, once a month. *Id.* at ¶¶ 21-22 and Exh. B. at P320-23.

From the expiration of the court-ordered psychiatric treatment period on January 4, 2009 until April of 2009, plaintiff refused to be medicated, which caused him to become symptomatic. Waldron Aff. (Dkt. No. 66) ¶ 23 and Exh. B. at P327-30. On April 8, 2009, Dr. Sohail Gillani, a psychiatrist, requested that McQuilkin be taken to the Clinton Mental Health Satellite Unit ("Satellite Unit") for evaluation as to whether an involuntary psychiatric hospitalization in the CNYPC, based upon the recommendation of two physicians, should be sought and with the intent of seeking another court order permitting involuntary psychiatric medication. Waldron Aff. (Dkt. No. 66) ¶ 24 and Exh. B at P331-32. This request was based on plaintiff's ongoing refusal to take psychiatric medication and his repeated history of subsequent psychiatric decompensation, as well as his refusal to attend therapy sessions during which his mental status could be clinically monitored. *Id.*

***3** As a result of Dr. Gillani's request, plaintiff was escorted from his cell to the Mental Health Satellite unit at Clinton, where he was assigned to a residential crisis treatment program cell. *Id.* at ¶ 26. Once there, McQuilkin showed poor insight and judgment, continued to display symptoms of paranoia, and persisted in his denial of any mental health issues. *Id.* at ¶ 27. Plaintiff remained in the satellite unit for less than twenty-four hours, however, based upon his agreement to take his prescribed psychiatric medication (Haldol 50 mg). *Id.* at ¶ 28.

During the period that Haldol was administered, plaintiff complained of side effects including a rash.[FN5] Waldron Aff. (Dkt. No. 66) ¶ 32. The use of Haldol to address plaintiff's condition was ultimately discontinued, and Risperal was added to his prescription drug regimen on or about July 17, 2009. *Id.* at ¶ 33 and Exh. B at P336. Since then, plaintiff has not registered any further medical complaints, and reports that he "like[s] the Risperdal better." *Id.* at ¶ 34.

FN5. According to defendants' submissions, this is not a side effect ordinarily associated with Haldol. Waldron Aff. (Dkt. No. 66) ¶ 32.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on September 22, 2008, and has since twice amended his complaint. Dkt. Nos. 1, 8, and 35. As defendants, plaintiff's second amended complaint names the CNYPC; J. Taylor, the Superintendent of the Gouverneur Correctional Facility; CNYPC psychiatrists J. Berggren, V. Komareth, K. Sangani, S. Hanna, and Dr. Hernandez; D. Sawyer, the Director of the CNYPC; and G. Bodrog, whose position is not disclosed in plaintiff's complaint but who appears to be a physician involved in the October, 2007 petition to have him involuntarily committed. Dkt. No. 35; *see* Waldron Aff. (Dkt. No. 66) Exh. B at P287-88. Plaintiff's second amended complaint contains three designated causes of action requesting various forms of relief, including 1) an order prohibiting defendants from forcing McQuilkin to take psychiatric medications against his free will; 2) total expungement of any reference of being a mental health patient from plaintiff's institutional record; and 3) damages for wanton disregard of his Eighth Amendment rights as well as directing that defendants not retaliate against him for filing this proceeding. Dkt. No. 35.

In response all of the defendants, with the exception of Dr. Sangani, have answered generally denying the allegations of plaintiff's complaint and asserting eighteen separate affirmative defenses. Dkt. No. 38. For his part, Dr. Sangani has moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure seeking the dismissal of plaintiff's claims against him for failure to state a claim upon which relief may be granted. Dkt. No. 56.

On January 28, 2010, following the completion of discovery, the defendants other than Dr. Sangani moved for summary judgment dismissing plaintiff's complaint upon a variety of grounds. Dkt. No. 66. In their motion, those defendants argue that 1) all claims against the CNYPC and against the other defendants in their official capacities should be dismissed as barred by the Eleventh Amendment; 2) plaintiff's first cause of action, seeking

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

injunctive relief, should be dismissed as moot in light of his release from DOCS custody; 3) plaintiff's claims are procedurally barred based upon his failure to exhaust administrative remedies with respect the majority of his claims; 4) plaintiff's claims surrounding his interfacility transfer lack merit since inmates do not have a constitutional right to be incarcerated at a correctional facility of their choice; 5) plaintiff's due process claim concerning the alleged seizure and destruction of his personal property is not constitutionally cognizable; 6) plaintiff is not entitled to expungement of his psychiatric records; 7) plaintiff's allegations of wrongdoing are unduly conclusory and therefore subject to dismissal; 8) plaintiff's challenges to his OMH confinement are barred by *Heck v. Humphrey* and the *Rooker-Feldman* doctrine [FN6]; 9) defendants are entitled to qualified immunity; and 10) plaintiff's claims surrounding disagreement with his medical care are not actionable under the Eighth Amendment.

> FN6. *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *District of Columbia v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

***4** Despite expiration of the time for responding, plaintiff has failed to offer any submissions in opposition to either of the pending motions, which are now ripe for determination and have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Standards of Review*

1. *Motion to Dismiss*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ----, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

2. *Summary Judgment Motions*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

***5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though pro se plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether pro se plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Assn. v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Oppose Defendants' Summary Judgment Motion*

***6** Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendants' motions, and specifically whether that failure automatically entitles defendants to the relief sought.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against dismissal or summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b) (3). *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.) FN7; *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed motions should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

FN7. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

It should also be noted that the plaintiff's failure to properly oppose the pending summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement. *See Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dept. of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

Based upon plaintiff's failure to oppose defendants' summary judgment motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.[FN8]

FN8. I note that defendants' notice of motion contains the required the notice to plaintiff of the consequences of his failure to respond to the summary judgment motion. Dkt. No. 66; *see* N.D.N.Y.L.R. 56.2.

C. *Eleventh Amendment Immunity*

At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against the CNYPC as well as the individual defendants, to the extent that they are sued in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

***7** As defendants correctly argue, "it is beyond dispute that the State of New York and its agencies have never consented to be sued in federal court." *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594-95 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991).[FN9] "The law is clear that the state, and state agencies ..., are immune from prisoner § 1983 suits because of their Eleventh Amendment sovereign immunity." *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997).

FN9. "On the other hand, a state official acting in his [or her] official capacity may be sued in a federal forum to enjoin conduct that violates the federal Constitution, notwithstanding the Eleventh Amendment bar. *Id.* at 595 (citing *Papasan v. Allain,* 478 U.S. 265, 276-77, 105 S.Ct. 2932, 2939-40 (1986)). Insofar as plaintiff seeks injunctive relief, his claims against the CNYPC and the individual defendants in their official capacities are not barred by the Eleventh Amendment. As will be seen, however, plaintiff's request for injunctive relief is nonetheless moot in light of his release from prison. *See* pp. 21-23, *post.*

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest.[FN10] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91 102 S.Ct. 2325, 2328-2329 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN11] *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361.

FN10. In a broader sense, this portion of defendants' motion implicates the sovereign

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

FN11. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

Because plaintiff's section 1983 claims against the CNYPC are in reality claims against the State of New York, they typify those against which the Eleventh Amendment protects, and are therefore subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). Additionally, to the extent that plaintiff asserts claims for damages against the defendants in their official capacities, those claims are properly regarded as claims against the state, and are likewise barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985); *Ying Jing Gan v. City of N.Y.,* 996 F.2d 522, 529 (2d Cir.1993). Accordingly, I recommend the entry of summary judgment dismissing plaintiff's claims for damages against the CNYPC and the individual defendants in their official capacities.

D. *Mootness*

In their motion, defendants next seek summary judgment with respect to plaintiff's first cause of action, in which he seeks "[a]n order prohibiting defendants from forcing plaintiff to take psychiatric medications against his free will." Second Amended Complaint (Dkt. No. 35) p. 9. In support of their request, defendant argues that because the plaintiff is no longer in state custody, that claim is moot.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies. 'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate.' " *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (citations omitted). A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin-Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). The capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur. *Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 988, 140 L.Ed.2d 43 (1998) (citing and quoting *Lyons* ). This limited exception does not appear to be potentially applicable in this instance.

***8** The record now before the court reflects that plaintiff is no longer in state custody. *See* Dkt. No. 57; Waldron Aff. (Dkt. No. 66) Exh. A. To the extent McQuilkin seeks injunctive relief preventing the defendants from forcing him to be medicated against his will, they are no longer involved with him, and the claim is now moot. I therefore recommend dismissal of plaintiff's first cause of action on this basis.

E. *Exhaustion*

In their motion defendants seek dismissal of certain of plaintiff's claims on the basis of his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement, though not jurisdictional, gives rise to a defense which may affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See* *Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also* *Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also* *Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). FN12

FN12. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004) (emphasis omitted).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See* *Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia,* *Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

***9** In support of their exhaustion argument, defendants submit a declaration given by Karen Bellamy, the Director of the IGP, reflecting that from a review of records maintained by the CORC it appears that only one grievance filed by the plaintiff, grievance number CL 57139-08, relating to missing personal property, was processed through to completion under the IGP. *See* Bellamy Aff. (Dkt. No. 66) ¶ 10. This, they assert, requires dismissal of all of plaintiff's remaining claim as unexhausted.

While McQuilkin does not appear to have filed grievances related to the other matters at issue in this case, including principally his treatment while at the CNYPC, and to have processed those grievances through to completion under the IGP, he did take certain measures to complain of the treatment received while there. At the suggestion of personnel employed at the Mental Hygiene Legal Services, with whom plaintiff communicated in writing concerning his plight on multiple occasions including in February of 2008, plaintiff McQuilkin sent letters on March 28, 2008, and again on June 27, 2008, to Dr. Jonathan Kaplan, the Clinical Director of the Mental Hygiene Psychiatric Center at Marcy, New York, to whom he had been referred. FN13 *See* Second Amendment Complaint (Dkt. No. 35) pp. 12-23, 26. In those letters, plaintiff requested that Dr. Kaplan review his treatment plan in light of adverse effects from which he claimed to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

suffer as a result of the medication being administered. *Id.* at pp. 12-13, 26. In addition, McQuilkin forwarded a letter dated February 21, 2008, to "the psychiatrist" at Clinton, again complaining of being compelled to take the drugs and of their side effects, and also that he was not being properly monitored "due to insincere motives on the original action for the court order." *See* Attachments to Second Amended Complaint (Dkt. No. 35) p. 31.

FN13. The attachments to plaintiff's Second Amended Complaint (Dkt. No. 35) are not separately marked as exhibits, nor are the pages numbered. The page numbers referred to herein as are reflected in the court's docket.

While confined at Clinton, plaintiff also filed an inmate grievance, dated April 1, 2008 and assigned grievance number CL-56924-08, complaining that he was being ordered to take psychiatric medication against his will, that he was experiencing adverse side effects from the medication, and requesting that the medication be discontinued. Attachments to Second Amended Complaint (Dkt. No. 15) p. 10. In response to plaintiff's grievance, the IGRC advised McQuilkin that pursuant to DOCS Directive No. 4040,[FN14] the OMH, together with its employees, policies and procedures, are not within the jurisdiction of the DOCS inmate grievance program, and he was therefore directed to address the issue of psychiatric medication with Joanne Waldron, Satellite Unit Chief. *Id.* at p. 11. Thus, in accordance with the DOCS Directive No. 4040, the matter was deemed closed, and there is no record of plaintiff having appealed this determination. *Id.*

FN14. DOCS Directive No. 4040 provides, in relevant part, that "[t]he IGRC may dismiss and close a grievance after a hearing if it determines, by majority vote (3 of 4), that ... the grievant is seeking action with respect to any policy, regulation, rule or action of any agency not under the supervision of the Commissioner of Correctional Services (see section 701.3[f] of this Part)." 7 N .Y.C.R.R. § 701.5(b)(4)(i)(d).

On June 27, 2008, plaintiff wrote letters to Drs. Gillani and Berggren complaining of the administration of psychiatric drugs, claiming that he was being discriminated against and harassed by certain corrections officers and nurses who administered his oral medication, and requesting a meeting to discuss the possibility of receiving all of his medication once a month by injection. *See* Second Amended Complaint (Dkt. No. 15) at pp. 24-25. Plaintiff wrote a second letter to Dr. Gillani on July 16, 2008, voicing the same complaint and again requesting that he be given all his court-ordered drugs at the same time each month. *Id.* at pp. 27-28.

***10** Although the plaintiff was at all relevant times an inmate in the primary care and custody of the DOCS, the conduct giving rise to his claims occurred at the CNYPC, a facility operated by the OMH. Based upon that circumstance, it is arguable that plaintiff's claims are not subject to the PLRA because they do not involve "prison life." While the court's research has not identified a case in this circuit squarely addressing the issue, it appears that even though confined to the CNYPC at the time in question, plaintiff would still qualify as a prisoner subject to the requirements of the PLRA. *See, e.g., Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000) ("[W]e hold that only individuals who, at the time they seek to file their civil actions, are detained as a result of being accused of, convicted of, or sentenced for criminal offense are 'prisoners' within the definition of 42 U.S.C. § 1997e...."); *Kalinowski v. Bond,* 358 F.3d 978, 979 (7th Cir.) ("As used in this section, the term 'prisoner' means any person incarcerated or detained at any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, [or] probation ....") (quoting 28 U.S.C. § 1915(h)), *cert. denied,* 542 U.S. 907, 124 S.Ct. 2843, 159 L.Ed.2d 273 (2004). It would therefore appear that plaintiff's complaint includes a combination of claims relating to lost property, which were properly exhausted, and claims for which he failed to exhaust his administrative remedies, including those relating to his confinement to CNYPC and the forced administration of psychiatric drugs, as well as that relating to retaliation.[FN15]

FN15. Because defendants have not raised failure to exhaust administrative remedies with regard to plaintiff's claims that he was denied access to the courts and the right to practice his

religion, I have not addressed exhaustion of these claims.

In a series of decisions rendered since enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d 37 at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). The test for determining whether a claim has not been properly exhausted should nonetheless be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d at 676-77; *Hargrove,* 2007 WL 389003, at *10. The circumstances potentially qualifying as "special" under this prong of the test can include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ).

Undeniably, plaintiff appears not to have pursued to completion a grievance regarding his treatment at the CNYPC. It should be noted, however, that "DOCS Directive 4040 states, *inter alia,* that '[t]he individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered non-grievable.' " *Giano,* 380 F.3d at 678. Indeed, as was previously noted, the IGRC response to plaintiff's grievance number CL 56924-08 requesting discontinuation of his medication specifically stated, "OMH, it's [sic] employees and policies and procedures are not with in [sic] the jurisdiction of the DOCS Inmate grievance program." *See* Attachments to Second Amended Compl. (Dkt. No. 35) p. 11. Given this response, it seems somewhat disingenuous for defendants to now contend that plaintiff failed to fully exhaust his administrative remedies as to the claims relating to his psychiatric treatment. It is true that, strictly construed, plaintiff's grievance number CL 56924-08 does not specifically complain of his CNYPC confinement; nonetheless, after having received the foregoing response from the IGRC, and being specifically advised that the his grievance complaining of being forced to take the drugs was being "closed and dismissed", it certainly would have been reasonable for plaintiff to conclude that he could not grieve either claim, and likewise that an appeal of the denial of the medication grievance would be rejected.

***11** It is also worth noting that the IGRC directed the plaintiff to the OMH, and that both before and after he was notified that his grievance was closed and dismissed, he sent numerous letters to the Clinical Director of CNYPC, both the Director and Deputy Director of Mental Hygiene Legal Services, and Drs. Gillani and Berggren complaining of his psychiatric treatment. In each instance, Mental Hygiene Legal Services referred plaintiff to the physicians and ultimately advised that they could provide no further assistance; McQuilkin's letters to the doctors received no responses at all.

In view of the foregoing, it appears that, at a minimum, issues of fact exist as to whether sufficient special circumstances are present to excuse plaintiff's failure to exhaust claims relating to his psychiatric treatment. For the going reasons, I conclude that the defendants' motion for summary judgment dismissing the plaintiff's unexhausted claims regarding his confinement in the CNYPC and involuntarily administration of psychiatric drugs against the plaintiff's wishes will be denied.

F. *Confinement At Clinton*

Although not identified as a discrete cause of action, plaintiff's complaint alleges that he was "transported to the Clinton Correctional Facility against his free will and adamant refusal." Second Amended Compl. (Dkt. No. 35) ¶ 3. To the extent that plaintiff attempts to premise his section 1983 claim in part upon this prison transfer, defendants seek dismissal of that claim as failing to allege a constitutional violation.

It is well-established that convicted prisoners have no right to choose the prison they are housed in. *Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Prison authorities are entrusted with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

unfettered discretion to transfer prisoners from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922-23 (2d Cir.1980).

In view of the foregoing, summary judgment in favor of the defendants on plaintiff's apparent claim of violation of his constitutional rights based upon his alleged involuntarily transfer to Clinton is appropriate.

G. *Due Process Claim Based on Destruction of Personal Property*

Although not alleged as a distinct cause of action, in his second amended complaint plaintiff appears to claim that all of his legal work and documentation-five draft bags altogether-were seized and allegedly destroyed by employees at the Gouverneur Correctional Facility ("Gouverneur"). Second Amended Compl. (Dkt. No. 35) ¶ 2. Defendants contend that this claim also should be dismissed as failing to state a constitutionally cognizable cause of action.

Addressing inmate claims relating to stolen or lost property, the Supreme Court has held that even intentional destruction of prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson v. Palmer,* 468 U.S. 517, 531, 104 S.Ct. 3194, 3202, 82 L.Ed.2d 393 (1984) (citing *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981)). As long as a meaningful post deprivation remedy is provided, the due process requirement is met and the Fourteenth Amendment is satisfied. *Howard v. Leonardo,* 845 F.Supp. 943, 947 (N.D.N.Y.1994) (citing *Paratt,* 451 U.S. at 540, 101 S.Ct. at 1916). With regard to claims of lost or stolen property, the Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, *inter alia,* a Court of Claims action. *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001) (citing *Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir.1983)).

***12** In this instance plaintiff had available to him, and indeed apparently pursued, an internal DOCS process for making a claim for his lost property. Additionally, under the New York Court of Claims Act, the State provides inmates like the plaintiff with a post deprivation remedy by way of an action asserted in the New York Court of Claims for appropriation of personal property. *See* N.Y. CT. OF CLAIMS ACT §§ 8, 9(2). Thus, as a matter of law, McQuilkin was afforded adequate procedural protections and any procedural due process claim premised upon the alleged destruction of his property at Gouverneur is subject to dismissal.[FN16]

FN16. The availability of a post-deprivation remedy does not foreclose plaintiff's claim that he was effectively denied meaningful access to the courts as a result of the loss of his legal documents. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996). As will be seen, however, that claim also lacks merit. *See* pp. 41-43, *post.*

H. *Expungement of Psychiatric Records*

Plaintiff's second cause of action seeks "total expungement from [sic] any reference of mental health patient from Plaintiff's institutional record." Second Amended Compl. (Dkt. No. 35) Second Cause of Action. In their motion, defendants request dismissal of this cause of action as not presenting a constitutional claim, and additionally because the relief sought is not available under New York law.

To state a valid claim under section 1983, a plaintiff must allege that he or she was deprived of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). Plaintiff has identified no cognizable constitutional right at stake with regard to his mental health records. While plaintiff complains of his involuntary commitment at the Center, it appears from the record now before the court that the commitment occurred, at least in part, based upon state court proceedings conducted pursuant to New York Correction Law § 402.[FN17] *See generally* Waldron Aff. (Dkt. No. 66). As such, plaintiff cannot plausibly allege the denial of procedural due process associated with that commitment.

FN17. Under that provision, upon receiving a report from a physician that an inmate is, in his or her opinion, mentally ill the superintendent of a correctional facility must apply to the court for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

designation of two examining physicians who, conducting a personal examination, may certify that the inmate is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correction Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to an appropriate state court judge for an order of commitment, with notice to the affected inmate as well as any known relative. *Id.* § 402(3). The inmate thereafter may request a hearing, and the court additionally may request one of its own initiative. *Id.* § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months in order that the inmate may be transferred into an OMH facility. *Id.*

Nor has McQuilkin stated a claim under New York law, even assuming such a claim would be actionable under section 1983. Generally, expungement of psychiatric records is not an available form of relief in New York. *Wade v. Dep't of Mental Hygiene of New York,* 49 N.Y.2d 947, 428 N.Y.S.2d 945, 406 N.E.2d 800 (1980). MHL section 33.14 does allow for the sealing of psychiatric records when

> the petitioner has demonstrated by competent medical evidence that he is not currently suffering from a mental illness, has not for a period of three years received inpatient services for the treatment of a mental illness, and the interests of the petitioner and society would best be served by sealing the petitioner's records.

N.Y. MENTAL HYG. LAW § 33.14(a)(1)(b). Plaintiff cannot avail himself of the sealing provision in this instance, however. At the outset, plaintiff cannot establish that he has not "received inpatient services for a period of three years." *Id.* Plaintiff was discharged from services on October 27, 2009 and has therefore received inpatient services within the last three years. Waldron. Aff. (Dkt. No. 66) Exh A. Additionally, plaintiff has not established, by competent medical evidence, that he is not currently suffering from a mental illness, nor has he demonstrated that both his interests and those of society would be best served by sealing his records of mental health treatment.

***13** For these reasons, the defendants' motion should be granted with respect to plaintiff's second cause of action.

I. *Religious Discrimination and Access to Court*

Plaintiff's complaint makes passing reference to abridgement of his right to "access the court of law" and his "religious rights." Second Amended Complaint (Dkt. No. 35) ¶¶ 2, 8. As defendants assert in support of their motion, plaintiff's complaint is devoid of any factual allegations to support these claims, and there is nothing in the record that would suggest that these rights are implicated.

1. *Religious Discrimination*

While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services. *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases). The task of defining the contours of that right in a prison setting requires careful balance of the rights of prison inmates against the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003); *Salahuddin,* 993 F.2d at 308. When determining whether an action taken by prison officials impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

[the] right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404).

In this instance, neither plaintiff's complaint nor the record before the court discloses any facts demonstrating religious discrimination or establishing that plaintiff's religious beliefs were somehow burdened by his confinement to CNYPC or the administration of psychiatric drugs against his will. Plaintiff's complaint does not identify his religion, nor does it explain how the forced administration of psychiatric medications infringes upon his sincerely held religious beliefs. Since plaintiff's religious deprivation claim is stated in wholly conclusory terms without the articulation of facts demonstrating the existence of a plausible claim, and in light of his failure to come forward with the evidence to support that claim in the face of defendants' summary judgment motion, I recommend that any cause of action deemed to assert a First Amendment freedom of religion violation be dismissed.

2. *Access to Courts*

***14** Turning to plaintiff's reference to his deprivation of access to the courts, I note that undeniably "[p]risoners have a constitutional right of access to the courts, which is infringed when prison officials interfere with a prisoner's preparation of legal documents." *Thomas v. Egan,* 1 Fed. App'x 52, 54 (2d Cir.2001) (citing *Lewis,* 518 U.S. at 350, 116 S.Ct. at 2179) (cited in accordance with Fed. R.App. Proc. 32.1). "To state a claim of denial of access to the courts, an inmate must allege an actual injury." *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179). Conclusory allegations are insufficient. *Id.* (citing *Lewis,* 518 U.S. at 349, 116 S.Ct. at 2179).

In this instance, plaintiff's complaint alleges that among his property confiscated and destroyed by unnamed prison workers at Gouverneur were legal documents. Second Amended Complaint (Dkt. No. 35) ¶ 2. Neither his complaint nor anything within the record now before court suggests, however, that plaintiff suffered any harm as a result of the alleged destruction of his legal documents. Plaintiff's complaint therefore fails to allege the existence of prejudice, an essential element of such a claim. *See Davidson v. Murray,* 371 F.Supp.2d 361, 366 (W.D.N.Y.2005) (citing cases) (requiring proof on access to courts claim that "a nonfrivolous legal claim had been frustrated or was being impeded due to the action or inaction" of defendants). Based upon this lack of supporting facts, I recommend that plaintiff's court access claim be dismissed.

J. *Retaliation*

The claims set forth in plaintiff's complaint appear to be centered upon his involuntary commitment into the CNYPC and the forced administering of anti-psychotic medication, allegedly in retaliation for his filing a "notice of summons" against the DOCS. In their motion, defendants assert that plaintiff has failed to state a cognizable claim of retaliation. When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds sub nom., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

In order to state a prima facie claim under § 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

***15** Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

Plaintiff alleges that he was administered antipsychotic medication "in a continuing retaliation against him for filing a claim in the International Trade Court several years ago which was against the State of New York and the Quango New York State Brokerage Mortmain Collection Department of Correctional Services." Second Amended Compl. (Dkt. No. 35) ¶ 2. Plaintiff also alleges that in retaliation for his service of a "notice of summons upon [Defendant Taylor] on July 2, 2007 and July 3, 2007 ...". defendants seized and destroyed five bags containing his property on July 18, 2007, and "wrongfully referred" him to the psychiatric department at Clinton. *Id.*

Plaintiff's complaint clearly satisfies the first element of the retaliation claim. Both the filing of a claim with the International Trade Court and service of a notice of summons appear to qualify as constituting protected activity. *See Joseph's House and Shelter, Inc. v. City of Troy,* 641 F.Supp.2d 154, 159 n. 5 (N.D.N.Y.2009) (Scullin, S.D.J.) (citing *Dougherty v. Town of N. Hempstead,* 282 F.3d 83, 91 (2d Cir.2002) (finding lawsuit constitutionally protected activity under the First Amendment)). In addition I have assumed, solely for purposes of the instant motion, that the forced administering of drugs and the destruction of plaintiff's property could qualify as sufficiently adverse to trigger the protections of the First Amendment. *See Jones v. Harris,* 665 F.Supp.2d 384, 399 (S.D.N.Y.2009). The evidence of a connection between the two, however, is lacking in this case.

The portion of plaintiff's retaliation claim stemming from his filing of the claim in the International Trade Court is easily dispensed with. By plaintiff's own admission that claim was filed "several years ago" and does not appear to have involved any of the named defendants in this action. The bare allegation that the filing of that claim is somehow linked to the defendants' actions in forcing him to take medications, without further support, is woefully insufficient to establish the required connection between that protected activity and the adverse consequences claimed in his retaliation cause of action. *Flaherty,* 344 F.3d at 13.

Plaintiff's retaliation claim against defendant Taylor based upon service of a summons, followed by in short order by the seizure of his property, presents a closer question given the close proximity in time between the two events. In the face of a summary judgment motion, however, calling for plaintiff to lay bare his claims and the proof which supports them, however, this alone is insufficient to establish a basis upon which a reasonable factfinder could conclude that unlawful retaliation has occurred. *Vega v. Lareau,* No. 9:04-CV-0750, 2010 WL 2682307, at *10 (N.D.N.Y.2010) (Baxter, M .J.). I note, in that regard, that the record fails to support plaintiff's claim that defendant Taylor, against whom this portion of the retaliation claim is asserted, was involved in any way in the decision to admit the plaintiff into the CNYPC. Instead, the record reflects the decision was made by OMH care providers following an evaluation of plaintiff's mental status, and was authorized by a state court order.

***16** Because the record fails to support plaintiff's retaliation cause of action, I recommend that it be dismissed.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

K. *OMH Confinement and Involuntary Treatment*

Also embedded in plaintiff's complaint is a claim for violation of his Eighth and Fourteenth Amendment rights arising from his commitment to the CNYPC as well as the drugs he was forcibly administered while there. In support of their motion, defendants argue that these claims should be dismissed as impermissibly conclusory, and further that because they are precluded under *Heck v. Humphrey* and the *Rooker-Feldman* doctrine.

1. *Eighth Amendment*

The claims alleged in plaintiff's complaint relating to his involuntary commitment to the CNYPC and the forced administration of drugs are predicated upon alleged violation of the Eighth and Fourteenth Amendments and, in essence, are directed to the medical treatment that he received for his schizophrenia.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach,* 103 F.Supp.2d at 546 (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar.30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar.18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2).

***17** Plaintiff does not claim that he was deprived of any of basic need or that his personal safety was put at risk during his confinement in the CNYPC or at Clinton. Instead, his complaint is directed to the facts that he was confined to a mental health facility and forced to undergo mental health treatment. Broadly construed, at best, plaintiff's Eighth Amendment claim can be interpreted as a challenge to his medical treatment.

Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Here, however, even liberally construing plaintiff's allegations there is no claim, and indeed no evidence in the record to suggest that plaintiff's medical needs were disregarded. In fact, at the heart of plaintiff's claim is his contention that he did not need mental health treatment at all. It is well established, however, that "[c]harges that amount only to allegations of malpractice, and mere

disagreements with respect to quality of medical care do not state an Eighth Amendment claim." *Arroyo v. City of New York,* 2003 WL 22211500, at *2 (S.D.N.Y. Sept.25, 2003) (citing *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292). As a result, defendants are correct in their assertion that plaintiff's Eighth Amendment challenge to his CNYPC confinement and mental health treatment must fail as a matter of law.

2. *Heck v. Humphrey*

Defendants also assert that any claim by plaintiff that he should not have been placed in the CNYPC or in an OMH Satellite Unit is barred by the rule enunciated in *Heck v. Humphrey.* In *Heck,* the United States Supreme Court addressed the types of claims for which state prisoners may seek redress in section 1983 actions. *Heck,* 512 U.S. at 480-82, 114 S.Ct. at 2369-70. The Supreme Court specifically held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if a judgment in his or her favor "would necessarily imply the invalidity of his conviction or sentence." *Heck,* 512 U.S. at 487, 114 S.Ct. at 2372. For a plaintiff to recover damages for actions

> whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87, 2372. "But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* The Second Circuit has observed, however, that a section 1983 suit by a prisoner, "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *[Heck].*" *Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999).

***18** In this case, plaintiff is not disputing either his conviction or his confinement to prison; rather, McQuilkin is challenging his confinement to a mental health facility, which occurred in accordance with a state court order. Plaintiff additionally challenges the forced administration of psychotropic drugs, which also was court-authorized. It does not appear that these state court determinations had any effect on the length of the plaintiff's prison term. Waldron Aff. (Dkt. No. 66) Exh. B P263, P318-319. Additionally, these state court proceedings clearly were not criminal in nature, but rather were civil state mental health proceedings. As a result, it cannot be said that the instant action would affect the invalidity of a criminal judgment against the plaintiff.[FN18]

> FN18. The fact that plaintiff has been released from custody does not alter this conclusion because "[t]his favorable termination requirement applies to plaintiffs who are incarcerated at the time that they file their section 1983 actions, regardless of whether they are later released." *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 n. 6 (S.D.N.Y. May 5, 2009).

For these reasons, it therefore does not appear that plaintiff's claims are precluded by the doctrine enunciated in *Heck v. Humphrey.*

3. *Rooker-Feldman*

Defendants further assert that plaintiff's OMH retention and involuntary treatment claims are subject to dismissal under the *Rooker-Feldman* doctrine because the plaintiff was accorded due process in the state court mental health proceedings, and the claim presents a pure question of state law that is not properly raised in a section 1983 action.

"Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker-Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman,* 460 U.S. 462, 482, 103 S.Ct. 1303, 1315, 75 L.Ed.2d 206 (1983). "To do so would be an exercise of appellate jurisdiction which only the Supreme Court possesses over state court judgments." *Rooker v.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923).

The Supreme Court of the United States reviewed and redefined the limits of the *Rooker-Feldman* doctrine in *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The Court limited application of the doctrine to "cases brought by state court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobile Corp.,* 544 U.S. at 284, 125 S.Ct. at 1521-22. In *Hoblock,* the Second Circuit established four elements that must be met before the *Rooker-Feldman* doctrine applies:

> First, the federal court plaintiff must have lost in state court. Second the plaintiff must 'complain[ ] of injuries caused by [a] state court judgment [.]' Third, the plaintiff must 'invite district court review and rejection of [that] judgment[ ].' Fourth, the state court judgment must have been 'rendered before the district court proceedings commenced.'
>
> *Hoblock,* 422 F.3d at 85.

***19** Here, the first and fourth elements of this test are clearly satisfied. First, the plaintiff lost in the New York Supreme Court proceedings which resulted in the retention and involuntary treatment described in plaintiff's complaint. *See* Waldron Aff. (Dkt. No. 66) Exh. B at P263, P318-319. Additionally, the state court decisions at issue, dated October 11, 2007 and November 21, 2007, respectively, *see id.,* were rendered prior to the commencement of this action on September 15, 2008. *See* Dkt. No. 1.

The second and third elements of the prevailing *Rooker-Feldman* test also appear to have been established in this instance. Plaintiff's complaint is directly addressed to the injuries suffered as a result of those court determinations. Moreover, plaintiff's complaint, as amended, appears to challenge the correctness of those rulings, seeking both an order prohibiting his forced medication, despite the fact that it was accomplished pursuant to a state court order, as well as expungement of records of his treatment at the Center, also accomplished by court order. This, then, appears to present a classic case of a claim precluded under the *Rooker-Feldman* doctrine. I therefore recommend dismissal of plaintiff's confinement and administration of psychiatric drug claims on this basis.

L. *Due Process Claims*

In their motion defendants further attack plaintiff's procedural due process claim asserted under the Fourteenth Amendment.

To successfully state a claim under 42 U.S.C. § 1983 for denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). It is undeniable that [i]nvoluntary confinement, including civil commitment, constitutes a significant deprivation of liberty, requiring due process." *Abdul-Matiyn v. Pataki,* 9:06-CV-1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008) (Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citations omitted). "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 2007 WL 4115936, at *5 (S.D.N.Y. Nov.16, 2006) (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533, 124 S.Ct. 2633, 2648, 159 L.Ed.2d 578 (2004) (plurality opinion)). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul,* 2008 WL 974409, at *10 (citing *Kansas v. Hendricks,* 521 U.S. 346, 371, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501 (1997)).

The primary focus of plaintiff's due process claim and defendants' motion seeking its dismissal, then, is upon the sufficiency of the procedural safeguards associated with that deprivation.[FN19] In this instance, plaintiff was committed to the CNYPC by way of the procedures set out in the New York Corrections Law § 402.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN19. The record does not address, and I am therefore unable to determine, whether as a result of his involuntary commitment to the CNYPC and forced medication, plaintiff suffered deprivation of a cognizable liberty interest beyond that already associated with this criminal conviction and sentence. I have nonetheless assumed, for purposes of the pending motion, that the plaintiff can demonstrate the deprivation of a cognizable liberty interest associated with those acts.

***20** It is clear from the record before the court that plaintiff was retained at the CNYPC under the authority of that statute, and his retention and involuntary treatment with the antipsychotic medication were court-ordered. Section 402 provides procedures and safeguards similar to the provisions of MHL section 33.03, the general provision governing involuntary commitment, and one which "has withstood challenges that it was facially unconstitutional." *United States v. Waters,* 23 F.3d 29, 32 (2d Cir.1994) (citing *Project Release v. Prevost,* 722 F.2d 960, 971-981 (2d Cir.1983)).

Plaintiff's claims regarding involuntary medication are similarly destined to fail. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication-but such a hearing need not be judicial in nature." *Project Release,* 722 F.2d at 981. Moreover, due process does not require a guarantee that a physician's assessments in their commitment evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

Plaintiff was transferred from Mid-State to the CNYPC on September 17, 2007, after he refused medication and mental health treatment, and once admitted continued to refuse medication without any rational basis for doing so. As a result, the Executive Director of the CNYPC petitioned the court, based upon the certifications of two examining physicians, for an order committing McQuilkin for six months. McQuilkin objected to the retention petition, and a hearing was held in Oneida County Supreme Court to determine whether the plaintiff was mentally ill and a proper subject for involuntary commitment. Following the hearing, on October 11, 2007, the court ordered plaintiff's commitment to CNYPC for six months.

After the commitment order was issued, McQuilkin persisted in his refusal to consent to the administration of medication. As a result, following a similar procedure as he did for commitment, based upon the certification of two examining physicians, defendant Sawyer petitioned the court for an order authorizing the administration of the medication against McQuilkin's will. McQuilkin opposed the petition, and, after a hearing, the court determined that he lacked capacity to make a reasoned decision regarding his own treatment and granted the petition. *United States v. Waters,* 23 F.3d at 32.

Because the evidence in the record establishes that defendants followed the procedures outlined in New York Corrections Law § 402 in obtaining authorization for plaintiff's involuntary commitment, and plaintiff was afforded the constitutionally required process to which he was entitled in connection with both that determination and the court ordered forced mediation, his procedural process claim lacks merit.[FN20]

FN20. To the extent that plaintiff may be suggesting that defendants failed to follow the procedures outlined in the MHL, his claim would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles. *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). For this reason, even if defendants had failed to follow the letter of the New York MHL provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim.

For the foregoing reasons, I recommend summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

judgment granting dismissal of plaintiff's due process claim arising out of his mental health confinement and treatment with psychiatric medication.

M. *Defendant Sangani's Motion to Dismiss*

***21** In his motion Dr. K. Sangani, who has yet to answer plaintiff's complaint, seeks its dismissal for failure to state a claim against him upon which relief may be granted. The focus of defendant Sangani's motion is upon plaintiff's failure to allege in his complaint facts showing Sangani's involvement in the constitutional deprivations alleged.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)). It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cri.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The only mention of Dr. Sangani in plaintiff's second amended complaint is in that portion wherein it is alleged, "[t]he next day plaintiff was transferred to Marcy Psychiatric Center and petition before the court upon the application of K. Perlman and the certificates of Doctors K. Sangani and V. Komareth on 10/11/07 ..." Amended Complaint. (Dkt. No. 35) ¶ 5. It is doubtful that the mere provision of a certificate in support of an involuntary commitment petition would suffice to establish a physician's personal involvement in a claim that the involuntary commitment was either retaliatory or accomplished through lack of procedural due process. As such, it seems doubtful that plaintiff's claim against Dr. Sangani is legally plausible, given his failure to sufficiently allege that defendant's personal involvement in a constitutional deprivation. Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. Proc. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). I note, however, that I have already recommended dismissal of plaintiff's claims growing out of that commitment as legally insufficient. I therefore similarly recommend that an order be entered dismissing plaintiff's claims against Dr. Sangani on this basis, without leave to replead.

N. *Defendants Komareth and Bodrog*

***22** Although defendants' motion does not explicitly request this relief, I have of my own initiative determined to raise the question of whether plaintiff's claims should proceed against the defendants Komareth and Bodrog, two defendants who were never served with the summons and complaint, and who, if this report and recommendation is adopted, would be the sole remaining defendants in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons. [FN21] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an

extension may be granted in the absence of good cause. *See* Zapata, 502 F.3d at 197.

FN21. That rule provides that

> [i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of such a case on its merits, rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case here, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, "thereby relieving [the] plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996).

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki,* in which the court cautioned that

> [a] *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739-40 (11th Cir.2010).

*Murray v. Pataki,* No. 09-1657, 2010 WL 2025613, at *2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R.App. Proc. 32.1). In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon these defendants and, to the extent necessary, eliciting the court's assistance. Plaintiff's original complaint in this action was filed on September 15, 2008. Summonses issued for defendants Komareth and Bodrog were initially returned unexecuted on January 16, 2009. See Dkt. Nos. 18, 19. The summonses were thereafter reissued and again forwarded to the Marshals for service on April 29, 2009, Dkt. No. 30, and yet again on May 14, 2009, Dkt. No. 36, but were, once again, returned as unexecuted on July 23, 2007 (defendant Komareth), Dkt. No. 44, and August 3, 2009 (defendant Bodrog) Dkt. No. 46. Despite the passage of more than one year, and at least one court intervention at plaintiff's request seeking an order compelling discovery, *see* Dkt. Minute Entry Dated 8/5/09, plaintiff has failed to request assistance from the court in locating and serving these defendants. On that basis I recommend dismissal of plaintiff's claims against defendants Komareth and Bodrog, without prejudice.[FN22]

FN22. In his complaint plaintiff alleges that defendants Komareth and Bodrog are physicians who submitted certifications in support of the applications to confine McQuilkin to the CNYPC and to require that he submit to the administration of psychiatric medication. Since I have already determined that as to the defendants Hanna and Hernandez, who also submitted certifications in support of these applications, plaintiff has failed to establish that his constitutional rights have been violated, for the same reasons I could recommend dismissal of plaintiff's against these two defendants on the merits as well.

IV. *SUMMARY AND RECOMMENDATION*

***23** Although defendants have asserted that certain of plaintiff's claims should be dismissed for failure to exhaust his administrative remedies, the record shows that special circumstances potentially exist that could justify excusing the plaintiff from the exhaustion requirement in this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

instance. I therefore recommend against dismissal of plaintiff's claims on this procedural basis.

Turning to the merits of plaintiff's claims, I note first that his claim for injunctive relief must be dismissed as moot, based upon his release from custody. I also recommend dismissal of all claims against the CNYPC, and plaintiff's damages claims against the defendants in their official capacities, on the basis of the immunity afforded under the Eleventh Amendment. I further find that the balance of plaintiff's claims are not supported by the record now before the court, and no reasonable factfinder could conclude that those claims are meritorious. Finally, I recommend dismissal of plaintiff's involuntary commitment and forced medication claims on the basis of the *Rooker-Feldman* doctrine, and find it unnecessary, in light of these determinations, to address the additional, alternative basis for dismissal of qualified immunity.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 66) be GRANTED, and that plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor be DISMISSED in all respects, with prejudice; and it is further

RECOMMENDED that defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) be GRANTED and that all claims against that defendant be DISMISSED for failure to state a plausible civil rights claim; it is further

RECOMMENDED that plaintiff's claims against defendants Komareth and Bodrog be DISMISSED, *sua sponte,* without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court amend the court's records to reflect the correct spelling of defendant Berggen's name; and it is further

ORDERED THAT the clerk serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

McQuilkin v. Central New York Psychiatric Center
Slip Copy, 2010 WL 3765847 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Rudolph McQUILKIN, Plaintiff,
v.
CENTRAL NEW YORK PSYCHIATRIC CENTER, J. Taylor, J. Berggren, V. Komareth, K. Sangani, Dr. Hernandez, D. Sawyer, S. Hanna, and G. Bodrog, Defendants.
Civil Action No. 9:08-CV-00975 (TJM/DEP).

Sept. 20, 2010.
Rudolph McQuilkin, New York, NY, pro se.

Krista A. Rock, New York State Attorney General, Peter B. Joslin, Jr., O'Connor, O'Connor Law Firm, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

***1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the Report-Recommendation and Order dated August 27, 2010 have been filed, and the time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report-Recommendation and Order is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report-Recommendation and Order for the reasons stated therein.

It is therefore,

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 66) is **GRANTED,** and Plaintiff's claims against the Central New York Psychiatric Center, Berggren, Hernandez, Sawyer, Hanna and Taylor are **DISMISSED** in all respects, with prejudice; and it is further

**ORDERED** that Defendant Sangani's motion to dismiss the complaint (Dkt. No. 56) is **GRANTED** and all claims against Sangani are **DISMISSED** with prejudice; and it is further

**ORDERED** that Plaintiff's claims against Defendants Komareth and Bodrog are **DISMISSED,** *sua sponte,* without prejudice.

The Office of the Clerk of the Court is instructed to close the file in this matter.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

McQuilkin v. Central New York Psychiatric Center
Slip Copy, 2010 WL 3765715 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

***1** Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

## IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

***2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103,97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See* *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety." ' *Id.* (*quoting* *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

***3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See* *Murphy v. Grabo,* 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See* *Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See* *Murphy,* 1998 WL 166840, at *4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See* *Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 *(citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2).* Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

***4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

***5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

***6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York State Department of Correctional Services; Peter J. Lacy, Superintendent at Bare Hill Corr. Facility; Wendell Babbie, Acting Superintendent at Altona Corr. Facility; and John Doe, Corrections Officer at Bare Hill Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Albany, Eric D. Handelman, Esq., Asst. Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

***1** This matter comes before the Court following a Report-Recommendation filed on August 21, 1998 by the Honorable David R. Homer, Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York.

No objections to the Report-Recommendation have been raised. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not clearly erroneous. *See*Fed.R.Civ.P. 72(b), Advisory Committee Notes. Accordingly, the Court adopts the Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is GRANTED; and it is further

ORDERED that the complaint is dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m), and the action is therefore dismissed in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of Correctional Services ("DOCS"), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that while incarcerated in Bare Hill Correctional Facility ("Bare Hill") and Altona Correctional Facility ("Altona"), defendants violated his rights under the Eighth and Fourteenth Amendments.[FN2] In particular, plaintiff alleges that prison officials maintained overcrowded facilities resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

***2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

***3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See* *Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

***4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See* *Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also* *Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See* *Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

IV. Failure to Complete Service

***5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.







Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jose J. SHOMO, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 03 Civ. 10213(AKH).

April 4, 2005.

*OPINION AND ORDER GRANTING MOTION TO DISMISS, WITH PARTIAL LEAVE TO REPLEAD*

HELLERSTEIN, J.

***1** Plaintiff Jose J. Shomo, a *pro se* inmate in the custody of the Department of Correctional Services of the State of New York, brings this suit pursuant to 42 U.S.C. § 1983, seeking compensatory damages in the amount of $100 million relating to alleged violations of the First, Fourth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution by thirteen named defendants and 5 unnamed defendants. Plaintiff bases his claims on alleged deliberate indifference to his serious medical needs relating to his upper body paralysis and nervous system afflictions, assault, and destruction of personal property. Defendants have filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on the grounds that the action is barred by plaintiff's failure (1) to file his claim within the statute of limitations; (2) to file a notice of claim to preserve state law claims; (3) to allege personal involvement on the part of certain defendants; (4) to properly state a deliberate indifference to medical needs claim; (5) to properly state a destruction of property claim; and (6) because of certain defendants' qualified immunity. I address such assertions by defendants as are necessary to resolve this motion.

I. Background

From September 20, 1999 to January 4, 2001, Plaintiff was in the custody of the New York City Department of Corrections (DOC). Plaintiff alleges that during that time various corrections officers and medical care providers were responsible for numerous and continuous incidences of deliberate indifference to his medical needs, assault, and destruction of property. Plaintiff's allegations are summarized below.

A. *The Deliberate Medical Indifference Allegations*

On his first day in custody, September 20, 1999, Shomo received a physical examination from Dr. Christen Pedestu, who found that Shomo suffered from right arm paralysis and limited use of his left arm. *See* Compl., ¶ 30. Dr. Pedestu also noted that "Plaintiff was receiving Health Home Attendants Services while he was on the streets." Compl., ¶ 31. Accordingly, Dr. Pedestu recommended that the DOC admit Shomo to the North Infirmary Command (NIC). *Id.* Over the next five months, Shomo met with a barrage of doctors, including defendants Dr. Shahid Nawaz, ¶¶ 35, 41; Dr. Saroja Singha,[FN1] ¶¶ 39, 40, 78, 80; Dr. Joy Meyers, ¶¶ 40, 44-47, 71; Dr. Marie Francois, ¶ 52; Dr. Rameem Seegobin, ¶¶ 67, 71; and various unnamed doctors.

FN1. Defendant identifies Dr. Singha as "Dr. Saroga Singa" in his complaint. Compl., ¶ 15. I adopt the spelling provided by the defendants, "Saroja Singha."

Plaintiff Shomo's allegations relate that he suffered pain and paralysis in his arms, making it difficult or impossible to perform activities of daily living (ADLs) such as eating, dressing, grooming, toileting, or bathing. *See, e.g.,* Compl., ¶¶ 33, 42-46. Medical and security staff at the DOC refused to provide assistance with those activities, despite Plaintiff's repeated requests. *See e.g.,* Compl., ¶¶ 42-46, 50, 51, 54, 59, 66. Further, Plaintiff alleges that he was improperly housed with the general population of inmates during his stays at various detention facilities, when he should have been admitted to infirmary custody because of his medical condition. *See, e.g.,* Compl., ¶¶ 33, 49, 51, 56, 62-66. As a result of these deprivations and improper treatment, Plaintiff states that he experienced "muscle spasms, migraine headaches, severe back and neck pain, as well as emotional trauma." Compl., ¶ 99. In particular, Shomo alleges that since DOC

staff would not assist with him his ADLs, he was forced to pay other inmates to perform those activities for him or "remain dirty, stinking, unbathed, etc." Compl., ¶ 51. *See also* Compl., ¶ 97.

***2** Shomo also alleges that an injury to his foot went untreated by staff for a prolonged period of time, causing unnecessary pain and requiring Plaintiff to hop around on one foot for seven weeks while his foot healed. *See* Compl., ¶¶ 78-81, 101. Because medical staff refused to treat his foot, and because staff refused to provide Plaintiff with a wheelchair, Plaintiff allegedly fell down several times, causing injury to his left shoulder and ribs, as well as emotional trauma. *See* Compl., ¶ 102.

Finally, Plaintiff alleges he suffered injury to his left arm as the result of corrections officers' refusal to obey instructions provided by the medical staff at the DOC. Following a court appearance on October 7, 1999,[FN2] Corrections Officer Pelite indicated that he intended to handcuff Shomo to another inmate for the return trip to Rikers Island detention facility. *See* Compl., ¶ 38. Plaintiff then explained to Pelite that he carried medical instructions describing how to handcuff him. Officer Pelite then notified the area supervisor, "Captain Swartz." [FN3] *Id.* According to the complaint, Captain Swartz said "he didn't give a hoot" what the medical instructions said, that it was too late to call special transportation, NIC or anyone else. *Id.* He then ordered Shomo to be handcuffed to the other inmate. *Id.* While handcuffed to the other inmate, Shomo began to suffer muscle spasms. *Id.* He later slipped while boarding the bus, causing his left arm, which was cuffed to the other inmate, to be wrenched upwards. *Id.* After these incidents, Plaintiff was taken to the NIC where he indicated that he was feeling pain and could not move his left arm. *Id.*

FN2. Plaintiff's complaint states that the events in this paragraph occurred on September 7, 1999, but given the sequence of events he describes, it is clear that he meant October 7, 1999.

FN3. According to Defendant's Motion to Dismiss, Captain Swartz has not been identified by the Department of Corrections. *See* Reply Mem. of Law in Further Support of City Defendant's Mot. to Dismiss at 3.

B. *The Assault Allegation*

On March 11, 2000, Plaintiff alleges that after a brief exchange of words, Corrections Officer Little reached through the bars of his cell, and then "violently pulled him into the bars," Compl., ¶ 91, as well as "scratching and clawing him." Compl., ¶ 135. As a result, Plaintiff suffered severe pain to the left shoulder, lacerations, swelling, and bruises. *See* Compl., ¶ 136.

C. *Destruction of Property*

Shomo states generally that corrections officers destroyed his personal property during searches of his cell and that this occurred at least 100 times between October 8, 1999, and January 4, 2001. *See* Compl., ¶ 95. Plaintiff additionally states that he suffered physical and emotional pain after each cell search because his physical ailments made it painful for him to rearrange his cell and that he was compelled to pay other inmates to assist him. *See* Compl., ¶ 97.

II. Discussion

A. *Standards on a 12(b)(6) Motion to Dismiss*

A Rule 12(b)(6) motion requires the court to determine whether plaintiff has stated a legally sufficient claim. A motion to dismiss under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). The court's function is "not to assay the weight of the evidence which might be offered in support" of the complaint, but "merely to assess the legal feasibility" of the complaint. *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). In evaluating whether plaintiff may ultimately prevail, the court must take the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699-700 (2d Cir.1994). Moreover, a complaint submitted *pro se* must be liberally construed and is held to a less rigorous standard of review than formal pleadings drafted by an attorney. *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

173, 66 L.Ed.2d 163 (1980); *Salahuddin v. Coughlin,* 781 F.2d 24, 29 (2d Cir.1986).

B. *Service of Process*

***3** Corporate Counsel for the City of New York accepted service of process and represents defendants City of New York, New York City Department of Corrections, William Fraser, Eric Perry, Dr. Saroja Singh, and Dr. Marie Francois. *See* Letter From Jordan M. Smith to Hon. Alvin K. Hellerstein of April 26, 2004. Corporate Counsel provided addresses for defendants Pauline Little, Dr. Joy Myers, St. Barnabas Hospital, Marquita Wright, Dr. Shahid Nawaz, and Dr. Rameeh Seegobin. *Id.* In his Opposition to Defendant Motion to Dismiss ("Plaintiff's Opposition"), Shomo indicates that an attempt to serve defendants Wright, Dr. Nawaz, Dr. Seegobin by United States Marshals did not succeed, presumably because the addresses provided by the City of New York were no longer accurate when the attempt was made. *See* Plaintiff's Opposition ¶ 6.

Under ordinary circumstances, the plaintiff must serve notice on the defendant within 120 days of filing the complaint. *See* Fed. R. Civ. Proc. Rule 4(m). This rule is not strictly enforced in *pro se* prisoner cases. *See Carney v. Davis,* 1991 U.S. Dist. LEXIS 10254, No. 90 Civ. 2591, 1991 WL 150537, at *3 (S.D.N.Y.1991) (declining to dismiss *pro se* prisoner's action despite three and one-half years delay in service). I find that Plaintiff Shomo requested that U.S. Marshals serve notice on Drs. Nawaz and Seegobin within a reasonable period of time and that he was not in a position to monitor whether they succeeded in serving those defendants. I therefore direct Corporate Counsel for the City of New York to investigate and provide Shomo with updated addresses for Drs. Nawaz and Seegobin, and to confirm that Dr. Myers has been served notice, as these are the only three persons against whom Plaintiff has leave to re-plead.

C. *Statute of Limitations*

Plaintiff Shomo states claims under 42 U.S.C. § 1983, the Civil Rights Act of 1964, the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990. *See* Compl., ¶¶ 97-136. The defendants argue that the statute of limitations has expired for all claims made by Shomo pursuant to those Acts.

1. *42 U.S.C. § 1983*

Congress did not provide a statute of limitations period for the filing of § 1983 claims. In the absence of congressional specification, the Supreme Court has held that "[w]here state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." *Owens v. Okure,* 488 U.S. 235, 250 (1989). In New York, the relevant period is three years. *See* N.Y.C.P.L.R. § 214(5) (Consol.2004); *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (parties stipulated that relevant period for § 1983 claim was three years).

Shomo was in prison at the time he filed this lawsuit. Pursuant to the "mailbox rule" governing *pro se* complaints by incarcerated litigants, Shomo filed his complaint on September 26, 2003, the day he swore his complaint before a Notary Public and conceivably handed it to prison officials. *See Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (complaint deemed filed on date prisoner gives the complaint to prison officials). Under the three year statute of limitations, Shomo's complaint reaches back to September 26, 2000. As defendants argue, however, Shomo does not identify any specific conduct by defendants occurring after April 14, 2000, although he does generally allege that defendants were deliberately indifferent to his serious medical needs through his release from prison on January 4, 2001. Shomo's complaint therefore falls under the statute of limitations. Since, however, he also alleges continuing indifference, and therefore it is possible Shomo may allege a § 1983 claim that accrues after September 26, 2000, I allow that possibility, as I discuss later in this opinion.

***4** Federal law governs the question of when the § 1983 claim accrues, even though the statute of limitations is borrowed from state law. *See M.D. v. Southington Bd. of Educ.,* 334 F.3d 217, 221 (2d Cir.2003); *Pearl v. City of Long Beach,* 296 F.3d at 80 n. 2. Under federal law, the statute of limitations begins to run once the plaintiff knows or has reason to know of the injury on which his claim is based. *Comwell v. Robinson,* 23 F.3d 694, 703 (2d Cir.1994) (citing *Singleton v. New York,* 632 F.2d 185, 191 (2d Cir.1980)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

For the purposes of determining when Shomo's claim accrued, I must first evaluate whether the doctrine of continuing violation is applicable to his case. The doctrine of continuing violation is available to litigants who bring Title VII employment discrimination suits and tolls the statute of limitation such that it does not begin until the last injurious act. *See, e.g., AMTRAK v. Morgan,* 536 U.S. 101, 116-17 (2002). To date, several decisions have discussed, but refrained from applying, the doctrine of continuing violation to medical indifference claims. *See Pino v. Ryan,* 49 F.3d 51, 54 (2d Cir.1995) ("plaintiff has alleged no facts indicating a continuous or ongoing violation"); *Doe v. Goord,* 2004 U.S. Dist. LEXIS 24808 (D.N.Y.2004) ( "Whether the 'continuing violation doctrine' should apply also need not be determined at this stage"); *Griswold v. Morgan,* 317 F.Supp.2d 226, 232 (D.N.Y.2004) (declining to decide whether continuous violation doctrine applied to deliberate medical indifference claim and dismissing on other grounds); *Thomas v. Wright,* 2002 U.S. Dist. LEXIS 19618 (D.N.Y.2002) (same). However, in *Cole v. Miraflor,* 2001 U.S. Dist. LEXIS 1681 (D.N.Y.2001) (Sweet, J.) ("Second Circuit has recognized that the rule *may* apply in [deliberate medical indifference case]") (citing *Pino v. Ryan, supra* ) (emphasis added), the doctrine of continuing violation in a deliberate medical indifference case was applied. I note that Cole's complaint was later dismissed on administrative exhaustion grounds. *See* 195 F.Supp.2d 496 (S.D.N.Y.2002).

In *AMTRAK v. Morgan, supra,* the United States Supreme Court clarified the doctrine of continuing violation as it applied to Title VII employment discrimination claims, holding that "[h]ostile environment claims are different in kind from discrete acts." 536 U.S. at 115. Discrete acts are those acts that constitute a "separate actionable" violation by the defendant, *id.* at 114, and "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. Hostile environment claims, on the other hand, involve acts that "may not be actionable on [their] own." *Id.* at 115. Instead, the "entire hostile work environment encompasses a single unlawful employment practice," *id.* at 117, or in other words the plaintiff's injury has a temporal component-he or she is subjected to discriminatory conditions day after day, and while each day's undeserved humiliations may not independently provide grounds for a lawsuit, in the aggregate the plaintiff has a colorable claim of discrimination.

***5** Shomo's claim more closely resembles the accumulation of acts that create a hostile work environment claim, than allegations of discrete acts of deliberate indifference. This is not to say that all claims of deliberate indifference to serious medical needs should be characterized as hostile work environment claims for the purposes of tolling the statute of limitations. In fact, many such claims allege discrete behavior, as when an inmate suffers a serious injury that demands immediate attention, or when medical care provider acts in such a way that manifests deliberate indifference to the possibility of harm. Here, Shomo allegedly entered prison already suffering from a chronic neurological condition that, unlike a bleeding knife wound, required attention, but not necessarily immediate attention. Moreover, it is difficult to characterize an omission to provide care as a discrete act when the needed care can occur at any point during the day or week with identical effect. When the inmate is paralyzed and unable to perform ADLs, except with great pain and humiliation, as Shomo alleges, the desired assistance is frequently needed, but a single failure to provide it does not, by itself, cause an actionable injury.

I conclude that Shomo's claim is analogous to the hostile work environment described in *AMTRAK, supra,* and that tolling the statute of limitations on the basis of continuing violation in the deliberate medical indifference context has sufficient support in this Circuit, the Supreme Court, and in the rationale underlying the doctrine. Just as the hostile work environment confronts the claimant with daily indignations that rise to the level of a lawsuit only when aggregated, so might the suffering inmate lack a claim on the first day the prison authorities or doctors ignore his medical condition, and on the second day, and the third. But over a stretch of months, the prisoner's suffering at the hands of indifferent corrections officers and medical staff might ripen into a legitimate complaint, and in such a case, it would make sense to consider the entire period of medical neglect, meaning that the unlawful practice would end on the last day prison authorities had a duty to provide medical care to Plaintiff

Shomo. If this were true, Shomo's claim might accrue later than September 26, 2000, and until January 4, 2001, the day he was released from prison. Shomo's claim thereby might come within the statute of limitations.

Further, the doctrine of continuing violation applies even if the plaintiff became aware of the cause of action before the statute of limitations ran, so long as a related act or omission that forms part of the hostile environment, or in this case, deliberate medical indifference claim, occurred within the statute of limitations. *See AMTRAK v. Morgan,* 536 U.S. at 117-19. Thus even if Shomo were aware of a complete cause of action on April 14, 2000, under the doctrine of continuing violation, he would not be required to file suit within three years of that date *if* related acts or omissions of deliberate medical indifference occurred later. *See id.*

***6** Since I hold that the doctrine of continuing violation applies to deliberate indifference claims, I now must consider whether Plaintiff Shomo alleges facts that enable him to invoke the doctrine. To allege continuing violation, the plaintiff must "allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999). I hold, giving Shomo the pleading benefits of a *pro se* litigant, that Shomo has sufficiently alleged the existence of an ongoing policy of denying him medical treatment, but that he has not sufficiently alleged non-time-barred acts in furtherance of the alleged policy of denying him medical treatment.

Shomo's allegations might amount to deliberate medical indifference taking place between September 20, 1999, and April 14, 2000, but it is not clear. Shomo does not make any specific allegations, after April 14, 2000, that he sought medical assistance or was improperly denied care. His general allegations encompassing the period from January 29, 1999 to January 4, 2001, are insufficient to allege non-time-barred acts or omissions as required by *Harris v. New York, supra.*

Therefore I dismiss the complaint, but in light of the liberality accorded *pro se* litigants, *Boag v. MacDougall,* 454 U.S. 364 (1982), I give Plaintiff leave to re-plead. The re-pleading, which must be served and filed within 30 days after the City makes the report required by this Opinion, must give specific time, place, and circumstances to show that Plaintiff has a real, non-time-barred claim for relief.

2. *Rehabilitation Act of 1973; Americans with Disability Act of 1990*

The Rehabilitation Act of 1973, 29 U.S.C. § 704, and the American with Disability Act of 1990, 42 U.S.C. § 12132, both adopt the state residual personal injury statute of limitations, which in New York is three years. *See Harris v. City of New York,* 186 F.3d at 247-48. I decline to adopt the statute of limitations analysis above for these statutes, however, because Shomo clearly lacks a cause of action under either statute.

3. *Statute of Limitations as it Relates to Corrections Officer Little*

Unlike the provision of medical treatment, the assault allegedly committed by Corrections Officer Little cannot be construed as part of a deliberate medical indifference claim. An assault is independently actionable, and as such the logic that underlies the doctrine of continuing violation is inapplicable. The complaint as it relates to Corrections Officer Little is dismissed with prejudice.

4. *Statute of Limitations as it Relates to Captain Swartz*

Although Shomo might adequately state a claim of deliberate indifference to his medical needs against defendant Captain Swartz, I dismiss the claim against him with prejudice for the same reasons as apply to Corrections Officer Little. Specifically, the single incident that involved Captain Swartz, *see* Compl., ¶ 38, does not fit within the larger pattern of refusal to assist with ADLs that form the basis for Plaintiff's continuing violation theory.

5. *Statute of Limitations as it Relates to Destruction of Property Claims*

***7** The doctrine of continuing violation does not apply to destruction of property claims, and since Shomo does not specify any such acts after September 26, 2000, his claim is dismissed with prejudice to the extent that it alleges destruction of property.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

D. *Lack of Personal Involvement*

I dismiss Plaintiff's complaint as it relates to defendants William Fraser and Eric Perry since Plaintiff has failed to demonstrate the kind of personal involvement required to show constitutional violations. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted); *see also Back v. Hastings On Hudson Union Free School Dist.,* 365 F.3d 107, 127 (2d Cir.2004) ("An individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority,' but can be held liable if he was personally involved in the alleged deprivation." (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996))); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) ("The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.") (citation omitted).

*Colon* instructs that the "personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." 58 F.3d at 873 (citations omitted).

In his complaint, Shomo identifies Commissioner Fraser and Deputy Commissioner Perry as having responsibility for operating and maintaining DOC jails in the City of New York. *See* Compl., ¶¶ 5, 6. Shomo only mentions these defendants again to indicate that he filed a complaint with their respective offices alleging the violations discussed above. *See* Compl., ¶¶ 26, 73. In his Opposition to Defendant's Motion to Dismiss, Shomo adds that although Fraser and Perry were aware of the violations, they did nothing to protect him. Plaintiff's Opp., ¶ 15, and cites *Brown v. Coughlin,* 758 F.Supp. 786 (1991) (finding allegation against Commissioner sufficient to survive summary judgment).

Shomo does not adequately state that Fraser and Perry were aware of the violations he alleges. He does not indicate when he complained to their offices, or what the content of the complaint was. *See* Compl., ¶ 26, 73. Nor does the attempt to explain how defendants Fraser and Perry were responsible, directly or indirectly, for the acts of the other named defendants, or the prevailing conditions that contributed to Plaintiff's injuries. Therefore, Plaintiff fails to state a claim against defendants Fraser and Perry and I order that the complaint against each of them is dismissed, with prejudice.

E. *Municipal Liability and the Department of Corrections*

***8** In order to establish the liability of a municipality in an action under § 1983 for unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of his constitutional rights resulted from a municipal custom or policy. *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). To establish the violation, the plaintiff must demonstrate the existence of the policy and show that the policy caused his injuries. *See Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 824 n. 8 (1985)). The municipal policy does not need to be an explicitly stated rule or regulation. A plaintiff may state a claim against a municipality by showing that it repeatedly ignored complaints that would put it on notice of the alleged violations. *See Vann v. City of New York,* 72 F.3d at 1049.

Shomo fails to identify any municipal or DOC policy or custom that caused his injuries and he does not effectively claim that the DOC ignored his complaints. Plaintiff asserts that he was not transferred to Goldwater Hospital because of a DOC policy that restricted intake at the hospital to HIV positive patients. *See* Compl., ¶ 71, 129. This policy could not have caused Shomo's injuries, nor did it prevent the DOC staff from assisting him with ADLs at the NIC or other hospitals under contract with the DOC, like St. Barnabas Hospital.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The argument that the DOC had a policy of ignoring medical issues in general, or Shomo's medical issues in particular, fails because Shomo was seen by many doctors and received numerous medical tests. Shomo's complaint conveys that between the beginning of his confinement on September 20, 1999 and the end of his detailed allegations on March 11, 2000, he received attention from medical staff on nearly a weekly basis. *See generally* Compl., ¶¶ 29-91. He also received a nerve conduction study, Compl., ¶ 82; a diagnostic MRI, Compl., ¶ 83; and various x-rays, Compl., ¶ 86. Plaintiff also indicates that he received prescribed medication. *See e.g.,* Compl., ¶ 39. A reasonable DOC supervisor or other individual with responsibility for agency policy reviewing this record of treatment could easily conclude that Shomo was receiving adequate care. Plaintiff's claim against the City of New York is dismissed with prejudice.

Plaintiff's claim against the Department of Corrections is dismissed with prejudice as all claims against City agencies shall be construed as claims against the City of New York. *See* N.Y. City Charter, Ch. 17, § 396; *Echevarria v. Dep't of Correctional Servs.,* 48 F.Supp.2d 388, 391 (S.D.N.Y.1999) ("suits against the DOC are suits against a non-suable entity and are properly dismissed on that basis").

F. *Deliberate Medical Indifference*

The government has an obligation "to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). In order to establish a claim under § 1983 for failure to provide medical attention, the plaintiff must allege not only that he suffered from a serious injury, but also that the injury sustained was caused by "deliberate indifference" on the part of the defendants. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Deliberate indifference might be found when an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw that inference. *Id.* at 834. Though a plaintiff must prove at trial that the defendant had a state of mind "equivalent to criminal recklessness," *Hernandez v. Keane,* 341 F.3d at 144, the subjective element of intent may be pleaded generally. *See Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir., 2002).

***9** Plaintiff Shomo does not allege medical malpractice, nor would such a claim be actionable under Eighth Amendment law. *See Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Eighth Amendment is not a vehicle for bringing medical malpractice claims"). First, he claims that although various doctors ordered that he receive assistance with his ADLs, DOC staff, including nurses and corrections officers, refused to provide that assistance. Second, Shomo alleges that Drs. Myers, Nawaz, and Seegobin transferred him to general population even though they knew, on the basis of other doctors' findings, that he was unfit for general population living.

*Failure of Medical Staff and Security Staff to Assist with ADLs*

As to the first general allegation, Shomo has not named individuals who deliberately ignored medical instructions, with the exception of the aforementioned Captain Swartz, Compl., ¶ 38. Many of his allegations simply state that although he requested assistance with ADLs from medical staff and security staff, none was given, in spite of alleged doctor's orders. *See* Compl., ¶¶ 45, 50, 51, 54, 59, 63, 66, 68, 70, 72, 76, 94 (medical and security staff refused to assist with ADLs). Shomo alleges some of his injuries in the passive voice and these allegations do not name any defendant at all, except by inference. *See e.g.,* Compl., ¶ 56 ("Plaintiff was not transferred to NIC despite Dr. Daniel's expressed orders."); Compl., ¶ 58 ("In spite of Dr. Appel's order the day before, Plaintiff was cleared for housing in general population."); Compl., ¶ 58 ("Plaintiff was to receive assistance with [ADLs]. These orders were not carried out.").

These allegations do no more than provide context to Shomo's complaint. The plaintiff, however, must identify the party responsible for his injuries, and Shomo does not do this with respect to the medical and security staff's alleged failure to assist with ADLs. I evaluate the deliberate indifference to serious medical needs claims as to each of the named individuals who could possibly remain in the suit below.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*St. Barnabas Hospital*

Plaintiff Shomo identifies St. Barnabas Hospital ("the hospital") in paragraphs 119, 124, 125, 126, and 129, arguing that the hospital had institutional responsibility to ensure that medical staff provided proper care and that the hospital failed to provide that level of care. I assume, without deciding, that the hospital acts under color of state law with respect to DOC inmates and is therefore subject to claims under § 1983.

The hospital is subject to the supervisory defendant analysis of *Colon, supra.* Shomo does not adequately explain how the hospital created a policy or custom under which unconstitutional practices occurred, allowed the continuance of such a policy or custom, was grossly negligent in supervising subordinates who committed the wrongful acts, or exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon,* 58 F.3d at 873. It is not apparent from Shomo's complaint that any supervising authority at the hospital was aware that medical staff refused to comply with doctors' instructions, or that the hospital created or fostered a policy that would encourage medical staff to refuse to comply. The complaint is dismissed with respect to St. Barnabas Hospital.

*Dr. Saroja Singh*

***10** Plaintiff Shomo identifies Dr. Saroja Singh in paragraphs 15, 39, 40, 78, 80, 110, and 111, alleging that Dr. Singh refused to examine him, Compl., ¶ 39; and denied his request for a second opinion, Compl., ¶ 39, 110. Shomo's claim against Dr. Singh falls short because he indicates that during his medical appointments Dr. Singh asked him questions about his condition and prescribed him medication. At most, Shomo alleges that Dr. Singh was negligent in giving treatment, and "negligence, even if it constitutes medical malpractice, does not, without more, give rise to a constitutional claim." *Smith v. McGinnis,* 2003 U.S. Dist. LEXIS 25768 (D.N.Y.2003) (citing *Neitzke v. Williams,* 490 U.S. 319, 321-22 (1989)). To rise to the level of medical indifference, however, the defendant must have been aware of the condition and deliberately refused to treat it with conscious disregard of the substantial risk of serious harm. *See Hernandez v. Keane,* 341 F.3d at 144. Although Plaintiff is not required to plead that Dr. Singh acted with the "very purpose of causing harm," *Farmer v. Brennan,* 511 U.S. at 835, he must at least attempt to show that Dr. Singh was aware of the substantial risk of harm to the defendant and chose to ignore it. Shomo concludes that Dr. Singh's failure to provide more extensive treatment resulted in the loss of the use of his left arm, Compl., ¶ 110 but other parts of his complaint undermine this assertion. In particular, Shomo's complaint describes substantial neurological problems affecting his left arm that pre-dated his interaction with Dr. Singh, and indeed, appear to pre-date his incarceration. *See* Compl., ¶ 31 (Plaintiff's medical records showed that he received "Home Health" services); Compl., ¶ 36 (Physician's Assistant Pitchford issued medical instructions ... "to prevent further neurological damage to Plaintiff's left arm."). On the face of Shomo's pleading, therefore, it is clear that Dr. Singh was not the cause of the neurological damage to his left arm, and given the nature of his condition, it seems highly unlikely that Dr. Singh was in a position to make it worse when she treated him on several different occasions. The complaint is dismissed with prejudice as it relates to Dr. Singh.

*Dr. Marie E. Francois*

Plaintiff Shomo identifies Dr. Francois two times in his complaint, in paragraph 20, declaring that she is a physician with responsibility for treating inmates, and in paragraph 52, alleging that Dr. Francois denied him a second opinion following the results of an examination that indicated that he was able to perform ADLs. Shomo clearly fails to state a claim against Dr. Francois, since prisoners are not constitutionally entitled to a second medical opinion. *See Smith v. McGinnis,* 2003 U.S. Dist. LEXIS 25768 *13-14 (doctor's decision not to seek second opinion not deliberate indifference to serious medical needs). The complaint is dismissed with prejudice as it relates to Dr. Francois.

*Physician Assistant Marquita Wright* [FN4]

FN4. Plaintiff identifies defendant Wright as "Dr. Wright;" corporate counsel for the City of New York identifies the defendant as Physician Assistant Marquita Wright. I adopt the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant's title for Ms. Wright.

***11** Plaintiff Shomo identifies Ms. Wright in paragraph 19 and her name does not appear again the complaint. The complaint is dismissed as it relates to Ms. Wright.

*Dr. Joy Myers,*[FN5] *Dr. Shahid Nawaz,*[FN6] *and Dr. Rameeh Seegobin* [FN7]

FN5. Dr. Myers appears in paragraphs 14, 44-47, 71, 113, 121, 125, and 129.

FN6. Dr. Nawaz appears in paragraphs 17, 35, 41, 64, and 120.

FN7. Dr. Seegobin appears in paragraphs 18, 67, 71, 120, 121, and 129.

Plaintiff Shomo is granted leave to re-plead his claim as it relates to Drs. Myers, Nawaz, and Seegobin. The sequence of events he describes fulfills the requirements to state a deliberate indifference to medical needs claim under § 1983. Shomo alleges that these doctors ordered his discharge from the infirmary to the prison general population while fully aware that he was incapable of performing ADLs. *See* Compl., ¶ 113 (Dr. Myers); Compl., ¶ 120 (Drs. Nawaz and Seegobin).

On October 13, 1999, an unnamed neurologist at Bellevue Hospital determined that Shomo was capable of performing ADLs after performing a "non focal exam." *See* Compl., ¶ 48, 113. Following this exam, however, multiple doctors determined that Plaintiff required assistance with ADLs. *See* Compl., ¶ 55 (Dr. Vettigunta on November 2, 1999); Compl., ¶ 56 (Dr. Daniel on November 4, 1999); Compl., ¶ 57 (Dr. Appel on November 4, 1999); Compl., ¶ 62 (Dr. Yeager on November 20, 1999). On February 11, 2000, Dr. Ismaila Adiatu found that Plaintiff was declared fit for general population "due to a medical error." *See* Compl., ¶ 84. Finally, on March 8, 2000, Dr. Adiatu "emphasized that Plaintiff's case should be reviewed [at] the highest level, because Plaintiff was not receiving the proper care." Compl., ¶ 90.

Shomo alleges that each of the named doctors was aware that other doctors had found that he needed assistance with ADLs. *See* Compl ., ¶ 120 ("in spite of having reviewed various medical records from outside hospitals [and] diagnostic test results indicating Plaintiff's need for assistance with ADLs, Dr. Nawaz and Dr. Seegobin ordered Plaintiff discharged from infirmary care"); Compl., ¶ 121 (same allegation repeated for Drs. Myers and Seegobin). As physicians, these individuals would have known of and disregarded "an excessive risk to inmate health or safety," *Farmer v. Brennan,* 511 U.S. at 834, by transferring Shomo to general population where he was unable to eat or bathe because of his upper extremity paralysis. Shomo persistently requested assistance with ADLs, and multiple doctors agreed that his condition necessitated that assistance. Each doctor was aware of these facts from which the inference could be drawn that a substantial risk of serious harm existed.

Shomo alleges that he suffered serious physical pain and emotional trauma as a result of his residence in the general population with medical care. He also alleges that the refusal of medical and security staff to assists with ADLs deprived him of the conditions of basic human decency. *See e.g.,* Compl., ¶ 114 (Plaintiff could not comply with strip searches, forced to eat like a dog, pay other inmates to assist him with toileting, bathing, and washing clothes). Although these consequences "do not inevitably entail pain" they may nevertheless fail to comport with contemporary standards of decency. *See* *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996) (deprivation of medically-prescribed eyeglasses sufficiently serious to violate the Eighth Amendment).

III. Conclusion

***12** The complaint is dismissed with prejudice as it relates to defendants City of New York, New York City Department of Corrections, Commissioner William Fraser, Deputy Commissioner Eric Perry, Captain Swartz, Corrections Officer Little, St. Barnabas Hospital, Marquita Wright, Dr. Saroja Singh, and Dr. Marie Francois. The complaint is dismissed without prejudice and Shomo is given leave to re-plead as it relates to defendants Dr. Joy Myers, Dr. Shahid Nawaz, and Dr. Rameeh Seegobin.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Corporate Counsel for the City of New York is directed to determine the current addresses of defendants Drs. Myers, Nawaz, and Seegobin, and to ascertain whether they have been served with notice. Corporate Counsel shall file a report with Plaintiff and this Court containing the service of notice status of remaining defendants and their addresses within 30 days.

Plaintiff is advised that although he is granted leave to re-plead against Drs. Myers, Nawaz, and Seegobin, he must allege specific acts causing injuries committed by or at the instruction of one or more of those individuals occurring after September 26, 2000, in order to come within the continuing violation doctrine he seeks to invoke. If he fails to do so on re-pleading, his complaint will be dismissed with prejudice. The re-pleading must be filed within 30 days after the City files its report with the Plaintiff and this Court.

The Clerk of the Court Shall mark this case as closed.

SO ORDERED.

S.D.N.Y.,2005.

Shomo v. City of New York
Not Reported in F.Supp.2d, 2005 WL 756834 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Donald FELIX, Plaintiff,
v.
Dr. SIMON; O'Connor, CPL; Edward Reilly, Sheriff; Steele, Nurse; Dr. Grant; Mr. Aherne, Mcd. Tech; Mr. Kupec, Physician Assistant; Mr. Intal, Nurse; and Ms. Bonds, Defendants.
No. 01–CV–6023(SJF)(LB).

Jan. 14, 2004.
Donald Felix, Stormville, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma, NY, Catherine V. Battle Mineola, NY, Edward J. Troy, Troy & Troy, Centereach, NY, for Defendants.

REPORT AND RECOMMENDATION

BLOOM, Magistrate J.

***1** The Honorable Allyne R. Ross, United States District Judge, referred this matter to the undersigned for a Report and Recommendation in accordance with 28 U.S.C. § 636(b) (2000). On October 15, 2003, this case was reassigned to the Honorable Sandra J. Feuerstein, United States District Judge. For the following reasons, it is recommended that defendants' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure should be granted and the Court should dismiss the complaint with prejudice.

PROCEDURAL HISTORY

Plaintiff filed his original pro se complaint alleging defendants violated his rights under 42 U.S.C. § 1983 on September 5, 2001. On September 5, 2002, defendants Job Simon, M.D.; Nickia Steele, R.N.; Sandra Heinz–Grant, M.D.; Jerry Ahere, P.A.; William Kupec, P.A.; Perry Intal, R.N.; and Linda Bonds, M.D. (collectively the “medical defendants”) filed a motion for summary judgment, with the Local Rule 56.2 Notice to Pro Se Litigants Opposing a Summary Judgment Motion (“Local Rule 56.2 notice”). The remaining defendants, Sheriff Reilly, Corporal O'Connor, and Mr. Ahem (collectively the “county defendants”) moved to dismiss the complaint on September 5, 2002, but the motion attached materials outside the pleadings and did not include the Local Rule 56.2. notice. Thereafter, plaintiff filed an amended complaint on February 3, 2003.

By order dated February 12, 2003, the Court granted plaintiff leave to file the amended complaint, directed the defendants to re-serve their motions with the Local Rule 56.2. notice, and set a new motion schedule. However, since the medical defendants included the Local Rule 56.2 notice with their original motion, the medical defendants were not required to re-serve their motion. *See* Order dated March 10, 2003. The county defendants filed their motion for summary judgment on May 12, 2003. Plaintiff filed oppositions to both motions and defendants all filed replies.

BACKGROUND

Plaintiff's “claim is for negligence of the Nassau Medical Staff that has lead to pain, suffering, and mental anguish.” Amended Complaint (hereinafter “Complaint”) at IV(a).[FN1] The following facts are alleged by plaintiff or not disputed by him. On Saturday July 21, 2001, while plaintiff was incarcerated at Nassau County Correctional Center (“NCCC”), plaintiff twisted his ankle playing basketball and suffered “extreme swelling and cuts on [his] elbow.” On the same day, plaintiff was taken to the medical center where Doctor Grant examined his ankle and elbow for “minor scrap[e]s.” Dr. Grant gave plaintiff a bag of ice, a bandage and a pack of Motrin. Dr. Grant instructed plaintiff to rest for five days and told him that she was ordering an X-ray. However, she also informed plaintiff that no X-ray could be performed that day since there were no medical technicians on duty on weekends. Complaint at IV(b).

FN1. The Court has numbered the subparagraphs of plaintiff's amended complaint for case of reference.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The following Monday, July 23, 2001, plaintiff asked Officers Keller and Maranus to bring him to the doctor to get an X-ray. Complaint at IV(c). The officers responded by stating that doctors call up for inmates and officers do not call down to the doctor unless there is an emergency. That evening, plaintiff complained to a Mr. Camaniti. *Id.* at IV(d). Camaniti called a medical technician, defendant Ahere, who examined plaintiff and advised him that if an X-ray was ordered, plaintiff would get it. The following day, plaintiff complained to the nurse giving out morning medications, who assured plaintiff she would look into his X-ray. Plaintiff asked a corporal at lunch time about the ordered X-ray and the corporal responded that the X-ray technician would call him down when he was ready. *Id.* at IV(f).

***2** On July 27, 2001, another doctor, defendant Kupec, examined plaintiff in his cell and told him that he could only look into whether an X-ray was ordered, but as no X-ray technician worked past 11:00 p.m., it was too late to get an X-ray that night. *Id.* at IV(g). On August 3, 2001, plaintiff complained to Nurse Intal, who was distributing morning medications. *Id.* at IV(i). Nurse Intal directed plaintiff to complain to the doctors. The same day, Dr. Bonds examined plaintiff and assured him she would look into the delay. *Id.*

On August 6, 2001, plaintiff was again taken to the medical center, this time for an eye infection. Complaint at IV(j). The examining physician, Dr. Simon, told plaintiff that his request regarding an X-ray had been submitted to a "higher up" and "he guesses they will get to [plaintiff] sooner or later." While in the medical center, plaintiff complained to Corporal O'Connor who said that he would look into the status of the X-ray. *Id.* On August 8, 2001, plaintiff again complained to the nurse distributing morning medication and got the same response. Complaint at IV(1). On August 11, 2001, Officer Melendez told plaintiff he would call about the X-ray. *Id.* at IV(m). On August 13, 2001, Dr. Kupec examined plaintiff and stated he did not know what happened but would send plaintiff to be re-evaluated. *Id.* at IV(n). On August 15, 2001, plaintiff was re-evaluated by Dr. Mahmood who advised him that "there seems to be nothing wrong because broken bones speak loudly—meaning usually when something is broken you would not be able to walk on it." *Id.* at IV(o). Plaintiff asked Corporal O'Maly, who was standing in the medical center, for help. Corporal O'Maly told plaintiff that he would get plaintiff an X-ray today. *Id.* Plaintiff received an X-ray that evening. Plaintiff was diagnosed with a fractured ankle and was instructed to stay off the ankle for two weeks on August 17, 2001. Complaint at IV(q).

Nearly a year later, on July 27, 2002, plaintiff filed a Supervisor Intervention Form to grieve "the matter that I've been trying to get my ankle properly checked out, by X-raying it and measuring it for 2 weeks now, PA denied me either request. Its [sic] going on three weeks now." *See* Nassau County Sheriff's Department. *See* Exhibit A annexed to Plaintiff's Complaint. After filing this 2002 Supervisor Intervention Form, plaintiff filed a grievance, which was ignored. Complaint at II(c)(1).

Plaintiff alleges the delay in providing proper medical care "could have lead [sic] him to much more serious injuries. I am thankful that it didn't. Nassau Count[y] Correctional Medical Center staff should be held responsible for negligence." Complaint at IV(r). Defendants move for summary judgment on the grounds that plaintiff failed to exhaust his prison grievance under the Prison Litigation Reform Act, 28 U.S.C. § 1997(e).

DISCUSSION

I. *Standard for Summary Judgment*

***3** Summary judgment is appropriate if there is no genuine material issue of fact requiring a trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.2002) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). All reasonable inferences are to be drawn in favor of the nonmoving party, *id.,* and the moving party bears the burden of establishing the absence of a genuine factual dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When a motion for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

summary judgment is made and supported ..., an adverse party may not rest upon the mere allegations or denial of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Where, as here, a party is proceeding *pro se,* the Court is obligated to "read his supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

A pro se plaintiff must be advised of the consequences of failing to respond to a motion for summary judgment. *Irby v. New York City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("In the absence of such notice or a clear understanding by the *pro se* litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."). *Accord* *McPherson v. Coombe,* 174 F.3d 276 (2d Cir.1999). Where, as here, the moving party provides "easily comprehensible notice" of the requirements of Fed.R.Civ.P. 56 and the risks attendant to failing to oppose a summary judgment motion, the notice to plaintiff is sufficient. *Champion v. Artuz,* 76 F.3d 483 (2d Cir.1996).

II. *Prison Litigation and Reform Act*

The Prison Litigation Reform Act (PLRA) requires prisoners to exhaust available administrative remedies before bringing civil rights or prison conditions claims to federal court. 42 U.S.C. § 1997e(a). Failure to comply with and exhaust administrative remedies prior to commencing a civil rights action generally requires the dismissal of such an action without prejudice. *See* *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001), overruled on other grounds by *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Supreme Court has made clear that the exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

The Nassau County Correctional Center grievance process is outlined in the description of the Sheriff's Department Inmate Grievance Program. *See* Exhibit C to Affidavit of Kenneth Williams, dated May 6, 2003 ("Williams's Aff."). Pursuant to this grievance procedure, inmates should first attempt to resolve the issue with the correction officer assigned to the Housing Unit. Exhibit C at ¶ 1. Then, the inmate must try to resolve the issue with the Corporal in charge of the Housing Area. *Id.* at ¶ 2. If the issue is still unresolved, the inmate must file a written grievance with the Inmate Coordinator. *Id.* at ¶ 3. An adverse Inmate Coordinator decision is appealed first to the Sheriff's designee and then to the Citizen's Policy and Complaint Review Council of the New York State Commission of Correction. *Id.* at ¶¶ 8–10.

***4** Generally, a plaintiff must complete the entire grievance process to fulfill the exhaustion requirement. *See e.g.* *Orta v. City of New York,* 01 CV 10997, 2003 WL 548856, at *2 (S.D.N.Y. Feb.25, 2003) ("to have exhausted [the administrative] remedies, [plaintiff] must have proceeded through all four levels of procedure" in city facility); *Hemphill v. State of New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002) ("A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance process" in a state facility). However, if defendants' actions made exhaustion of all administrative remedies impossible, complete exhaustion may not be required. *See e.g.* *O'Connor v. Featherstone,* 01 CV 3251, 2003 WL 554752, at *3 (S.D.N.Y. Feb.27, 2003) (where plaintiff's attempts to comply with the appeal process were hampered by defendants' conduct, dismissal for failure to exhaust is not warranted).

It is defendants' burden to prove that plaintiff failed to exhaust his administrative remedies. *See* *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003) (the court must verify from a "legally sufficient source" the availability of an administrative remedy); *Sedney v. Hasse,* 02–CV–2583, 2003 WL 21939702 (S.D.N.Y. Aug.12, 2003) (defendant bears the burden to demonstrate plaintiff failed to exhaust administrative remedies). Here, defendant provides an affidavit from the Inmate Grievance Coordinator at NCCC which states that plaintiff never filed a written grievance. *See* Williams's Aff. At ¶ 10. Moreover, plaintiff admits that he never formally grieved

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the matter. Transcript of Plaintiff's deposition at 86, annexed to the Declaration of Malathi Krishnamachari, Deputy County Attorney as Exhibit D.

Plaintiff advances three arguments claiming that exhaustion is not required or that he did exhaust administrative remedies in this action: (1) *Porter v. Nussle* cannot be applied retroactively, *see* Plaintiff's Affidavit dated June 6, 2003 at ¶ 17, (2) the July 27, 2002 grievance was not for a reinjury but is simply a late grievance submitted to grieve the initial 27 day delay in receiving the X-ray in 2001, *see* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion at p. 2, and (3) plaintiff's verbal complaints constituted an informal grievance and complete exhaustion is not required where the informal grievance achieves the desired result, *see id.* at p. 3.

Plaintiff's arguments are without merit. First, it is well-settled that *Porter v. Nussle* applies retroactively. *Webb v. Goord,* 340 F.3d 105 (2d Cir.2003). Second, plaintiff's so-called "late grievance" relates to the medical staff's alleged failure to provide an X-ray in 2002, therefore, it is unrelated to plaintiff's claim that defendants delayed providing him an X-ray for 27 days in 2001. Moreover, "subsequent exhaustion after suit is filed is insufficient," *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) as the PLRA requires that "no action be brought ... until such administrative remedies as are available are exhausted." 28 U.S.C. § 1997e(a). *See e.g. Brown v. Commissioner,* 99–CV–976, 2003 WL 1571699 (S.D.N.Y. Mar.26, 2003) ("Not even subsequent and successful efforts to fulfill exhaustion requirements, which were not taken here, are sufficient to prevent dismissal since PLRA's exhaustion requirement must be satisfied at the time the complaint is filed.").

***5** Plaintiff's final argument is also unavailing. Plaintiff asserts that since his complaints to prison personnel achieved the desired result, the X-ray was provided, that the Court should deem the exhaustion requirement satisfied. Plaintiff argues that "resolution of the matter through informal channels satisfies the exhaustion requirements, as under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy." *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001). Contrary to defendants' assertion, even after *Porter v. Nussle,* "resolution of an inmate's grievances through informal channels can satisfy the exhaustion requirements of [the PLRA]." *Ortiz v. McBride,* 323 F.3d 191, 194 (2d Cir.2003). However, what type of informal grievance is necessary to satisfy the PLRA exhaustion requirements is unsettled under Second Circuit law and the Court has appointed counsel in at least four cases to clarify this issue. *Richardson,* 347 F.3d at 435 ("We recognize that it is unclear in this Circuit whether attempts to lodge informal grievances can satisfy the exhaustion requirements"); *Ortiz,* 323 F.3d at 194 (referring to recent appointment of counsel to address sufficiency of informal grievance).

Several district courts have held that verbal complaints are insufficient to exhaust remedies under the New York State Department of Correctional Services grievance process because the "administrative grievance process permits only written grievances." *McNair v. Sgt. Jones, C.O.,* 01–CV–3253, 2002 WL 31082948, at *7 (S.D.N.Y. Sept.18, 2002) *See generally Brown v. Commissioner,* 99–CV–0976, 2003 WL 1571699 (S.D.N.Y. Mar.26, 2003); *Dimick v. Baruffo,* 02–CV–2151, 2003 WL 660826 (S.D.N.Y. Feb.28, 2003). However, defendants cannot rely on such cases here, as the Nassau County grievance procedure specifically includes a provision for an inmate to verbally complain to an officer and corporal in the housing unit or area. *See* Exhibit C to Williams's Aff. *See generally Abney v. County of Nassau,* 237 F.Supp.2d 278 (E.D.N.Y.2002) (County of Nassau cannot rely on cases that analyze substantively different provisions in the New York State grievance procedures). Additionally, at least one court has found that plaintiff's verbal complaint to the Nassau County District Attorney's Office and written complaints to the Sheriff's Department and District Attorney's Office satisfied the exhaustion requirements. *Roland v. Murphy,* 289 F.Supp.2d 321 (E.D.N.Y.2003) (filing of an additional complaint through the Inmate Grievance Process could give the Nassau County Correctional Center no further notice or opportunity to resolve the issue).

Nonetheless, in the instant case, plaintiff's complaint to an officer, who the Court assumes was in his housing

unit, and to doctors, nurses, or corporals who happened to be passing by or examining him are insufficient to exhaust the Nassau County Grievance procedures. The Grievance Procedures require that plaintiff speak first to the officer in his housing unit, then complain to the corporal in his housing area, and then commence the written grievance process. Plaintiff did not complaint to the corporal of his housing unit after the initial officers refused his request, but merely complained to anyone with whom he came in contact.

***6** Plaintiff's persistent but haphazard requests to various individuals in his facility regarding the delay in scheduling an X-ray is insufficient to satisfy the exhaustion requirement under the PLRA. Plaintiff may not create his own informal grievance procedures but must use the "remedies available" in the facility. 42 U.S.C. § 1997e(a). *See also* *Hemphill v. State of New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002) ("Prison officials are entitled to require strict compliance with an existing grievance procedure). One purpose of the PLRA exhaustion requirement is to allow the facility to resolve the issue and to obviate the need for litigation. *Porter,* 534 U.S. at 524. "Permitting a plaintiff to bypass the codified grievance procedure ... would undermine the efficiency and the effectiveness that the prison grievance program is intended to achieve." *Byas v. State of New York,* 99 CIV 1673, 2002 WL 1586963 (S.D.N.Y. July 17, 2002). Here, if plaintiff had used the proper procedure, he may have been provided a more timely X-ray. Allowing plaintiff to bypass the grievance process would violate the terms and purpose of the PLRA exhaustion requirement. As plaintiff failed to follow the Nassau County Grievance Procedures regarding informal verbal grievances, he has failed to exhaust his administrative remedies as required by the PLRA.

Accordingly, the Court should grant defendants' motion for summary judgment.

III. Dismissal under 28 U.S.C. § 1915A, 1915(e)(2)

Even assuming that plaintiff had exhausted his administrative remedies, the Court should *sua sponte* dismiss the complaint for failure to state a claim upon which relief may be granted. Section 1915A of Title 28 of the United States Code "requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if *inter alia,* the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted." ' *Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999) (quoting 28 U.S.C. § 1915A(a) and b(1)). Additionally, pursuant to 28 U.S.C. § 1915(e)(2), a court must dismiss "at any time" a complaint filed in forma pauperis if the court determines that it is frivolous or malicious, fails to state a claim on which relief may be granted or seeks monetary relief against a defendant who is immune from such relief. *Giano v. Goord,* 250 F.3d 146, 149 (2d Cir.2001) (quoting 28 U.S.C. § 1915(e)(2)). As plaintiff is an inmate who is proceeding against a governmental entity or its agents, the Court is required to dismiss plaintiff's complaint for failure to state a claim on which relief may be granted under 28 U.S .C. § 1915A.

Plaintiff's complaint under Section 1983 fails to state a claim for deliberate indifference to plaintiff's serious medical need. Under the Eighth Amendment, States may not deprive convicted prisoners of their "basic needs-e.g. food, clothing, shelter, medical care, and reasonable safety." *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002) (quoting *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). In order for an inmate to prevail on an Eighth Amendment medical indifference claim, he must prove both objectively, that defendants' acts or omissions were "sufficiently harmful," *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and subjectively, that the officials acted or failed to act with a "sufficiently culpable state of mind, ... which is one of deliberate indifference to inmate health or safety." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations omitted).

***7** Plaintiff's complaint fails to establish both the objective and subjective components of a deliberate medical indifference claim. The harms suffered by plaintiff must be life-threatening, degenerative, or chronically painful to meet the objective prong of the test. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003); *Hathaway v. Coughlin,* 99 F.3d 550 (2d Cir.1996). A fractured ankle from a basketball injury may not be sufficiently harmful to meet the objective prong of a medical indifference claim. *See e.g.* *Thomas v. Nassau*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*County Corr. Center,* 288 F.Supp.2d 333 (E.D.N.Y.2003) (plaintiff failed to state a medical indifference claim for an injured hand that was not treated by specialist or X-rayed for at least six months); *Henderson v. Doe,* 98 CIV 5011, 1999 WL 378333 (S.D.N.Y. June 10, 1999) (plaintiff failed to state a claim because his broken pinky finger is not a "sufficiently serious need"); *Rivera v. S.B. Johnson,* 95–CV–845, 1996 WL 549336, at *2 (W.D.N.Y. Sept.20, 1996) (a broken finger, without more, simply does not present a condition of urgency of the type ... which correspondingly merits constitutional protection.").

However, even if plaintiff did suffer an objectively serious harm, his complaint is bereft of any allegation that would give rise to an inference that defendants acted with deliberate indifference. Plaintiff himself characterizes defendants' conduct as negligence. He admits that he saw Dr. Grant for his basketball injury on July 21, 2001 and was then re-examined on July 23, July 27, and August 3, 2001. His assertion that Dr. Grant should have "double-check [ed]" the status of the X-ray, *see* Transcript of Plaintiff's December 21, 2001 deposition at 88, annexed to the Declaration of Malathi Krishnamachari, Deputy County Attorney as Exhibit D, does not give rise to an inference of deliberate indifference. Doctors Grant and Kupec stated that an X-ray was unavailable at the moment of plaintiff's requests because no X-ray technician was on duty on that particular day or time. None of the other defendants refused plaintiff the X-ray, but in fact told him they would look into it, they had no control over it, or that it would be coming "sooner or later."

Also, the delay in scheduling plaintiff's X-ray only resulted in plaintiff being directed to remain off the ankle for two weeks. Although plaintiff states, "[i]t is obvious that this behavior could have lead to much more serious injuries," he admits, "I am thankful that it didn't." Complaint at IV(r). There is no allegation that any defendant deliberately denied, delayed, or interfered with plaintiff's X-ray. Even if defendants were negligent in scheduling the X-ray, negligence is not compensable under Section 1983. *Daniels v. Williams,* 474 U.S. 327 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). Even if the defendants flatly refused to order an X-ray, "[a] medical decision not to order an [x]-ray, or like measures does not represent cruel and unusual punishment" and is not an Eighth Amendment violation but is "[a]t most ... medical malpractice...." *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Here, although the X-ray was ordered and then delayed, a relatively short delay in treatment for a non-degenerative condition, as opposed to a flat refusal to treat an inmate, is generally insufficient to state a claim for medical indifference. *See generally, Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a "delay in treatment based on a bad diagnosis or erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady" may be medical malpractice, but it is not a constitutional violation). More specifically, where plaintiff admits that the injury did not degenerate or worsen because of the delay, he cannot state a claim for conscious disregard of a substantial risk of serious harm. *Thomas,* 288 F.Supp.2d at 339 (E.D.N.Y.2003) (plaintiff fails to state a claim where he fails to allege the hand injury deteriorated as a result of the delay); *Rodriguez v. Ames,* 224 F.Supp.2d 555 (W.D.N.Y.2002) (granting summary judgment where plaintiff failed to allege the delay in treatment caused his condition to deteriorate).

***8** Accordingly, even if plaintiff had exhausted his administrative remedies, he would still be unable to state a claim for an Eighth Amendment violation. The Court should therefore dismiss the complaint under 28 U.S.C. § 1915A. Finally, since all federal law claims should be dismissed, the Court should decline to exercise supplemental jurisdiction over any state law claims. *Valencia v. Lee,* 316 F.3d 299, 305 (2d Cir.2003) (citing 28 U.S.C. § 1367(c)(3)).

CONCLUSION

In sum, defendants' motions for summary judgment should be granted. Plaintiff's complaint should be dismissed for failure to exhaust administrative remedics under 42 U.S.C. § 1997(e) and for failure to state a claim upon which relief may be granted under 28 U .S.C. § 1915A. For purposes of any appeal, it is recommended that the Court certify pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made to the District Judge within the ten day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital District Physicians' Health Plan, Inc.,* 293 F.3d 42 (2d Cir.2002) (holding that failure to object to a magistrate judge's decision or recommendation generally forfeits the right to present those objections for appellate review); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *see* *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

SO ORDERED:

E.D.N.Y.,2004.

Felix v. Simon
Not Reported in F.Supp.2d, 2004 WL 5739416 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Donald Mack BENNETT, Plaintiff,
v.
T. HUNTER, Administrative Director of Medical, Riverview Correctional Facility, Defendant.
No. 9:02-CV-1365 (FJS/GHL).

March 31, 2006.
May 1, 2006.
Donald Mack Bennett, White Plains, NY, for Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General for the State of New York, Nelson Sheingold, Assistant Attorney General, of counsel, Albany, NY, for Respondent Department of Law.

***ORDER***

FREDERICK J. SCULLIN, JR., S.D.J.

***1** The above-captioned matter having been presented to me by the Report-Recommendation of Magistrate Judge George H. Lowe filed March 31, 2006, and the Court having reviewed the Report-Recommendation and the entire file in this matter; and Judge Lowe's Report-Recommendation which was mailed to plaintiff's last known address, but was returned to the Clerk's office marked "Return to Sender". Under Local Rule 41.2(b), failure to notify the Court of a change of address as required by Local Rule 10.1(b) may result in dismissal of the action. Therefore, in light of Plaintiff's failure to notify the Court of his change of address, it is hereby

**ORDERED,** that the Report-Recommendation filed by Magistrate Judge George H. Lowe filed on March 31, 2006, is, for the reasons stated therein, **ACCEPTED** in its entirety; and it is further

**ORDERED,** that Defendant's motion for summary judgment is **GRANTED,** and it is further

**ORDERED,** that the Clerk of the Court is to enter judgment in favor of Defendant and **CLOSE** this case.

**IT IS SO ORDERED.**

GEORGE H. LOWE, United States Magistrate Judge.

***REPORT-RECOMMENDATION***

This matter has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior U.S. District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). Generally, in this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Donald Mack Bennett ("Plaintiff"), formerly an inmate at the Riverview Correctional Facility ("Riverview C.F."), alleges that the Administrative Director of the Medical Department at Riverview C.F., Thomas B. Hunter ("Defendant"), violated Plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution when, between July and December of 2000, he was deliberately indifferent to Plaintiff's serious medical needs (which included a heart condition known as "atrial fibrillation," a seizure disorder, a disc problem in his back known as "spondylolisthesis," and a pinched nerve in his right wrist). (Dkt. No. 29 [Plf.'s Second Am. Compl.].)

Currently before the Court is Defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 59.) Generally, Defendant's motion raises three issues: (1) whether Plaintiff has failed to establish the elements for a claim of deliberate indifference to a serious medical need; (2) whether Plaintiff has failed to establish any personal involvement by Defendant in the alleged constitutional deprivations, and (3) whether Defendant is protected by qualified immunity. (Dkt. No. 59 [Def.'s Mem. of Law].) For the reasons discussed below, I answer each of these questions in the affirmative. As a result, I recommend that Defendant's motion be granted.

**I. SUMMARY JUDGMENT STANDARD**

Under Fed.R.Civ.P. 56(c), summary judgment is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted). However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

***2** To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [FN2]

FN2. N.D.N.Y. L.R. 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

"If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v.. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). "Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that ... the moving party is entitled to a judgment as a matter of law.' " *Champion,* 76 F.3d at 486 (quoting Fed.R.Civ.P. 56[c] ).[FN3] Therefore, the Court must review the merits of the motion. *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001).

FN3. Local Rule 7.1(b)(3) recognizes this requirement (that the motion have merit) when it provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," only

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein." N.D.N.Y. L.R. 7.1(b)(3).

Where a plaintiff has failed to respond to a defendant's Rule 7.1 Statement of Material Fact, the facts as set forth in that Rule 7.1 Statement are accepted as true to the extent those facts are supported by the record.[FN4] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN5] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN6] I note that, here, while Plaintiff's Second Amended Complaint ("Complaint") is *not* verified, he has submitted what purports to be an "affidavit" in opposition to Defendant's motion. (Dkt.Nos.29, 72.)

FN4. *See* N.D.N.Y. L.R. 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*") [emphasis in original]; *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g ., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

FN5. *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN6. *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [FN7] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN8] In addition, such an affidavit (or verified complaint) must not be conclusory.[FN9] An affidavit (or verified complaint) is conclusory if, for example, its

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

assertions lack any supporting evidence or are too general.[FN10] Moreover, "[a]n affidavit must not present legal arguments." [FN11]

FN7. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

FN8. *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

FN9. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN10. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN11. N.D.N.Y. L.R. 7.1(a)(2).

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN12]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**II. ANALYSIS**

***3** Before I analyze each of the three issues presented by Defendant in his motion, I would like to make a general observation. In support of each of his arguments, Defendant relies on certain record citations and legal citations. I find that these citations indeed support Defendant's arguments. My resulting conclusion that Defendant's motion has merit is not rebutted by Plaintiff's opposition papers. His papers are woefully deficient, despite the fact that he was twice warned of the potential consequences of failing to properly respond to Defendant's motion, and was granted numerous extensions of time in which to do so.[FN13]

FN13. (Dkt.Nos.59, 63, 67, 70.)

Specifically, because Plaintiff fails to include in his opposition papers a Rule 7.1 Response which specifically controverts Defendant's factual assertions in matching numbered paragraphs with specific citations to the record, Defendant's factual assertions in his Rule 7.1 Statement are deemed admitted by Plaintiff.[FN14] In addition, because in his opposition papers Plaintiff fails to address the legal arguments advanced by Defendant, Plaintiff is deemed to have consented to the granting of Defendant's motion based on those legal arguments.[FN15]

FN14. N.D.N.Y. L.R. 7.1(a)(3).

FN15. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); N .D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *Beers v.. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); *cf.*

Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

**A. Whether Plaintiff Has Failed to Establish the Elements for a Claim of Deliberate Indifference to a Serious Medical Need**

Defendant recites the correct legal standard that governs Plaintiff's claim of inadequate medical care under the Eighth Amendment. (Dkt. No. 59, Mem. of Law at 9-12.) Generally, to prevail on such a claim, Plaintiff must show two things: (1) that Plaintiff had a sufficiently serious medical need; and (2) that Defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**1. Serious Medical Need**

Defendant acknowledges, and the record establishes, that, during some or all of the time in question, Plaintiff had a heart condition (atrial fibrillation), [FN16] a seizure disorder,[FN17] a disc problem in his lower back (spondylolysis),[FN18] a pinched nerve in his right wrist, [FN19] and callouses on his feet.[FN20] However, Defendant argues that, while some of these health conditions may have constituted "serious medical needs" (e.g., Plaintiff's heart condition, his seizure disorder, etc.), other of these health conditions did not constitute "serious medical needs" (e.g., any callouses on his foot, etc.).[FN21]

FN16. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 4; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 589, 590-594, 639-642, 653, 678-679, 683.)

FN17. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 4; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 591, 594, 639.)

FN18. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 5; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 95, 536.)

FN19. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 6; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at Dkt. 536.)

FN20. (*See, e.g.,* Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶ 12; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 at 6 .)

FN21. (Dkt. No. 59, Mem. of Law at 9-10.)

Setting aside the fact that I can find no reference to any foot callouses in Plaintiff's Amended Complaint,[FN22] I am persuaded by Defendant's argument. Depending on the precise nature of the disease, generally a heart condition, a seizure disorder, and a disc problem in one's back are "serious medical needs,[FN23] while a pinched nerve in one's wrist, and callouses on one's feet are not "serious medical needs." [FN24]

FN22. Rather, Plaintiff's claim that he had foot callouses that constituted a "serious medical condition" appears to have been asserted in an administrative grievance filed by Plaintiff on January 2, 2001. (*Compare* Dkt. No. 29 *with* Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2.)

FN23. *See Mejia v. Goord,* 03-CV-0124, 2005 WL 2179422, at *7 (N.D.N.Y. Aug. 16, 2005) (Peebles, M.J.) ("The record in this case is strongly suggestive of a coronary condition which, though medically unspecified, could qualify as a serious medical need."); *Boomer v. Lanigan,* 00-CV-5540, 2001 WL 1646725, at *3 (S.D.N.Y. March 31, 1999) ("Epilepsy, or an epileptic seizure, is a serious medical injury."); *Williams v. M.C.C. Institution,* 97-CV-5352, 1999 WL 179604, at *10 (S.D.N.Y. March 31, 1999) ("There can be no question that epilepsy, and in particular an epileptic fit that runs unchecked, is a serious medical condition, even if for a half-hour.") [citation omitted]; *Veloz v. State of New York,* 339 F.Supp.2d 505, 522-524

(S.D.N.Y.2004) (spinal condition that included spondylosis was a serious medical need); *Faraday v. Lantz,* 03-CV-1520, 2005 WL 3465846, at *5 (D.Conn. Dec. 12, 2005) ("persistent [ ] ... back pain caused by herniated, migrating discs [and] sciatica" was a serious medical need).

FN24. *See Dixon v. Nusholtz,* No. 98-1637, 1999 U.S.App. LEXIS 13318, at *1, 5 (6th Cir.1999) (foot callouses that required orthopedic shoes were not a "grave medical need"); *Jackson v. O'Leary,* 89-CV-7139, 1990 U.S. Dist. LEXIS 17249, at *2, 4 (1990) (N.D.Ill.Dec. 17, 1990) ("[Plaintiff's] medical problem [of having callouses on his feet which allegedly required him to be able to wear gym shoes] is not one of especially grave concern."); *Green v. Senkowski,* 99-CV-1523, Decision & Order at 6-7 (N.D.N.Y. Aug. 5, 2003) (Hood, J.) (granting defendants' motion for summary judgment because, in part, plaintiff's wrist pain was not a "serious medical need"), *aff'd,* No. 03-250, 2004 U.S.App. LEXIS 11454 (2d Cir. June 10, 2004) (unpublished opinion); *Warren v. Purcell,* 03-CV-8736, 2004 U.S. Dist. LEXIS 17792, at *26 (S.D.N .Y. Sept. 3, 2004) ("[I]t appears highly unlikely that the injuries plaintiff alleges to have suffered ... namely pain in his wrists and pain, numbness and swelling in his foot and ankle, would be considered sufficiently serious to rise to the level of an Eighth Amendment violation.").

As a result, for purposes of summary judgment, I find that Plaintiff has established a serious medical need only with regard to his heart condition, seizure disorder, and back problem (but not with regard to his wrist pain and calloused feet). However, I note that, even if I were to consider all of Plaintiff's health problems *together* as constituting one "serious medical need" over the entire relevant time period, it would not change my ultimate recommendation in this report, for the reasons stated below

**2. Deliberate Indifference**

***4** Defendant asserts, and the record establishes, that Riverview C.F. provided a considerable amount of medical care to Plaintiff during his incarceration there.[FN25] Generally, Riverview C.F. (1) responded to Plaintiff's medical requests by examining and treating him (e.g., through the prescription of more than six medications, and the administration of "foot soaks," etc.), (2) investigated his complaints, and (3) kept comprehensive and detailed records regarding Plaintiff's various health problems and complaints.

FN25. (Dkt. No. 59, Def.'s Rule 7.1 Statement, ¶¶ 4, 5, 6, 12, 13, 14, 15, 16, 17, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30; *see generally* Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement.)

Based on this evidence, Defendant argues that (1) Plaintiff was receiving more than adequate care for his various health problems at Riverview C.F., and (2) even if he was not receiving adequate care for some of those health problems, absolutely no evidence exists suggesting that Defendant was deliberately indifferent to those health problems (whether they constituted "serious medical needs" or not).[FN26]

FN26. (Dkt. No. 59, Mem. of Law, at 10-12.)

I agree with Defendant, for the reasons stated in his Memorandum of Law. Simply stated, there is no evidence that Defendant's state of mind was equivalent to the sort of *criminal recklessness* necessary for liability under the Eighth Amendment.[FN27] At most, the evidence indicates there may have been a difference of opinion between the medical staff at Riverview C.F. and Plaintiff, or *conceivably* a hint of negligence on the part of someone on the medical staff at Riverview C.F. However, even if true, neither of those facts implicate Defendant or (if they did implicate Defendant) would be enough to make Defendant liable to Plaintiff under the Eighth Amendment.[FN28]

FN27. *See Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ( "The required state of mind [under the Eighth Amendment is] equivalent to criminal recklessness....").

FN28. *See Estelle v. Gamble,* 429 U.S. 97, 106

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see, e.g., Veloz v. New York,* 339 F.Supp.2d 505, 522-24 (S.D.N.Y.2004) (granting defendants' motion for summary judgment on plaintiff's claim for deliberate indifference because defendants denied plaintiff's request for a stronger pain medication to treat his back condition based on a mere disagreement as to treatment, and medical malpractice is not actionable under the Eighth Amendment); *Connors v. Heywright,* 02-CV-9988, 2003 WL 21087886, at *3 (S.D.N.Y. May 12, 2002) (granting defendants' motion to dismiss because plaintiff's allegations that defendants forgot to give him his medications, altered his medications, and did not give him his monthly examinations, despite his epileptic seizures, failed to state a claim for deliberate indifference but stated a claim only for negligence).

As a result, I find that Plaintiff has not established that Defendant acted with deliberate indifference to any of Plaintiff's various health conditions, including his heart condition, seizure disorder, and back problem.

**B. Whether Plaintiff Has Failed to Establish any Personal Involvement by Defendant in the Alleged Constitutional Deprivation**

A defendant's personal involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in an action under 42 U.S.C. § 1983. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). To prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior)* is insufficient to show his or her personal involvement in that unlawful conduct. *Richardson v. Goord,* 347 F .3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

Rather, for a supervisory official to be personally involved in unlawful conduct, he or she must have (1) directly participated in that violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

***5** Here, even after conducting an independent review of the record, I can find no evidence of any such personal involvement by Defendant in the alleged unlawful conduct (which primarily consisted of Nurse Holden's dispensing the wrong medication to Plaintiff). Plaintiff has not established (or even alleged) that Defendant directly participated in Nurse Holden's (alleged) misconduct. [FN29] Nor has Plaintiff established (or even alleged) the existence of a policy or custom under which Nurse Holden's (alleged) misconduct occurred.

FN29. For example, in his opposition papers, Plaintiff acknowledges that "Defendant Hunter was not present for the pill incident." (Dkt. No. 72, ¶ 6.)

Rather, liberally construed, Plaintiff's sole theories of personal involvement appear to be that (1) Defendant knew of various of Plaintiff's complaints about Nurse Holden before and during the misconduct, but negligently

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to act on those complaints, and (2) Defendant failed to remedy Nurse Holden's misconduct (and indeed sought to cover it up) after learning of it through Plaintiff's complaints. (Dkt. No. 29, ¶¶ VII, VIII, IX.) The problem with these theories of personal involvement is that they are completely devoid of any evidentiary support in the record.

At most, the record shows that Defendant supervised Nurse Holden (a part-time employee), and dutifully investigated Plaintiff's *sole* complaint about Nurse Holden, which was contained in Grievance No. RV-5422-01 (filed on January 2, 2001). In pertinent part, Plaintiff's grievance alleged that (1) on December 25, 2000, Nurse Holden gave Plaintiff the wrong liquid in which to soak his feet, making his calloused feet uncomfortable, and (2) on August 27, 2000, Nurse Holden failed to give Plaintiff a new pill after dropping that pill on the floor, and improperly took his pulse.

I can find no evidence in the record that Plaintiff made any complaints to Defendant about Nurse Holden before August 27, 2000, or even before December 25, 2000 (such that Defendant could possibly be said to have been “grossly negligent” or “deliberately indifferent” for failing to act on those complaints before the dates of the alleged misconduct in question). Indeed, he had arrived at Riverview C.F. only in July of 2000. Nor do I have any reason to believe that, if there existed any such complaints, they would have been sufficient to put Defendant on notice of the potential for misconduct by Nurse Holden, given Plaintiff's prolix and confusing use of language.[FN30]

FN30. (*See, e.g.,* Dkt. No. 29; Dkt. No. 59, Appendix to Def.'s Rule 7.1 Statement, Ex. D-2 [attaching Plaintiff's Grievance No. RV-5422-01.)

The crux of Plaintiff's theory of personal involvement appears to be that Defendant failed to *remedy* Nurse Holden's misconduct during the “foot soak,” dropped pill, and pulse reading. Setting aside the issue of whether any discipline of Nurse Holden would even be warranted for such “misconduct,” the fact remains that Plaintiff wanted a remedy other than discipline of Nurse Holden.[FN31] Rather, Plaintiff wanted Defendant to somehow undo the (alleged) results of Nurse Holden's misconduct, namely the worsening of Plaintiff's medical conditions, which (allegedly) included having his heart condition, seizure disorder and back problem “upgraded.” I do not understand this extraordinary feat of medicine (bordering on a supernatural act) to be the sort of “remedy” referred to in the above-described personal involvement test for supervisors.

FN31. (*See* Dkt. No. 29, ¶ IX [complaining that Defendant merely informed Plaintiff that Nurse Holden “will either be suspended or fired”].)

***6** All that was required of Defendant, under the circumstances, was what he did. He investigated Plaintiff's grievance (reviewing his medical records, and talking to both Plaintiff and Nurse Holden), and determined Plaintiff's complaints about Nurse Holden to be without merit. Even if Defendant's determination had been incorrect, there is no evidence that Nurse Holden's misconduct (if it indeed occurred) constituted a violation of Plaintiff's constitutional rights (i.e., that it occurred during the treatment of a serious medical need, and that it resulted from anything more than negligence by Nurse Holden). This absence of evidence is especially noteworthy, considering that Plaintiff was provided the opportunity to obtain such evidence during this action's discovery period, which closed long ago.[FN32] Under analogous circumstances, other district courts within the Second Circuit have refused to find personal involvement by a nurse supervisor.[FN33]

FN32. (*See* Dkt. No. 39 at 1 [Scheduled Order of 6/22/04, setting discovery deadline as 10/30/04].)

FN33. *See, e.g., Gates v. Goord,* 99-CV-1378, 2004 U.S. Dist. LEXIS 12299, at *32-35 (S.D.N.Y. July 1, 2004) (granting summary judgment to nurse supervisor, because-despite inmate's conclusory allegations that nurse supervisor was “repeatedly notified” of inmate's allegedly inadequate medical care but refused to take appropriate action-inmate had offered no facts showing personal involvement by nurse

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

supervisor in any constitutional violation, and discovery was closed); *Patterson v. Lilley,* 02-CV-6056, 2003 U.S. Dist. LEXIS 11097, at *19-22 (S.D.N.Y. June 30, 2003) (granting motion to dismiss filed by nurse administrator, because fact that inmate sent complaint letter to nurse administrator about subordinate nurse's allegedly inadequate medical care was not sufficient to personally involve nurse administrator in alleged misconduct, especially where no facts indicated any constitutional deprivation); *Gadson v. Goord,* 96-CV-7544, 2000 U.S. Dist. LEXIS 3944, at *20-21 (S.D.N.Y. March 28, 2000) (granting summary judgment to nurse supervisor, because no evidence existed showing he was personally involved in physical therapist's alleged denial of adequate wheel chair, even though he attended meetings at which issue of wheel chair was discussed, and because no evidence existed that alleged misconduct constituted a constitutional deprivation); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 267 (W.D.N.Y.1998) (granting summary judgment to nurse supervisor because of lack of personal involvement, where record did not include any evidence that nurse supervisor failed to take appropriate action in response to inmate's complaints of inadequate medical care); *Muhammad v. Francis,* 94-CV-2244, 1996 U.S. Dist. LEXIS 16785, at *25 (S.D.N.Y. Nov. 13, 1996) (granting summary judgment to nurse supervisor because of lack of personal involvement, where evidence showed merely that nurse supervisor had been contacted during investigation of inmate's grievance complaint regarding his medical care); *Holmes v. Fell,* 856 F.Supp. 181, 183-184 (S.D.N.Y.1994) (granting summary judgment to nurse supervisor because of lack of personal involvement in subordinate nurse's allegedly inadequate medical care of inmate, and because of lack of any evidence that the allegedly inadequate medical care constituted a constitutional violation).

As a result, I find that, even if Plaintiff had established the elements of a claim for deliberate indifference to a serious medical need, Plaintiff has not established that Defendant was personally involved in any constitutional deprivation.

**C. Whether Defendant Is Protected by Qualified Immunity**

Finally, Defendant argues that he is entitled to dismissal because he is protected by qualified immunity. Regardless of the merits of this defense, I have already concluded that Plaintiff's Amended Complaint should be dismissed on two alternative grounds (failure to establish the elements of an Eighth Amendment claim, and failure to establish the personal involvement of Defendant in any constitutional deprivation). As I result, I need not address this issue. However, in the interest of thoroughness, I will do so briefly.

Defendant recites the correct legal standard with regard to the qualified immunity defense. (Dkt. No. 59, Mem. of Law at 14-16.) Generally, Defendant has established facts showing that (1) his investigation of Plaintiff's January 2, 2001, grievance was reasonably conducted, and (2) as a result of that investigation, he found no evidence that Nurse Holden had been deliberately indifferent to any of Plaintiff's medical needs (whether those needs were serious or not). Under the circumstances, I can find no violation of a "clearly established" right, much less a right of which a reasonable person would have known.

As a result, I find that Defendant is entitled to qualified immunity.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 59) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d

Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.

Bennett v. Hunter
Not Reported in F.Supp.2d, 2006 WL 1174309 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Eugene JONES, Plaintiff,
v.
Sergeant FURMAN, C.O. Carpender, C.O. Bly, C.O. Losito, C.O. John Doe # 1, C.O. John Doe # 2, C.O. John Doe # 3, C.O. John Doe # 4, Nurse John Doe, Nurse J. Brink, R. Murphy, C.O., Lanasa, C.O., D. Hersh, Nurse, and T. Lanasa, Correctional Officer, Defendants.
No. 02-CV-939F.

March 21, 2007.
Eugene Jones, Fallsburg, NY, pro se.

Andrew M. Cuomo, Attorney General, State of New York, Stephen F. Gawlik, Assistant Attorney General, of Counsel, Buffalo, NY, for Defendants.

**DECISION and ORDER**

LESLIE G. FOSCHIO, United States Magistrate Judge.

***JURISDICTION***

***1** On May 7, 2003, the parties to this action consented pursuant to 28 U.S.C. § 636(c) to proceed before the undersigned. The matter is presently before the court on Defendants' motion for summary judgment (Doc. No. 58), filed February 18, 2005.

***BACKGROUND***

Plaintiff Eugene Jones ("Plaintiff"), proceeding *pro se,* commenced this civil rights action on December 27, 2002, alleging that while incarcerated at Southport Correctional Facility ("Southport"), Defendants Sergeant Furman ("Sgt.Furman"), C.O. Carpenter [FN1] ("Carpenter"), C.O. Bly ("Bly"), C.O. Losito ("Losito"), C.O. John Does 1 through 4 and Nurse Jane Doe (together, "the Doe Defendants"), and Nurse J. Brink ("Brink"), subjected Plaintiff to excessive force, cruel and unusual punishment and acted with deliberate indifference to Plaintiff's medical needs, in violation of the Eighth Amendment. On March 27, 2003, an answer was filed by Defendants Sgt. Furman, Carpenter, Bly, Losito and Brink. On October 21, 2003, Plaintiff filed an Amended Complaint (Doc. No. 21) ("Amended Complaint"), asserting essentially the same claims against the original named Defendants, and naming new Defendants, including C.O. Lanasa ("Lanasa"), C.O. R. Murphy ("Murphy"), and Nurse D. Hersh ("Hersh") in place of the Doe Defendants. Answers to the Amended Complaint were filed on November 13, 2003, by Defendants Sgt. Furman, Bly, Brink, Carpenter, and Losito (Doc. No. 22), and on October 14, 2004, by Defendants Hersh, LaNasa and Murphy (Doc. No. 49).

FN1. Plaintiff incorrectly spells Carpenter's name as "Carpender".

On February 18, 2005, Defendant filed the instant motion seeking summary judgment ("Defendants' motion"). Defendants also filed, on February 18, 2005, papers in support of the motion a Memorandum of Law (Doc. No. 59) ("Defendants' Memorandum"), a Statement of Facts Not in Dispute (Doc. No. 60) (Defendants' Statement of Facts"), and the Declarations of Defendants Brink (Doc. No. 61) ("Brink Declaration"), Furman (Doc. No. 62) ("Furman Declaration"), Lanasa (Doc. No. 63) ("Lanasa Declaration"), Murphy (Doc. No. 64) ("Murphy Declaration"), Hersh, a/k/a Weed (Doc. No. 65) ("Weed Declaration"), Carpenter (Doc. No. 66) ("Carpenter Declaration"), Bly (Doc. No. 67) ("Bly Declaration"), and Losito (Doc. No. 68) ("Losito Declaration").

In opposition to summary judgment, Plaintiff filed on June 8, 2005, a Memorandum of Law (Doc. No. 72) ("Plaintiff's Memorandum"), a Statement of Disputed Factual Issues and Questions (Doc. No. 73) ("Plaintiff's Statement of Facts"), and the Declaration of Plaintiff (Doc. No. 74) ("Plaintiff's Declaration"), attached to which are exhibits A though X ("Plaintiff's Exh(s). ----"). In further support of summary judgment, Defendants filed on June 16, 2005 the Reply Declaration of Assistant Attorney General Stephen F. Gawlik ("Gawlik") (Doc. No. 75) ("Gawlik Declaration"). Oral argument was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

deemed unnecessary.

Based on the following, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

### *FACTS* [FN2]

FN2. Taken from the pleadings and motion papers filed in this action.

***2** Plaintiff's claims are based on separate incidents occurring on April 26, 2002 and June 4, 2002. Because Plaintiff's and Defendants' versions of the events concerning each incident vary greatly, and are critical to resolution of Defendants' motion, the court describes both.

**The April 26, 2002 Incident**

Plaintiff alleges that while incarcerated at the Southport Correctional Facility ("Southport"), on April 26, 2002, Defendants Sgt. Furman, and Corrections Officers Bly, Carpenter, and Lanasa, subjected Plaintiff to excessive force by engaging in an unprovoked physical attack on Plaintiff, and that following the attack, Defendants Thurman, Bly, Carpender, Lanasa and Nurse Brink ("Brink") acted with deliberate indifference to Plaintiff's medical needs by failing to treat Plaintiff for injuries allegedly sustained as a result of the attack. First Claim for Relief, Amended Complaint at 4. According to Plaintiff, on the morning of April 26, 2002, Plaintiff was released from his prison cell to attend recreation, and Sgt. Furman proceeded to pat-frisk Plaintiff, and remarked that Plaintiff "like[d] to write, huh? Well, we are going to give you something to write about." *Id.* Plaintiff maintains that after the pat-frisk concluded, Plaintiff "was directed back on to the company," and when Plaintiff reached the "shower area" he was struck on the right side of his head by Sgt. Furman, causing Plaintiff to fall to the floor, where Defendants Furman, Bly, Carpenter and Lanasa kicked, punched and jabbed at Plaintiff with batons. *Id.* According to Plaintiff, he was handcuffed and restrained with a wrist chain during the incident. *Id.*

According to Plaintiff, after the incident, Defendants Bly and Carpenter dragged Plaintiff to his cell and placed him inside. Amended Complaint at 4. Plaintiff requested that his injuries, including a sore and painful right ear, lumps behind his right ear and on the back of his head, small cuts on his nose and hand, and bruising on his ribs, back, and legs, be treated, but Sgt. Furman responded "Yeah, right!," and no treatment was provided at that time. *Id.*

Later, while Defendant Losito was on rounds, Plaintiff described his injuries to Losito and requested to see the nurse. Amended Complaint at 4. Losito responded that "the nurse will be around with medication and as long as you ['re] still breathing [it's] not a[n] emergency." *Id.* Plaintiff never saw the nurse on April 26, 2002. *Id.* Rather, on April 27 or 28, 2002, Plaintiff informed Defendant Nurse Brink of his injuries and blood in his urine while Brink was distributing medications to the inmates. *Id.* at 5. Plaintiff maintains Brink did not believe Plaintiff and, instead, responded by calling Plaintiff a "trouble maker and liar." *Id.*

Defendants deny any force was used against Plaintiff on April 26, 2002. Rather, Defendants maintain that Plaintiff, during his daily exercise run on April 26, 2002, refused to comply with exercise procedures by repeatedly turning his head while undergoing a pat-frisk. As a result, Sgt. Furman ordered Plaintiff to stop turning his head and warned that Plaintiff's continued refusal to comply with proper exercise procedures would constitute an exercise refusal necessitating Plaintiff's return to his cell. Because Plaintiff continued to turn his head, he was placed in restraints and escorted back to his cell where the restraints were removed without incident.

***3** According to Defendants, Plaintiff was seen by Nurse Brink on April 28, 2002 during Brink's regular rounds. Brink maintains that at that time, Plaintiff complained that since the previous evening, he had been passing blood in his urine, but made no other complaints and exhibited no other signs or symptoms, and there was no indication that Plaintiff suffered from any serious ailment requiring immediate attention. Brink Declaration ¶ 4. Brink advised Plaintiff to increase his fluids intake and report any change in signs or symptoms, and also requested a urinalysis be ordered. *Id.* The urinalysis order was approved by Southport Medical Director Dr. Alves. and, on April 30, 2002, Plaintiff's urine sample was collected for urinalysis which showed blood, bacteria and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

increased white blood cell count indicative of a mild urinary tract infection ("UTI"). *Id.* ¶¶ 4-5. Follow-up urinalysis on samples collected from Plaintiff on May 7 and 13, 2002 established that by May 13, 2002, Plaintiff's urine was normal. *Id.* ¶ 6.

On April 30, 2002, Plaintiff was seen by Nurse Peters [FN3] in connection with complaints of problems with his right ear. Upon examination, Nurse Peters observed no bruising or swelling and scheduled an ear examination.

FN3. Nurse Peters is not a party to this action.

When Nurse Brink next saw Plaintiff on May 1, 2002, Plaintiff complained that he was unable to hear out of his right ear. Brink found no outward sign of injury and discussed the matter with staff from Southport's mental health unit, advising of Plaintiff's recent allegations of paranoia. Brink noted in Plaintiff's medical chart that Plaintiff would sporadically refuse his morning psychiatric medications and that an ear examination was pending.

On May 2, 2002, Nurse Brink, at the request of Southport's security staff, examined Plaintiff in connection with Plaintiff's complaint that he had recently been the subject of an excessive use of force, which revealed a mark on Plaintiff's nose, a right swollen ear, a bump on the back of Plaintiff's head, a sore right rib, bilateral flank soreness, and a mark between Plaintiff's fourth and fifth left fingers. Upon a complete physical examination of Plaintiff in his underwear, Nurse Brink observed only a 3 cm superficial abrasion on Plaintiff's nose, and a 2 cm superficial abrasion on Plaintiff's knuckle. Otherwise, Plaintiff had no swelling or trauma about his ears, his ear canals were healthy, there were no bumps or bruising on Plaintiff's head, his lungs were clear, Plaintiff ambulated without difficulty and had full range of motion in all extremities, digits were normal, all skin was intact, and Plaintiff required no medication.

**The June 4, 2002 Incident**

As to the incident Plaintiff claims occurred on June 4, 2002, Plaintiff alleges Sgt. Furman advised that Plaintiff was being moved from C-Block, 2-Company, 6-Cell to C-Block, 1-Company, 15-Cell, and while escorting Plaintiff to the new cell, remarked that such cell "was technically our of order, but that was where [Plaintiff] was being placed." Second Claim for Relief, Amended Complaint at 6. Plaintiff describes his new cell as "not in living condition," as the toilet did not flush, the sink's cold water did not work, although the hot water was on and would not stop running, the cell's floor was covered with water and grime, and the cell mattress was wet with water or urine. *Id.* Plaintiff maintains that upon informing Furman of the cell's conditions, Furman ignored Plaintiff and walked away. *Id.*

***4** According to Plaintiff, later that day, Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell. Amended Complaint at 6. When Plaintiff asked about his other personal property, including legal materials, bed sheets, letters, photographs, and other items, Murphy "just walked away." *Id.* Plaintiff also maintains that Murphy failed to provide Plaintiff with lunch, and when Plaintiff complained to Sgt. Furman about not receiving his luncheon meal, Furman acted as though he could not hear Plaintiff and walked away. *Id.*

Plaintiff asserts that the stress Defendants caused Plaintiff on June 4, 2002, "gave me a mental breakdown," such that after dinner, Plaintiff ate and smeared feces on his body, face and around his cell. Amended Complaint at 6-7. Plaintiff further maintains he slashed his wrist and forearm with a medication tube and that when he showed such wounds to Defendant Losito and requested help, Losito did nothing. *Id.* at 7. Defendants Losito and Nurse Hersh later stopped by Plaintiff's cell and, upon observing the blood and feces smeared on Plaintiff and around the cell, as well as the slash marks on Plaintiff's arms for which Plaintiff again requested help, Losito and Hersh laughed and Hersh stated "You want to kill yourself? Use your socks and hang yourself from the bars," and then walked away. *Id.*

On June 5, 2002, at 7:10 A.M., Nurse Peters stopped by Plaintiff's cell and advised that she was going to get Plaintiff some help. At 9:15 A.M. on June 5, 2002, two unidentified corrections officers and a sergeant removed Plaintiff, who was covered in feces and crying uncontrollably, from the cell and escorted to the infirmary. Plaintiff was never returned to the cell where the alleged actions on June 4th and 5th took place.

Defendants maintain that when Sgt. Furman placed Plaintiff in the new cell on June 4, 2002, Plaintiff did not inform Furman of any problems with the cell's conditions. Rather, according to Southport's logbook,[FN4] Plaintiff was placed in the new cell on June 4, 2002, at 2:30 P.M., after Plaintiff made threats against Defendant Murphy. The officer making rounds at 5:15 P.M. that same day observed that Plaintiff had wiped feces on the cell's walls. Southport's logbook indicates that on June 5, 2002, at 9:10 A.M., Mr. Militello, a mental health worker from the New York State Office of Mental Health, visited Plaintiff and, by 10:10 A.M. on June 5, 2002, Plaintiff had been transferred to Southport's infirmary.

FN4. Copies of the relevant portions of Southport's logbook are attached as Exh. A to the Furman Declaration.

According to Plaintiff's medical records, on June 4, 2002, Plaintiff was examined at 7:30 P.M., by Nurse Whedon [FN5] who noted that Plaintiff complained of a rash and dryness on his lower legs. June 4, 2002 Medical Records, Weed Declaration Exh. A. On June 5, 2002, Plaintiff was transferred from Southport to the Elmira Correctional Facility ("Elmira").

FN5. Nurse Whedon is not a party to this action.

According to Outpatient Psychiatric Progress Notes prepared by Militello and submitted by Plaintiff ("Outpatient Psychiatric Progress Notes"), Plaintiff's Exh. W, when Plaintiff was transferred to Elmira on June 5, 2002, Plaintiff exhibited anger, self-harm, threats to self-harm, was withdrawn, had regressed and had behavioral problems including scratching his wrists, and smearing feces on himself. Plaintiff was noted to have an extensive pyschiatric history. Plaintiff was diagnosed with schizophrenia and antisocial personality disorder, and was further noted with self-harm gestures, and tendencies toward exposing himself to females and violence. On June 24, 2003, Mr. H.E. Smith ("Smith"), Executive Director of Central New York Psychiatric Center filed a petition ("the Petition") in New York Supreme Court, Oneida County, seeking an order pursuant to New York Correction Law § 402, committing Plaintiff to a state hospital for the mentally ill. Plaintiff's Exh. X. According to Smith, the Petition was based on an examination of Plaintiff conducted by prison physicians [FN6] on June 23, 2002. *Id.*

FN6. The record does not specify whether such "physicians" included a psychiatrist.

***DISCUSSION***

**1. Summary Judgment**

***5** Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The court is required to construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 58, 59 (2d Cir.1999) (citing *Anderson, supra,* 477 U.S. at 255); *Rattner,* 930 F.2d at 209. The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see Anderson,* 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [FRCP 56],' and Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 323-24 (1986) (quoting Fed.R.Civ.P. 56). Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 742 (2d Cir.1998). Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). Rule 56 further provides that

> [w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e).

***6** Here, Plaintiff alleges Defendants violated his civil rights under 42 U.S.C. § 1983. Pursuant to § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. However, "Section 1983 'is not itself a source of a substantive rights,' but merely provides 'a method for vindication of federal rights elsewhere conferred.' " *Albright v.. Oliver,* 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, (1989); and *Baker,* 443 U.S. at 140).

Based on the incident of April 26, 2002, Plaintiff claims violations of his Eight Amendment rights when Defendants Furman, Bly, Carpenter and Lanasa used excessive force on him, and when Defendants Furman, Bly, Carpenter, Lanasa and Brink acted with deliberate indifference to Plaintiff's medical needs. Amended Complaint at 5. Based on the incident of June 4, 2002, Plaintiff alleges violations of his Eighth Amendment rights against cruel and unusual punishment occurred when Defendant Sgt. Furman placed Plaintiff in an unsanitary cell and refused to resolve Plaintiff's complaints of not being served a meal and providing clean bedding, and Murphy withheld from Plaintiff food, clean bedding and Plaintiff's personal property. Amended Complaint at 7. Plaintiff further claims Losito and Hersh violated his Eighth Amendment rights by acting with deliberate indifference to Plaintiff's psychiatric and medical needs. *Id.* at 7-8.[FN7]

> FN7. Although Defendants assert as an affirmative defense that Plaintiff failed to exhaust administrative remedies for any of the instant claims, Answer filed by Defendants Sgt. Furman, Bly, Brink, Carpenter, and Losito (Doc. No. 22), ¶ 17; Answer filed by Defendants Hersh, Lanasa and Murphy (Doc. NO. 49) ¶ 18, Defendants have not moved for summary judgment on that ground. Further, it is unclear from the record whether Plaintiff has, in fact, exhausted his administrative remedies. *See* Amended Complaint, Inmate Grievance Program Superintendent Statement (advising Plaintiff his grievance was untimely and granting Plaintiff permission to appeal to the Superintendent's Office, but failing to disclose whether Plaintiff ever pursued such appeal). The court takes no position as to whether Defendants can now move for leave to amend the scheduling order to permit further dispositive motions as to the exhaustion issue after the cut-off date provided in the Scheduling Order (Doc. No. 53) for dispositive motions. Accordingly, for the purposes of the instant motion, no exhaustion of remedies defense is before the court.

**2. Eighth Amendment**

Plaintiff's claims of excessive force, deliberate indifference to medical needs, and unsanitary conditions of confinement pertaining to the separate incidents on April 26, 2002 and June 4, 2002 all arise under the Eighth Amendment. In particular, the Eighth Amendment prohibits "cruel and unusual punishments" during imprisonment. U.S. Const. 8th amend.; *Wilson v. Seiter,* 501 U.S. 294, 296-97 (1991); *Romano v. Howarth,* 998 F.2d 101, 104 (2d cir.1993). Not every governmental

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

action affecting the interests or well-being of a prisoner, however, is subject to Eighth Amendment protections. *Whitley v. Albers,* 475 U.S. 312, 319 (1986). Rather, only the unnecessary and wanton infliction of pain constitutes the cruel and unusual punishment forbidden by the Eighth Amendment. *Id.* Nevertheless, within the ambit of the Eighth Amendment are protections against the use of excessive force, deliberate indifference to an inmate's serious medical need, and inhumane conditions of confinement. *See Trammell v. Keane,* 338 F .3d 155, 162 (2d Cir.2003) (observing different tests for evaluating Eighth Amendment claims for excessive force, conditions of confinement, and denial of medical care).

**A. Excessive Force**

***7** Defendants argue in support of summary judgment that despite Plaintiff's claims asserted in the Amended Complaint and by Plaintiff in his affidavit opposing summary judgment, there is a complete lack of any objective evidence supporting Plaintiff's assertion that on April 26, 2002, he was subjected to excessive force, resulting in injuries for which Plaintiff was subsequently denied medical treatment. Defendants' Memorandum at 3-9. In opposition to summary judgment, Plaintiff submits the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4.

In assessing an inmate's claims that prison officials subjected him to cruel and unusual punishment by using excessive force, courts must determine whether the prison officials acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan,* 503 U.S. 1, 7 (1992). An inmate plaintiff claiming that prison officials subjected him to cruel and unusual punishment by use of excessive force must establish both an objective and subjective component of the claim. *Romano,* 998 F.2d at 105.

Objectively, a § 1983 plaintiff must establish that the alleged deprivation is sufficiently serious or harmful to reach constitutional dimensions. *Romano,* 998 F.S2d at 104, *see also Wilson,* 501 U.S. at 296. This objective component is "contextual and responsive to 'contemporary standards of decency.' " *Hudson,* 503 U.S. at 8. Thus, while a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in any serious injury. *Id.* at 9-10; *see also Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (noting that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). An inmate's constitutional protections against excessive force by corrections officers "is nowhere nearly so extensive as that afforded by the common law tort action for battery ." *Johnson,* 481 F.2d at 1033; *Anderson v. Sullivan,* 702 F.Supp. 424, 426 (S.D.N.Y.1988).

In the instant case, Plaintiff has filed in opposition to summary judgment the affidavit of David Albelo ("Albelo") ("Albelo Affidavit"), an inmate who was also confined in Southport's C-Block on April 26, 2002, and who claims to have witnessed the incident. Albelo Affidavit, Plaintiff's Exh. A, ¶ 1-4. Albelo avers he observed Sgt. Furman strike Plaintiff in the side of the head, causing Plaintiff to fall to the floor, and then observed Furman, Bly, Carpenter and two other corrections officers punch and kick Plaintiff as he lay on the floor in handcuffs and chains. *Id.* ¶ 5. According to Albelo, he and other inmates screamed for the officers to stop assaulting Plaintiff, *id.* ¶ 6, but that "Plaintiff was then half dragged and half walked to his cell while officer Bly slapped him." *Id.* ¶ 7. Albelo further stated that he was concerned about Plaintiff's well-being and asked the "unit officer" to check on Plaintiff, but the unit officer told Albelo to "mind your business, it does not concern [ ] you." *Id.* ¶ 9.

***8** The statements contained in the Albelo Affidavit contradicts the statements made by Defendants in support of summary judgment in which Defendants, while admitting that Plaintiff was placed in handcuffs and chained, deny that any force was used in returning Plaintiff to his cell on the morning of April 26, 2002, following Plaintiff's refusal to comply with Sgt. Furman's order to stop turning his head while being pat-frisked in preparation for the exercise run. Furman Declaration ¶¶ 5-10; Bly Declaration ¶¶ 5-7; Carpenter Declaration ¶¶ 5-8.

Nor is the fact that Plaintiff's medical records are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

devoid of any evidence that Plaintiff was injured in the April 26, 2002 dispositive of the claim. Rather, an Eighth Amendment excessive force claim does not require any serious injury. *Hudson,* 503 U.S. at 8; *Johnson,* 481 F.2d at 1028. Furthermore, the record on this motion establishes that Plaintiff was not thoroughly examined in connection with his complaints following the April 26, 2002 incident until May 2, 2002, almost a week later, during which time more minor injuries would likely become less apparent. Had Plaintiff undergone a thorough examination on April 26, 2002, the two abrasions observed on May 2, 2002, including the 3 cm superficial abrasion on Plaintiff's nose, and the 2 cm superficial abrasion on Plaintiff's knuckle, would likely have appeared more palpable and thus more serious. As such, there is a material issue of fact as to the first prong of Plaintiff's excessive force claim, and the court next considers the second, subjective prong of the claim.

The subjective component of an Eighth Amendment excessive force claim requires that the defendants act malicious and with the intent to harm the inmate plaintiff. *Hudson,* 503 U.S. at 7; *Romano,* 998 F.2d at 105. To determine whether the defendants acted maliciously, the trier of fact should consider (1) the extent of the plaintiff's injuries; (2) the need for the application of force; (3) the correlation between the need for force and the amount of force used; (4) the threat reasonably perceived by the defendants; and (5) any efforts made by the defendants to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321. Here, the record also establishes a material issue of fact as to whether Plaintiff was subjected to the use of any force in being returned to his cell on April 26, 2002 and, if so, whether the use of such force was reasonable.

Specifically, as discussed above, *supra,* at 5, Defendants admit that Plaintiff was both handcuffed and restrained with a wrist chain before being escorted to his cell on April 26, 2002, but deny any force was used against Plaintiff, in contrast to Plaintiff's allegations, corroborated by Albelo, that Defendants struck Plaintiff in the side of the head, knocking Plaintiff to the ground, and then continued to punch and kick plaintiff while he lay in on the floor, still restrained by handcuffs and the chain. Defendants' assertion that no force was used implies that any threat posed by Plaintiff was small, such that any use of force by Defendants could be disproportionate. It is significant that Defendants do not challenge the accuracy or authenticity of the Albelo Affidavit, which is both signed and notarized as required to be considered admissible evidence. This unresolved factual issue as to the subjective prong of Plaintiff's excessive force claim is not only material, but also sufficient to preclude summary judgment.

***9** Summary judgment on Plaintiff's excessive force claim arising from the April 26, 2002 incident is DENIED.

**B. Deliberate Indifference to Serious Medical Need**

Defendants also maintain that the record contains no objective evidence supporting Plaintiff's alleged injuries resulting from Defendants alleged use of excessive force on April 26, 2002, or that Plaintiff was denied necessary medical treatment for any serious injury. *Id.* at 9-12. According to Defendants, the record also fails to contain any evidence that on June 4, 2002, Plaintiff experienced a mental breakdown for which he was denied appropriate psychiatric care. *Id.* at 17-19.

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (bracketed text in original)). A serious medical condition exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702. The standard for determining whether there has been an Eighth Amendment violation based on deliberate indifference to a prisoner's serious medical needs

> incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison officials acted with a sufficiently culpable state of mind.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.2003) (citing *Estelle,* 429 U.S. at 104, and *Hathaway v. Coughlin,* 99 F.3d 550. 553 (2d Cir.1996)).

Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Estelle,* 429 U.S. at 104; *see Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding dentist's outright refusal for one year to treat a cavity, a degenerative condition tending to cause acute and pain if left untreated, combined with imposition of an unreasonable condition on such treatment, could constitute deliberate indifference on the part of the prison dentist, precluding summary judgment in defendant's favor). Such delay in treatment violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards by intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104-05. Further, culpable intent requires the inmate establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Department of Corrections,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 834-35 (1994). Nevertheless, neither "inadvertent failures to provide adequate medical care" nor "negligence in diagnosing or treating a medical condition" comprise Eighth Amendment violations. *Estelle,* 429 U.S. at 105-06 (holding medical malpractice does not become a constitutional violation merely because the victim is a prisoner); *Harrison,* 219 F.3d at 139 ("We agree that the mere malpractice of medicine does not amount to an Eighth Amendment violation."). Nor does a "mere disagreement" with a physician over the appropriate course of treatment arise to a constitutional violation, although in certain instances a physician may evince deliberate indifference by consciously choosing "an easier and less efficacious" treatment plan. *Chance,* 143 F.3d at 703.

***10** As to the objective prong, a sufficiently serious conditions is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Hathaway,* 99 F.3d at 66. In the instant case, the record is devoid of any evidence establishing that Plaintiff, in connection with either incident, had any medical urgency that might produce death, degeneration or extreme pain. Rather, the record demonstrates that any injury inflicted on Plaintiff in connection with the April 26, 2002 incident was relatively minor, given that by the time Plaintiff underwent the thorough physical examination on May 2, 2002, only two small abrasions were discovered. As such, assuming, *arguendo,* that on April 26, 2002, Plaintiff did in fact suffer the alleged injuries, including soreness, pain in and a lump behind his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs and legs, Amended Complaint at 4, such injuries do not constitute the requisite "serious medical condition" necessary to establish an Eight Amendment deliberate indifference claim. *Compare Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998) (reversing district court's grant of summary judgment in favor of defendants on inmate plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim where inmate suffered from ruptured Achilles tendon, which remained swollen and painful, requiring plaintiff use crutches to walk, which was originally diagnosed as a bad sprain, yet defendants failed for two months to provide proper treatment despite fact that plaintiff's disabling condition was "easily observable"). That by May 2, 2002, such injuries had healed without any medical treatment further establishes that the injuries were not likely to produce death, degeneration or extreme pain without urgent medical treatment. Additionally, that Plaintiff, on April 28, 2002, reported he was passing blood in his urine, yet failed at that time to make any other complaints, demonstrates that Plaintiff's claimed injuries had already sufficiently healed such that urgent treatment for them was never required. That Plaintiff received timely medical care in response to such complaint, including collecting a urine sample which, upon analysis, showed evidence of a mild UTI, rather than any trauma, further undermines Plaintiff's asserted denial of urgent medical care. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the April 26, 2002 incident.

The record is similarly deficient as to the June 4, 2002 incident. Specifically, although Plaintiff claims that he had a "mental breakdown" after he was placed in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

unsanitary cell, which caused him to eat and smear feces on himself, and to attempt to slash his wrists with a medication tube, Amended Complaint, at 7, the record shows that Plaintiff was first observed to have wiped feces on himself and the walls of his cell at 5:15 P.M. on June 4, 2002, less than three hours after Plaintiff was moved to the cell. Prison Logbook, Furman Declaration Exh. A. At 7:10 P.M. that same day, Plaintiff was seen by Nurse Whedon in connection with Plaintiff's complaints of a rash and dryness on his lower legs. Weed Declaration ¶ 4 and Exh. A, Plaintiff's Ambulatory Health Record for June 4, 2002. In fact, two affidavits submitted by Plaintiff in opposition to summary judgment corroborate the fact that Plaintiff was seen by a nurse in the evening of June 4, 2002. *See* Plaintiff's Exhs. T (Affidavit of Inmate Bussey ("Bussey Affidavit")) and U (Affidavit of Inmate Douglas ("Douglas Affidavit")).[FN8] Significantly, Whedon did not note any injury to Plaintiff's wrists. Moreover, the very next morning, June 5, 2002, at 9:10 A.M., Plaintiff was seen by a mental health worker, Mr. Militello, who had Plaintiff transferred to the infirmary and then transferred to Elmira for reevaluation of Plaintiff's schizophrenia diagnosis because Plaintiff was exhibiting signs of mental illness. Furman Declaration ¶¶ 14-15; Outpatient Psychiatric Progress Notes, Plaintiff's Exh. W. Militello also reported that Plaintiff exhibited anger, was threatening to harm himself, had smeared feces on himself, and described Plaintiff as having "scratched wrists," Outpatient Psychiatric Progress Notes, but did not report any physical or mental condition arising to a serious medical need for which treatment had been denied. Rather, the record establishes that Defendants realized in the evening of June 4, 2002 that Plaintiff was experiencing some mental issues for which help was provided the next morning. The record thus fails to establish any factual issue which, if decided in Plaintiff's favor, could establish the objective prong of Plaintiff's deliberate indifference claim with regard to the June 24, 2002 incident.

FN8. Both Bussey and Douglas state that at 6:30 P.M. on June 24, 2002, Defendant Nurse Hersh, accompanied by C.O. Losito, stopped at Plaintiff's cell and while dispensing nighttime medications. Bussey Affidavit ¶ 10; Douglas Affidavit ¶ 10.

***11** Because Plaintiff has failed to establish the objective prong for his deliberate indifference claim as to either the April 26 or June 4, 2002 incident, the court need not address whether Plaintiff can establish the subjective prong as to either incident. Summary judgment as to Plaintiff's claim that Defendants acted with deliberate indifference to his serious medical needs is GRANTED as to Defendants.

**C. Conditions of Confinement**

Defendants argue in support of summary judgment that the alleged unsanitary conditions of the cell to which Plaintiff was transferred on June 4, 2002, even if true, are insufficient to support Plaintiff's claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Defendants' Memorandum at 13-15. Nor does Defendant Murphy's failure to serve Plaintiff lunch one day constitute any Eighth Amendment claim. *Id* . at 15-17. In opposition to summary judgment, Plaintiff submits the Bussey and Douglas Affidavits in which Southport inmates Bussey and Douglas corroborate Plaintiff's assertions that Plaintiff, upon being placed in a different cell on June 4, 2002, complained of the living conditions in the cell, or the fact that he was not served lunch, and that although Defendant Murphy dropped two of Plaintiff's books into Plaintiff's cell, Plaintiff's request for the rest of his personal belongings were ignored. Bussey Affidavit ¶¶ 3-6; Douglas Affidavit ¶¶ 3-6.

To establish an Eighth Amendment violation based on prison conditions, a plaintiff must demonstrate "that it is contrary to current standards of decency for anyone to be exposed against his will" to the challenged prison conditions. *Helling v. McKinney,* 509 U.S. 25, 35 (1993).

An Eighth Amendment claim based on prison conditions must satisfy

> both an objective element-that the prison official's transgression was "sufficiently serious"-and an objective element-that the officials acted, or omitted to act, with a "sufficiently culpable state of mind," *i.e.,* with "deliberate indifference to inmate health or safety."

*Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer,* 511 U.S. at 834).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

As to the objective element, while the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981), prison inmates may not be denied "the minimal civilized measure of life's necessities." *Id.* at 347. The Supreme Court has held that the Eighth Amendment requires that inmates not be deprived of their "basic human needs-*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling,* 509 U.S. at 32 (internal citation and quotation omitted). "Nor may prison officials expose prisoners to conditions that 'pose an unreasonable risk of serious damage to [their] future health.' " *Phelps,* 308 F.3d at 185 (quoting *Helling,* 509 U.S. at 35). The Eighth Amendment's objective prong requires an inmate "prove that the conditions of his confinement violate contemporary standards of decency." *Id.*

***12** As to the subjective element, the Supreme Court has held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer,* 511 U.S. at 837.

The "deliberate indifference" element is equivalent to criminal law's reckless indifference standard. *Id.* at 839-40.

In the instant case, Plaintiff's Eighth Amendment claim fails to satisfy the objective element necessary to state a claim based on prison conditions. Although Plaintiff claims the cell to which he was moved on June 4, 2002 was dirty, the mattress was wet, no bedding was provided, the cell sink's cold water did not work, while the hot water continually ran, and Plaintiff missed receiving one meal, the amount of time for which Plaintiff endured such conditions, less than one full day, renders the claim without merit. *See* *Hutto v. Finney,* 437 U.S. 678, 687 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell and a diet of 'grue' *[sic]* might be tolerable for a few days and intolerably cruel for weeks and months."). As such, Defendant's motion for summary judgment is GRANTED as to Plaintiff's claim challenging the conditions of his confinement based on the June 4, 2002 incident.

**3. Deprivation of Property**

Although not asserted as such, Plaintiff's claim that upon being transferred to a different cell on June 4, 2002, Defendants failed to give Plaintiff his personal property is properly construed under the Fourteenth Amendment as asserting a deprivation of property without due process. Nevertheless, no claim under 42 U.S.C. § 1983 lies based on the negligent conduct of a state actor even though such conduct may result in deprivation of a property interest. *Daniels v. Williams,* 474 U.S. 327, 330-31 (1986). Further, even intentional, unauthorized deprivations of property by prison officials are not redressable pursuant to 42 U.S.C. § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). In New York, several adequate post-deprivation remedies are available such that even if Defendants either negligently or intentionally failed to provide Plaintiff with his personal property, no claim for relief under § 1983 lies.

Specifically, an administrative procedure for inmate personal property claims is provided by N.Y. Comp.Codes R. & Regs. Tit. 7, Pt. 1700. Plaintiff may also commence an action to recover the value of his lost property in New York Court of Claims. *See* *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)(holding that New York court of claims presents adequate post-deprivation remedy which precludes § 1983 action only where alleged deprivation was result of random, unauthorized conduct rather than the result of operation of established state procedure). Plaintiff alleges no state policy caused the alleged interference with his property. As such, Plaintiff may not sue under § 1983 to recover for deprivation of personal property. *Hudson,* 468 U.S. at 533.

***13** Summary judgment is thus GRANTED in favor of Defendants on Plaintiff's Fourteenth Amendment Due

Process claim based on the June 4, 2002 incident.

**4. Qualified Immunity**

Alternatively, Defendants assert they are entitled to qualified immunity on all claims for damages. Defendants' Memorandum at 19-21. Plaintiff has not responded to this argument. Because the court is granting summary judgment on Plaintiff's claims alleging deliberate indifference to his serious medical needs and challenging the conditions of his confinement, as well as on Plaintiff's Fourteenth Amendment due process claim, the court addresses qualified immunity only as to Plaintiff's excessive force claim.

Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288, 1291 (2d Cir.1990). Even if the right at issue was clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity. *Saucier v. Katz,* 533 U.S.194, 201-02 (2001); *Anderson v. Creighton,* 483 U .S. 635, 641 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568-69 (2d Cir.1996); *Van Emrik v. Chemung County Dep't of Soc. Servs.,* 911 F.2d 863, 865-66 (2d Cir.1990); *Robison v. Via,* 821 F.2d 913, 920-21 (2d Cir.1987). “The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed.” *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996) (internal quotation marks omitted).

A right is clearly established if (1) it was defined with reasonable specificity, (2) its existence has been affirmed by either the Supreme Court or the relevant court of appeals, and (3) a reasonable defendant official would have understood under the existing law that his acts were unlawful. *Brown v. City of Oneonta, N.Y. Police Dep't,* 106 F.3d 1125, 1131 (2d Cir.1997). If, however, it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may be entitled to qualified immunity. *Robison,* 821 F.2d at 920-21.

A defendant is entitled to summary judgment based on qualified immunity if the court finds that the asserted rights were not clearly established, or “if the defendant adduces[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to the plaintiff ... could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not violate a federally protected right.” *Robison,* 821 F.2d at 921 (internal quotation omitted). Stated another way, a defendant is entitled to qualified immunity under the objectively reasonable standard if “officers of reasonable competence could disagree” on the legality of the defendant's actions. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995).

***14** Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied. *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991); *Brawer v. Carter,* 937 F.Supp. 1071, 1082 (S.D.N.Y.1996). Provided that no factual issues are disputed, the application of qualified immunity to the facts is a question of law for the court to decide. *Finnegan v. Fountain,* 915 F.2d 817, 821 (2d Cir.1990). Accordingly, as to Plaintiff's excessive force claim, the court must evaluate whether Defendants' actions, in light of clearly established law in existence as of April 26, 2002, violated Plaintiff's civil rights.

Prison inmates have a clearly established right to be free from the application of excessive force by prison employees. *Hudson,* 503 U.S. at 7. However, a prisoner does not have a clearly established right to be free from the use of force by corrections officers attempting to subdue the prisoner with regard to a physical altercation and whether Defendants' conduct violated a clearly established right is not dependent on whether identical conduct has been previously held to violate a prisoner's constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 740-41 (2002) (for purposes of qualified immunity, notice that a corrections officer's conduct violates established law does not require facts of previous cases be materially or fundamentally similar to situation in question, but that

state of law at relevant time provides fair warning that conduct is unconstitutional).

Here, the same disputed issues of fact that preclude summary judgment on Plaintiff's excessive force claim also prevent the court from finding Defendants are qualifiedly immune from liability on such claim. Accordingly, determination of Defendants' qualified immunity defense must await a fact trier's resolution of the questions of fact presented. Summary judgment based on qualified immunity is DENIED.

***CONCLUSION***

Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 58) is DENIED in part and GRANTED in part. The action will proceed only on Plaintiff's Eighth Amendment excessive force claim asserted against Defendants Sgt. Furman, Bly, Carpenter and Lanasa based on the April 26, 2002 incident. The parties are directed to appear before the court on **April 18, 2007** at 10:30 A .M. to schedule a trial date. Defendants are directed to make arrangements for Plaintiff to participate in the conference by telephone.

SO ORDERED.

W.D.N.Y.,2007.

Jones v. Furman
Not Reported in F.Supp.2d, 2007 WL 894218 (W.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.






Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Sean TAPP, Plaintiff,
v.
R. TOUGAS, et al., Defendants.
**Civil Action No. 9:05-CV-01479 (NAM/DEP).**

Aug. 11, 2008.

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

***1** Plaintiff Sean Tapp, a former New York prison inmate who is now apparently in the custody of Pennsylvania officials, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Donald Selsky, who at the relevant times served as an Assistant Commissioner of the New York State Department of Correctional Services ("DOCS"), and various other employees of the department including four corrections officers, a sergeant, a nurse, a hearing officer, and a guidance counselor, complaining of several constitutional violations alleged to have occurred during the time of his confinement in New York. In his complaint, as amended, plaintiff asserts claims stemming from a series of events precipitated by an altercation between himself and several corrections officers. Plaintiff maintains that he was assaulted by corrections workers without provocation, denied adequate medical care for injuries sustained during the course of the conflict, and subjected to a lengthy period of disciplinary special housing unit ("SHU") confinement as a result of the incident, purportedly without first having been afforded the procedural safeguards guaranteed under the Fourteenth Amendment. As relief, *inter alia,* plaintiff seeks a mandatory injunction directing the restoration of good time credits forfeited as a result of the incident and directing his release from prison, termination of all defendants' employment with the DOCS, and recovery of $15 million in compensatory and punitive damages.

Now that pretrial discovery has concluded, the defendants have moved for summary judgment requesting dismissal of plaintiff's claims, arguing that they are substantively deficient, and further asserting their entitlement to qualified immunity. In addition to opposing defendants' motion, plaintiff has since cross-moved for summary judgment on the issue of liability, based substantially upon the allegations as set forth in his complaint.

Despite the existence of what at first blush appear to be conflicting accounts of the circumstances surrounding plaintiff's excessive force claim, having surveyed the record I am convinced no reasonable factfinder could credit plaintiff's version and find in his favor with respect to that claim. Additionally, discerning the existence of no genuine issues of material fact surrounding plaintiff's remaining claims, including for deliberate medical indifference, the issuance of a false misbehavior report, and violation of his procedural due process rights, and similarly concluding that no reasonable factfinder could rule in plaintiff's favor on any of those claims, I recommend that defendants' summary judgment motion be granted in its entirety, and plaintiff's cross-motion addressing those claims correspondingly be denied.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). To the extent that the parties' versions of the relevant events differ, those discrepancies will be noted.

At the times relevant to his claims, the plaintiff was entrusted to the custody of the DOCS and designated to the Great Meadow Correctional Facility ("Great Meadow"), a maximum security prison facility located in Comstock, New York. *See generally* Amended Complaint (Dkt. No. 19) ¶ 3; *see also* Brown Aff. (Dkt. No. 50-5) Exh. A at 60:21-22 (hereinafter cited as "Tapp Dep. (Dkt. No. 50-6) at ___."). On June 24, 2005, while waiting in a line in the Great Meadows B-block for a call out slip permitting him to go to the library, and later to a scheduled religious service, plaintiff was involved in a physical conflict with correctional officers at the Great Meadow facility. *See* Amended Complaint (Dkt. No. 19) ¶¶ 4-5, 7-9. It is that incident, together with events which followed, which form the underpinnings for plaintiff's claims in this action.

***2** Neither Tapp nor the defendants dispute the fact that a physical altercation, initially involving only the plaintiff and Corrections Officer R. Tougas, but with later intervention by other corrections officers, occurred on the date in question. The parties' respective versions of the controlling events, however, are sharply contradictory, particularly as relates to the issue of who initiated the confrontation. While both sides agree that the plaintiff attempted to go to the front of a relatively lengthy line of inmates awaiting call out passes, accustomed as he was to having his daily library pass already written and awaiting him, and that the plaintiff was ordered by Corrections Officer Tougas to return to the back of the line but ignored that directive, it is at this point that the parties' versions of the relevant events diverge.

Defendants assert that upon moving ahead of the other inmates also awaiting call out slips, Tapp was given a direct order by Corrections Officer Tougas to return to his place in line and, when he refused to obey that directive and instead uttered expletives directed toward that officer, was ordered to return to his cell-an instruction which he also ignored. Tougas Decl. (Dkt. No. 50-24) ¶¶ 6-10. After Tapp refused a further order to place his hands on the cat walk bars, instead assuming an offensive fighting stance, raising his clenched fist and lunging at the officer, a struggle ensued between the two. *Id.* ¶¶ 10-17. After signaling an alert in an attempt to gain control of the situation, with the assistance of Corrections Officer Sharrow, another defendant in the action, Tougas was ultimately able to force the plaintiff to lie face down on the floor, at which point mechanical restraints were applied by a third corrections officer, defendant Rando, and plaintiff was transported to the facility hospital for examination, strip frisked, and then taken to the facility SHU. *Id.* ¶¶ 16-17; Sharrow Decl. (Dkt. No. 50-22) ¶¶ 4-10 and Exh. A; *see also* Rando Decl. (Dkt. No. 50-18) ¶ 4. While at the prison infirmary plaintiff was examined by defendant Santini-Correa, who did not observe any injuries to the plaintiff, nor did he complain of any during her examination. Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-11 and Exh. A. During that examination, Nurse Santini-Correa wiped dried blood which did not appear to be his from the plaintiff's back. *Id.*

Plaintiff's sworn submissions recite a significantly different version of the relevant events. While acknowledging that he ignored a directive from Corrections Officer Tougas, and at one point instructed the officer to "shut the f__k up[,]" plaintiff maintains that after a verbal exchange between the two defendant Tougas "outright attacked" him, "banging [his] head against cell bars while he pulled on inmate & repeatedly punched [him] in the face, body & head for no apparent reason." Amended Complaint (Dkt. No. 19) ¶ 4; *see also* Tapp Dep. (Dkt. No. 50-6) at 66-72. While acknowledging that he punched defendant Tougas in the mouth during the course of the encounter, Tapp also asserts that it was only after he was punched and his shirt was pulled over his head, adding that he did so in an effort to defend himself. *Id.* Plaintiff also asserts that other corrections employees responded to an alert concerning the incident and continued to assault him and that defendant Michael, a corrections sergeant, stood idly by and refused to intercede on his behalf. Tapp Dep. (Dkt. No. 50-6) at 72-73.

***3** According to Tapp, once he was subdued and mechanical restraints were applied, he was escorted to the infirmary by defendant Rando who, along the way, intentionally stepped on his leg chains causing him to experience pain in his Achilles tendon. Tapp Decl. (Dkt. No. 50-6) at 75-76. Upon his arrival at the facility

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

hospital, plaintiff claims to have complained of pain in his wrist, back, right shoulder, and groin and having requested medical attention for his injuries. *Id.* at 88. Plaintiff further maintains that as a result of the incident he experienced blood in his urine, but that at the directive of defendant Michael, Nurse Santini-Correa "refused to note actual injuries of plaintiff such as swollen testicles, blood in urine & stool, lower back pain, bruises to [plaintiff's] wrist & face while she prevented co-workers from seeing [plaintiff] at sick call for" his injuries. Amended Complaint (Dkt. No. 19), at ¶¶ 5-6.

On the date of the incident, plaintiff was issued a misbehavior report charging him with multiple violations of prison disciplinary rules stemming from the altercation, including assault on staff (Rule 100.11), engaging in violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), violating a direct order (Rule 106.10), and failure to comply with frisk and search procedures (Rule 115.10) .[FN2] *See* Amended Complaint (Dkt. No. 19) ¶ 4; Tougas Decl. (Dkt. No. 50-24) ¶ 19 and Exh. A; Harvey Decl. (Dkt. No. 50-10) ¶ 5 and Exh. A, p. 9. A Tier III superintendent's hearing was convened at Great Meadow to address the charges set forth in the misbehavior report, beginning on July 1, 2005 and ending two weeks later on July 15, 2005; presiding at that hearing was Andrew Harvey, a Commissioner's Hearing Officer ("CHO") employed by the DOCS.[FN3] Harvey Aff. (Dkt. No. 50-10) ¶¶ 3-6 and Exh. A. In preparation for that hearing, following the filing of charges, plaintiff was offered a list of DOCS employees available to aid in preparation for the hearing and was assigned defendant Melanie Jones, a DOCS Guidance Specialist at the facility and his designated first choice, as his assistant. Amended Complaint (Dkt. No. 19) ¶ 12; Jones Decl. (Dkt. No. 50-14) ¶¶ 2-3 and Exh. A. In his amended complaint plaintiff asserts that defendant Jones conspired with others at the prison to deprive him of "everything that [he] was entitled too [sic] by due process of law." Amended Complaint (Dkt. No. 19) ¶ 12. Plaintiff's submissions, however, fail to identify any document or information obtained by defendant Jones that was withheld from him.

FN2. Plaintiff maintains that this misbehavior report was falsely written by defendant Tougas and deliberately fashioned to make it appear as if the plaintiff caused the incident by punching Tougas and resisting restraint. *See* Amended Complaint (Dkt. No. 19), at ¶ 4.

FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See* *Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

In a declaration filed in support of defendants' summary judgment motion, defendant Jones advises that she met with the plaintiff on a total of three occasions to prepare for the impending disciplinary hearing. Jones Decl. (Dkt. No. 50-14) ¶ 4. According to Jones, during those meetings plaintiff requested numerous documents, and asked that she interview four witnesses identified by him. *Id.* ¶ 5. Upon interviewing those witnesses, defendant Jones ascertained that three of the four would agree to testify and secured a written statement from the fourth inmate declining plaintiff's request to testify on his behalf. *Id.* ¶ 5 and Exh. A. In addition, defendant Jones obtained most of the documents requested by the plaintiff, and advised him that other requested information could not be provided by prison officials. *Id.* ¶ 6. Among the documents withheld by prison officials from defendant Jones, as plaintiff's assistant, were Corrections Officer Tougas' medical records. *Id.* ¶ 7 and Exh. A.

***4** Defendant Jones explained her inability to obtain certain records to the plaintiff and informed him that in her role as his assistant she did not control what documents would be made available to the plaintiff, consistent with institutional security concerns and privacy interests. *Id.* ¶¶ 8-9. Defendant Jones also informed the plaintiff of his right to request additional information, either at the hearing or through other avenues. *Id.* ¶ 7.

At the conclusion of the hearing defendant Harvey found plaintiff guilty of all charges set forth in the misbehavior

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

report, imposing a penalty which included eighteen months of disciplinary SHU confinement, with a corresponding loss of package, commissary and telephone privileges, and additionally recommending a twelve month loss of good time credits.[FN4] Harvey Aff. (Dkt. No. 50-10) ¶ 18 and Exh. A at pp. 3-4.

FN4. Despite plaintiff's apparent belief otherwise, a Tier III superintendent's hearing officer is not empowered to make a final determination regarding forfeiture of good time credits; such determinations are left to the appropriate facility time allowance committee (“TAC”). *See* *Dawes v. Kelly,* No. 01CV6276, 2005 WL 2245688, at *3, 8 (W.D.N.Y. Sep. 14, 2005). Inmate claims regarding improperly withheld good time credits are not appropriately brought under 42 U.S.C. § 1983, the court having no power in such a case to direct that an inmate be released from custody, but instead must be pursued by means of habeas petitions brought pursuant to 28 U.S.C. §§ 2241 and/or 2254. *See generally* *Peralta v. Vasquez,* 467 F.3d 98, 104-05 (2d Cir.2006); *see also* *Jenkins v. Duncan,* No. 9:02-CV-0673, 2003 WL 22139796, at *2-3 (N.D.N.Y. Sep. 16, 2003) (Sharpe, D.J.).

CHO Harvey's determination, including the penalty imposed, was upheld following plaintiff's appeal of that decision to defendant Donald Selsky, formerly an Assistant DOCS Commissioner and the Director of Special Housing and Inmate Disciplinary Programs for the agency. Selsky Decl. (Dkt. No. 50-20) ¶ ¶ 2, 7 and Exh. A. Plaintiff opted not to avail himself of the right to commence a proceeding in New York State Supreme Court under Article 78 of the N .Y. Civil Practice Law and Rules further challenging that disciplinary determination.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 29, 2005, and later filed an amended complaint-the operative pleading now before the court-on April 11, 2006.[FN5] *See* Dkt. Nos. 1, 19. In his complaint, as amended, plaintiff asserts multiple constitutional violations relating to the events occurring on and after June 24, 2005 at Great Meadow including, *inter alia,* the use of excessive force and the failure to protect him from injury, deliberate indifference to his injuries, the deprivation of procedural due process, and denial of equal protection.[FN6],[FN7] Named as defendants in plaintiff's amended complaint, apparently both in their official capacities and as individuals, are various DOCS employees, including Assistant Commissioner Selsky; Sergeant Michael; CHO Harvey; Corrections Officers Tougas, Wilson, Rando, and Sharrow; and Nurse Santini-Correa. Amended Complaint (Dkt. No. 19) at ¶¶ 4-12.

FN5. From a review of the court's records it appears that the amendment was prompted by a court order dated March 28, 2006 directing the filing of an amended complaint naming Corrections Officer Wilson as an additional defendant before that officer could be served as a defendant. Dkt. No. 10.

FN6. The introductory portion of plaintiff's complaint makes reference to supplemental jurisdiction over state law tort claims pursuant to 28 U.S.C. § 1367. *See* Amended Complaint (Dkt. No. 19) ¶ 2. The body of plaintiff's complaint, however, does not assert any such claims, which in any event could well be precluded under N.Y. Corrections Law § 24. *See* *Ierardi v. Sisco,* 119 F.3d 183, 186-88 (2d Cir.1997).

FN7. In his motion for summary judgment plaintiff addresses additional claims not included in his complaint, including discrimination, violation of his right to free speech, and lost property. *See generally* Plaintiff's Motion (Dkt. No. 56). Because those matters are raised for the first time on motion for summary judgment, and they are not included within his amended complaint, the court will not address these additional claims. *See, e.g.,* *Caidor v. Potter,* No. 5:02-CV-1486, 2007 WL 2847229, at *8 (N.D.N.Y. Sep. 26, 2007) (Mordue, C.J.) (refusing to hear a claim raised for the first time in a summary judgment motion).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

On February 20, 2008, following the close of discovery, the defendants filed a motion seeking summary judgment dismissing plaintiff's complaint in its entirety. *See generally* Defendants' Motion (Dkt. No. 50). In their motion defendants offer a variety of grounds for dismissal of plaintiff's claims, asserting deficiency of plaintiff's claims for violations of the Eighth Amendment, plaintiff's due process rights, and medical indifference. *Id.* Defendants also argue that plaintiff has not raised a cognizable constitutional question pertaining to the allegedly false misbehavior report issued by defendant Tougas, that this court lacks subject matter jurisdiction to decide plaintiff's due process claim based upon his failure to first invalidate the hearing results, and that they are entitled to qualified immunity. *Id.* In response, plaintiff has opposed defendants' motion and cross-moved for summary judgment, offering substantially the same arguments as those found in his complaint.[FN8] *See generally* Plaintiff's Motion (Dkt. No. 56).

FN8. Although the plaintiff devotes a portion of his motion submission to discussion of his efforts to exhaust administrative remedies, because the defendants have not raised failure to exhaust as an affirmative defense there is no need to address the issue in this report and recommendation. *See* Plaintiff's Brief (Dkt. No. 56) at Argument, Point 2; *see also* Schwartz Decl. (Dkt. No. 61) at ¶¶ 3-4.

***5** The parties' motions are now ripe for determination, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* FED. R. CIV. P. 72(b).

III. *DISCUSSION*

*A. Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

B. *Excessive Force*

***6** The centerpiece of plaintiff's complaint is his claim of being beaten on June 24, 2005, initially by Corrections Officer Tougas, and later by others including Corrections Officers Wilson, Rando, and Sharrow, and that Sergeant Michael failed to intervene to protect him from injury. This component of plaintiff's civil rights claim implicates potential violations of the right of a sentenced prison inmate to be free from cruel and unusual punishment, as guaranteed under the Eighth Amendment.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)). Analysis of claims of cruel and unusual punishment requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91.

The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999-1000 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe,' " a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element, to prevail the plaintiff must establish that defendants acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson,* 481 F.2d at 1033).

***7** The portion of defendants' motion addressing whether plaintiff was subjected to a level of force which a reasonable factfinder could conclude was unlawful, considered against this backdrop, presents a close case. Because the versions of the relevant events offered by the various participants are sharply contradictory, it could be argued that defendants' motion invites the court to make a credibility determination, something which courts are generally loathe to do on motion for summary judgment. *See Snyder v. Goord,* 9:05-cv-01284, 2007 WL 957530, at *9 (N.D.N.Y.2007) (McAvoy, S.J).

In this instance, however, the evidence now before the court overwhelmingly establishes that the incident and resulting injuries to the participants was precipitated by the plaintiff and his admitted failure to comply with lawful directives of C.O. Tougas and his admonition to that corrections officer that he should "shut the f__k up".[FN9]

Tapp Dep. (Dkt. No. 50-6) at 66. Coupled with these factors is the stark contrast presented by evidence of the injuries suffered by the two primary participants. Corrections Officer Tougas, who the plaintiff admitted punching, received an injury during the conflict which required twelve stitches to repair. Tougas Decl. (Dkt. No. 50-24) ¶ 20; Tapp Dep. (Dkt. No. 50-6) at p. 69. By comparison the plaintiff, who contends that he was beaten, punched, dragged, and stomped on by Corrections Officer Tougas, with the assistance of Corrections Officers Wilson, Sharrow and Rando, suffered little if any injury despite the alleged participation of four corrections officers, as evidenced by both the sworn declaration of Nurse Santini-Correa, who examined him shortly after the incident, a videotape of plaintiff's escort following the incident, and photographs taken of him on that day. *See* Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-10; *see also* Dkt. No. 50-12. This evidence, augmented by a hearing officer's finding, following a disciplinary hearing at which plaintiff was provided due process, that it was the plaintiff who in fact assaulted staff members, including Corrections Officer Tougas, on the date in question, and the fact that at least on two prior occasions plaintiff was subjected to lengthy periods of disciplinary SHU confinement for having assaulted other DOCS staff members, convinces me that no reasonable factfinder could credit plaintiff's version and determine that the force applied by the corrections officers involved in the incident, including Corrections Officer Tougas, to control the situation and restore the safety and security of the institution, was unlawfully excessive.[FN10] *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (in circumstances where the record is lacking in support of plaintiff's contradictory and incomplete statements, summary judgment may be appropriate upon the basis that no reasonable factfinder could credit plaintiff's version of the relevant events); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y.1998) (same); *see also Panetta v. Crowley,* 460 F.3d 388, 394 (2d Cir.2006) (noting that "[j]udgment as a matter of law is appropriate if no reasonable factfinder could have viewed the evidence as supporting plaintiff's claim"). Accordingly, I recommend dismissal of plaintiff's Eighth Amendment claim against Corrections Officer Tougas, Wilson, Michael, Rando and Sharrow as a matter of law.

FN9. While the plaintiff apparently believed that Corrections Officer Tougas' directive that he return to the end of the line was somehow unreasonable, that belief did not legitimize Tapp's acknowledged failure to comply with that directive. *See Kalwasinski v. Artuz,* No. 02 CV 2582, 2003 WL 22973420, at *3 (S.D .N.Y.2003). As one court has noted,

> Under New York law, "inmates are not free to choose which orders to obey and which to ignore. *Farid v. Coombe,* 236 A.D.2d 660, 653 N.Y.S.2d 715, 716 (App.Div.1997). This is true even where the inmate feels that the order infringes upon his or her rights. "Inmates may not refuse to obey orders issued by correction officers, even if the orders appear to be without authority or to infringe upon the inmate's constitutional rights." *Keith v. Coombe,* 235 A.D.2d 879, 880, 653 N.Y.S.2d 401 (N.Y.App.Div.1997). The penological rationale for this is clear. "The threat to prison security would be manifest were we to allow inmates to decide for themselves which orders to obey and which to ignore as violative of their rights and to act accordingly." *Rivera v. Smith,* 63 N.Y.2d 501, 516, 483 N.Y.S.2d 187, 472 N.E.2d 1015 (1984).

*Kalwasinski v. Artuz,* 2003 WL 22973420, at *3.

FN10. The incident at Great Meadow was not the first involving an altercation between the plaintiff and corrections officers. In 1996, while at the Attica Correctional Facility, plaintiff was found guilty of charges related to an alleged assault upon one or more corrections officers and was sentenced to serve three years of disciplinary confinement in the Attica SHU. *See* Tapp Dep. (Dkt. No. 50-6) at 53:3-55:22. Similarly, in 2000, while incarcerated at the Wende Correctional Facility, plaintiff became involved in a confrontation with a corrections officer, again receiving a penalty which included disciplinary confinement of between eighteen months and two years following a hearing to address the matter. *Id.* at 55:24-58:13.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*C. Deliberate Indifference*

***8** Liberally construed, plaintiff's amended complaint also appears to assert deliberate indifference on the part of the defendants to his injuries following the June 24, 2005 incident. Amended Complaint (Dkt. No. 19) ¶¶ 6-7. While this aspect of plaintiff's complaint appears to focus principally on the actions of Nurse Santini-Correa, in his motion for summary judgment plaintiff seems to expand that claim, though without disclosing specifics, explaining that it is also being asserted against defendant Jones, his assigned hearing assistant, and Sergeant Michael. *See* Defendants' Motion for Summary Judgment (Dkt. No. 56) at p. 1. In their motion, defendants also seek dismissal of this cause of action.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-3 (N.D .N.Y. Apr. 3, 2002) (Sharpe, M.J.).

***9** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff alleges in his complaint that as a result of the incident, he suffered from "swollen testicles, blood in urine & stool, lower back pain, bruises to [his] wrist & face" which defendant Santini-Correa allegedly refused to note, as well as cuts to his wrists, a shoulder "pop," numbness in his right shoulder, left thumb, and both wrists, as well as a rash on his wrists. [FN11] Amended Complaint (Dkt. No. 19) ¶¶ 6-8. Noticeably absent from plaintiff's complaint is any indication that these conditions gave rise to extreme pain, degeneration, or death.[FN12] Even crediting plaintiff's claims concerning these injuries, it does not appear that plaintiff has set forth a "sufficiently serious" condition to support a claim for either deliberate or medical indifference. *See Peterson v. Miller,* No. 9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N .Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (Hurd, D.J. and Peebles, M.J) (citing *Hathaway,* 37 F.3d at 66; *Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006)); *see also Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703, at *12 & n. 70 (S.D .N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim).

FN11. In his summary judgment motion plaintiff also raises, for the first time, a claim that he was denied an asthma inhaler. *See* Plaintiff's Statement of Undisputed Facts (Dkt. No. 56) at § 5. Because the first mention of any issue pertaining to plaintiff's asthma medication has occurred at this late stage in the case, I recommend against expansion of his indifference cause of action to encompass this claim. *See, e.g., Caidor,* 2007 WL 2847229, at *8.

FN12. In his motion for summary judgment plaintiff now asserts that his back condition has been "diagnosed as chronic serious pain," and speculates as to his physical ability to have children in the future. *See* Plaintiff's Motion (Dkt. No. 56), at p. 6; Plaintiff's Statement of Undisputed Facts (Dkt. No. 56), at § 9. It is also noted that while plaintiff's ambulatory record entry for "6/24/05" reveals "[n]o injuries noted or voiced" by the plaintiff, an entry made a day later reveals that Nurse Santini-Correa observed "dry abrasion[s]" on plaintiff's wrist and upper extremities, along with numbness of his left thumb and two big toes, all of which appear to be injuries that plaintiff "want[ed] ... noted in [his] chart." *See* Plaintiff's Ambulatory Record (Dkt. No. 56-4), Exhs. 21-22. These matters are far too speculative and attenuated from the incident in question to constitute serious medical needs arising from the June 24, 2005 incident.

Moreover, even assuming the existence of a serious medical need, the record now before the court is also lacking in any evidence from which a reasonable factfinder could conclude that any of those three defendants implicated in this claim, and in particular Nurse Santini-Correa, was deliberately indifferent to his medical needs. At best, plaintiff appears to assert a claim of negligence or malpractice against Nurse Santini-Correa for failure to treat his injuries; such a claim, however, is not cognizable under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross,* 784 F.Supp. at 44. As for the other defendants, the record is devoid of any evidence to suggest their awareness of, and deliberate indifference to, plaintiff's allegedly serious medical needs.

***10** In sum, because plaintiff has established neither the existence of a serious medical need nor defendants' subjective, deliberate indifference to any such need, his medical indifference claim is subject to dismissal as a matter of law.

D. *False Misbehavior Report*

One of the claims in this action is predicated upon plaintiff's contention that the misbehavior report issued by Corrections Officer Tougas, following the June 24, 2005 incident, was fabricated. In their motion, defendants seek dismissal of this claim as lacking in merit.

As defendants correctly note, the mere allegation that a false misbehavior report has been issued against an inmate, standing alone, does not implicate constitutional considerations. *Boddie v.. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U .S. 982, 108 S.Ct. 1273 (1988)). Proof that a false misbehavior report has been issued in response to an inmate having engaged in activity protected under the First Amendment, however, may suffice to support a claim of unlawful retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

A thorough canvas of the record in this case, including plaintiff's amended complaint, fails to reveal any evidence tending to suggest that the misbehavior report issued in this case was in retaliation for Tapp having engaged in protected activity. Because plaintiff has not raised any further allegations concerning the allegedly false misbehavior report, any constitutional claims associated with it are subject to dismissal as a matter of law.

E. *Procedural Due Process*

A second major theme of plaintiff's amended complaint surrounds the procedures which followed the issuance of the June 24, 2005 misbehavior report. Plaintiff contends that during the course of the ensuing disciplinary proceedings he was denied procedural due process, and that assigned hearing officer was biased. [FN13] Those involved in this cause of action include defendants Harvey, the hearing officer; Jones the corrections employee assigned to assist the plaintiff; and Selsky, the Assistant DOCS Commissioner who upheld the hearing determination on appeal. Defendants also seek dismissal of this claim as a matter of law.

FN13. Plaintiff also argues that the hearing did not comply with governing State requirements, in that it was not commenced within seven days of the filing of charges and did not end within the required fourteen days, and additionally because extensions were not properly sought and validly granted. Amended Complaint (Dkt. No. 19) ¶ 10. This portion of plaintiff's due process claim implicates only state procedural requirements which if violated nonetheless would not support a federal constitutional claim under section 1983. *See, e.g., Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987). To the extent that federal due process considerations are called into play, it appears that plaintiff's disciplinary hearing did occur within the "reasonable time" required by federal law. *See Green v. Bauvi,* 46 F.3d 189, 195 (2d Cir.1995); *see also* Harvey Declaration (Dkt No. 50-10) at §§ 7-9 (explaining that the hearing could not start until one day after the applicable state requirement of seven days due to a high volume of cases and that a six-day extension was granted due to the unavailability of defendant Tougas and certain of plaintiff's witnesses to testify).

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). The allegation that as a result of the disciplinary hearing at issue plaintiff was subjected to eighteen months of disciplinary confinement in a facility SHU suffices to establish the deprivation of a liberty interest and trigger the due process protections of the Fourteenth Amendment. *See Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999)); see also *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)).

***11** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established; the contours of the requisite protections were discussed in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

some detail in the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). In addition, in order to pass muster under the Fourteenth Amendment a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

The record now before the court convincingly establishes that plaintiff received the requisite due process during the course of the disciplinary proceedings against him. The record discloses, and the plaintiff does not dispute, that he received written notice of the charges against him, as well as a written determination from the hearing officer, following the hearing, outlining his findings.

One of the issues raised in support of his due process argument is plaintiff's contention that he was precluded from presenting witnesses on his behalf. Undeniably, under *Wolff* and its progeny an inmate must be afforded the right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. Due process requires that the hearing officer explain why any witnesses requested were not allowed to testify. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990) (citing *Ponte* ); *Parris v. Coughlin,* No. 90-CV-414, 1993 WL 328199, at *5 (N.D.N.Y. Aug. 24, 1993) (Hurd, M.J) (same). These reasons may be provided at the disciplinary hearing itself, or by presenting testimony in the course of a later constitutional challenge. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Parris,* 1993 WL 328199, at *6 (citing *Ponte* ). The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but rather upon the official to prove the rationality of his or her position. *Fox,* 893 F.2d at 478 (citing *Ponte* ); *Parris,* 1993 WL 328199, at *6 (citing *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30-31 (2d Cir.1991)).

In this case the record discloses that the plaintiff was permitted to call all of the witnesses necessary to present a meaningful defense to the charges. At the outset of the hearing plaintiff requested the presence of four inmate witnesses, one of whom refused to testify after which plaintiff advised the hearing officer that he did not wish to pursue securing testimony from him in any event. Jones Decl. (Dkt. No. 50-14) Exh. A; Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 1-2. The remaining three witnesses were permitted to testify on behalf of the plaintiff. Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 17-27. While the plaintiff later announced his intention to call twelve additional witnesses, and the hearing officer permitted him to select four-all of whom, when contacted, indicated their refusal to testify-plaintiff subsequently advised CHO Harvey that he did not find it necessary to call other witnesses all of whom would have repeated versions of events already given by himself and his other witnesses.[FN14] Harvey Decl. (Dkt. No. 50-10) Exh. C at pp. 41-47.

FN14. In addition to the inmate witnesses CHO Harvey also permitted plaintiff to call to elicit further testimony from Corrections Officers Walcak and Tougas. Harvey Decl. (Dkt. No. 50-10) Exh. C. at pp. 41-47.

***12** Under these circumstances it appears that CHO Harvey had a rational basis to conclude that calling the additional requested witnesses would have been cumulative and unnecessary. Similarly, it appears that the hearing officer had a reasonable basis to conclude that calling the witnesses who had refused to testify would be futile. *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N.Y. Sept. 26, 1997) (Pooler, D.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir.1993)). "Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him." *Silva,* 992 F.2d at 22; *see also Wolff,* 418 U.S. at 568-69, 94 S.Ct. at 2981 (recognizing discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify). Regarding the two witnesses who refused to testify with an explanation, a hearing officer has no power to force an inmate to testify, and when an inmate refuses, the hearing officer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

need not call that witness. *Silva,* 992 F.2d at 21-22; *Dumpson,* 1997 WL 610652, at *5 (citing *Greene v. Coughlin,* No. 93 Civ. 2805, 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) (hearing officer need not make independent evaluation of the basis for refusal to testify)). Finally, with regard to the plaintiff's eight additional witnesses who would have stated "basically ... the same thing," Harvey clearly had a rational basis to refuse to call these witnesses as their testimony would be unnecessarily repetitive. Thus, neither defendant Harvey or Jones took part in any improper denial of plaintiff's right to call witnesses to testify in his behalf.

It appears that the plaintiff finds fault with the aid rendered by the selected hearing assistant, Melanie Jones. The Fourteenth Amendment requires only that prison officials provide an inmate accused of a disciplinary infraction, in some though not necessarily all circumstances, meaningful assistance in preparing a defense. *Eng v. Coughlin* 858 F.2d 889, 897 (2d Cir.1988) (holding that in some circumstances, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges"). The assistant acts as a *"surrogate*-to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 (emphasis in original). An assistant also may not act in bad faith in aiding a prisoner in mounting a defense. *Id.* The law does not require that the assistant assigned be a trained lawyer or that the assistant be held to a standard of competent representation guaranteed to criminal defendants under the Sixth Amendment. *Contrast Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984) (outlining the contours of the right to effective assistance of counsel guaranteed to criminal defendants). Despite plaintiff's protestations regarding the adequacy of her aid, the record discloses that defendant Jones provided him with capable assistance in preparing for the hearing, and that she met with the plaintiff on three occasions, interviewed the witnesses which he designated, and obtained a significant amount of the materials requested by him. *See generally* Jones Decl. (Dkt. No. 50-14) ¶¶ 3-9. Having carefully reviewed the record, I find no basis to conclude that plaintiff was not afforded the meaningful assistance guaranteed under *Wolff.*

***13** Although plaintiff does not place significant emphasis on this element, the due process provision of the Fourteenth Amendment requires that a hearing officer's disciplinary determination be supported by "some evidence." *See Hill,* 472 U.S. at 447, 105 S.Ct. at 2770; *Morales v. Woods,* No. 9:06-CV-15, 2008 WL 686801, at *6 (N.D.N.Y. Mar. 10, 2008) (McAvoy, S.J.) (citations omitted). Based upon a careful review of the record developed during the course of plaintiff's disciplinary proceeding, I conclude that no reasonable factfinder could determine that the hearing officer's decision in this case was not supported by the requisite modicum of evidence.

A focal point of plaintiff's due process argument relates to alleged bias on the part of the hearing officer. The fact that the hearing officer appointed to address the charges against Tapp was a DOCS employee, as is normally the case, does not disqualify him from serving as a hearing officer or in and of itself provide reason to question his objectivity. Prison disciplinary hearing officers are not held to the same standard of neutrality as are adjudicators in other types of controversies. *See Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). Such a hearing officer must only be sufficiently impartial as to avoid "a hazard of arbitrary decision making," *Wolff,* 418 U.S. at 571, 94 S.Ct. at 2982, and is deserving of a presumption of honestly and integrity. *Winfrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464 (1985); *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995). Based upon thorough review of the record associated with the disciplinary proceeding, I am unable to discern any basis from which a reasonable factfinder could conclude that CHO Harvey was biased or partial. Simply stated, plaintiff's bald allegation of bias, representing little more than sheer speculation on his part, is insufficient to overcome the presumption of impartiality. *See Lebron v. Artus,* No. 06-CV-0532, 2008 WL 111194, at *15 (W.D.N.Y. Jan. 09, 2008).

In sum, because the record firmly discloses that plaintiff was afforded all of the process to which he was entitled prior to the imposition of disciplinary SHU confinement, I recommend dismissal of plaintiff's due process claim against defendants Harvey, Jones and Selsky.[FN15]

FN15. In light of this determination, I find it unnecessary to address defendants' alternative argument, to the effect that plaintiff's section 1983 surrounding the disciplinary proceeding are precluded under *Heck v. Humphrey,* 512 U.S.

477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997). As was previous noted, however, plaintiff may not necessarily be precluded from pursuing section 1983 claims surrounding his disciplinary proceeding under *Edwards* and *Heck,* despite not having first secured reversal of that determination, provided that he agrees to forego any potential habeas corpus claim challenging the loss of good time credits which resulted from the recommendation made following that hearing. *See Peralta,* 467 F.3d at 104-05.

F. *Equal Protection*

In his amended complaint, plaintiff incants that he was denied equal protection by the defendants. Neither plaintiff's amended complaint nor his motion papers, however, articulates the basis for that claim.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

***14** Because plaintiff has offered no proof that he was the subject of an improper classification, nor has he adduced any evidence of either invidious motivation for defendants' actions or discriminatory motivation, I recommend summary dismissal of plaintiff's equal protection claim.

G. *Conspiracy*

Also embedded within plaintiff's complaint, when liberally construed, is a claim that the defendants conspired to deprive him of his civil rights.

In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). In this instance plaintiff alleges that the various defendants named conspired to deprive him of his civil rights. Since those conspiracy claims are asserted against officers, agents or employees of the DOCS, each acting within the scope of his or her employment, they are precluded by virtue of the intracorporate conspiracy doctrine. *See Little v. City of New York,* 487 F.Supp.2d 426, 441-42 (S.D.N.Y.2007) (citations omitted); *Lewis v. Goord,* No. 9:06-CV-504, 2008 WL 902179, at *4 (N.D.N.Y. Mar. 31, 2008) (Scullin, S.J.).

IV. *SUMMARY AND RECOMMENDATION*

The plaintiff in this action has advanced an array of constitutional claims arising out of an incident occurring on June 24, 2005, alleging the use of excessive force by prison officials, the failure to adequately address the injuries resulting from the incident, and due process deprivations associated with the disciplinary proceedings which ensued. Having carefully reviewed plaintiff's amended complaint, I conclude that no reasonable factfinder could credit plaintiff's version of the incident, and determine that defendants did not violate his rights by exerting unnecessary force against him, in violation of the Eighth Amendment. Similarly, I find that plaintiff has not alleged or proven the existence of a serious medical need

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

associated with injuries stemming from the incident, nor has he offered evidence tending to establish the defendants' subjective indifference to his medical needs, and therefore cannot support a medical indifference claim under the Eighth Amendment. Lastly, I find that while plaintiff was deprived of a liberty interest by virtue of the disciplinary proceedings against him, he received the requisite procedural due process guaranteed under the Fourteenth Amendment during the course of that deprivation. Accordingly, finding no other cognizable constitutional claim asserted in his amended complaint and supported by evidence in the record now before the court, I conclude that no reasonable factfinder could find liability on the part of one or more of the named defendants on any of plaintiff's claims, and therefore recommend dismissal of his complaint in its entirety as a matter of law.[FN16] Accordingly, it is hereby

FN16. In light of this determination, I find it unnecessary to address the additional issue of qualified immunity, also raised by the defendants in support of their motion. *See* *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001).

***15** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 50) be GRANTED, and plaintiff's complaint in this action be DISMISSED its entirety; and is further

RECOMMENDED that in light of this determination, plaintiff's motion for summary judgment (Dkt. No. 56) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.
Tapp v. Tougas
Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Sean TAPP, Plaintiff,
v.
R. TOUGAS, C.O.; C.O. Wilson; M.E. B. Santini-Correan; C.O. J. Rando; Sgt. Michael; C.O. Sharrow; Mr. Harvey, Hearing Officer; Donald Selsky; and Ms. Jones, Defendants.
No. 9:05-CV-1479.

Sept. 18, 2008.

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Esq., Assistant Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

***1** Plaintiff, formerly an inmate in the custody of New York State Department of Corrections, brings this civil rights action pursuant to 42 U.S.C. § 1983, claiming in his amended complaint (Dkt. No. 19) that he was assaulted by corrections officers, denied adequate medical care for injuries sustained during the course of the altercation, and subjected to a lengthy period of disciplinary special housing unit ("SHU") confinement as a result of the incident without having been afforded procedural due process.

Defendants move (Dkt. No. 50) for summary judgment. Plaintiff cross-moves (Dkt. No. 56) for summary judgment. The motions were referred to United States Magistrate Judge David E. Peebles pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). Magistrate Judge Peebles has issued a thorough Report and Recommendation recommending that this Court grant defendants' motion, deny plaintiff's motion, and dismiss the action.

Plaintiff interposes specific objections to numerous aspects of Magistrate Judge Peebles' Report and Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those parts of a report and recommendation to which a party specifically objects. Where only general objections are filed, the Court reviews for clear error. *See Brown v. Peters,* 1997 WL 599355,*2-* 3 (N.D.N.Y.), *af'd without op.*, 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a report and recommendation waives further judicial review of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

The Court adopts all factual and legal recitations in the Report and Recommendation. The Court has conducted *de novo* review of all issues to which plaintiff interposes objections, and adopts Magistrate Judge Peebles' analysis and recommendation with respect to all issues except the recommendation that summary judgment be granted dismissing the excessive force claim against defendants Tougas, Wilson, Rando, Michael, and Sharrow.

The Court adopts Magistrate Judge Peebles' recitation of the law and facts with respect to the excessive force claim. The Court agrees with his observation that the question of whether to grant summary judgment to defendants on this issue is a close one; however, in the Court's view, plaintiff's testimony at his deposition and the disciplinary hearing, and the supporting testimony of his inmate witnesses at the disciplinary hearing, are sufficient to raise questions of fact on this claim.[FN1]

FN1. Given his recommendation of dismissal, Magistrate Judge Peebles did not address whether plaintiff's excessive force claim might be barred under the rule in *Edwards v. Balisok* that a prisoner's section 1983 claim is not cognizable where, if successful, it would necessarily implicate the invalidity of a disciplinary determination affecting the length of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

> confinement. 520 U.S. 641, 645-48 (1997). It is not clear on this record that the *Edwards* rule would preclude plaintiff in the instant case from proceeding on his section 1983 excessive force claim, because it is not clear that a jury determination that defendants used excessive force in subduing plaintiff would necessarily implicate the invalidity of the disciplinary determination that he was guilty of violent conduct, creating a disturbance, an assault on staff, refusing a direct order, and refusing a search and frisk. *See, e.g., Sales v. Barizone,* 2004 WL 2781752, *13-14 (S.D.N.Y. Dec. 2, 2004). Further, plaintiff's excessive force claim is based in part on events occurring after the events that were the subject of the disciplinary charge. Specifically, plaintiff and other inmates allege that the corrections officers continued to beat plaintiff after they had subdued him, even after they had placed him in handcuffs and leg irons. A finding in plaintiff's favor on these allegations would not affect the validity of the disciplinary determination. Moreover, the record does not clearly establish plaintiff's present custodial status on his New York sentence; if he has served his full sentence, *habeas corpus* is no longer an available remedy, and the *Edwards* rule would not bar the section 1983 claim. *See Huang v. Johnson,* 251 F.3d 65, 74-75 (2d Cir.2001). Accordingly, the *Edwards* rule does not warrant summary judgment in defendants' favor.

The Court also rules that the application of the doctrine of qualified immunity does not warrant dismissal of the excessive force claims against defendants Tougas, Wilson, Rando, Michael, and Sharrow. Accepting plaintiff's allegations as true for purposes of this motion, these defendants could not reasonably have believed their actions were consistent with plaintiff's Eighth Amendment rights. *See Anderson v. Creighton,* 483 U.S. 635, 639-40 (1987).

It is therefore

***2** ORDERED that defendants' motion (Dkt. No. 50) for summary judgment is denied with respect to plaintiff's excessive force claim against defendants Tougas, Wilson, Rando, Michael, and Sharrow, and otherwise granted; and it is further

ORDERED that plaintiff's cross motion (Dkt. No. 56) for summary judgment is denied in its entirety; and it is further

ORDERED that the case will proceed to trial solely on the issue of excessive force; and it is further

ORDERED that the Report and Recommendation is rejected insofar as it recommends summary judgment dismissing plaintiff's claim of excessive force, and is otherwise accepted and adopted in all respects.

IT IS SO ORDERED.

N.D.N.Y.,2008.

Tapp v. Tougas
Not Reported in F.Supp.2d, 2008 WL 4371762 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Alvin PETERSON, Plaintiff,
v.
Sheryl MILLER, Nurse Practitioner; and Nurse Admin. Tousignant, Nurse Administrator, Defendants.
No. 9:04-CV-797.

July 13, 2007.
Alvin Peterson, East Elmhurst, NY, pro se.

Stephen M. Kerwin, Esq, Michael G. McCartin, Esq., Assts. Attorney General, of Counsel, Hon. Eliot Spitzer, Hon. Andrew M. Cuomo, Attorney General of the State of New York, Department of Law, Albany, NY, for Defendants.

***DECISION and ORDER***

DAVID N. HURD, United States District Judge.

***1** Plaintiff brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated April 27, 2007, the Honorable David E. Peebles, United States Magistrate Judge, recommended that the defendants' motion for summary judgment be granted and that plaintiff's complaint be dismissed in all respects. No objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Treece, the Report-Recommendation is accepted and adopted in whole. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendants' motion for summary judgment is GRANTED; and

2. Plaintiff's complaint is DISMISSED in all respects.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Alvin Peterson, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 complaining of the deprivation of his constitutional rights. Plaintiff asserts that while incarcerated, he was denied adequate medical treatment by the defendants, both of whom were nurses at the facility in which he was confined at the relevant times, for kidney pain and a foot rash, and denied the migraine medication of his choice, in violation of his Eighth Amendment right to be free of cruel and unusual punishment.

Currently pending before the court is a motion by the defendants for summary judgment dismissing plaintiff's complaint, both on the merits and based upon qualified immunity. Having carefully considered the record in light of defendants' motion and finding that it presents no genuine issue of material fact for trial, I recommend that defendants' motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of this case, the following facts are presented in a light most favorable to the plaintiff, the non-moving party. *See Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996). In this instance, the court's findings of fact are also informed by defendants' statement pursuant to Northern District of New York Local Rule 7.1(a)(3), the contents of which are assumed to be true as a result of plaintiff's failure to oppose defendants' motion. *See* pp. 9-11, *post.*

At the times relevant to his complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

confined within the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. Plaintiff was released from DOCS custody on July 7, 2004.

While at Clinton, plaintiff was treated over time for a variety of medical ailments including, *inter alia,* complaints of pain in the area of his kidney, a foot rash condition which has on occasion been described as athlete's foot, and migraine headaches. Among the medical personnel at Clinton who have acted as plaintiff's care providers are defendants Sheryl Miller, a nurse practitioner, and Amy Tousignant, who at the relevant times served as a nurse administrator. [FN2]

FN2. Defendant Tousignant, a registered nurse, is currently employed by the DOCS as Supervisor of Utilization Management and Quality Improvement. Tousignant Decl. (Dkt. No. 25) ¶ 1.

A. *Kidney Pain*

According to his medical records, plaintiff complained to prison medical personnel of pain, the origin of which is not disclosed, in his right flank or kidney area on eleven separate occasions between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. On November 30, 2001, plaintiff lodged his fourth such complaint, describing his symptoms as including a "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128. Plaintiff was seen by a prison doctor several times for evaluation of his complaints of kidney pain, and was provided with Motrin to address his discomfort. *See, e.g., id.* at pp. 128, 133, 144, 171. X-rays taken in or about July of 2002 were reviewed by a consulting radiologist, Dr. M. Browman, M.D., D.A.B.R., who concluded that plaintiff had "no suspicious calcifications" and a normal bowel gas pattern. *Id.* at p. 92. Plaintiff's x-rays were characterized by Dr. Browman as "normal abdominal radiographs." *Id.*

B. *Foot Rash*

***2** The record, including plaintiff's complaint, reveals that Peterson suffered from a chronic foot rash condition over at least the last two and one-half years of his incarceration as a New York State inmate. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 7. Early on, plaintiff's foot rash condition was treated principally with Hydrocortisone cream, administered on a minimum of fifteen occasions between August 9, 2001 and January 30, 2004. Miller Decl. (Dkt. No. 25) ¶ 8 and Exh. A at pp. 138-40, 155, 158. Plaintiff was also provided with Vitamin E lotion for his condition at least eight times during 2003 and 2004. *See, e.g., id.,* Exh. A at pp. 160-62, 166.

In addition to these nonprescription remedies, plaintiff was prescribed at least four different types of medication to help combat his foot condition. Miller Decl. (Dkt. No. 25) ¶ 9. On July 5, 2002, defendant Miller initially prescribed Selenium Sulfide (2.5% strength), a prescription medication used to treat tinea versicolor, a type of fungal infection of the skin. *Id.* ¶ 9. Plaintiff reported on August 29, 2002 that the Selenium Sulfide had completely relieved his itch, although he continued to experience a rash on his feet. Miller Decl. (Dkt. No. 25) Exh. A at p. 144. Three other prescription medications were subsequently administered in an effort to control plaintiff's foot condition, including 1) Temovate, a medication designed to relieve skin itching and inflammation of moderate to severe degrees; 2) Itraconazole, a drug utilized to combat fungal infections including aspergillosis, blastomycosis, histoplasmosis, and fungal infection localized to the toenails and fingernails (onychomycosis); and 3) Lamisil, another anti-fungal prescription medication used to combat foot conditions. *Id.* ¶ 10 and Exh. A at pp. 186, 193.

C. *Migraine Headache Medication*

The third element of plaintiff's deliberate medical indifference claim relates to the discontinuance of Fioricet, described as a strong, non-narcotic pain reliever used for relief of tension headache symptoms caused by muscle contractions in the head, neck and shoulder area. Miller Decl. (Dkt. No. 25) ¶ 12. The drug Fioricet contains butalbital, a sedative barbiturate, and acetaminophen, a non-aspirin pain reliever, as well as caffeine. *Id.*

Prison officials, including defendant Miller, prescribed Fioricet to the plaintiff on several occasions prior to March 29, 2004. *See, e.g.,* Miller Decl. (Dkt. No. 25) Exh. A at pp. 146, 153, 186. After learning on March 29, 2004 that plaintiff had accumulated four tablets of Fioricet on his person, while asking medical personnel for yet another two tablets of the same medication, and, upon

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

further investigation, learning that another inmate locked in the same area as plaintiff had thirty Fioricet tablets stockpiled in his cell, security staff at Clinton requested that medical personnel discontinue providing the drug to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 13. Defendant Miller and other medical personnel complied, substituting instead a prescription for Motrin 600 mg, a pain reliever much more potent than the over-the-counter medication known by the same name, to address plaintiff's headaches. *Id.* ¶ 14 and Exh. A. at p. 191.

***3** A month later, on May 4, 2004, defendant Miller prescribed Naproxen, a non-steroidal anti-inflammatory drug utilized for the management of moderate pain, fever, and inflammation through reduction of levels of prostaglandins, for plaintiff's migraine headaches. Miller Decl. (Dkt. No. 25) ¶ 15. Following complaints by the plaintiff that the Naproxen was not working well to control his migraine headaches, defendant Miller replaced that drug with Inderal, a medication specifically designed for the treatment of migraine headaches, among other ailments. *Id.* ¶ 16 and Exh. A at p. 193. Plaintiff continued on the Inderal migraine medication until shortly before leaving DOCS custody. *Id.* at ¶ 16 and Exh. A at p. 197.

One of plaintiff's complaints concerns the failure of prison officials to resume his Fioricet as recommended by a cardiac consultant following its discontinuance. That portion of plaintiff's complaint relates to a consultation which occurred on June 2, 2004, at defendant Miller's recommendation, resulting in a report that the cardiologist "would [discontinue] Inderal & resume Norvasc 5 QD & Fioricet." [FN3] Miller Decl. (Dkt. No. 25) Exh. A at p. 87. That recommendation was not followed in light of the finding of security personnel at the facility regarding plaintiff's "saving" of Fioricet tablets for later use and suspected conveyance of Fioricet tablets to a fellow inmate. Miller Decl. (Dkt. No. 25) ¶ 18 and Exh. A at p. 187.

FN3. Norvasc is a medication used to treat high blood pressure and angina. Miller Decl. (Dkt. No. 25) ¶ 17.

II. *PROCEDURAL HISTORY*

After exhausting available administrative remedies, plaintiff commenced this action on July 8, 2004. Dkt. No. 1. Plaintiff's complaint asserts three separate causes of action, all of which relate to defendants' alleged failure to provide him with proper medical treatment for his various medical conditions. Named as defendants in the action are Nurse Practitioner Sheryl Miller, and Nurse Administrator Amy Tousignant. *Id.* ¶ 3. As relief, plaintiff seeks recovery of $750,000 in compensatory damages and $1,500,000 in punitive damages. *Id.*

On March 27, 2006, following the close of discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 25. In their motion, defendants argue that 1) plaintiff's deliberate indifference claim is legally deficient, based both on the lack of a showing that he suffered from a serious medical condition and his failure to establish that either of the defendants was deliberately indifferent to any such condition; 2) plaintiff has failed to demonstrate the personal involvement of defendant Tousignant in the matters complained of; and 3) in any event, both defendants are entitled to qualified immunity. *Id.* Defendants' motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).[FN4]

FN4. A prior action brought by the plaintiff in this court pursuant to 42 U.S.C. § 1983 against various DOCS employees at Clinton, *Peterson v. Lacy, at al.,* 9:03-CV-1226 (DNH/RFT) (N.D.N.Y., filed 2003), was dismissed, on recommendation of United States Magistrate Judge Randolph F. Treece, on February 27, 2006, based upon plaintiff's failure to comply with the requirement that he notify the court of any change of address. 9:03-CV-1226, Dkt. Nos. 52, 54; *see also* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b). In this case, plaintiff similarly has failed to notify the court of any change of address since his apparent release from DOCS custody. Based upon information received in connection with 9:03-CV-1226, the court has nonetheless adjusted its records to reflect a current address for the plaintiff in East

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Elmhurst, New York. It appears from correspondence forwarded in the *Peterson v. Lacy* case to the plaintiff at that address but returned as undeliverable, *see* 9:03-CV-1226, Dkt. No. 63, however, that plaintiff may have again moved without notifying the court and defendants' counsel of his change of circumstances, thereby making it impossible for the court to communicate with him regarding his action and, if true, providing an independent basis for dismissal of his complaint. *See* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b).

III. *DISCUSSION*

A. *Failure to Respond*

***4** The first issue to be addressed is the legal significance, if any, of plaintiff's failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown. N.D.N.Y.L.R. 7.1(b)(3).

While recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see* *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N .Y.1997) (McAvoy, C.J.), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3) based upon a pro se plaintiff's failure to respond. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, D.J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, D.J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, D.J. & Hurd, M.J.). Before such an unopposed motion can be granted, however, the court must review the motion to determine whether it is facially meritorious. *See* *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

While a party's failure to properly oppose an adversary's dispositive motion thus does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to the motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have uniformly enforced Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[FN5] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also* *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

FN5. Local Rule 7.1(a)(3) provides that "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

B. *Summary Judgment Standard*

***5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (stating that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Eighth Amendment Claims*

Plaintiff asserts three causes of action in his complaint. First, plaintiff avers that defendants violated his Eighth Amendment rights when "they failed to provide adequate medical attention and treatment for two and one half years for his complaints of pain in his left kidney area, and rashes on his feet." Complaint (Dkt. No. 1) ¶ 7. Plaintiff next contends that defendants violated his Eighth Amendment rights by discontinuing the Fioricet migraine medication and failing to prescribe a beneficial medication. *Id.* Finally, the plaintiff claims that the defendants violated his Eighth Amendment rights by disregarding the order of the cardiologist to re-prescribe the Fioricet migraine medication. *Id.*

***6** Plaintiff's medical indifference claims are properly analyzed against the backdrop of a body of well-established Eighth Amendment jurisprudence. The Eighth Amendment prohibits the imposition of cruel and unusual punishments, including those that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 290-91 (1976) (quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison officials have violated the Eighth Amendment by their failure to provide adequate medical care must satisfy both an objective and a subjective requirement-the medical need must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See* *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713909, at * 2 (same).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1. *Serious Medical Need*

To establish a constitutionally cognizable claim of deliberate medical indifference under the Eighth Amendment, a plaintiff must initially allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citations omitted); *LaFave v. Clinton County,* No. 00CV744, 2002 WL 31309244, at *2-3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.), *adopted,* No. 00-CV-744, Dkt. No. 27 (N.D.N.Y. June 20, 2002) (Hurd, D.J.).

a. *Kidney Pain*

***7** According to his medical records, plaintiff complained to prison officials of pain in his kidney area over a period of two and one half years. Those records show that Peterson communicated those complaints to the medical staff, and as a result was seen on eleven occasions. Miller Decl. (Dkt. No. 25) ¶¶ 4, 6. Plaintiff described this pain as "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128.

Having carefully reviewed plaintiff's medical records, I find that no reasonable factfinder could conclude that his complaints of back or kidney pain arose to a level of constitutional significance, demonstrating the requisite level of "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66; *see also Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at * 10 (N.D.N.Y. Sept. 29, 2006) (Kahn, D.J. and Lowe, M.J.) (back pain that requires treatment with pain relievers and physical therapy was not a sufficiently serious medical need for purposes of the Eighth Amendment). Since at no time did plaintiff describe his pain in terms which would equate to "urgent," "debilitating," or "extreme", no reasonable factfinder could conclude that the condition constituted a sufficiently serious medical need to trigger the protections of the Eighth Amendment.

b. *Foot Rash*

Plaintiff alleges, and his medical records bear out, that over a lengthy period of time he registered multiple complaints regarding a foot rash condition. Those records, however, fail to suggest that the rash increased in severity over time or that because of it, plaintiff suffered from a condition capable of producing "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66. Indeed, plaintiff's records reflect that while the rash persisted, the itch associated with it was relieved by medication provided to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 9 and Exh. A at p. 144. Under these circumstances, once again, no reasonable factfinder could conclude that during the relevant period, plaintiff's foot condition rose to a level of constitutional significance. *See Smith v. Nash,* No. 04-CV-0074, 2006 WL 2806464, at *4-5 (N.D.N.Y. Sept. 28, 2006) (Kahn, D.J. and Homer, M.J.) (arthritis pain for which plaintiff was being treated with medication, and of which plaintiff did not complain of any pain, was not a sufficiently serious medical need).

c. *Migraine Headaches*

Plaintiff's complaint also claims a failure on the part of the defendants to properly medicate and otherwise treat his migraine headaches, causing him to needlessly suffer. Neither plaintiff's complaint nor his medical records are particularly informative as to the specifics regarding his migraine headaches, including their severity, duration, and degree. At most, plaintiff's medical records reveal that in March of 2004, plaintiff noted he "generally" suffered from headaches twice a week, and in April of 2004, his headaches were "bad" and generally started late at night. Miller Decl. (Dkt. No. 25) Exh. A at pp. 186, 189. While

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the court is therefore disadvantaged on this score, this particular issue is not appropriately resolved on summary judgment, since such a condition has, on occasion, been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for summary judgment attacking the sufficiency of a plaintiff's showing in this regard. [FN6] *See, e.g., Moriarity v. Neubould,* No. 02CV1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (suggesting that plaintiff's migraine headaches constituted a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating"); *O'Bryan v. Sedgwick County,* No. 98-3308, 2000 WL 882516, at *5 (D. Kan. June 12, 2000) (assuming plaintiff's migraine headaches, for which he was prescribed medication, comprised a sufficiently serious medical need under the Eighth Amendment); *Medcalf v. State of Kansas,* 626 F.Supp. 1179, 1183 (D.Kan.1986) (finding that deceased prisoner, who consistently complained of severe headaches, nausea and vomiting, exhibited sufficiently severe medical symptoms for the court to conclude that administrator of prisoner's estate had stated a claim for relief under section 1983 and the Eighth Amendment).

> FN6. Defendants have not argued that plaintiff's migraine headaches do not constitute a sufficiently serious medical condition to warrant the Eighth Amendment protections, and I have therefore not assumed otherwise.

2. *Deliberate Indifference*

***8** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998); *see also Perez v. Hawk,* 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (noting that "treatment of a prisoner's medication condition generally defeats a claim of deliberate indifference") (quotations omitted).

a. *Kidney Pain*

Plaintiff's medical records show that he complained of pain in the area of his kidney eleven times between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. Defendant was given Motrin to alleviate his discomfort, *see, e.g., id.,* Exh. A at pp. 128, 133, 144, 171, and was seen by a medical doctor on several of those occasions. Miller Decl. (Dkt. No. 25) ¶ 3 and Exh. A at pp. 133, 144, 171. As a general matter, the record fails to disclose any failure on the part of medical officials at Clinton to respond to his pain complaints.

Focusing on the involvement of defendant Miller, the record supports a finding that she was made aware of the plaintiff's kidney pain through plaintiff's complaints to her on July 5, 2002-a fact which she readily acknowledges. On that one and only occasion when defendant Miller saw the plaintiff regarding his pain complaints, she arranged for an outside radiologist to review x-rays of the plaintiff's back. Miller Decl. (Dkt. No. 25) ¶¶ 4, 5. Those x-rays were determined to be negative. *Id.* at ¶ 5. After the x-rays were taken, defendant Miller had no contact with the plaintiff regarding the condition. The record therefore fails to disclose any evidence from which a reasonable factfinder could conclude that defendant Miller was aware of but deliberately indifferent to plaintiff's kidney condition.

While the record discloses at least some minimal involvement on the part of defendant Miller in the treatment of plaintiff's kidney pain, there is no evidence from the record currently before the court of any involvement on the part of defendant Tousignant in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

connection with care or treatment for that complaint. Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See* *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

***9** Although plaintiff's complaint is silent on this issue, it may be that plaintiff asserts claims against defendant Tousignant in her administrative capacity as a nurse administrator. A supervisor, however, cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). Even under this test the record fails to disclose any basis for finding defendant Tousignant liable with regard to plaintiff's kidney condition. Accordingly, I recommend that the portion of plaintiff's deliberate indifference claim against defendant Tousignant, related to the treatment of his kidney pain, be dismissed on this basis.

b. *Foot Rash*

The record reflects that both defendants were subjectively aware of plaintiff's foot rash. Plaintiff was seen on February 11, 2004 by defendant Tousignant, complaining of a rash on his feet. Tousignant Decl. (Dkt. No. 25) ¶ 4; Miller Decl. (Dkt. No. 25) Exh. A at p. 180. Defendant Tousignant reports that on that date she discussed with another nurse at the facility the care and treatment of plaintiff's foot condition, and was of the opinion that the treatment was appropriate. Tousignant Dec. (Dkt. No. 25) ¶ 4. While defendant Tousignant was aware of the plaintiff's foot rash condition, there was no evidence in the record demonstrating her deliberate indifference to that condition. I therefore recommend dismissal of plaintiff's foot rash indifference claim as against defendant Tousignant.

The record also reflects that defendant Miller was aware of, and indeed had a more active role in caring for, plaintiff's foot condition. The medical records associated with defendant Miller's care and treatment for that condition reflect significant efforts on her part, through administering of various prescription and non-prescription medications, to control plaintiff's condition and to relieve the itch associated with it. While plaintiff's quarrel appears to stem from his frustration over the inability to cure his rash condition, this without more fails to establish a constitutional violation. *See, e.g.,* *Armour v. Herman,* No. 1:05CV295, 2005 WL 2977761, at *3 (N.D.Ind. Nov. 4, 2005) ("The Eighth Amendment does not require medical success ...."); *Ramos v. Artuz,* No. 00 Civ. 0149, 2003 WL 342347, at *9 (S.D.N.Y. Feb. 14, 2003) (indicating that an unsuccessful course of treatment does not support a finding of deliberate indifference); *see also* *Moolenaar v. Champagne,* No. 03-CV-1464, 2006 WL 2795339, at *7 (N.D.N.Y. Sept. 26, 2006) (Kahn, D.J. and Peebles, M.J.) (plaintiff's complaints of pain resulting from degenerative disc disease, a chronic ailment sustained by many individuals and treated with exercise, pain medication, and physical therapy, with which plaintiff was treated, did not give rise to a valid deliberate indifference claim). Based upon my review of the records associated with that defendant Miller's treatment, I am unable to discern any basis upon which a reasonable factfinder could conclude that defendant Miller was inattentive and deliberately indifferent to plaintiff's foot rash condition.

c. *Migraine Headaches*

The treatment administered by medical personnel with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

respect to plaintiff's migraines similarly belies any claim of deliberate indifference to his medical needs. It is true that both defendants were aware of plaintiff's prescription of Fioricet and his desire to continue with that medication. *See, e.g.,* Miller Decl. (Dkt. No. 25) ¶ 13; Tousignant Decl. (Dkt. No. 25) ¶ 5. Plaintiff's complaint in this regard stems from the failure to continue prescribing his pain medication of choice; that decision, however, was not made by the defendants, who instead were merely following directives from security personnel at the facility to discontinue the prescription drug in light of plaintiff's stockpiling and at least the suspected potential for having sold or given the drugs to fellow inmates. Such legitimate security concerns can provide a basis for discontinuing or denying a treatment, especially when, as in this case, adequate alternative measures are taken. *See, e.g., Kosilek v. Maloney,* 221 F.Supp.2d 156, 161 (D.Mass.2002) (stating that the duty of prison officials to protect the safety of both inmates and prison staff "is a factor that may properly be considered in prescribing medical care"); *Hawley v. Evans,* 716 F.Supp. 601, 604 (N.D.Ga.1989) (noting that as long as prison system abides by reasonable medical practices, whether to permit a prisoner to be treated with experimental drugs is within the discretion of the state officials, as "jail authorities have a legitimate security concern in limiting the exposure of inmates to drugs").

***10** In this instance, alternative efforts were taken by prison medical officials to address plaintiff's pain complaints. After termination of the Fioricet in or about late March, 2004, plaintiff was written a prescription for Motrin 600 mg, a strong pain reliever. Miller Decl. (Dkt. No. 25) ¶ 14 and Exh. A at p. 191. That was followed with a prescription on May 4, 2004 for Naproxen, another non-steroidal anti-inflammatory drug. Following a determination that the Naproxen was not working well enough to treat plaintiff's headaches, defendant Miller prescribed Inderal, a medication specifically designed for such purposes. Miller Decl. (Dkt. No. 25) ¶ 16 and Exh. A at p. 193.

In sum, plaintiff's medical records reflect that his migraine headaches were treated with three different prescription pain reliever medications. "[T]reatment of a prisoner's medical condition 'generally defeats a claim of deliberate indifference.' " *Perez,* 302 F.Supp.2d at 21 (quoting *Wells v. Franzen,* 777 F.2d 1258, 1264 (7th Cir.1985)). In this instance plaintiff's complaint represents nothing more than a disagreement with prison officials' choice of treatments, a matter which does not arise to a level of medical deliberate indifference. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *see also Chance,* 143 F.3d at 703. Accordingly, I find that plaintiff has not established medical deliberate indifference on the part of either of the defendants to his migraine medical condition.[FN7]

FN7. The evidence reflects that defendant Tousignant did have at least minimal awareness of an involvement in the decision to discontinue his Fioricet medication and of plaintiff's quarrel with that determination. *See e.g.,* Tousignant Decl. (Dkt. No. 25) ¶ 5. I therefore recommend against dismissal of plaintiff's migraine headache claim as against defendant Tousignant on the independent basis of lack of personal involvement.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint claims deliberate indifference on the part of defendants to three separate conditions, including pain in the region of his kidney, a foot rash, and migraine headaches. Because the first two of those three conditions are insufficiently serious, either separately or in combination, to trigger the Eighth Amendment's cruel and unusual punishment protections, I recommend dismissal of those claims on this basis. Additionally, having carefully reviewed the available records associated with plaintiff's medical treatment while an inmate at Clinton, I find no evidence from which a reasonable factfinder could conclude that either of the defendants was deliberately indifferent to plaintiff's medical conditions even assuming, *arguendo,* that they were sufficiently serious to implicate the Eighth Amendment. Finally, in light of my recommendations on the merits, I find it unnecessary to address defendants' additional argument that they are entitled to qualified immunity.[FN8]

FN8. The first step in the qualified immunity analysis requires a threshold determination of whether plaintiff has facially established a constitutional violation. *Harhay v. Town of*

> *Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). Only if the answer to that inquiry is in the affirmative must the court then turn its focus to whether the right in issue was clearly established at the time of the alleged violation, and if so whether it was objectively reasonable for the defendant to believe that his or her actions did not violate any such clearly established right. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also* *Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002).

Based upon the foregoing, it is hereby,

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 25) be GRANTED, and that plaintiff's complaint be DISMISSED in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

***11** It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

N.D.N.Y.,2007.

Peterson v. Miller
Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Corey FORD, Plaintiff,
v.
William E. PHILLIPS, Superintendent of Green Haven Correctional Facility; Guiney, Deputy Superintendent; Matthew Miller, Corrections Officer; Franklin W. Middleton, Corrections Officer; S. Phillip, Corrections Officer; D. McClenning, Corrections Officer, J. Erns, Corrections Officer; D. Huttel, Corrections Officer; C. Austin, Corrections Officer; L. Czyzewski, Corrections Officer; R. Myers, Sergeant; D. Carey, Sergeant; John Doe # 1, Corrections Officer; John Doe # 2, Corrections Officer; Josepth T. Smith, Superintendent of Shawangunk Correctional Facility; John Maly, Deputy Superintendent; Bipin Bhavsar, Medical Doctor; Kimbler, Sergeant; Jewett, Sergeant; Alfred Vacca, Inspector General, individually and in their official capacities, Defendants.[FN1]

FN1. This caption reflects the caption in plaintiff's Complaint. Defendants did not provide the Court with a full, corrected caption.

**No. 05 Civ. 6646(NRB).**

March 27, 2007.

Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of the Attorney General, State of New York, New York, NY, for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

***1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently incarcerated, brings this action against employees of the Department of Correctional Services ("DOCS"), pursuant to 42 U.S.C. § 1983, alleging: (1) excessive force; (2) denial of recreation, showers, special meals and property; (3) deliberate indifference to a serious medical need; and (4) mail interference, all in violation of his constitutional rights. Ford moved for summary judgment on July 24, 2006 and defendants cross-moved for summary judgment on December 22, 2006.[FN2] For the reasons stated below, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment in part.

FN2. Although the title of Ford's motion is "Motion for Partial Summary Judgment", his papers clearly argue for judgment on all of the claims raised in his Complaint. Defendants' motion for summary judgment expressly applies to Ford's entire Complaint.

*BACKGROUND* [FN3]

FN3. Unless otherwise noted, the following facts are not in controversy.

A. Ford's Attack on Officer Miller

Plaintiff's Complaint arises from events at the Green Haven and Shawangunk correctional facilities in April and May of 2004.[FN4] In the early afternoon of April 14, 2004, at approximately 12:30 p.m., Ford exited his cell without permission when a corrections officer unlocked the door for Ford's cellmate.[FN5] After leaving his cell, Ford headed directly for Officer Miller, who was writing passes for inmates.[FN6] As Ford later admitted, [FN7] Ford then threw hot oil on Officer Miller, burning his face, head, eye, neck, shoulders and chest, and repeatedly stabbed Officer Miller with a homemade shank measuring approximately nine inches in length. As he was attacked by Ford, Officer Miller repeatedly screamed, "Get him off me!" [FN8]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN4. Plaintiff is currently incarcerated and serving a sentence of twelve and one-half to twenty-five years, having plead guilty to attempted murder, kidnapping and a weapons violation. *See* Declaration of Efthimios Parasidis ("Parasidis Decl."), dated December 22, 2006.

FN5. *See* Parasidis Decl., Ex. B, FORD 42. Earlier that day, Officer McClenning observed Ford yelling from his cell gate and generally being disrespectful. *Id.* at FORD 39.

FN6. *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

FN7. *Id.,* Ex. E., FORD IG 26-29, 290-295.

FN8. *Id.,* Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me" ').

Officers Phillips, Middleton and Todriff responded to Officer Miller's call, attempting to restrain Ford.[FN9] After slipping in the oil and falling with Ford to the ground, the officers pried the shank out of Ford's hand, placed him in mechanical restraints, stood him up, and faced him against a wall.[FN10] Once the officers had Ford under control, an ambulance rushed Officer Miller to St. Francis Hospital in Poughkeepsie, New York, where he remained over night.[FN11] Officers Todriff and Middleton were also treated at the St. Francis emergency room for injuries sustained while restraining Ford.[FN12] Ford was later convicted by a jury for his assault on Officer Miller and is currently awaiting sentencing.[FN13]

FN9. *Id.*

FN10. *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

FN11. *Id.* at FORD 45-46.

FN12. *Id.* at FORD 1-2, 21-22, 43.

FN13. *See id.,* Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a weapon, and one count of promoting prison contraband in the first degree).

In his Complaint, Ford provides a somewhat different version of the events of April 14, 2004. Specifically, Ford asserts that Officer Miller denied him recreation, an alternative meal, and showers on April 5, 12, 13 and 14 of 2004[FN14] and that, on the morning of April 14, 2004, prior to his attack on Officer Miller, Officers Miller, Erns, and McClenning kicked and punched Ford in the face, head, chest and back without provocation.[FN15] Ford further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him.[FN16]

FN14. Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

FN15. *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative attack.

FN16. *Id.* at 7.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

B. Ford's Escort to Special Housing

***2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.[FN17] As is evident from a videotape showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort and was picked up by the officers each time.[FN18] Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarrantly malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.[FN19]

FN17. Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

FN18. *Id.*

FN19. Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he sustained "extreme and numerous abriasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT upper back" from the April 14 attacks.

C. Ford's Post-Incident Medical Treatment

Upon his arrival at Special Housing, Ford was examined by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back.[FN20] The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time.[FN21]

FN20. Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

FN21. *See id.,* Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood.[FN22] The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar that afternoon.[FN23] After examining Ford, Dr. Bhavsar ordered a urine analysis [FN24] and prescribed Tylenol.[FN25] Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis.[FN26] Both urine analyses found evidence of blood.[FN27]

FN22. *Id.,* Ex. B, 47; Ex. D, FORD MEDICAL 26.

FN23. *Id.*

FN24. *Id.;* Ex. G (Bhavsar Decl.) at 1.

FN25. *Id.*

FN26. *Id.* at FORD MEDICAL 25; Ex. G at 2.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN27. *Id.*

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists.[FN28] The staff determined that Ford had "no obvious loss of dexterity." [FN29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement.[FN30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution.[FN31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change." [FN32]

FN28. *Id.*

FN29. *Id.*

FN30. *Id.* at FORD MEDICAL 24; Ex. G at 9.

FN31. *Id.* at FORD MEDICAL 37.

FN32. *Id.* at FORD MEDICAL 41.

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004.[FN33] The CAT-scan results were negative.[FN34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS policy, made regular rounds of the entire Special Housing unit.[FN35]

FN33. *Id.* at FORD MEDICAL 22-3, 69; Ex. G at 2.

FN34. *Id.* (Ford's "renal parenchyma and collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

FN35. *Id.,* Ex. C, FORD GRIEVANCE 34.

***3** Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004.[FN36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in excruciating pain, "never received medical attention".[FN37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion.[FN38]

FN36. *See e.g.* Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

FN37. *Id.*

FN38. *Id.*

D. Post-Incident Restrictions on Ford

Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants, Ford was under a restraint order as a result of his assault on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities.[FN39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others.[FN40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004. [FN41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

23, 2004. [FN42]

FN39. Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

FN40. *Id.*

FN41. *Id.*

FN42. *Id.*

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexi-glass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper. [FN43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days.[FN44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sargeants ignored his complaints.[FN45]

FN43. *See e.g.* Complaint at 10.

FN44. *Id.*

FN45. *Id.* at 10-11.

E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy.[FN46] During the mail watch, DOCS employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: “I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment.” [FN47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: “I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do.” [FN48]

FN46. Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

FN47. *Id.,* Ex. E, FORD IG 316-324.

FN48. *Id.,* at FORD IG 316, 325-333.

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend.[FN49] Ford further claims that DOCS employees and others conspired to deprive him of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him.[FN50]

FN49. Compl. at 13-14.

FN50. *Id.* at 15.

*DISCUSSION*

A. Legal Standard

***4** Summary judgment may not be granted unless “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 55(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of “informing the district court of the basis for its motion”

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 314 (2d Cir.1981); *accord Abrams v. United States,* 797 F.2d 100, 103 (2d Cir.1986). However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble,* 429 U.S. 97 (1976); *Patrick v. LeFevre,* 745 F.2d 153, 160 (2d Cir.1984).

B. Analysis

1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants for damages in their individual capacities. Defendants are correct. *See Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York,* 316 F.3d 93 (2d Cir.2002); *see also Kentucky v. Graham,* 473 U.S. 159 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984) (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs.,* 945 F.2d 25, 28 n. 1 (2d Cir.1991) (department that is an agency of the state is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo,* 502 U.S. 21, 27-31 (1991) (Eleventh Amendment does not bar actions for damages against state officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

2. Excessive Force

***5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wonton infliction of pain. *Hudson v. McMillian et al.,* 503 U.S. 1 (1992) (citing *Whitley v. Albers,* 475 U.S. 312 (1986)). Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley,* 475 U.S. at 320. Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id.* at 320-21; *Hudson,* 503 U.S. at 7 (prison officials must act quickly when responding to a prison disturbance, balancing the need to "maintain and restore discipline" against "the risk of injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005) (citing *Tennessee v. Garner,* 471 U.S. 1, 11-12 (1985) and *Estate of Kenneth Jackson v.. Rochester,* 705 F.Supp. 779, 783 (W.D.N.Y.1989)).

a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14, 2004 and that corrections officers "verbally counseled" Ford without using any force.[FN51]

FN51. *See e.g.* Parasidis Decl., Ex. E., FORD IG 303.

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim [FN52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic. [FN53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004.[FN54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris' sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took place.

FN52. Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

FN53. Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

FN54. Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

***6** Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect,[FN55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does

not accuse Officers Miller, McClenning and Erns of punching and kicking him during the morning of April 14, 2004. On the contrary, Ford makes no mention of any force used by Officers McClenning and Erns and only alleges that Officer Miller used a *de minimus* amount of force against him: "At this point, Miller slapped me on each side of my face ..." [FN56] *Candelaria v. Coughlin,* 787 F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *de minimus* when officer "pushed his fist against [plaintiff's] neck so that [he] couldn't move and was losing [his] breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).

FN55. *See supra* note 51.

FN56. Parasidis Decl., Ex. E, FORD IG 26-28 (quoting Ford's April 14, 2004 statement); *see also id.* at FORD IG 290-93 ("This is where he yells at me and slap me (sic) across my face"), dated April 15, 2004 at 9:00 a.m.

Third, given the different versions of the April 14 events offered by Ford and the inconsistencies between the affidavits submitted by Ford to support his Complaint, no reasonable jury could credit Ford's latest allegations. *See e.g. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not "create a material issue of fact by submitting ... affidavit[s] disputing his own prior sworn testimony" in order to defeat defendants' summary judgment motion) (quoting *Mack v. United States,* 814 F.2d 120, 124 (1987)); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (affirming district court's grant of summary judgment for defendants in section 1983 case brought by *pro se* prisoner-where plaintiff relied almost exclusively on his own testimony, district court could make assessments about whether a reasonable jury could credit plaintiff's testimony); *Shabazz v. Pico,* 994 F.Supp. 460, 470 (S .D.N.Y.1998) (Sotomayor, J.) (granting summary judgment for defendants where "plaintiffs allegations of the events at issue [were] replete with inconsistent and contradictory statements" and "plaintiff's version of the events ... [had] undergone at least one significant revision"). Ford has offered no fewer than four versions of what happened on the morning of April 14, 2004 through his submissions to the Court, at least three of which allege only a *de minimus* use of force and many of which, as discussed, are inconsistent with one another.[FN57] Moreover, Ford's signed and personal version of the events, without any explanation from Ford, has undergone at least one significant and self-serving revision, changing from a story about a *de minimus* use of force to one about a brutal, unprovoked beating.

FN57. *See supra* note 53. Versions of the events offered in Ford's submissions include: (1) Ford was pushed into his cell; (2) Ford was held up on a wall; (3) Ford was slapped in the face by Officer Miller; (4) Ford was punched and kicked by Officers Miller, McClenning and Erns; and (5) Ford was punched and kicked by Officers Miller and McClenning.

In sum, given the sheer lack of evidence to support Ford's new version of the April 14 morning events, the substantial evidence against that version, and the fact that Ford's initial, signed statements contradict the allegations in his Complaint and confirm defendants' position, no reasonable jury could find in favor of Ford on this claim. Accordingly, we deny Ford's motion for summary judgment and grant summary judgment in favor of defendants.

b. Attack on Officer Miller

***7** Regarding the afternoon of April 14, 2004, Ford alleges that Officers Miller, Erns, Middleton and Phillips kicked and punched him, and that Sgt. Carey watched this happen without taking action. Having reviewed the parties' submissions, we hold that, even accepting Ford's allegations as true, no reasonable jury could find that defendants responded with excessive force when attempting to save Officer Miller.

The genesis of Ford's claim is his own brutal attack on Officer Miller. As Ford admits, he rushed Officer Miller, threw hot oil on his face and then stabbed him repeatedly with a nine inch shank. Given this use of potentially lethal force, and given that defendants had to react quickly to save Officer Miller, defendants were legally authorized to respond to Ford with significant force of their own, perhaps including deadly force. *See e.g. Tennessee,* 471 U.S. at 11-12; *see also Diggs v. New York Police Dep't et*

*al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under control.[FN58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny summary judgment for Ford and grant it for defendants.[FN59]

FN58. *See e.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

FN59. Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *See e.g.* *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

c. Transfer to Special Housing

Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him, that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room.[FN60] Defendants respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

FN60. Compl. at 9.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra,* and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

***8** Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the morning attack, this version is consistent with Ford's Post-Incident Statements.[FN61]

FN61. Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

got the bump on my head when they threw me into the wall....".

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[FN62]

FN62. As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to have internal bleeding, they violated his Eighth Amendment rights.

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[FN63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[FN64]

FN63. Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

FN64. Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his transfer to Special Housing. *See supra* note 59.

d. Due Process

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment. For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

3. Deprivations

***9** Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

a. Cruel and Unusual Punishment

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

objectively, the inmate's deprivation must have been sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if members of DOCS staff determine that the inmate poses a threat to himself or to others. [FN65] Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

FN65. See Defendants' Mem. of Law at 10-13.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, *1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 *6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

***10** Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care.[FN66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

FN66. *See e.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (prisoner failed to demonstrate a significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin,* 26 F.Supp.2d 615 (S.D.N.Y.1996) (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was infringed without due process of law. *See e.g. Cespedes v. Coughlin,* 956 F .Supp. 454, 469 (S.D.N.Y.1997).

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See e.g. Frazier,* 81 F.3d at 317. We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See e.g. Frazier,* 81 F.3d at 317. Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf. Sandin,* 515 U.S. at 487-88 (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

***11** Third, although Ford does allege that defendants deprived him of privileges and Special Housing property in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A "Deprivation Order", dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

> In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. FN67

FN67. Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." FN68

FN68. *Id.* at FORD GRIEVANCE 30.

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. FN69

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN69. We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the deprivation orders and related documents submitted by defendants. *See supra* note 67.

4. Deliberate Indifference to a Serious Medical Need

Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs." *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Id.; see e.g. Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious); *Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

***12** The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to inmate health or safety". *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002 WL 31413804, *1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and are inadequate to state claim for deliberate medical indifference in section 1983 suit). FN70

FN70. The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally; x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided.FN71

FN71. *Id.*

***13** As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly resolved itself, obtained more thorough medical attention while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim.FN72

FN72. Even if one or more officers ignored Ford's complaints on one or more specific occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

interference.

a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also* *Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing.[FN73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants' mail-watch clearly does not state that Ford lost an otherwise meritorious claim.[FN74] This is especially true in light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *pro se,* has been represented by counsel throughout his criminal and post-trial proceedings.[FN75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

FN73. *See* Ford Brief at 22-23; *see also* Complaint at 25.

FN74. Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

FN75. *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with his CPL §§ 330.30 and 440.10 motions).

b. First Amendment

***14** Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend.[FN76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. *Davis,* 2003 U.S.App. LEXIS 13030 at *8-10 (citing *Washington v. James,* 782 F.2d 1134 (2d Cir.1986)); *U.S. v. Felipe et al.,* 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing *U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN76. At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed *supra* that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial for that assault.[FN77] In fact, the mail watch revealed one letter in which Ford admits to stabbing and throwing hot oil on Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial. [FN78]

FN77. *See* Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

FN78. *Id.*

Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without any evidence offered to support such an allegation, and given defendants' affidavits and documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures,[FN79] no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

FN79. *See e.g.* Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

***15** Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for his mail claims is denied and summary judgment is granted in favor of defendants.

6. Responsibility of Individual Defendants

Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3) that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 .[FN80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers,[FN81] but his Complaint is dismissed as to the following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

FN80. Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

FN81. Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it found that Ford deserved nothing more.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Ford v. Phillips
Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dennis BONNER, Plaintiff,
v.
NEW YORK CITY POLICE DEPT.; Michael Orlowski, 5577; New York City Department of Corrections; Jame Sanchex, 5769, Defendants.
**No. 99 Civ. 3207(AGS).**

Aug. 17, 2000.

Michael D. Hess, Corporation Counsel of the City of New York, by Lisa J. Black, for Defendants.

*OPINION AND ORDER*

SCHWARTZ, J.

***1** Plaintiff Dennis Bonner, appearing *pro se,* brings this action pursuant to 42 U.S.C. § 1983 against defendants New York City Police Department ("NYPD"), New York City Department of Corrections ("DOC"), Michael Orlowski ("Orlowski"), and Jame Sanchex ("Sanchex") (collectively: "defendants"). Before the Court is defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(b)(6). For the reasons stated below, defendants' motion is GRANTED.

FACTUAL BACKGROUND [FN1]

FN1. On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court is required to accept as true the allegations stated by the non-moving party. *SeeGant v. Wallingford Board of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). Further, in deciding the motion under 12(b)(6), the court may consider "facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as [ ] matters of which judicial notice may be taken." *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (citation omitted). Accordingly, the facts discussed herein are accepted as true for the purposes of this motion and are drawn from the allegations of the complaint or are otherwise reflected in the record.

Plaintiff alleges that, on March 12, 1997, while in police custody at the 46th Precinct in the Bronx, he requested medical treatment "for [a] hand that was extremely swolle[n]". (Complaint at 3, section IV.) Allegedly, plaintiff was denied medical treatment for a period of time. (Complaint at 3, section IV.) Plaintiff further alleges that, on April 4, 1997, a bus conveying plaintiff was involved in an accident and plaintiff's head and back were injured. (Complaint at 4, section IV.) The bus was allegedly operated by the DOC. (Complaint at 4, section IV.) Plaintiff asserts that he was "given pain killer" but still suffers discomfort. (Complaint at 4, section IV-A.) He further asserts that he is still in need of medical attention because a finger on his right hand "does not close". (Complaint at 4, section IV-A.)

On May 4, 1999, plaintiff filed this action seeking approximately five million dollars in damages. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("section 1983"), alleging that, by denying him adequate medical treatment and by deliberately disregarding his safety, defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. (Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Pl's.Mem.Law") at 1, 6.) In addition, the complaint is construed to assert a pendent claim for negligence under New York common law. Defendants filed the instant motion to dismiss, which was fully submitted on May 17, 2000.[FN2]

FN2. Defendants filed the instant motion to

dismiss on January 5, 2000. By letter dated January 6, 2000, defendants apprised the Court that although they had filed their own papers, plaintiff's opposition papers had been rejected by the Clerk of the Court for failure to set forth the correct docket number. Plaintiff, who is incarcerated, was ultimately successful in filing his opposition papers to the instant motion on May 17, 2000.

DISCUSSION

I. LEGAL STANDARD GOVERNING DISMISSAL PURSUANT TO FED. R. CIV. P. 12(b)(6)

Defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). On such a motion, the court is required to accept the material facts alleged in the complaint as true and to construe all reasonable inferences in plaintiff's favor. *See Grandon v. Merril Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998); *Caspar v. Lew Lieberbaum & Co., Inc.,* No. 97 Civ. 3016(JGK), 1998 WL 150993, *1 (S.D.N.Y. Mar. 31, 1998). Further, the court's function on a motion to dismiss "is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Caspar,* 1998 WL 150993, *1 (citation omitted). Therefore, a defendant's motion should be granted only if the court determines that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (quoting *Conley v. Gibson,* 35 U.S. 41, 45-46 (1957)). Where, as here, the plaintiff is proceeding *pro se,* courts must apply a "more flexible standard in determining the sufficiency of [the] complaint than they would in reviewing a pleading submitted by counsel." *Platsky v. CIA,* 953 F.3d 26, 28 (2d Cir.1991) (*per curiam* ); *see Haines v. Kernier,* 404 U.S. 519, 520-21 (1972).

***2** However, "while *Conley* permits a pleader to enjoy all favorable inferences from facts that have been pleaded, it does not permit conclusory statements to substitute for minimally sufficient factual allegations". *Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.,* 129 F.3d 240, 243 (2d Cir.1997) (citation omitted). The Court is not required to uphold the validity of a claim supported only by conclusory allegations. *See Gant,* 69 F.3d at 673 ("It is well settled in this Circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation ... fails to state a claim under Rule 12(b)(6).").

II. CLAIM PURSUANT TO SECTION 1983

Plaintiff asserts a claim under section 1983, alleging that his Eighth Amendment right to be protected from cruel and unusual punishment was violated by inadequate medical care and defendants' deliberate disregard for his safety. Defendants contend that the section 1983 claim must be dismissed because: (i) defendants NYPD and DOC are not suable entities; (ii) plaintiff has failed to allege facts upon which a court could find that defendants Orlowski and Sanchex were personally involved in the alleged misconduct; and (iii) plaintiff has failed to allege facts upon which a court could find that a constitutional violation had occurred.

A. *Section 1983 claim as against the NYPD and the DOC is barred*

Defendants argue that the section 1983 claim as asserted against defendants NYPD and DOC must be dismissed because these defendants are not suable entities. Chapter 17 § 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not that of any agency, except where otherwise provided by law." The NYPD and the DOC are agencies of the City of New York and, consequently, may not be sued independently. *See Baird v. Perez,* No. 98 Civ. 3762(SAS), 1999 WL 386746, *4 (S.D.N.Y. Jun. 10, 1999) (recognizing that the NYPD is an agency and pursuant to § 396 may not be sued independently); *Adams v. Galletta,* 996 F.Supp. 210, 212 (S.D.N.Y.1997) (recognizing that the DOC is an agency and pursuant to § 396 may not be sued independently) (collecting cases). Accordingly, plaintiff's section 1983 claim as asserted against the NYPD and the DOC must be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

dismissed. *See* Perez, 1999 WL 386746, *4 (dismissing section 1983 claim as against the NYPD pursuant to § 396); *Adams,* 966 F.Supp. at 212 (dismissing section 1983 claim as against the DOC pursuant to § 396).

B. *Section 1983 claim as against defendants Orlowski and Sanchex is barred*

Defendants argue that the section 1983 claims as asserted against defendants Orlowski and Sanchex must be dismissed because plaintiff has failed to allege that these defendants were personally involved in the allegedly unconstitutional activity. It is well established in the Second Circuit that to state a claim under section 1983 a plaintiff must allege facts showing that the defendant was directly and personally involved in the alleged constitutional deprivations. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) (cited by *Ella v. Jackson,* No. 95 Civ. 2314(AGS), 1996 WL 673819, *2 (S.D.N.Y. Nov. 20, 1996) (Schwartz, J.); *cf. Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (holding that doctrine of *respondeat superior* cannot be applied to impute liability to a supervisor under section 1983). The only circumstances under which allegations of direct participation may not be necessary arise when a supervisory official has had "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." *Ella,* 1996 WL 673819, *2 (quoting *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) (citation omitted)).

***3** Here, under the most liberal construction of the complaint, plaintiff merely alleges that Orlowski and Sanchex were supervisors. This allegation is inadequate to establish personal involvement. *See Pritchett v. Artuz,* No. 99 Civ. 3957(SAS), 2000 WL 4157, *6-7 (S.D.N.Y. Jan. 3, 2000) (finding that plaintiff had failed to establish personal involvement where "plaintiff has simply alleged that [defendant] should be held liable because he is in charge"). Plaintiff's complaint is entirely devoid of allegations that defendants Orlowski and Sanchex (i) were directly involved in the alleged violation of plaintiff's civil rights; or (ii) were supervisors who had actual or constructive notice of unconstitutional practices and had demonstrated gross negligence or deliberate indifference in failing to act. Accordingly, plaintiff's claims against Orlowski and Sanchex must be dismissed. *See Ella,* 1996 WL 673819, *2 (dismissing section 1983 claim for failure to state a claim where complaint was "entirely devoid of allegations of any personal involvement" by individual defendants and "there [wa]s no evidence of actual or constructive notice of unconstitutional practices demonstrating gross negligence or deliberate indifference in the failure to act"); *see also Simmons v. Artuz,* No. 98 Civ. 777(SAS), 1999 WL 287366, *5 (S.D.N.Y. May 6, 1999) (dismissing section 1983 claim for failure to allege each defendant's personal involvement in the alleged constitutional deprivation).

C. *Plaintiff has failed to allege facts upon which a court could find that plaintiff's Eighth Amendment rights have been violated*

Even were the complaint amended to name the City of New York as a defendant and to allege personal involvement by Orlowski and Sanchex, plaintiff's section 1983 claim would be dismissed for failure to allege facts showing a constitutional violation. Neither *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 690-91 (1978), nor its progeny "authorize the award of damages against a municipal corporation based on the actions of one of its officers when in fact ... the officer inflicted no constitutional harm." *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986); *see Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994). In order to assert a claim pursuant to section 1983, a plaintiff must allege that a constitutional violation has occurred. *See Paul v. Davis,* 424 U.S. 693 (1976); *Batista v. Rodriquez,* 702 F.2d 393, 397 (2d Cir.1983). Here the constitutional violation alleged is that defendants violated the Eighth Amendment both by providing inadequate medical care and by deliberately disregarding plaintiff's safety.

1. *Inadequate Medical Care*

In order to state an Eighth Amendment claim arising out of inadequate medical treatment, a prisoner must set forth facts showing "deliberate indifference to [his] serious medical needs." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)) (brackets in original). This standard includes an objective and a subjective component. The objective

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

component, a "serious medical need", involves "a condition of urgency, one that may produce death, degeneration, or extreme pain". *See* *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The subjective component, the defendant's "deliberate indifference", requires that the defendant "knows [of] and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (cited by *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, *4 (Jun. 10, 1999)). "Negligence, even if it constitutes medical malpractice, does not without more, engender a constitutional claim" *Chance,* 143 F.3d at 703; *see also* *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

***4** Here, however liberally this Court construes plaintiff's allegations, the complaint falls short of meeting these pleading requirements. First, plaintiff has not alleged facts that show that there was a sufficiently serious medical need. Plaintiff's asserts that, as a result of allegedly inadequate treatment of his swollen hand, one of his fingers "does not close" and he "still suffers discomfort." These assertions do not set forth facts upon which the Court could conclude plaintiff suffered or suffers from a condition that may produce death, degeneration, or extreme pain. *Cf.* *Henderson,* 1999 WL 378333, *4 (finding that broken right pinky finger was not a medical condition that might "produce death, degeneration, or extreme suffering"); *Rivera v. Johnson,* 1996 WL 549336, *2 (W.D.N.Y. Sept. 20, 1996) ("A broken finger without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection.").[FN3]

> FN3. Plaintiff further alleges that he "suffered a back and head injury" as a consequence of a motor vehicle accident. Given the liberal reading of the pleadings required on a motion to dismiss, the Court liberally construes this to be an additional allegation intending to establish the inadequacy of the medical care plaintiff has received. However, the terse allegation that plaintiff was injured, bereft of any facts that would indicate incipient death, degeneration, or extreme pain, likewise fails to support the existence of a "serious medical need".

Second, even were the Court to conclude that plaintiff had alleged a serious medical need existed, plaintiff has failed to plead facts that establish "deliberate indifference." Plaintiff entirely fails to set forth facts showing that defendants had been "aware of the facts from which the inference could be drawn [that serious harm existed]", had, in fact, "drawn the inference," and had, nevertheless, disregarded such harm. *Chance,* 143 F.3d at 703. Consequently, plaintiff has failed to allege facts upon which the Court could find that a constitutional violation arising out of inadequate medical care has occurred.

2. *Deliberate disregard for safety of plaintiff*

In order to state a claim for violation of the Eighth Amendment arising out of disregard for prisoner safety, a plaintiff must allege facts showing that the defendants acted toward him with "deliberate indifference." *Rangolan v. County of Nassau,* No. 99 Civ. 9343, 2000 WL 827312, *2 (2d Cir. Jun. 26, 2000) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)). Under that standard, plaintiff must show, *inter alia,* that defendants must have known of and disregarded an excessive risk to plaintiff's health and safety. *See* *Branham v. Meachum,* 77 F.3d 626, 631 (2d Cir.1996); *Pritchett v. Artuz,* No. 99 Civ. 3957(SAS), 2000 WL 4157, *2 (S.D.N.Y. Jan. 3, 2000) ("Similarly, with respect to a prisoner's safety, a prison official may be held liable if the official: (1) knows that the inmate faces a substantial risk of serious harm; and (2) disregards that risk by failing to take reasonable measures to abate it.").

Here, plaintiff fails to allege any facts demonstrating that defendants knew of and disregarded an excessive risk to plaintiff's safety. The sole reference to disregard for plaintiff's safety in the complaint is the terse allegation that the DOC motor vehicle conveying plaintiff was involved in an accident. This brief assertion that a motor vehicle accident occurred does not set forth facts showing deliberate indifference. *Cf.* *Stewart v. McMickens,* 677 F.Supp. 226 (S.D.N.Y.1988) (finding that plaintiff had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*failed* to state a claim pursuant to section 1983 alleging deliberate disregard for safety in violation of the Eighth Amendment where plaintiff had not only alleged that the DOC bus conveying him had been involved in a motor vehicle accident, but also had alleged that his back had been injured as a result of "excessive speeding, no screws in the seat cushions, and a general lack of concern by the correction officers operating the vehicle").

***5** In fact, in the only reference to the claim of deliberate disregard for plaintiff's safety that appears in plaintiff's motion papers, plaintiff himself asserts that the operation of the vehicle was merely negligent. (Pl's. Mem. Law at 6.) Negligence is not actionable under section 1983. *See* *Rucco v. Howard,* No. 91 Civ. 6762(RPP), 1993 WL 299296, *3 (S.D.N.Y. Aug. 4, 1993) (citing *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)) ("Mere negligence on the part of the prison guard will not give rise to a claim under section 1983."). Consequently, plaintiff has failed to allege facts upon which a court could find that a constitutional violation arising out of deliberate disregard for plaintiff's safety has occurred.

Having failed to allege facts showing that a constitutional violation has occurred, plaintiff has failed to state a claim pursuant to section 1983. Accordingly, even had plaintiff named the City of New York as a defendant and alleged facts showing Orlowski's and Sanchex's personal involvement, plaintiff's section 1983 claim would be dismissed.

III. CLAIM FOR NEGLIGENCE UNDER NEW YORK COMMON LAW

Given the liberal reading of the pleadings required on a motion to dismiss, particularly where a plaintiff is proceeding *pro se,* the Court construes the complaint to assert a claim for negligence, arising out of the alleged inadequacy of medical treatment defendant received or the alleged motor vehicle accident. However, insofar as the complaint may be construed to assert a pendent claim under New York law for negligence, such claim must be dismissed. Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a state claim where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. C. § 1367(c)(3). The Court, having dismissed plaintiff's federal claim, declines to exercise supplemental jurisdiction over plaintiff's state claim. *See* *Polar International Brokerage Corp. v. Reeve,* No. 98 Civ. 6915(SAS), 2000 WL 827667, *18 (S.D.N.Y. Jun. 27, 2000) (declining to exercise supplemental jurisdiction over state claims where no federal claims remained) (citing *Martinez v. Simonetti,* 202 F.3d 625, 636 (2d Cir.2000)).

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.

S.D.N.Y.,2000.
Bonner v. New York City Police Dept.
Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



LEXSEE 1995 U.S.DIST. LEXIS 7136

**MINA POURZANDVAKIL, Plaintiff, -against- HUBERT HUMPHRY, JUDISICIAL SYSTEAM OF THE STATE OF MINNESOTA AND OLMESTED COUNTY COURT SYSTEAM, AND STATE OF MINNESOTA, SAINT PETER STATE HOSPITAL, DOCTOR GAMMEL STEPHELTON, ET EL ERICKSON, NORTH WEST BANK AND TRUST, OLMESTED COUNTY SOCIAL SERVICE, J.C. PENNY INSURNCE, METMORE FINICIAL, TRAVELER INSURNCE, COMECIAL UNION INSURNCE, HIRMAN INSURNCE, AMRICAN STATE INSURNCE, FARMERS INSURNCE, C. O BROWN INSURNCE, MSI INSURNCE, STEVEN YOUNGQUIST, KENT CHIRSTAIN, MICHEAL BENSON, UNITED AIRLINE, KOWATE AIRLINE, FORDMOTOR CRIDITE, FIRST BANK ROCHESTER, GEORGE RESTWICH, BRITISH AIRWAYS, WESTERN UNION, PRUDENIAL INSURNCE, T.C.F. BANK, JUDGE SANDY KIETH, JUDGE NIERGARI, OLMESTEAD COUNTY JUDGERING, JUDGE MORES, JUDGE JACOBSON, JUDGE CHALLIEN, JUDGE COLLIN, JUDGE THOMASE, JUDGE BUTTLER, JUDGE MORKE, JUDGE MOWEER, SERA CLAYTON, SUSAN MUDHAUL, RAY SCHMITE, Defendants.** [1]

1 Names in the caption are spelled to reflect plaintiffs complaint.

**Civil Action No. 94-CV-1594**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK**

***1995 U.S. Dist. LEXIS 7136***

**May 22, 1995, Decided**
**May 23, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a complaint accusing defendants with kidnapping plaintiff and her daughter, torturing plaintiff in the Mayo Clinic, and causing plaintiff and her daughter to suffer physically, financially, and emotionally. Certain defendants sought vacation of the defaults entered against them without proper service, some sought dismissal of the complaint, and some sought both vacation of the defaults and dismissal.

**OVERVIEW:** Plaintiff served defendants by certified mail. The court determined that such service was not authorized under federal law or under either New York or Minnesota law. Additionally, plaintiff's extraterritorial service of process was not effective under *Fed. R. Civ. P. 4(k)*. Defendants were not subject to federal interpleader jurisdiction, and they were not joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19*. No federal long-arm statute was argued as a basis for jurisdiction, and the alleged harm did not stem from acts in New York for jurisdiction under *N.Y. C.P.L.R. § 302(a)*. The complaint showed no basis for subject matter jurisdiction against defendants that were insurance companies with no apparent relationship to claims of rape, torture, harassment, and kidnapping, and the court found that no basis for supplemental jurisdiction under *28 U.S.C.S. § 1367(a)* existed. Venue was clearly improper under *28 U.S.C.S. § 1391(b)* because no defendant resided in the district and none of the conduct complained of occurred there. Plaintiff's claims of civil rights violations were insufficient because her complaint was a litany of general conclusions, not specific allegations of fact.

**OUTCOME:** The court vacated all defaults. The court dismissed plaintiff's complaint against all moving and non-moving defendants. The dismissal of the complaint against certain defendants premised on the court's lack of power either over the person of the defendant or the subject matter of the controversy was without prejudice, but dismissals against the remaining defendants were with prejudice. Requests for sanctions and attorney's fees were denied.

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Service of Process > Methods > Residential Service***
***Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents***
***Governments > Federal Government > Employees & Officials***
[HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2)*. Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed. R. Civ. P. 4(e)(1)*.

***Business & Corporate Law > Agency Relationships > Agents Distinguished > General Overview***
***Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail***
***Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Corporations***
[HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1)*, *4(e)(1)*.

***Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview***
[HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *N.Y. C.P.L.R. §§ 308*, *311* (Supp. 1995); *N.Y. Bus. Corp. Law § 306* (Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995).

***Civil Procedure > Pleading & Practice > Service of Process > Methods > Mail***
***Civil Procedure > Pleading & Practice > Service of Process > Time Limitations > General Overview***
***Governments > Local Governments > Claims By & Against***
[HN4] Service on states, municipal corporations, or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2)*. Minnesota law does not authorize service on a governmental entity by certified mail. Minn. R. 4.03(d), (e) (1995).

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
***Civil Procedure > Parties > Interpleaders > General Overview***
[HN5] A plaintiff's extraterritorial service of process in New York can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York state; (2) if the defendant is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Fed. R. Civ. P. 14* or *Fed. R. Civ. P. 19* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN6] *N.Y. C.P.L.R. § 302(a)* provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain minimal contacts between the defendant and the state such as transacting any business in the state and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General***

***Overview***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy***
[HN7] *28 U.S.C.S. § 1367(a)* requires a relationship between the state and federal claims for pendent jurisdiction so that they form part of the same case or controversy.

***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview***
***Civil Procedure > Venue > Multiparty Litigation***
[HN8] See *28 U.S.C.S. § 1391(a)*.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Questions > General Overview***
***Civil Procedure > Venue > Multiparty Litigation***
[HN9] See *28 U.S.C.S. § 1391(1)*.

***Civil Procedure > Venue > Federal Venue Transfers > Improper Venue Transfers***
***Civil Procedure > Venue > Individual Defendants***
***Civil Procedure > Venue > Multiparty Litigation***
[HN10] Where venue is laid in the wrong district, the court shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. *28 U.S.C.S. § 1406(a)*.

***Civil Procedure > Venue > Motions to Transfer > General Overview***
***Civil Procedure > Judicial Officers > Judges > Discretion***
***Governments > Legislation > Statutes of Limitations > General Overview***
[HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is to eliminate impediments to the timely disposition of cases and controversies on their merits.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Motions to Dismiss***
[HN12] Where a court has already dismissed against the moving parties on jurisdictional grounds, it has no power to address a *Fed. R. Civ. P. 12(b)(6)* issue.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Rights Law > General Overview***
[HN13] Complaints that rely on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights instead of a litany of general conclusions that shock but have no meaning.

***Civil Procedure > Parties > Self-Representation > Pleading Standards***
[HN14] A pro se plaintiff's complaint must be construed liberally and should be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

***Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims***
***Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview***
***Civil Procedure > Parties > Self-Representation > Pleading Standards***
[HN15] Even pro se complaints must show some minimum level of factual support for their claims.

***Civil Procedure > Parties > Self-Representation > General Overview***
***Civil Procedure > Counsel > Appointments***
***Civil Rights Law > Prisoner Rights > Prison Litigation Reform Act > Claim Dismissals***
[HN16] The United States Supreme Court explicitly has acknowledged a district court's power under *28 U.S.C.S. § 1915(d)* to dismiss as frivolous a complaint that lacks an arguable basis either in law or in fact. The Supreme Court has explicitly declined to rule, however, on whether a district court has the authority to dismiss sua sponte frivolous complaints filed by non-indigent plaintiffs. The law in the district of New York is that a district court may sua sponte dismiss a frivolous complaint even if the plaintiff has paid the filing fee.

**COUNSEL:** [*1] HUBERT H. HUMPHREY, III, Attorney General of the State of Minnesota, Attorney for Hubert H. Humphry, III, Judicial System of the State of Minnesota, St. Peter Regional Treatment Center, Gerald Gammell, MD, William Erickson, MD, Thomas Stapleton, MD, the Honorable James L. Mork, Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen, and Judge Lawrence Collins, St. Paul, MN, OF COUNSEL: JEROME L. GETZ, Assistant Attorney General.

CONDON & FORSYTH, P.C., Attorneys for British Airways, P.L.C. and Kuwait Airways Corp., New York, NY, OF COUNSEL: STEPHEN J. FEARON, ESQ., MICHAEL J. HOLLAND, ESQ.

DUNLAP & SEEGER, P.C., Attorneys for Olmsted County, Raymond Schmitz, Susan Mundahl, Norwest Bank Minnesota, N.A. (the Northwest Bank & Trust), C.O. Brown Agency, Inc., Rochester, MN, OF COUNSEL: GREGORY J. GRIFFITHS, ESQ.

ARTHUR, CHAPMAN, McDONOUGH, KETTERING & SMETAK, P.A., Attorneys for J.C. Penney Insurance Co. and Metropolitan Insurance Co., Minneapolis, MN, OF COUNSEL: EUGENE C. SHERMOEN, JR., ESQ.

SHAPIRO & KREISMAN, Attorneys for Metmor Financial, Inc., Rochester, NY, OF COUNSEL: JOHN A. DiCARO, ESQ.

COSTELLO, COONEY & FEARON, Attorneys [*2] for Travelers Insurance Companies; Hirman Insurance; Commercial Union Insurance Companies, Syracuse, NY, OF COUNSEL: PAUL G. FERRARA, ESQ., ROBERT J. SMITH, ESQ.

SMITH, SOVIK, KENDRICK & SUGNET, P.C., Attorneys for American States Insurance Co. and Prudential Insurance Co., Syracuse, NY, OF COUNSEL: THOMAS N. KAUFMANN, ESQ.

STEVEN C. YOUNGQUIST, ESQ., Pro Se, Rochester, MN.

THOMAS J. MARONEY, United States Attorney, Attorney for Michael Benson, Postmaster, Northern District of New York, Syracuse, NY, OF COUNSEL: WILLIAM F. LARKIN, Assistant United States Attorney.

GEORGE F. RESTOVICH & ASSOCIATES, Attorneys for George F. Restovich, Esq., Rochester, MN, OF COUNSEL: GEORGE F. RESTOVICH, ESQ.

CONBOY, McKAY, BACHMAN & KENDALL, L.L.P, Attorneys for Western Union, Watertown, NY, OF COUNSEL: GEORGE K. MYRUS, ESQ.

RICHARD MAKI, Pro Se, Rochester, MN.

**JUDGES:** ROSEMARY S. POOLER, UNITED STATES DISTRICT JUDGE

**OPINION BY:** ROSEMARY S. POOLER

**OPINION**

***MEMORANDUM-DECISION AND ORDER***

**INTRODUCTION**

In the four and one-half months since she filed this action, plaintiff Mina Pourzandvakil has filed three amended complaints and ten motions. She also has sought and received [*3] entry of default against ten defendants, none of whom she properly served. She twice has sought and been denied temporary restraining orders. She has included in her action defendants with no apparent connection to this forum, that were vindicated in actions she brought in other forums.

In response, several individual defendants and groups of defendants have filed a total of twelve motions, some seeking vacation of the defaults entered against them, some seeking dismissal and others seeking both. We grant defendants' motions insofar as they seek vacation of the clerk's entries of default and dismissal of the complaint. We vacate *sua sponte* the entries of default against the non-moving defendants. Finally, we dismiss the complaint in its entirety against all defendants.

**BACKGROUND**

Pourzandvakil commenced this action by filing a complaint in the Office of the Clerk on December 9, 1994 (Docket No. 1). The complaint named as defendants the Attorney General of the State of Minnesota, the State of Minnesota and Olmsted County, Minnesota judicial systems, various Minnesota judges and prosecutors, St. Peter State Hospital in Minnesota and various doctors who worked at St. Peter's. [*4] Without specifying the time or defendant involved, the complaint accused the defendants of kidnapping Pourzandvakil and her daughter, torturing Pourzandvakil in the Mayo Clinic since April 1985, and causing Pourzandvakil and her daughter to suffer physically, financially and emotionally. Pourzandvakil twice requested that we issue a temporary restraining order. We denied both requests. *See* Order entered December 14, 1994 (Docket No. 4) and Memorandum-Decision and Order entered December 22, 1994 (Docket No. 6).

On December 27, 1994, Pourzandvakil filed an amended complaint (the "first amended complaint") (Docket No. 7) that appears to differ from the original complaint by adding British Airways as a defendant without making any allegations against British Airways. The first amended complaint also differs by requesting additional damages for prior cases and adding descriptions of several previous cases. Annexed to the first amended complaint is another document labeled amended complaint (the "annexed amended complaint") (Docket No. 7) whose factual allegations differ substantially from both the original complaint and the first amended complaint. The annexed amended complaint also [*5] adds British Airways as a party but specifies only that Pourzandvakil has travelled on that airline and that British Airways, along with other airlines on which Pourzandvakil has travelled, is aware of all the crimes committed against her.

Pourzandvakil filed yet another amended complaint

on January 13, 1995 (the "second amended complaint") (Docket No. 11). The second amended complaint adds as defendants several banks, other financial institutions, insurance companies, insurance agents or brokers, attorneys and airlines as well as the Postmaster of Olmsted County and Western Union. The allegations against these defendants defy easy summarization and will be addressed only insofar as they are relevant to the various motions.

The Clerk of the Court has entered default against the following defendants: J.C. Penny Insurnce (*sic*) [2] ("J.C. Penney"), British Airways, Kowate (*sic*) Airline ("Kuwait"), MSi Insurnce (*sic*) ("MSI"), Judge Mork, Steven Youngquist ("Youngquist"), Prudncial Insurnce (*sic*) ("Prudential"), Ford Motor Credit ("Ford"), First Bank Rochester, and TCF Bank ("TCF"). Based on the submissions Pourzandvakil made in support of her requests for entry of default, [*6] it appears that she served these defendants by certified mail.

The court has received answers from the following defendants: Hubert H. Humphrey III, St. Peter Regional Treatment Center, and Drs. Gerald H. Gammell, William D. Erickson, and Thomas R. Stapleton (joint answer filed January 9, 1995); Olmsted County, Ray Schmitz ("Schmitz"), Susan Mundahl ("Mundahl"), C.O. Brown Agency, Inc. ("C.O. Brown") (answer to amended complaint filed January 23, 1995); George Restovich ("Restovich") (answer to complaint or amended complaint filed January 30, 1995); Norwest Corporation ("Norwest") (answer to amended complaint filed January 31, 1995, amended answer of Norwest Bank Minnesota, N.A. to amended complaint filed February 13, 1995); Travelers Insurance Company ("Travelers") (answer filed February 1, 1995); Michael Benson ("Benson") (answer filed February 6, 1995); Hirman Insurance ("Hirman") (answer filed February 6, 1995); Richard Maki ("Maki") (answer to complaint or amended complaint filed February 17, 1995); Western Union (answer filed February 21, 1995); Steven C. Youngquist ("Youngquist") (answer to complaint or amended complaint filed February 23, 1995); Kuwait (answer filed March [*7] 6, 1995); J.C. Penney (answer filed March 22, 1995); Susan E. Cooper [3] (answer to amended complaint filed March 24, 1995); and Chief Judge Anne Simonett, Judge Jack Davies, Judge Roger Klaphke, Judge Dennis Challeen and Judge Lawrence Collins (joint answer filed April 3, 1995).

2 Plaintiff's spelling is idiosyncratic, and we preserve the spelling in its original form only where absolutely necessary for accuracy of the record. Otherwise we substitute the word we believe plaintiff intended for the word she actually wrote, e.g., "tortured" for "tureared."

The court has also received a total of ten motions from Pourzandvakil since February 27, 1995. She moved for a default judgment against defendants J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways, and TCF. She moved for immediate trial and "venue in a different place" against several defendants and also requested action according to law and criminal charges. Finally, she made motions opposing defendants' motions.

3 Susan E. Cooper is not named as a defendant in the original complaint or any amended complaint filed with this court. From correspondence with Cooper's attorney, it appears that plaintiff sent Cooper a copy of a different version of the complaint. Because the original of this version was not filed with the court, no action against Cooper is pending in this court.

[*8] The court also has received a total of thirteen motions [4] from defendants. Several of the defendants moved for dismissal either under Rule 56 or *Rule 12 of the Federal Rules of Civil Procedure*. For instance, Commercial Union Insurance Companies ("Commercial") moved for dismissal of Pourzandvakil's complaint pursuant to *Fed. R. Civ. P. 12(b)* or, in the alternative, for a more definite statement. Commercial argued that Pourzandvakil's complaint against it is barred by *res judicata* and collateral estoppel and that this court does not have subject matter jurisdiction over the complaints against Commercial. American States Insurance Company ("ASI") moved for dismissal based on plaintiff's failure to state a claim upon which relief can be granted. ASI further moved for an order enjoining Pourzandvakil from further litigation against it. Maki moved for summary judgment based on lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim upon which relief can be granted, and lack of subject matter jurisdiction. Hubert H. Humphrey, III, the Judicial System of the State of Minnesota, Judge James L. Mork, St. Peter Regional Treatment Center and Drs. Gammell, Erickson [*9] and Stapleton (collectively, the "state defendants") moved for summary judgment alleging lack of personal jurisdiction, improper venue, plaintiff's failure to state a claim on which relief can be granted, lack of subject matter jurisdiction, sovereign immunity, and, on behalf of Judge Mork and the judicial system, absolute judicial immunity. The state defendants also requested costs and attorney's fees. Travelers moved for summary judgment based on *res judicata* and/or collateral estoppel, frivolity, lack of subject matter jurisdiction, and improper venue. Travelers sought a transfer of venue to Minnesota in the alternative. Hirman moved for summary judgment based on frivolity, lack of subject matter jurisdiction, and improper venue. Hirman also sought transfer of venue in the alternative. Olmsted County, Schmitz, Mundahl, C.O. Brown and Norwest sought dismissal based on lack of personal jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. With respect to

Schmitz and Mundahl, defendants sought dismissal based on absolute prosecutorial immunity, and with respect to C.O. Brown, defendants sought dismissal on *res judicata* grounds. [*10] Metmor Financial, Inc. ("Metmor") sought dismissal based on lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and plaintiff's failure to state a claim upon which relief can be granted. Finally, Restovich moved for dismissal based on lack of personal jurisdiction. [5]

4 The court has also received three additional motions returnable May 22, 1995. The first -- from Judges Davies, Klaphake, Challeen, Collins and Chief Judge Simonett requests summary judgment dismissing the complaint based on lack of personal jurisdiction. The second by Western Union also requests summary judgment based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. The third, by British Airways, also requests dismissal based, *inter alia,* on plaintiff's failure to state a claim on which relief can be granted. All three motions are mooted by this memorandum-decision and order which dismisses the complaint in its entirety against nonmoving defendants for failure to state a claim on which relief can be granted.

5 The court also received an affidavit and memorandum of law in support of summary judgment from J.C. Penney. However, the documents were not accompanied by a notice of motion.

[*11] Four defendants, British Airways, Kuwait, Prudential, and Youngquist, sought vacatur of the defaults entered against them. Prudential coupled its request with a request for an order enjoining plaintiff from filing or intervening in any litigation against it. Youngquist also requested dismissal of the complaint based on lack of personal jurisdiction and lack of subject matter jurisdiction.

**ANALYSIS**

**The Defaults**

We vacate the defaults entered in this matter because plaintiff improperly served defendants. Each application for entry of default shows service by certified mail, which is not permitted by relevant federal, New York or Minnesota rules. [HN1] Under the Federal Rules of Civil Procedure, service on an individual may be made by (1) delivery to the named defendant; or (2) delivery to a person of suitable age and discretion at the defendant's dwelling house or usual place of abode; or (3) delivery to an agent authorized by law or by the defendant to receive service of process. *Fed. R. Civ. P. 4(e)(2)*. Service on an individual also can be accomplished through a method authorized by the state in which the district court sits or in which the individual is located. *Fed.* [*12] *R. Civ. P. 4(e)(1)*. [HN2] Service on a corporation may be accomplished in a judicial district of the United States (1) pursuant to a method authorized by the law of the state in which the court sits or in which the corporation is located; or (2) by delivering a copy of the summons and complaint to an officer, managing or general agent, or to any other agent authorized by statute to receive service and, if the statute so requires, by also mailing a copy to the defendant. *Fed. R. Civ. P. 4(h)(1)* and *4(e)(1)*. [HN3] Neither New York nor Minnesota law authorizes personal service on an individual or corporation by certified mail. *See N.Y. Civ. Prac. L. & R. §§ 308*, *311* (McKinney Supp. 1995); *N.Y. Bus. Corp. Law § 306* (McKinney Supp. 1995); *Minn. Stat. § 543.08* (1995); Minn. R. 4.03 (1995). Finally, [HN4] service on states, municipal corporations or other governmental organizations subject to suit can be effected by (1) delivering a copy of the summons and complaint to the state's chief executive officer; or (2) pursuant to the law of the state in which the defendant is located. *Fed. R. Civ. P. 4(j)(2)*. Minnesota law does not authorize service on a governmental entity by certified mail. *See* Minn. [*13] R. 4.03(d) and (e) (1995).

We therefore grant the motions by British Airways, Prudential, Kuwait, and Youngquist to vacate the defaults entered against them based both on the defective service and also on the meritorious defenses discussed below. We vacate *sua sponte* the entries of default against MSI, Ford, First Bank Rochester and TCF, all of whom were served improperly and preserved the service issue by raising it or declining to waive it. Concomitantly, we deny Pourzandvakil's motion for a default judgment against J.C. Penney, First Bank Rochester, Prudential, Ford, MSI, British Airways and TCF. We vacate *sua sponte* the entry of default against J. C. Penney, which preserved the issue of service in its answer. By moving to dismiss or for summary judgment without raising the issue of service, Judge Mork may have waived the service issue. However Judge Mork objected to personal jurisdiction as inconsistent with due process and otherwise presented meritorious defenses. We therefore treat his motion for summary judgment as including a motion to vacate the entry of default and accordingly grant it.

**II. The Jurisdictional Arguments**

In addition to raising various [*14] other grounds for dismissal, such as plaintiff's failure to state a claim on which relief can be granted and *res judicata,* most of the moving defendants urge (1) that this court lacks jurisdiction over either their persons or the subject matter of the controversy or (2) that this action is improperly venued. As we must, we examine jurisdiction and venue first.

**A. Personal Jurisdiction**

Maki, the state defendants, Olmsted County,

Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich and Youngquist each allege that this court cannot exercise personal jurisdiction over them consistent with due process constraints. In support of their motions, these defendants present affidavits showing that they have had no significant contacts with the state of New York relevant to this lawsuit and that their contacts with Pourzandvakil all occurred in Minnesota. Nothing in plaintiff's voluminous submissions links any of these defendants with New York. [HN5] Plaintiff's extraterritorial service of process can be effective only under any of the following circumstances: (1) if defendants could be subjected to the jurisdiction of a court of general jurisdiction in New York State; (2) if the defendant [*15] is subject to federal interpleader jurisdiction; (3) if the defendant is joined pursuant to *Rule 14* or *Rule 19 of the Federal Rules of Civil Procedure* and is served within a judicial district of the United States and not more than 100 miles from the place from which the summons issues; (4) if a federal statute provides for long-arm jurisdiction; or (5) if plaintiff's claims arise under federal law and the defendants could not be subject to jurisdiction in the courts of general jurisdiction in any state of the United States. *Fed. R. Civ. P. 4(k)*. Defendants are not subject to federal interpleader jurisdiction and they were not joined pursuant to *Rule 14* or *Rule 19*. In addition, no federal long-arm statute is argued as a basis for jurisdiction, and the moving defendants all would be subject to jurisdiction in Minnesota. Therefore, we must look to New York's long-arm statute to determine whether plaintiff's extraterritorial service of process could be effective under the one ground remaining pursuant to *Rule 4(k)*. *See N.Y. Civ. Prac. L. & R. § 302* (McKinney Supp. 1995). [HN6] This rule provides that in order to obtain jurisdiction over a non-domiciliary, the plaintiff must show both certain [*16] minimal contacts between the defendant and the state (such as transacting any business in the state) and that the harm plaintiff suffered springs from the act or presence constituting the requisite contact. *Id. § 302(a)*. The moving defendants have demonstrated that plaintiff does not claim harm stemming from acts or contacts within the purview of *Section 302(a)*. Therefore, we grant these defendants' motions to dismiss the complaint for lack of personal jurisdiction.

**B. Subject Matter Jurisdiction**

Pourzandvakil's complaint does not contain the jurisdictional allegations required by *Fed. R. Civ. P. 8(a)(1)*. Several defendants move for dismissal based either on this pleading defect or on an affirmative claim that no subject matter jurisdiction exists. Commercial, Travelers and Hirman (collectively, the "moving insurance companies") moved for dismissal because plaintiff has not pled the complete diversity of citizenship required for subject matter jurisdiction. The state defendants, relying on *District of Columbia Court of Appeals v. Feldman,* argue that we lack subject matter jurisdiction over any issue that was determined in a state court proceeding to which plaintiff [*17] was a party. *District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 482, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983)*. These issues include plaintiff's hospitalization at St. Peter Regional Treatment Center. Finally, Metmor also moved for dismissal based on lack of subject matter jurisdiction because plaintiff has failed to plead a jurisdictional basis.

The moving insurance companies note correctly that insofar as the claims against them can be deciphered, plaintiff states that Traveler's and Commercial did not pay for damages to Pourzandvakil's property, harassed her and cancelled her policy. Pourzandvakil does not mention Hirman in her complaint, but Hirman's attorney states that Pourzandvakil informed him in a telephone conversation that her complaint against Hirman stemmed from actions it took as an agent of Travelers in denying Pourzandvakil's 1985 property damage claim.

The moving insurance companies argue that this court has no jurisdiction over the state insurance law claims absent complete diversity of citizenship between plaintiff and the defendants. *28 U.S.C. § 1332*. They point out that plaintiff lists a Syracuse, New York address for herself and that Kuwait's [*18] address as listed in the complaint is also in New York. Therefore, they argue, there is no complete diversity and this court lacks subject matter jurisdiction absent a basis for pendent jurisdiction under *28 U.S.C. § 1367(a)*. *Section 1367(a)* [HN7] requires a relationship between the state and federal claims so that "they form part of the same case or controversy." *Id.* Because plaintiff's claims of denial of insurance coverage bear no apparent relationship to her other claims of rape, torture, harassment and kidnapping, we do not believe that an adequate basis for supplemental jurisdiction exists. *Id.* Plaintiff's complaint therefore shows no basis for subject matter jurisdiction against the moving insurance companies, and we dismiss as against them. [6]

6 We ordinarily would offer plaintiff an opportunity to amend her complaint because her submissions and Kuwait's answer indicate two bases on which plaintiff might be able to argue diversity of citizenship. First, although plaintiff lists her address in Syracuse, New York, she also has indicated on the civil cover sheet that she is an Iranian Citizen and we are not aware of her residence status. As a permanent resident, she would be deemed a citizen of the state in which she resides. *28 U.S.C. § 1332(a)*. However, if she lacks permanent resident status, her citizenship would be considered diverse from that of all the defendants. *Id. § 1332(a)(2)*. Second, Kuwait has submitted an answer in which it claims to be a foreign state within the meaning of *28 U.S.C. §*

> *1603*. If Kuwait is correct, plaintiff may have an independent basis for jurisdiction over Kuwait. *See 28 U.S.C. § 1330*. If Pourzandvakil could show subject matter jurisdiction over Kuwait without resort to diversity of citizenship, then Kuwait's residence in New York may not be relevant to the issue of whether this court has diversity jurisdiction under *Section 1332*. *Cf. Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1511-1512 (11th Cir. 1989)*, *cert. denied, 131 L. Ed. 2d 219, 115 S. Ct. 1362 (1995)* (holding that the joinder of a non-diverse defendant sued under federal question jurisdiction did not destroy diversity as to the remaining defendant). Here, however, plaintiff's complaint is subject to so many other meritorious defenses -- including complete failure to state a cause of action -- that an amendment would be an exercise in futility. Additionally, plaintiff has not requested permission to amend, proffered an amended pleading, or indeed even supplied an affidavit stating her residency status or alleging a basis of jurisdiction over her claims against Kuwait other than diversity under *28 U.S.C. § 1332*.

[*19] We also agree with the state defendants that state court decisions may render certain of plaintiff's claims against them unreviewable either because of *res judicata* or lack of subject matter jurisdiction. However, because plaintiff's claims are so generally stated and so lacking in specifics, we are unable to discern at this juncture what parts of her complaint would be outside the jurisdiction of the court. In any case, we already have determined that the state defendants are clearly entitled to dismissal on personal jurisdiction grounds. As for Metmor, we believe that plaintiff may be attempting to state a civil rights claim by alleging a conspiracy to murder in connection with a judge although she fails to articulate an actionable claim. We note that we already have determined, in any case, that Metmor is entitled to dismissal on personal jurisdiction grounds.

**C. Venue**

Metmor, Travelers, Maki, Hirman, Norwest, Olmsted County, C.O. Brown, Schmitz and Mundahl also allege that Pourzandvakil's action is not properly venued in this court. Although these defendants are entitled to dismissal on independent grounds, improper venue also would support dismissal as to these defendants. [*20] The general venue statute provides that a diversity action, except as otherwise provided by law, may be brought only in

> [HN8] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

*28 U.S.C. § 1391(a)*. *Section 1391(b)* provides that federal question actions, except as otherwise provided by law, may be brought only in

> [HN9] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

[*21] *Id. § 1391(b)*. The majority of the defendants in this action are residents of Minnesota and all of the events of which Pourzandvakil complains occurred in Minnesota. No defendant resides in the Northern District of New York, and none of the conduct plaintiff complains of occurred in this district. Therefore, venue in the Northern District of New York is clearly improper. [HN10] Where venue is laid in the wrong district, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Id. § 1406(a)*. Because, as we will explain below, Pourzandvakil's complaint not only fails to state a claim upon which relief can be granted but is also frivolous, we do not deem it to be in the interest of justice to transfer this case to another district. [HN11] The purpose of the court's discretionary authority to transfer rather than dismiss in cases of improperly laid venue is "to eliminate impediments to the timely disposition of cases and controversies on their merits." *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir. 1993)* (holding that it was an improper exercise of discretion to dismiss rather than transfer [*22] when the statute of limitations on a timely filed complaint ran between filing and dismissal). In this case, as discussed below, a review of the complaint and the plaintiff's submissions on these motions indicates that her claims are frivolous. We therefore dismiss as to the moving defendants both on venue grounds and on the other grounds already identified as applicable. We note also that plaintiff has made claims similar to those in this action against many of the same defendants in the United

States District Court for the District of Minnesota. *Pourzandvakil v. Price,* Civ No. 4-93-207 (D.Minn. 1993). This action was dismissed by Order to Show Cause entered April 12, 1993.

**III. Failure to State a Claim on Which Relief Can be Granted and Frivolity**

Defendants ASI, Travelers, Hirman, Norwest, C.O. Brown, Olmsted County, Schmitz, Mundahl, Prudential, Metmor, and Youngquist as well as the state defendants have attacked the sufficiency of plaintiff's complaint. Travelers and Hirman urge that the complaint is frivolous while the remaining defendants argue only that the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. [7] [HN12] We already [*23] have dismissed against all the moving parties except ASI on jurisdictional grounds and therefore have the power to address the *Rule 12(b)(6)* issue only on ASI's motion. *See Bell v. Hood, 327 U.S. 678, 682-83, 90 L. Ed. 939, 66 S. Ct. 773 (1946)* (subject matter jurisdiction); *Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963)* (personal jurisdiction). We grant ASI's motion and note in passing that were we empowered to reach the merits regarding the remaining moving defendants, we also would dismiss the complaint against them for failure to state a claim upon which relief can be granted. We also dismiss *sua sponte* as frivolous the complaint against all defendants who have not been granted dismissal previously on jurisdictional grounds.

7 J.C. Penney also submits an affidavit requesting dismissal on this basis and others, but has not filed or served a notice of motion.

Pourzandvakil has not specified a statutory or constitutional basis for her claims against ASI or any of the other [*24] defendants. She alleges that certain of the insurance company defendants denied her claims for damages without alleging that the denial was in any respect wrongful. She also alleges in general terms that the defendants harassed, tortured, kidnapped and raped her and perhaps were involved in a murder plot but does not supply (1) the dates on which these actions occurred, except to say that they began in 1984 and 1985; (2) the names of the specific defendants involved in any particular conduct; or (3) a description of any particular conduct constituting the harassment, torture or kidnapping. She suggests without further detail that ASI was involved in a plot to murder her by placing her in the Mayo Clinic. Although plaintiff does not allege specific constitutional provisions or statutes that defendants have violated, we assume -- largely because many of the defendants involved are state officials or state employees and she appears to complain of certain aspects of various trials -- that she wishes to complain of violations of her civil rights. [HN13] Complaints that rely on civil rights statutes are insufficient unless "they contain some specific allegations of fact indicating a deprivation [*25] of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams, 810 F.2d 358, 363 (2d Cir. 1987)*. [HN14] A *pro se* plaintiff's complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (quotation omitted). Pourzandvakil has not satisfied even this minimal test; her complaint and submissions on this motion demonstrate that she cannot prove any set of facts in support of her claim which would entitle her to relief. Her complaint consists of a "litany of general conclusions" rather than "specific allegations of fact". *Barr, 810 F.2d at 363*.

Ordinarily we would allow plaintiff an opportunity to replead to state specific allegations against ASI, but three factors militate against this course of action. First, our December 22, 1994, Memorandum - Decision and Order denying plaintiff's request for a temporary restraining order indicated that she had not shown a likelihood of success on the merits of her claim because she had not [*26] pled any specific actionable facts. Despite the fact that plaintiff since has filed three amended complaints, she still fails to set forth specific actionable conduct. Second, the defendants' motions themselves have alerted plaintiff to the need to show specific actionable facts, and yet her voluminous submissions in opposition to the motions contain no specific actionable facts. Finally, plaintiff has asserted similar allegations against many of the same defendants sued in this action -- although not ASI -- as well as others in several different jurisdictions. *See Pourzandvakil v. Blackman,* [8] Civ. No. 94-C944 (D.D.C. 1994), *Pourzandvakil v. Doty* (E.D.N.Y. 1993), *Pourzandvakil v. Price,* Civ. No. 7 (D.Minn. 1993). Where the results are known to us these actions resulted in dismissals for failure to state a claim upon which relief can be granted. *Pourzandvakil v. Price,* Civ. No. 4-93-207, Order to Show Cause entered April 12, 1993; *Pourzandvakil v Blackman,* Civ. No. 94-C-94, Order entered April 28, 1994, *aff'd* Civ. No. 94-5139 (D.C. Cir. 1994) (per curiam). In the Minnesota case, dismissal took place after the district court offered plaintiff an opportunity to [*27] amend her pleading and plaintiff still was not able to offer specifics. [9] [HN15] Even *pro se* complaints must show "some minimum level of factual support for their claims." *Pourzandvakil v. Blackman,* Civ. No. 94-C-94, (quoting *White v. White, 886 F.2d 721, 724 (4th Cir. 1989))*. We therefore dismiss plaintiff's complaint against ASI for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*.

8 Former Supreme Court Justice Harry A. Blackmun.

9 We note also that plaintiff has not requested leave to amend in this action.

We note that in *Pourzandvakil v. Blackman,* Judge John H. Pratt dismissed plaintiff's *in forma pauperis* complaint *sua sponte* under *28 U.S.C. § 1915(d)*, holding both that it failed to state a claim on which relief can be granted and that it was frivolous. We consider here whether we have the authority to dismiss *sua sponte* plaintiff's complaint, which was not filed *in forma pauperis,* as frivolous as against all non-moving defendants. [*28] [HN16] The Supreme Court explicitly has acknowledged a district court's power under *Section 1915(d)* to dismiss as frivolous a complaint which "lacks an arguable basis either in law or in fact." *Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989)*. The Supreme Court explicitly declined to rule, however, on whether a district court has the authority to dismiss *sua sponte* frivolous complaints filed by non-indigent plaintiffs. *Id. at 329 n.8*. The law in this circuit is that a district court may *sua sponte* dismiss a frivolous complaint even if the plaintiff has paid the filing fee. *See Tyler v. Carter, 151 F.R.D. 537, 540 (S.D.N.Y. 1993)*, *aff'd 41 F.3d 1500 (2d Cir. 1994)*; *cf. Pillay v. I.N.S., 45 F.3d 14, 17 (2d Cir. 1995) (per curiam)* (dismissing *sua sponte* appeal for which appellant had paid normal filing fee). We believe that *sua sponte* dismissal is appropriate and necessary here because (1) plaintiff's claims lack an arguable basis in law and fact; (2) plaintiff has repeatedly attempted to replead her claims without being able to articulate actionable conduct; (3) some of plaintiff's claims have been tested in other courts [*29] and found to be without merit; and (4) the issue of frivolity has been presented by at least some of the moving defendants.

We therefore dismiss with prejudice plaintiff's complaint as frivolous as to all defendants -- regardless of whether they have moved for dismissal -- that have not been granted dismissal on jurisdictional grounds. We direct the clerk to return plaintiff's filing fee to her. *Tyler, 151 F.R.D. at 540*.

**IV. Requests for Sanctions, Costs, Attorney's Fees and Injunction Against Filing Further Actions**

Because plaintiff is *pro se* and appears to have a belief in the legitimacy of her complaint, we do not believe that the purpose of Rule 11 would be served by awarding sanctions. *See Carlin v. Gold Hawk Joint Venture, 778 F. Supp. 686, 694-695 (S.D.N.Y. 1991)*. Moreover, her litigiousness has not yet reached the point at which courts in this circuit have justified injunctive relief. *See id. at 694* (and collected cases). We therefore deny the requests of ASI and Prudential for injunctive relief. Our refusal to grant sanctions and injunctive relief however, is conditioned on this dismissal putting an end to plaintiff's attempts to sue these defendants [*30] on these claims in this forum. Any further attempts by plaintiff to revive these claims will result in our revisiting the issue of sanctions. *Id. at 695*.

**CONCLUSION**

All defaults entered by the clerk are vacated. Plaintiff's complaint is dismissed in its entirety against all moving and non-moving defendants. The dismissal of the complaint against Maki, the state defendants, Olmsted County, Schmitz, Mundahl, C.O. Brown, Norwest, Metmor, Restovich, Youngquist, Commercial, Travelers and Hirman is without prejudice as it is premised on this court's lack of power either over the person of the defendant or the subject matter of the controversy. *See Voisin's Oyster House, Inc. v. Guidry, 799 F.2d 183, 188-9 (5th Cir. 1986)* (dismissal for lack of subject matter jurisdiction is not a dismissal on the merits); *John Birch Soc'y. v. National Broadcasting Co., 377 F.2d 194, 199 n.3 (2d Cir. 1967)* (dismissal for lack of subject matter jurisdiction implies no view of merits); *Orange Theatre Corp. v. Rayherstz Amusement Corp., 139 F.2d 871, 875* (3d Cir.) *cert. denied, 322 U.S. 740, 88 L. Ed. 1573, 64 S. Ct. 1057 (1944)* (dismissal for lack of personal jurisdiction is not [*31] a dismissal on the merits). The dismissals against the remaining defendants are with prejudice. All requests for sanctions and attorney's fees are denied. The requests of defendants ASI and Prudential for an injunction with respect to future litigation is denied. However, plaintiff is cautioned that any litigation in this forum attempting to revive the claims addressed herein may subject her to sanctions. Plaintiff's motions are denied as moot.

IT IS SO ORDERED.

DATE: May 22, 1995

Syracuse, New York

ROSEMARY S. POOLER

UNITED STATES DISTRICT JUDGE





C

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,
v.
Christopher ARTUZ, Warden Philip Coombe, Commissioner Sergeant Ambrosino Doctor Manion Defendants.
No. 95 CIV. 4768(JSR).

Nov. 30, 1998.

Mr. Theodore Hudson, Great Meadow Correctional Facility, Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

***1** Plaintiff Theodore Hudson filed this *pro se* action pursuant to 42 U.S.C. § 1983 on April 26, 1995. Plaintiff's complaint alleges defendants violated his constitutional rights while he was an inmate at Green Haven Correctional Facility.[FN1] Plaintiff's complaint was dismissed *sua sponte* by Judge Thomas P. Griesa on June 26, 1995 pursuant to 28 U.S.C. § 1915(d). On September 26, 1995, the Second Circuit Court of Appeals vacated the judgment and remanded the case to the district court for further proceedings.

FN1. Plaintiff is presently incarcerated at Sullivan Correctional Facility.

The case was reassigned to Judge Barbara S. Jones on January 31, 1996. Defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) on November 25, 1996. Thereafter, the case was reassigned to Judge Jed S. Rakoff on February 26, 1997. On February 26, 1998, Judge Rakoff granted defendants' motion to dismiss, but vacated the judgment on April 10, 1998 in response to plaintiff's motion for reconsideration in which plaintiff claimed that he never received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was referred to me for general pretrial purposes and for a Report and Recommendation on any dispositive motion. Presently pending is defendants' renewed motion to dismiss. Plaintiff filed a reply on July 6, 1998. For the reasons discussed below, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the Green Haven Correctional Facility mess hall on March 14, 1995. (Complaint at 4.) He alleges that he was struck with a pipe and a fork while in the "pop room" between 6:00 p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends that the attack left him with 11 stitches in his head, chronic headaches, nightmares, and pain in his arm, shoulder, and back. (*Id.*) Plaintiff also states that Sergeant Ambrosino "failed to secure [the] area and separate" him from his attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz is that he "fail [sic] to qualify as warden." (Complaint at 4.) Plaintiff names Commissioner Coombes as a defendant, alleging Coombes "fail [sic] to appoint a qualified warden over security." (Amended Complaint at 5.) Plaintiff further alleges that Dr. Manion refused to give him pain medication. (Complaint at 5.) Plaintiff seeks to "prevent violent crimes" and demands $6,000,000 in damages. (Amended Complaint at 5.)

Defendants moved to dismiss the complaint, arguing that: (1) the Eleventh Amendment bars suit against state defendants for money damages; (2) the plaintiff's allegations fail to state a claim for a constitutional violation; (3) the defendants are qualifiedly immune from damages; and (4) plaintiff must exhaust his administrative remedies before bringing this suit.

DISCUSSION

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

I find that plaintiff's complaint runs afoul of Rules 8 and 10 of the Federal Rules of Civil Procedure and dismiss the complaint without prejudice and with leave to amend. Federal Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

***2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.*[FN2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 Civ. 4838, 1992 WL 392597, *3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

FN2. Rule 10 states:

> (b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See Salahuddin,* 861 F.2d at 42–42; *see also Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at *2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

muddled pleadings.

***3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

S.D.N.Y.,1998.

Hudson v. Artuz
Not Reported in F.Supp.2d, 1998 WL 832708 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.